## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL<br>501 2nd Street NE<br>Washington, DC 20002,<br><br>     Plaintiff,<br><br>v.<br><br>SALLY M. R. JEWELL, in her official<br>capacity as Secretary of the U.S.<br>Department of the Interior;<br>U.S. DEPARTMENT OF THE INTERIOR,<br>an agency of the United States;<br>DANIEL ASHE, in his official capacity as<br>Director of the U.S. Fish and Wildlife Service; and<br>U.S. FISH AND WILDLIFE SERVICE,<br>an agency of the United States<br>1849 C Street, NW<br>Washington, DC 20240,<br><br>     Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civ. No.<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

### INTRODUCTION

1.     For decades U.S. hunters have been able to hunt African elephants in Zimbabwe and Tanzania and legally import their trophies into the United States. This hunting and importation supported elephant conservation by increasing the value of African elephants for local communities, discouraging poaching for ivory and/or food and providing financial resources for elephant protection. On April 4, 2014, without warning or public input, all this abruptly ended. The U.S. Fish and Wildlife Service, an agency of the Department of the Interior, abruptly and immediately suspended the importation of legally sport-hunted African

1

elephant trophies from Zimbabwe and Tanzania ("trophy importation ban").  With this Complaint, Plaintiff, Safari Club International ("Safari Club"), challenges this April 4, 2014 final action of Defendants Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service; and the U.S. Fish and Wildlife Service ("Federal Defendants")

2.      In establishing the trophy importation ban, Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion by 1) relying on "limited" data and "anecdotal" evidence and failing to obtain accurate and substantiated information before making the decision to implement the trophy importation ban; 2) failing to follow the U.S. Fish and Wildlife Service's ("FWS") own stated procedures for changing its position on whether sport hunting of elephants in Zimbabwe enhances the survival of the species; 3) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Zimbabwe is necessary for the importation of sport-hunted trophies from elephant populations listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora ("CITES") Appendix II without first providing notice of the requirement and an opportunity for the public to comment; 4) failing to give the public notice and the opportunity to comment on the trophy importation ban from Tanzania; 5) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Tanzania is necessary for the importation of sport-hunted trophies without first providing notice of the requirement and an opportunity for the public to comment; and 6) applying an incorrect non-detriment finding analysis for the importation of African elephant trophies from Tanzania.

3.      Federal Defendants' actions violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

4.      Declaratory and injunctive relief is required to remedy the harm the adoption and implementation of the trophy importation ban has caused and will continue to cause.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

6.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club maintains an office in this District; and no real property is involved.

7.      Members of Safari Club are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts and otherwise rely on hunting for their personal, professional and conservation interests in African elephants and who rely on the ability of U.S. hunters to import African elephant sport-hunted trophies from Zimbabwe and Tanzania into the United States to fulfill those interests.

8.      The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

## PARTIES

9.      Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 50,000 members worldwide.  Safari Club's mission is to protect the freedom to

hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the

following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

10.      Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

11.      Safari Club promotes the principles and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

African elephants in Zimbabwe and Tanzania.  Safari Club members have an interest in their

ability to hunt those elephants and to import their trophies from successful hunts.  Other Safari

Club members have an interest in guiding those hunts and being able to sell to U.S. residents

elephant hunts that take place in Zimbabwe and Tanzania.  Still other Safari Club members have

an interest in arranging those hunts, performing the taxidermy on sport-hunted trophies from

successful African elephant hunts and conducting other types of business related to African

elephant hunting in Zimbabwe and Tanzania.  Safari Club members have an interest in the

continued ability to participate in the sustainable use conservation of the African elephant, in the

long-term survival of the African elephant species, and in preventing poaching from threatening

the survival of the species.

       12.      Safari Club and members of Safari Club are harmed and aggrieved by the abrupt

suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe

and Tanzania.  For many, the opportunity to hunt elephant in Zimbabwe and Tanzania is an event

of a lifetime that will never be repeated.  Most Safari Club members who want to participate in

an African elephant hunt wish to bring back the trophy from their successful hunt as a prized

memento of a treasured experience.  A hunter's inability to import the trophy from his legally

sport-hunted African elephant deprives the hunter of an element of the hunting experience to

which he or she attributes great value.  A great number will not invest in an expensive elephant

hunt if they cannot import the symbol of their successful hunt. Many Safari Club members

booked upcoming hunts in these countries years in advance, invested significant funds towards

the trip, and are or will be unable to recover the funds already expended if and when they cancel

their bookings.

       13.      Other Safari Club members are outfitters, professional hunters and booking agents

who provide African elephant hunts to U.S. residents.  These Safari Club members have been

and will continue to be harmed and aggrieved by the abrupt suspension of African elephant

trophy importation for 2014.  These Safari Club members have lost clients and bookings due to

the importation ban.  Their livelihoods and ability to remain in business have been drastically affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters and the lack of interest from U.S. hunters to book future hunts.

14.     Still other Safari Club members are taxidermists and other craftsmen who rely on U.S. hunters for business related to their successfully hunted African elephants.  The loss of U.S. hunters and the inability of U.S. hunters to import their trophies into the U.S. will significantly harm these Safari Club members' businesses and livelihoods.

15.     Safari Club and Safari Club members are aggrieved by the harm that the suspension of trophy importation will cause to African elephant conservation in Zimbabwe and Tanzania.  Safari Club members support sustainable use conservation generally and the role that hunting plays in African elephant conservation specifically.  The trophy importation bans will diminish the number of hunters and potentially the number of outfitting operations present in the field in elephant range in Zimbabwe and Tanzania, which will consequently erase a major deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and elephant meat (contributed by sport-hunters) going to local communities in Zimbabwe and Tanzania.  This loss of a source of income and food will increase the incentives for poaching both by those who kill elephants only to sell the ivory and those who kill elephants only to provide food for their families and communities.

16.     The inability to import trophies combined with the reduction of demand by U.S. hunters will diminish the value of elephants to all but the poachers.  This loss of value will reduce the tolerance of local communities for the destructive tendencies of elephants and will encourage local communities to kill the elephants themselves or facilitate their removal by

poachers.  Safari Club members will be harmed by the loss of conservation incentives and the ultimate loss of elephants that will result from the importation ban.

17.     Before the April 4, 2014 implementation of the trophy importation ban, Safari Club members could import African elephant trophies from Zimbabwe and Tanzania.  Now they cannot import any elephant trophy taken after April 4, 2014, regardless of whether the elephant from which that trophy was taken was hunted in accordance with the laws of the countries that have the authority to regulate the hunting of these animals.

18.     Safari Club and its members possess sufficient interests in the subject matter of this litigation to establish standing.  In addition, Safari Club and Safari Club members have suffered concrete injury in fact caused by Federal Defendants' trophy importation ban.  A court ruling declaring illegal and enjoining the ban would redress those injuries.  Safari Club members could once again import their legally sport-hunted African elephant trophies, guide hunts, sell hunts, process elephant trophies and otherwise engage in activities that are dependent on and/or related to the ability to import African elephant trophies from Zimbabwe and Tanzania.  Safari Club and Safari Club members could then continue to participate in activities that help to encourage African elephant conservation in these two countries and to support and finance activities that discourage if not prevent poaching.  Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

19.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

20.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

21.     Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including with regard to the suspension of African elephant trophy importation from Zimbabwe and Tanzania for 2014.  He is sued in his official capacity.

22.     Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

### FACTUAL BACKGROUND

23.     African elephants (loxodonta Africana) are found throughout much of Africa. The majority of African elephants live in southern and eastern Africa, including Zimbabwe and Tanzania.

24.     Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants, including those in Tanzania, are listed on Appendix I of CITES.

25.     In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed. Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a special rule that regulates the importation of trophies from legally hunted African elephants.  50 C.F.R. § 17.40(e) ("special rule").

8

26.     At the seventh CITES Conference of the Parties ("COP") in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment finding" or "NDF")  CITES text, Article III.

27.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the special rule to include a provision that allowed the importation of sport-hunted elephant trophies so long as CITES requirements were fulfilled and the trophy was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the special rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

28.     In the Federal Register notice accompanying the special rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id.*

29.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, the DSA makes a non-detriment finding called an "advice."  The DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

30.     At least as early as 1993, the DSA issued general non-detriment advices for African elephants taken from Zimbabwe and South Africa and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  At least as early as 1993, the DSA issued non-detriment advices for African elephants taken from Tanzania, Namibia and Cameroon and the FWS allowed the importation of legally taken sport-hunted trophies into the United States.  60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

31.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted trophies of members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephant trophies from Zimbabwe to apply for or obtain an importation permit from the U.S.  CITES text, Article IV.   62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

32.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  Further the FWS stated that the enhancement finding for importation of sport-hunted trophies from Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal Register." *Id.*

33.     As of the filing of this Complaint, the FWS has never published in the Federal Register a notice that the conditions of the special rule are no longer met or a change in the enhancement finding previously in existence for elephants from Zimbabwe.

34.     Until 2014, the FWS allowed the importation of African elephant sport-hunted trophies from Zimbabwe, Namibia, South Africa, Botswana and Tanzania.  During the eight year period from 2004 to 2011, 1,186 African elephant sport-hunted trophies were imported into the United States from Zimbabwe.  During that same eight year period, 300 African elephant sport-hunted trophies were imported into the United States from Tanzania.

35.     Each year, in accordance with CITES, the range states establish a quota for the number of African elephant sport-hunted trophies that will be allowed to be exported from their country.  For 2014, Zimbabwe's quota is 500 elephants and Tanzania's quota is 200 elephants.

36.     On April 4, 2014, the FWS announced, in a press release posted on the FWS website, an immediate suspension of the importation of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during the 2014 calendar year.

http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B. The FWS gave no prior notice of this decision to the public.  The FWS did not publish notice of the suspension in the Federal Register.  The FWS did not provide a public comment opportunity.

37.     The press release noted that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation."  Neither the press release nor a brief Question and Answer ("Q and A") webpage that the FWS published on the same day analyzed the role that hunting plays in the conservation of Zimbabwe's elephants or described the role that sport hunters and sport hunting plays in discouraging elephant poaching.  http://www.fws.gov/international/pdf/questions-and-answers-suspension-of-elephant-sport-hunted-trophies.pdf.

38.     The press release and Q and A webpage explained that the FWS based its decision to suspend importation for African elephant trophies from Zimbabwe on "limited" data and "anecdotal" evidence.  Neither the FWS's press release nor the Q and A page indicated that the FWS had obtained the data or evidence for Zimbabwe's suspension from the Scientific or Management Authorities of Zimbabwe.

39.     On April 18, 2014, the FWS announced a modification of the suspension of legally taken African elephant trophies.  By telephone message and letter to Safari Club, the FWS explained that Federal Defendants had revised the complete suspension of trophy importation for Zimbabwe for 2014 and had removed the retroactive portion of the ban that had banned the importation of trophies from the period between January 1, 2014 and April 4, 2014. "We will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy."  Letter, dated April 18, 2014, from Robert R. Gabel, Chief, Division of Management Authority, U.S. Fish and Wildlife Service to Nelson Freeman, Deputy Director of Governmental Affairs, Safari Club International.

40.     The April 18, 2014 letter confirmed that the FWS had imposed the ban on April 4, 2014 without obtaining information about the status of elephants or the conservation benefits of sport hunting from the Scientific and Management authorities of the government of Zimbabwe. The letter explained:

> I hope everyone understands as well that we are in contact with the Government of Zimbabwe, professional hunters, and others in Zimbabwe, and working through our embassy there, to get the most current information on African elephants in that country, including population status, poaching levels, how hunting programs are currently managed, etc.  If the information we are receiving addresses our concerns sufficiently and shows that hunting continues to be well managed, populations are stable, etc., we may lift the suspension of imports

completely and continue to allow the import of all trophies legally taken in 2014.  We intend to conduct this review as quickly as possible and will get the word out once the review is completed.

*Id.*

41.     The FWS's April 4, 2014 press release indicated that the FWS's decision to ban the importation of elephant trophies in Zimbabwe was based in part on a "widely publicized poisoning last year of 300 elephants in Hwange National Park."  The information upon which the FWS based its trophy importation ban was incorrect.  The number of elephants involved in the Hwange National Park incident was less than half the number reported in the press release.  In addition, the press release did not mention, and apparently Federal Defendants did not take into account, the fact that it was sport-hunting outfitters in Zimbabwe who discovered the poaching and helped finance the effort to capture the poachers.  Without sport-hunting outfitters present in the field, the poachers and the poaching would not have been discovered and stopped.

42.     The trophy importation ban affects only U.S. residents who seek to import their trophies into the U.S.  It has no impact on the export quotas established by Zimbabwe or Tanzania, or on the number of elephants that the governments of the two countries authorize for hunting annually.  Federal Defendants' ban on U.S. importation of African elephant trophies does not control the number of elephants taken in each of those countries each year.

43.     Federal Defendants based their trophy importation ban for Tanzania on a February 21, 2014 determination from the Scientific Authority of the FWS not to issue an NDF for elephant trophy importation from Tanzania and a March 27, 2014 determination from the Management Authority of the FWS that the importation of sport-hunting trophies from Tanzania is not likely to enhance the survival of the species.

44.     The February 21, 2014 decision advising the FWS not to issue an NDF for

Tanzania discussed sport hunting but was not based on "a consideration of purpose for which the

specimen will be used upon import into the United States."  Instead of determining if the

importation of sport-hunted trophies for the personal use of the hunters would pose a detriment

to the species, the NDF advice document focused on the take of elephants generally, both for

legal and illegal purposes.

> We recognize that sport-hunting, as part of a sound management program,
> can provide benefits to wildlife conservation and that sport-hunting of
> elephants is not the primary cause of the decline of elephant populations in
> Tanzania.  However, given the significant decline in the elephant
> population due to uncontrolled poaching and questionable management
> and governance, we are concerned that additional killing of elephants,
> even if legal, is not sustainable and will not support effective elephant
> population recovery efforts in Tanzania.

*Id.*

45.     The NDF failed to examine the role that sport-hunting has in decreasing and

discouraging poaching in Tanzania.  The NDF did not address how the presence of hunters,

outfitters and their staff in the field provides a deterrent to poachers or how the introduction of

revenue generated by the hunting and other activities of U.S. hunters encourages local

communities to guard against poaching.  The NDF completely avoided this analysis and merely

analyzed sport hunting as an "additional" source of take.

46.     Because U.S. hunters are no longer permitted to import their legally sport-hunted

African elephant trophies, some have cancelled their elephant hunts in Zimbabwe and Tanzania,

and many more will cancel their hunts.  Instead of having the desired effect – to reduce

"additional" take of elephants, the ban is likely to have the opposite effect.  The absence of

hunters in the field will remove a major deterrent to poaching.  Poachers, freed from the risk of

being discovered by hunters, outfitters and their staff, will be encouraged to illegally take more

rather than fewer elephants.  Local residents who have generated income for their families and communities from jobs with hunting operations and other activities associated with the presence of U.S. hunters will no longer have that income.  As a consequence, the elephants that local residents protected for the benefit of the hunters will decline in value to local communities. Poachers who offer money for protection from authorities and for the illegal killing of elephants will take the place of hunters as the source of revenue for local communities.  As a result, more elephants will be poached and fewer elephants will survive.

47.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will themselves kill the elephants to feed their families and communities.

48.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe and Tanzania, the outfitters and professional hunters who depend on elephant hunts in these countries for their livelihoods will attempt to sell the cancelled hunts to other, non-U.S. hunters who are still able to import trophies into their home countries. While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe and Tanzania, U.S. citizens often pay the highest fees for elephant hunts in Zimbabwe and Tanzania and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants in the two countries will lower the value of the elephants.

49.     Because of the abruptness with which the U.S. announced the ban, some outfitters and professional hunting businesses in these two countries will not be able to survive the economic loss.  Many are likely to go out of business, leaving greater areas of the elephant range without people on the ground, who by their very presence, act as a deterrent to poaching.

50.     In some areas of Zimbabwe, elephant populations are too large for the local communities to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter will eliminate local incentives to tolerate elephant behavior and will encourage those troubled by elephants to kill the elephants themselves.

51.     Sport hunting discourages many reasons and sources for illegal elephant killings. Without U.S. hunters in the field, the African elephant populations in Zimbabwe and Tanzania are likely to suffer and decrease.

## RELEVANT LAW

**A.     The Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")**

52.     The ESA provides the FWS with the authority to classify African elephants, including those from Zimbabwe and Tanzania, as a threatened species.  16 U.S.C. §1533(a)(1).

53.     The ESA does not prohibit the importation of sport-hunted trophies from animals designated as threatened.  16 U.S.C. §1538((a)(1)(A).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

54.     Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

55.     In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted trophies:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the importer's principal in an ivory producing country that has submitted an ivory quota.

16 U.S.C. § 4222(e) (emphasis added).

56.     In the AECA, Congress singled out the hunting and importation of African elephant trophies as acts that benefit the survival of the species.  Congress specifically found that "[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal trade in African elephant ivory, and there is evidence that the proper utilization of well-managed elephant populations provides an important source of funding for African elephant conservation programs."  16 U.S.C. § 4202(9).

57.     The FWS does not rely on the AECA for its authority to regulate the importation of African elephant trophies but instead takes that authority from the ESA. 16 U.S.C. § 4241.

58.     The FWS's regulation of the importation of African elephants relies on decisions made by both Congress, through the authority given to the FWS in the ESA, and by CITES, through resolutions and other decisions.  50 C.F.R. § 23.1.

59.     CITES is an international agreement between governments.  During conferences held between the party members to the agreement, the parties agree upon decisions and adopt resolutions designed to prevent international trade in specimens of wild animals and plants from threatening the survival of those species.

60.     The United States, Zimbabwe and Tanzania are all parties to CITES.

61.     The parties to CITES placed African elephants from Zimbabwe on Appendix II and those from Tanzania on Appendix I.

62.     Appendix I includes species that the parties to CITES have determined are threatened with extinction and that are or may be affected by trade of that species.  Appendix II includes species that the parties to CITES have determined are not presently threatened with extinction, but may become so if their trade is not regulated.  Appendix II also includes species that the parties to CITES consider in need of being regulated so that trade in certain other Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4

63.     The ESA and CITES direct the FWS to treat species classified as "threatened" in different ways, depending on whether the species are listed on CITES Appendix I or II.

64.     Article III of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that, for species that are listed on CITES Appendix I, the importing country must make its own

18

NDFs.  The FWS has promulgated regulations that require it to make NDFs for the import of Appendix I species.  50 C.F.R. § 23.61.

65.     Articles III and IV of the CITES Treaty and CITES Resolution Conf. 10.3 recommend that exporting countries make findings that the proposed trade of species on both CITES Appendix I and Appendix II will not be detrimental to the survival of the species.

66.      The FWS is required to make different types of NDFs, depending on whether the species in question is being imported or exported.  For NDFs for species being exported from the United States, the FWS examines the potential detriment that could be caused by the "take" of the species from the wild.  In contrast, NDFs for species being imported into the U.S. must examine the potential detriment to the species that could be caused by the purpose for which the animal is being imported into the U.S. The FWS has explained that "[t]he finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States."  71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  An NDF for a sport-hunted trophy must therefore consider whether the personal possession by the hunter who took the animal will itself pose a detriment to the survival of the species.

67.     CITES does not require that the importing country conduct an NDF for species listed on Appendix II.

68.     The ESA states that, for species classified as threatened, that are listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate federal statute or regulation.  16 U.S.C. § 1538(c).

69.     Despite this presumption, the FWS has, by regulation, imposed additional requirements for the importation of sport-hunted elephant trophies, whether they are listed on CITES Appendix I or II ("special rule").  50 C.F.R. § 17.40(e)(3)(iii).

> Sport-hunted trophies may be imported into the United States provided:
>
> (A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;
>
> (B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;
>
> (C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and
>
> (D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

70.     The FWS promulgated the special rule on August 10, 1992.  That regulation created the requirement that the take of the elephant to be imported would enhance the survival of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the rule, all African elephants were listed on CITES Appendix I.  In addition, at the time that the FWS promulgated the special rule, the CITES resolution pertaining to the importation of Appendix I species contained a requirement for a determination by the importing country that the take of the animal intended for importation enhanced the survival of the species by financially benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation. This requirement is retained in the final

revised special rule for the import of sport-hunted trophies from threatened
populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1).  The FWS's reason for including the

enhancement of survival requirement was the parallel obligation adopted by CITES.

71.     Since the FWS promulgated the special rule, CITES changed the listing status of

African elephants from Zimbabwe from Appendix I to Appendix II.  Consequently, CITES

would no longer have imposed an enhancement of survival requirement for the species once it

was downlisted to Appendix II.  In addition, at the CITES COP 9 in 1994 the parties to CITES

amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely

from the resolution.  As a result, from that point forward CITES no longer required an

enhancement of survival determination for the importation of elephant trophies from either

Appendix I or Appendix II species and therefore would not have required the finding for

elephants from either Zimbabwe or Tanzania.

72.     The FWS has made no change to its special rule's enhancement of survival

finding requirement for the importation of elephants since including those requirements in the

rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement

have all disappeared.  The FWS has never explained why the retention of the enhancement

requirement is necessary or advisable for the conservation of elephants listed on Appendix I or

Appendix II of CITES or offered the public an opportunity to comment on the retention of the

enhancement of survival requirement, despite the fact that the FWS's justification for the

imposition of this requirement no longer exists.

73.     Since at least as early as 1993 until April 4, 2014, the FWS has consistently made

NDFs for the importation of sport-hunted African elephant trophies from Tanzania and has

determined that all criteria identified in 50 C.F.R. § 17.40(e)(3)(iii) have been met.

21

**B.      The Administrative Procedure Act ("APA")**

74.      The APA provides for judicial review of final agency action by persons "aggrieved" by the action.  5 U.S.C. § 702.

75.      It also provides standards applicable when a Federal agency proposes and adopts final rules and regulations.  Those standards include formal notice of the proposed rulemaking and an opportunity to participate in the rulemaking by providing comments through the submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

76.      The APA authorizes a reviewing court to

> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
>> a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

### Federal Defendants Illegally Relied on "Limited" and "Anecdotal" Information to Reverse a Longstanding Approach to African Elephant Sport-Hunted Trophy Importation from Zimbabwe

77.      Safari Club realleges and incorporates by reference all the allegations of paragraphs 1-76 above, as though fully set forth below.

78.      Federal Defendants abruptly suspended the importation of legally sport-hunted African elephant trophies from Zimbabwe after consistently allowing such importations for over two decades.  Federal Defendants made the decision to suspend importation of legally sport-hunted African elephant trophies based on "limited" data and "anecdotal evidence" without first waiting to obtain comprehensive and substantiated data on the issues relevant to the continued

importation of those trophies from the Scientific or Management Authorities of Zimbabwe or from others.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

79.     Federal Defendants abruptly suspended the importation of legally hunted African elephant trophies from Zimbabwe without fully analyzing the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe as well as the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching.  Federal Defendants did not fully consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

80.      Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters in fact reduces the number of elephants illegally killed in Zimbabwe.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

81.     Federal Defendants failed to adhere to the purpose for which the FWS included the enhancement of survival requirement in the special rule for African elephant trophy importation – to determine whether the sport hunting "enhances the survival of the species by providing financial support programs for elephant conservation."  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

82.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

83.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

## Count II – Violations of the ESA and APA:

### Federal Defendants Erroneously and Illegally Failed to Justify and to Provide Notice and an Opportunity to Comment on the Decision to Suspend the Importation of African Elephant Trophies from Zimbabwe

84.     Safari Club realleges and incorporates by reference all the allegations of paragraphs 1-83, as though fully set forth below.

85.     Federal Defendants abruptly changed their position on April 4, 2014 on the legality of the importation of legally sport-hunted African elephant trophies from Zimbabwe without complying with the process to which they had committed for making such decisions. Federal Defendants' change of position on the enhancement finding and on the legality of the importation of sport-hunted African elephant trophies contradicted the FWS's own announcement on August 22, 1997 that the enhancement finding for Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register." 62 Fed. Reg. 44627 (Aug. 22, 1997).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

86.     Federal Defendants announced their decision to suspend the importation of legally sport-hunted African elephant trophies on April 4, 2014 with only a press release and a Q and A webpage published on the FWS's website, and without publishing a Federal Register notice that the conditions of 50 C.F.R. §17.40(e)(3)(iii) are no longer met.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

87.     Federal Defendants also violated APA rulemaking procedures by abruptly suspending the ability of Safari Club members to import their African elephant trophies from Zimbabwe, without first giving the public advance notice and the opportunity to comment and without providing data to support the finding that the take and importation of legally sport-hunted African elephant trophies continue to enhance the survival of the species.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

88.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

89.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

## Count III - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed an Enhancement of Survival Finding Requirement in the Special Rule Pertaining to Trophy Importation from African Elephants on CITES Appendix II

90.     Safari Club realleges and incorporates herein by reference all the allegations of paragraphs 1-89, as though fully set forth below.

91.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephant conservation.  This failure to act was arbitrary and capricious, not in accordance with law, and an abuse of discretion.

92.     On August 10, 1992, Federal Defendants instituted the enhancement of survival

finding requirement when all African elephants, including Zimbabwe's, were listed on CITES

Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for

the importation of Appendix I species.  Federal Defendants included the enhancement of survival

finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for

Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival

finding requirement from its resolution applicable to Appendix I species and in 1997 CITES

downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have

never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In

addition, Federal Defendants have never published a public notice justifying the enhancement of

survival requirement for African elephants listed on CITES Appendix II and have never given

the public the opportunity to comment on the requirement.  Despite the fact that the status of the

species changed and the FWS's original justification for the requirement disappeared, Federal

Defendants have never provided proper justification, notice and an opportunity for comment on

its decision to modify the basis for imposing an enhancement of survival requirement on an

elephant population listed on CITES Appendix II.  These actions were arbitrary and capricious,

not in accordance with law, and an abuse of discretion.

93.     On April 4, 2014, for the first time since imposing the enhancement of survival

requirement for the importation of legally sport-hunted African elephants from Zimbabwe,

Federal Defendants determined that an enhancement of survival finding could not be made.

These actions were arbitrary and capricious, not in accordance with law, and an abuse of

discretion.  These April 4, 2014 actions also caused harm to Safari Club and its members for the

first time since Federal Defendants illegally retained the requirement in the special rule.

94.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

95.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count IV - Violation of the ESA and APA:

**Federal Defendants Illegally Failed to Provide the Public with Notice and the Opportunity to Comment on the Trophy Importation Ban for Tanzania**

96.     Safari Club realleges and incorporates herein by reference all the allegations of paragraphs 1-95, as though fully set forth below.

97.     Federal Defendants announced the trophy importation ban for Tanzania in a press release published on the FWS's website and implemented the ban immediately.  Despite the fact that the ban applied to the hunting public generally, and reversed an opportunity available to Safari Club members and others for decades, Federal Defendants failed to publish notice of the ban in the Federal Register and provide the public with an opportunity for comment on a proposed ban.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

98.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

99.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count V - Violations of the ESA and APA:

**Federal Defendants Illegally Imposed an Enhancement of Survival
Finding Requirement in the Special Rule Pertaining to Trophy
Importation from African Elephants on CITES Appendix I**

100.     Safari Club realleges and incorporates herein by reference all the allegations of paragraphs 1-99, as though fully set forth below.

101.     Federal Defendants failed to explain why the enhancement finding requirement included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant conservation.  For species classified as "threatened," the ESA authorizes Federal Defendants to issue such regulations deemed "necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement finding is "necessary and advisable" for African elephants listed on CITES Appendix I.  This failure to act was arbitrary and capricious, not in accordance with law, and an abuse of discretion.

102.     On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species.  Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) as a result of a parallel CITES requirement.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species, Federal Defendants never removed the enhancement of survival finding requirement from § 17.40(e)(3)(iii), never provided a public notice justifying the retention of the requirement for African elephants, including those from Tanzania, and never gave the public the opportunity to comment on the requirement when the reason for the requirement no longer existed.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

28

103.     On April 4, 2014, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Tanzania, Federal Defendants determined that an enhancement of survival finding could not be made.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion. These April 4, 2014 actions also caused harm to Safari Club and its members for the first time since Federal Defendants illegally retained the requirement in the special rule.

104.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

105.     The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

### Count VI - Violation of the ESA and APA:

**Federal Defendants Illegally Applied the Incorrect Non-Detriment Standard
to the Importation of African Elephant Trophies from Tanzania**

106.     Safari Club realleges and incorporates herein by reference all the allegations of paragraphs 1-105, as though fully set forth below.

107.     Federal Defendants failed to conduct the proper NDF assessment for the importation of an Appendix I species.  When considering the potential detriment posed by U.S. importation of legally sport-hunted trophies from Tanzania, Federal Defendants applied the analysis authorized for exportation, rather than importation.  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

108.     Federal Defendants wrongfully assessed the potential detrimental impact of both legal and illegal (poaching) take of elephants in Tanzania rather than focusing their NDF assessment on the purpose for which sport-hunted trophy importations would be intended.  In

doing so, Federal Defendants ignored and/or contradicted their own published conclusion that the "finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States." 71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

109.    On April 4, 2014, Federal Defendants, for the first time since African elephants in Tanzania were listed as a threatened species, determined that it could not make an NDF for the importation of African elephant sport-hunted trophies and caused Safari Club and its members harm for the first time.

110.    These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

111.    The remedies requested in this Complaint would remedy Safari Club and Safari Club members' injuries, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, Safari Club respectfully requests that the Court grant the following relief:

1.    Declare that Federal Defendants violated the ESA and the APA in suspending the importation of African elephant trophies legally hunted in Zimbabwe between April 5, 2014 to December 31, 2014.

2.    Declare that Federal Defendants violated the ESA and APA in suspending the importation of legally sport-hunted African elephant trophies from Tanzania for 2014.

3.    Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Zimbabwe was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

30

4.      Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephant trophies from Tanzania was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

5.      Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Zimbabwe for 2014.

6.      Enjoin the Federal Defendants from continuing and/or enforcing the suspension of the importation of African elephant trophies from Tanzania for 2014.

7.      Award Safari Club the costs of litigation, including reasonable attorneys' fees.

8.      Award Safari Club such other relief that is just and proper.

Dated this 21st day of April 2014.


Respectfully submitted,


/s/ Anna M. Seidman

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Jeremy E. Clare, Esq. (DC Bar No. 1015688)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org


*Counsel for Plaintiff,*
*Safari Club International*