## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| S.M.R. JEWELL, in her official capacity as Secretary of the United States Department of Interior, *et al.*, | )<br>)<br>)<br>) |
| Defendants. | )<br>)<br>)<br>) |

Civil No. 1:14-cv-00670-ABJ

MOTION TO DISMISS

Federal Defendants S.M.R. Jewell, in her official capacity as Secretary of the United States Department of the Interior, United States Department of the Interior, Daniel Ashe, in his official capacity as Director of the United States Fish and Wildlife Service, and the United States Fish and Wildlife Service, respectfully move this Court to dismiss all of Plaintiff's claims under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction. Plaintiff lacks standing to bring its claims challenging Federal Defendants' April 2014 findings regarding importation of sport-hunted African elephant trophies from Tanzania. Plaintiff's claims challenging Federal Defendants' April 2014 finding regarding importation of sport-hunted African elephant trophies from Zimbabwe is prudentially unripe because the finding is interim in nature, Plaintiff will not suffer hardship from waiting for the agency's final decision, and judicial review may become unnecessary. The Court should decide this Motion before it considers Plaintiff's Motion for Preliminary Injunction because the Court must determine that it has jurisdiction to consider a motion for preliminary. *Aamer v. Obama*, 953 F. Supp. 2d 213, 218 (D.D.C. 2013) ("Before the

Court can address [Plaintiff's] request for a preliminary injunction, [Plaintiff] must show that the Court has jurisdiction over [its] claim[s].'").

 In support of this Motion, Federal Defendants rely upon the accompanying memorandum of points and authorities, the pleadings and other papers on file in this action, and such oral argument as the Court may entertain.  For the reasons provided, Federal Defendants respectfully request that this Court grant the Motion, and dismiss Plaintiff's complaint. A proposed order accompanies this motion, as required by Local Civil Rule 7(c).

Pursuant to Local Civil Rule 7(d)-(e), within 7 days of the filing of the memorandum in opposition to this Motion, Federal Defendants will file a reply memorandum of not more than 25 pages, unless another schedule and/or page limit is ordered by the Court.

Dated: May 13, 2014

ROBERT G. DREHER
Acting Assistant Attorney General
Environment and Natural Resources Division
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON, Assistant Chief

   */s/  Meredith L. Flax*
MEREDITH L. FLAX, Senior Trial Attorney
(D.C. Bar No. 468016)
ANDREA GELATT, Trial Attorney
(CA. Bar No. 262617)
CHRISTINE HILL, Trial Attorney
(D.C. Bar No. 461048)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Benjamin Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0404| (202) 305-0275
meredith.flax@usdoj.gov

**Counsel for Federal Defendants**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **Safari Club International**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 14-cv-00670-ABJ |
| v. ) | |
| ) | |
| **S.M.R. Jewell,** in her official capacity as ) | |
| Secretary of the United States Department of ) | |
| Interior, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

**Federal Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction and
Memorandum in Support of Federal Defendants' Cross-Motion to Dismiss**

TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

  I.   LEGAL BACKGROUND ............................................................................................ 3

  II.  FACTUAL BACKGROUND ...................................................................................... 6

     A.  Tanzanian Elephants ......................................................................................... 6

     B.  Zimbabwean Elephants ..................................................................................... 7

ARGUMENT ........................................................................................................................ 8

  I.   THE COURT LACKS SUBJECT MATTER JURISDICTION........................................ 8

     A.  Plaintiff Lacks Standing to Challenge the Tanzania Findings. ....................................... 9

       1.  Plaintiff's Declarants Cannot Demonstrate Standing Because They Have Not Applied for a CITES or ESA Permit to Import Tanzanian Elephants. ..................... 10

       2.  Plaintiff Has Not Shown That its Remedy Sought Would Redress its Members' Alleged Injuries from the Tanzania Findings. ........................................................... 13

     B.  Plaintiff's Challenge to the Zimbabwe Enhancement Finding is Not Ripe. ................ 15

       1.  Plaintiff's Zimbabwe Claims Are Not Fit for Judicial Decision. ............................. 16

       2.  Plaintiff Will Not Suffer Hardship if the Court Withholds Consideration of the Zimbabwe Claims. ...................................................................................................... 18

  II.  PLAINTIFF HAS NOT SATISFIED ITS BURDEN FOR PRELIMINARY INJUNCTIVE RELIEF........................................................................................................ 21

     A.  Standard for Preliminary Injunctive Relief ................................................................. 21

     B.  Plaintiff Has Not Shown Irreparable Harm From the Service's Decisions. ................ 24

       1.  Plaintiff's Members' Inability to Import Elephant Trophies Does Not Constitute Irreparable Harm. ....................................................................................................... 25

       2.  Plaintiff's Alleged Economic Harm is Speculative and Not Irreparable. ................. 29

i

a.    The Declarant-Hunters Will Not Suffer Irreparable Harm Based on Economic Loss. ............................................................................................................... 30

b.    Hunting Outfitters Will Not Suffer Irreparable Loss from the Findings. ............. 33

3.    The Alleged Harm to Plaintiff's Conservation Interest in African Elephants in Tanzania and Zimbabwe is Not Irreparable. ............................................................. 35

CONCLUSION ....................................................................................................................... 40

## DEFENDANTS' EXHIBIT LIST

1. Declaration of Timothy Van Norman, Chief, Branch of Permits, the Division of Management Authority of the U.S. Fish and Wildlife Service

2. Declaration of Rosemarie Gnam, Chief, Division of Scientific Authority of the U.S. Fish and Wildlife Service

3. Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies, 79 Fed. Reg. 26,986 (May 12, 2014)

# INTRODUCTION

In its Complaint, Plaintiff Safari Club International ("SCI") challenges findings made by the U.S. Fish and Wildlife Service (the "Service") on April 4, 2014 that the importation of sport-hunted trophies of African elephants taken in two countries, the United Republic of Tanzania ("Tanzania") and Zimbabwe, could not be found to enhance the survival of the species. The African elephant is listed as a threatened species under the Endangered Species Act ("ESA"), and an "enhancement" finding is required under a special rule for African elephants before their trophies may be imported. Plaintiff also challenges the Service's decision that it could not make the required finding under the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES") that the import of African elephant trophies from Tanzania will be for purposes that are not detrimental to the survival of the species ("non-detriment" finding).[1]

The Court cannot consider the merits of the Service's decisions or even entertain Plaintiff's Motion for Preliminary Injunction, however, because the Court lacks subject matter jurisdiction over Plaintiff's claims. Plaintiff lacks standing to challenge the Service's decisions regarding importation of trophies from Tanzania because CITES and ESA import permits are required and none of Plaintiff's declarant-members has applied for a permit to import a sport-hunted elephant trophy from that country. For similar reasons, Plaintiff has not met its burden to demonstrate that any injury from the Service's Tanzania findings is redressable. Plaintiff's challenges to the Service's enhancement finding for Zimbabwe also suffer from a threshold

---

[1] African elephants from Tanzania and Zimbabwe share a common status as a "threatened species" under the ESA. Under CITES, however, African elephants from Tanzania are listed under CITES Appendix I, while African elephants from Zimbabwe are listed under CITES Appendix II, a less protective status. "Enhancement" findings under the ESA and "non-detriment" findings under CITES are made on a country-by-country basis. Thus, trophy imports from both countries require an enhancement finding, but only imports from Tanzania (the Appendix I country) require a non-detriment finding. The process for importing a trophy from Tanzania also differs from Zimbabwe in that ESA and CITES permits must be obtained for the Tanzania trophy.

jurisdictional flaw: they are prudentially unripe. These challenges are not fit for judicial review because the Service's April 2014 finding for Zimbabwe was an interim decision and the Service is working to complete a final finding on enhancement for that country based on new information it has received from Zimbabwe. Plaintiff will not suffer hardship from a delay in judicial review and such review may become unnecessary depending on the outcome of the final finding and also would benefit from a more concrete setting. Since the Court lacks subject matter jurisdiction for both the Tanzania and Zimbabwe decisions, it should dismiss Plaintiff's Complaint and deny Plaintiff's Motion for Preliminary Injunction as moot.

Even if the Court were to find that it has subject matter jurisdiction, it should deny Plaintiff's Motion for Preliminary Injunction. Plaintiff has failed to satisfy any of the four factors courts consider in deciding whether to grant preliminary injunctive relief. Of relevance here, Plaintiff has failed to demonstrate that the Service's decisions irreparably harm it or its members.[2] Plaintiff's alleged harm to its members' interest in importing an elephant trophy and to its members' financial and conservation interests are speculative, self-inflicted, and remediable, and do not satisfy Plaintiff's burden to demonstrate that it is entitled to the extraordinary remedy of a preliminary injunction.

//

//

//

---

[2] Pursuant to the Court's May 2, 2014 Minute Order, Federal Defendants are limiting their argument to irreparable harm and subject matter jurisdiction. Federal Defendants reserve their rights to provide argument on the other preliminary injunction factors should the Court find that Plaintiff has satisfied its burden to demonstrate that the Court has jurisdiction and that Plaintiff has suffered irreparable harm. Of particular note, Federal Defendants do not address the final agency action requirement for judicial review under the Administrative Procedure Act in this brief, as the D.C. Circuit does not treat the requirement as jurisdictional. *See Trudeau v. Federal Trade Commission*, 456 F.3d 178, 185 (D.C. Cir. 2006).

2

**BACKGROUND**

**I.     LEGAL BACKGROUND**

Two legal regimes govern the trade in sport-hunted African elephant trophies:  the ESA, 16 U.S.C. § 1531, *et seq.*, and CITES, 27 U.S.T. 1087; T.I.A.S. 8249, Mar. 3, 1973, a multilateral treaty that aims to protect wildlife that is vulnerable to or adversely affected by trade, by regulating trade in species that are listed in its three Appendices, which Congress has implemented into domestic law through the ESA, 16 U.S.C. §§ 1537a; 1538(c). The African elephant (*Loxodonta africana*) is listed as a threatened species under the ESA. 43 Fed. Reg. 20,499 (May 12, 1978); 50 C.F.R. § 17.11(h). However, African elephants from some countries, including Tanzania, are listed on CITES Appendix I, whereas African elephants from other countries, including Zimbabwe are listed on CITES Appendix II. This difference dictates different processes for obtaining authorization to import sport-hunted African elephant trophies from Tanzania and Zimbabwe.

Under the ESA, Section 9(a)(1) contains certain prohibitions, including a prohibition on import into the United States, that apply to species of fish and wildlife listed as endangered. 16 U.S.C. § 1538(a)(1). ESA Section 4(d) allows the Service to extend those same prohibitions to species of fish or wildlife listed as threatened. *Id.* § 1533(d). The Service has extended all of the Section 9(a)(1) prohibitions to wildlife species listed as threatened, except where the Service issues a "special rule" containing "all the applicable prohibitions and exceptions." 50 C.F.R. § 17.31. The Service has issued a "special rule" for African elephants. 43 Fed. Reg. at 20,502; 47 Fed. Reg. 31,384 (July 20, 1982); 57 Fed. Reg. 35,473 (Aug. 10, 1992). The special rule allows sport-hunted elephant trophies to be imported into the United States so long as four conditions are met. 50 C.F.R. § 17.40(e)(3)(iii)(A)-(D). The third of these conditions is that "[a] determination is made that the killing of the animal whose trophy is intended for import would

3

enhance survival of the species." *Id.* § 17.40(e)(3)(iii)(C). The Service makes enhancement findings on a country-by-country basis. Declaration of Timothy Van Norman, Chief, Branch of Permits, the Division of Management Authority of the U.S. Fish and Wildlife Service ("Van Norman Decl.") at ¶ 3, Def. Ex. 1.

The African elephant in Tanzania is listed on CITES Appendix I, 63 Fed. Reg. 63,210, 63,215 (Nov. 12, 1998), the most protective of the CITES Appendices, meaning that the species is threatened with extinction and that trade in specimens of these species is permitted only in exceptional circumstances. CITES Art. II(1); *see also id.* (providing that "[t]rade in specimens of these [Appendix I] species must be subject to particularly strict regulation in order not to endanger further their survival"). CITES generally prohibits international transport of Appendix I species absent an import and export permit from authorized Management Authorities in the respective countries. CITES Art. III(2), (3). The Service has promulgated regulations to implement CITES, which prohibit the import or export of any CITES-listed animals, live or dead, whether whole or parts, unless expressly authorized by valid CITES export and import documents or specifically exempted from CITES documentation requirements. 50 C.F.R. §§ 23.13-23.36; *accord* 16 U.S.C. § 1540(f). The ESA designates the Department of the Interior as the United States' Scientific and Management Authorities for purposes of the treaty, with all functions carried out through the Service. 16 U.S.C. § 1537a(a).

To obtain a CITES export permit for an Appendix I species, the Scientific Authority in the country of export must find that the trade at issue will not be "detrimental to the survival of the species involved." CITES Art. III(2); *see also* 50 C.F.R. §§ 23.35(c)(1), 23.61 (ESA regulations implementing the CITES non-detriment finding). In addition, the country of import must issue a separate import permit supported by a number of findings, including the Scientific

Authority of the importing country's separate and independent determination that "the import will be for purposes which are not detrimental to the survival of the species involved." *Id*. Art. III(3); *see also* Conf. 2.11 (Rev.) (available at the official CITES website, maintained by the CITES Secretariat on behalf of the Parties, at http://www.cites.org/eng/res/index.php) (recommending that "the scientific examination by the importing country in accordance with paragraph 3 (a) of Article III of the Convention be carried out independently of the result of the scientific assessment by the exporting country in accordance with paragraph 2(a) of Article III, and vice versa"). The Service has a combined application for a CITES authorization and ESA import permit (which are required for Appendix I African elephants like those in Tanzania), which the Service considers on a case-by-case basis. Van Norman Decl. at ¶ 21.

The African elephant in Zimbabwe is listed on CITES Appendix II, 63 Fed. Reg. 63,215, which includes species that, although not necessarily threatened with extinction currently, may become so unless trade in them is strictly controlled. *See* CITES Art. II(2). The import of a CITES Appendix II species requires the prior grant and presentation of a valid CITES export permit issued by the exporting country. *Id.* Art. IV(4). The Service has determined that, for Appendix-II African elephants, there is no requirement for a CITES import permit for non-commercial imports of sport-hunted African elephants. 62 Fed. Reg. 44,627, 44,633 (Aug. 22, 1997). However, as explained above, a person can import sport-hunted African elephant trophies from Zimbabwe under the ESA only if four conditions are met, including that the Service has made a determination that "the killing of the animal whose trophy is intended for import would enhance survival of the species." 50 C.F.R. § 17.40(e)(iii)(C). Nevertheless, the Service does not require ESA import permits for species listed on CITES Appendix II. Van Norman Decl. at ¶ 24.

## II.     FACTUAL BACKGROUND

### A.     Tanzanian Elephants

On February 21, 2014, the Chief of the Division of Scientific Authority for the Service issued a General Advice on the importation of sport-hunted trophies of African elephants taken in Tanzania in 2014. ECF No. 4 ("Pl.'s Br."), Ex. I. The Service concluded in its 2014 non-detriment finding that it was unable to determine that the importation of sport-hunted trophies of African elephants taken in 2014 in Tanzania would be for purposes that are not detrimental to the survival of the species. *Id.* at 1. It detailed several sources of recent information that had become available since the Service made its non-detriment finding for Tanzania for 2013. *Id.* at 1-2. The 2014 non-detriment finding clarified that the Service was still accepting CITES permit applications for the importation of sport-hunted elephant trophies from Tanzania for 2014. It explained: "[i]f permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis." *Id.* The Division of Scientific Authority's 2013 non-detriment finding for Tanzania had noted increasing poaching of elephants in that country, which, based on the Service's evidence, had caused a significant decline in elephant populations in Tanzania by 2014. Declaration of Rosemarie Gnam, Chief, Division of Scientific Authority of the U.S. Fish and Wildlife Service ("Gnam Decl.") at ¶ 2, Def. Ex. 2.

On March 27, 2014, the Chief of the Branch of Permits for the Division of Management Authority for the Service issued a memorandum concluding that the Service could not, at that time, make an enhancement finding to allow the import of sport-hunted trophies of African

elephants from Tanzania under the ESA. *See* Pl.'s Ex. J. The finding noted that, recent information showed a decline in the Tanzanian elephant population, including a decline from approximately 39,000 elephants to 13,000 in the Selous-Mikumi ecosystem, an ecosystem that had previously supported the second-largest elephant population in Africa. Pl.'s Ex. J at 1-2.

On April 4, 2014, the Service denied the first applications that sought import permits for sport-hunted African elephant trophies for elephants to be killed in Tanzania in hunts planned for later in 2014. Van Norman Decl. at ¶¶ 14-15. To advise the broader hunting public of these permit denials and to put the hunting public on notice that they should plan their future hunts accordingly, the Service issued a press release, Pl.'s Ex. A, advising that the Service had been unable to make positive findings under the ESA and CITES (i.e., an enhancement finding and a non-detriment finding, respectively) for calendar year 2014 for Tanzania and for Zimbabwe (discussed immediately below). *Id.* The press release was emailed to over 300 news organizations and posted on the Service's website. Gnam Decl. at ¶ 13. The day prior, the Director of the Service, Dan Ashe, called Plaintiff's president and other leaders of hunting organizations to advise them of the decisions. *Id*. The Service noted that it "will reevalute this suspension for calendar year 2015 or upon receipt of new information that demonstrates an improved situation for elephants in these countries." *Id.* To date, none of the hunters or outfitters who have submitted declarations in support of Plaintiff's Motion has applied for a permit to import a sport-hunted elephant trophy taken from Tanzania in 2014.

### B. Zimbabwean Elephants

On April 4, 2014, the Chief of the Branch of Permits for the Division of Management Authority for the Service concluded that the Service could not, at that time, make an enhancement finding to allow the import of sport-hunted trophies of African elephants from

Zimbabwe under the ESA. *See* Pl.'s Ex. D. The Service noted that it appeared that there has been an increase in human-elephant conflicts in Zimbabwe. Pl.'s Ex. D at 1-2. The Service also explained that it had not received recent information from Zimbabwe regarding its elephant population, regulations, and conservation programs and therefore, because of insufficient information, the Service was unable to make an enhancement finding for Zimbabwe. *Id.* Also on April 4, 2014, the Service sent a letter to the Government of Zimbabwe, requesting more information about Zimbabwe's elephant population and conservation efforts. *See* Pl.'s Ex. F. Zimbabwe responded by letter on April 17, 2014, *see* Pl.'s Ex. E, and has provided further information since then. On May 7, 2014, consistent with the April 4th press release, the Service submitted a notice to the Federal Register that explained that the Service was reviewing the information recently sent by Zimbabwe, as well as other information to be sent shortly, and would make a final enhancement finding for Zimbabwe in the future, which will be announced in the Federal Register. *Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies*, 79 Fed. Reg. 26,986, 26,988 (May 12, 2014), Def. Ex. 3. On May 8, 2014, representatives from the Service met with members of the Zimbabwean government to discuss the state of African elephants in Zimbabwe. Van Norman Decl. at ¶¶ 31-32.

## ARGUMENT

### I.   THE COURT LACKS SUBJECT MATTER JURISDICTION.

As courts of limited jurisdiction, federal courts may decide cases only after the party asserting jurisdiction demonstrates that the dispute falls within the court's Constitutional and statutory jurisdiction. *Rasul v. Bush*, 542 U.S. 466, 489 (2004) (federal courts "possess only that power authorized by Constitution and statute") (*quoting Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994)). Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. Once challenged, the burden of

establishing a federal court's subject-matter jurisdiction by a preponderance of the evidence rests on the party asserting jurisdiction. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). The presumption is that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *Renne v. Geary*, 501 U.S. 312, 316 (1991). Because subject-matter jurisdiction focuses on the court's power to hear the claim, "the court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim." *Nat'l Ass'n of Home Builders v. U.S. Army Corps. of Eng'rs*, 539 F. Supp. 2d 331, 337 (D.D.C. 2008) (citations omitted). Moreover, in evaluating a motion under Rule 12(b)(1), the Court is not limited to the allegations of the complaint, but may also consider materials outside the pleadings in determining whether to dismiss for lack of jurisdiction. *Nat'l Motor Freight Traffic Ass'n v. Gen. Servs. Admin.*, --- F. Supp. 2d ---, No. 13-cv-0429, 2014 WL 958599, at *5 (D.D.C. Mar. 12, 2014).

## A.     Plaintiff Lacks Standing to Challenge the Tanzania Findings.

To establish Article III standing, a plaintiff must show: (1) that it has suffered a concrete and particular injury in fact that is either actual or imminent; (2) the injury is fairly traceable to the alleged actions of the defendant; and (3) the injury will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). Because Plaintiff is not itself the subject of the Service's challenged decisions, it must come forward with specific facts to demonstrate that it has an identifiable member who has suffered a redressable injury from the decisions. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) (explaining that the standing requirements apply whether an organization asserts standing to sue on its own behalf, or on behalf of its members). As demonstrated below, Plaintiff cannot show that any of its members

has Article III standing to challenge the Tanzania findings, and thus Plaintiff itself has no standing to assert these challenges.

Plaintiff does not present a separate standing argument, but rather submitted declarations in support of the irreparable harm argument in its Motion for Preliminary Injunction. *See* Pl.'s Br. at 25-28. These declarations detail plane tickets, deposits for hunts, hunters' interest in the conservation of the elephant, and hunters' concern that the inability to import a sport-hunted trophy will lead them to cancel their own hunting trips. *See id.* However, none of these declarations satisfies Plaintiff's burden to demonstrate Article III standing.

**1.     Plaintiff's Declarants Cannot Demonstrate Standing Because They Have Not Applied for a CITES or ESA Permit to Import Tanzanian Elephants.**

Plaintiff alleges that the Tanzanian "trophy importation ban" was improperly issued without notice and comment (Claim IV), that Federal Defendants improperly included an enhancement finding as a predicate to import permits for Tanzanian elephants (Claim V), and that the Tanzanian non-detriment finding was based on the wrong standard (Claim VI). At base, in asserting these claims, Plaintiff requests that the Court declare that the "suspension of the importation of legally sport-hunted African elephant trophies" from Tanzania is invalid and enjoin the Service from "continuing and/or enforcing the suspension of the importation of African elephant trophies from Tanzania for 2014." *See* Pl.'s Compl. at 30-31.

For purposes of this argument, we assume, as we must, that Plaintiff is correct on the merits of its claims. However, to establish injury-in-fact for purposes of standing, Plaintiff must show that its members have suffered a particularized and concrete injury traceable to the Tanzania findings. The injury alleged cannot be "conjectural" or "hypothetical," *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983), "remote," *Warth v. Seldin*, 422 U.S. 490, 507 (1975),

10

"speculative," *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42-46 (1976), or "abstract," *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974). Rather, it must be "certainly impending," and not simply "objectively reasonable." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1151 (2013) (*citing Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). Plaintiff may allege procedural injury based on its claims, but "deprivation of a procedural right without some concrete interest that is affected by the deprivation ... is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1151 (2009). As demonstrated below, none of Plaintiff's declarants has identified an injury in fact that is sufficiently "actual and imminent," *id.* at 1149, to meet the requirements for Article III standing.

Plaintiff lacks standing to raise claims against the Service's Tanzania findings because Plaintiff has provided no evidence that it or its members has even applied for the requisite permits under CITES or the ESA in 2014 for Tanzania, much less had a permit application denied. Plaintiff thus fails to demonstrate an injury in fact. Plaintiff's declarants had the opportunity to pre-apply for Tanzanian import permits for any elephants they anticipated hunting. Van Norman Decl. ¶ 14. However, they failed to avail themselves of this opportunity and, therefore, they lack standing. *See, e.g.*, *Hightower v. City of Boston*, 693 F.3d 61, 70-71 (1st Cir. 2012) (finding lack of standing for a type of permit because the plaintiff never applied for it nor had such application denied); *Pedreira v. Kentucky Baptist Homes for Children, Inc.*, 579 F.3d 722, 727 (6th Cir. 2009) (dismissing potential job applicant for lack of standing to challenge allegedly discriminatory policy because she had not yet applied and therefore "ha[d] not shown that her failure to be hired is due to her sexual orientation" and thus her injury "is purely speculative"); *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 658 (9th Cir. 2002) (dismissing for lack of standing because the plaintiff did not "support her claim for prospective

relief by presenting evidence that individual plaintiffs are ready and able to apply to the voluntary schools and that the [challenged] policy prevents them from doing so 'on an equal basis.'"); *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1097-98 (2d Cir. 1997); *see also Warth*, 422 U.S. at 504 (finding individual plaintiffs had not demonstrated standing to challenge housing practices when "none of these petitioners has a present interest in any Penfield property; none is himself subject to the ordinance's strictures; and none has even been denied a variance or permit by respondent officials.") (citation omitted); *Parker v. District of Columbia,* 478 F.3d 370, 376 (D.C. Cir. 2007) (finding standing only for citizen who had applied for and been denied a license: "We have consistently treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury."), *aff'd sub nom. District of Columbia v. Heller,* 554 U.S. 570 (2008).[3]

Plaintiff's declarants' alleged injuries are not based on acts that the Service has taken to date, but rather on discretionary action the Service may take in the future, should Plaintiff's members decide to apply for import permits for any future elephant trophies. Presumed future action is insufficient to confer standing. *See Louisiana Envtl. Action Network v. Browner*, 87 F.3d 1379, 1383-84 (D.C. Cir. 1996). Moreover, any claim that the findings will result in the

---

[3] Plaintiff likewise cannot demonstrate that it would have been futile to apply for a permit because the Service has stated numerous times that if the applicant provides new information sufficient to support the positive findings needed to support an ESA or CITES import permit, those permits will be issued. *See, e.g.*, Pl. Ex. I ("If permit applications are received that include new or additional information showing that elephant management practices by the Government of Tanzania have led to the sustainability of its elephant population on a nation-wide basis, these applications should be referred to the Division of Scientific Authority for consideration on a case-by-case basis"); Van Norman Decl. at ¶¶ 21; *see Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 57 (D.C. Cir. 1991) (holding that plaintiff's members failed to establish an injury in fact when they were "discouraged" from applying to an office and finding that district court erred in assuming that it would have been futile for the plaintiff to apply); *cf. Sporhase v. Nebraska ex rel. Douglas,* 458 U.S. 941, 944 n. 2 (1982) (holding that plaintiffs had standing to challenge Nebraska water laws even though they had not applied for a permit because the permit clearly would not have been granted and the application would have been futile).

denial of a permit application would be pure speculation because Plaintiff and its members have not submitted an application. Under Plaintiff's theory of the facts, its members have information that could demonstrate to the Service that an enhancement finding and a non-detriment finding should be issued for any permit application for Tanzanian elephants for 2014.

If Plaintiff's members do apply for import permits and they are denied, then the members can contest those permits through the administrative process (*see* 50 C.F.R. § 13.29) and, eventually in a reviewing court more fully apprised of the relevant permit issues than is this court. *See, e.g.*, *N. Carolina Utilities Comm'n v. FERC*, 653 F.2d 655, 665 (D.C. Cir. 1981); *cf, Franks v. Salazar*, 816 F. Supp. 2d 49 (D.D.C. 2011) (reviewing denial of African elephant permit).[4]

In sum, Plaintiff cannot establish a member's injury in fact sufficient to assert associational standing because its members have not even applied for an ESA or CITES import permit and because the declarants' injuries underpinning their allegations of Article III standing are wholly deficient. Thus, Plaintiff's Tanzania-based claims must be dismissed.

### 2. Plaintiff Has Not Shown That its Remedy Sought Would Redress its Members' Alleged Injuries from the Tanzania Findings.

It is also far from certain that Plaintiff's chosen remedy—an injunction prohibiting the purported suspension of the importation of elephant trophies from Tanzania—is available or would redress Plaintiff's injuries. Even if the Tanzania findings, *i.e.*, that the Service was unable

---

[4] Moreover, Plaintiff's claim of threatened future injury is not ripe for judicial review as it lacks "finality, definiteness, and . . . depends on facts that may not yet be sufficiently developed." *Stern v. U.S. Dist. Court for Dist. Mass.*, 214 F.3d 4, 10 (1st Cir. 2000) (citation omitted); *cf. Central & Sw. Servs., Inc. v. EPA*, 220 F.3d 683, 698-702 (5th Cir. 2000) (plaintiffs lacked standing to challenge EPA's final rule on PCB use and disposal because individual affiants' alleged injuries were predicated on a series of hypothetical events that had not occurred); *see also* Ripeness Discussion *infra*.

to make the requisite enhancement finding under the ESA and non-detriment finding under CITES, were remanded to the Service or even vacated, Plaintiff's members would still have to apply for and receive import permits before they could import any trophies of sport-hunted elephants they may kill this year in Tanzania.

More fully stated, if the Court were to find the Tanzania findings arbitrary and capricious, the remedy would be a remand to the agency to take further action in light of the Court's findings. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). It is well established that, except in extraordinary circumstances not presented here, a court cannot force the Service to take particular action like issuing import permits. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) (explaining the 4-part test for a permanent injunction); *Cnty. Of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (noting that district court erred when it devised a "specific remedy for the Secretary to follow" instead of remanding to the agency for examination of the evidence and proper fact-finding). Thus, even if the Tanzania findings were vacated, Plaintiff's members would have no right to import sport-hunted African elephants without valid CITES and ESA permits from the Service, for which they have not yet applied. *See* Van Norman Decl. at ¶¶ 13-14, 21.

The permit requirements include determinations by the Service that it can make both a non-detriment finding and an enhancement finding for the trophy. The non-detriment and enhancement findings that were in place in 2013 for Tanzania expired on their own terms. Gnam Decl. Ex. at ¶ 5; Van Norman Decl. at ¶ 11. Thus, if the 2014 findings are vacated, there are no extant findings for Tanzania that would support Plaintiff's 2014 applications for a CITES or ESA permit. Although Plaintiff may believe that imports would resume if the Tanzania findings were vacated, in fact, Plaintiff's hunter members would still have to apply for a permit, show that they

could meet the conditions for a CITES permit and show that both non-detriment and enhancement findings could be properly made, before their purported injuries could be redressed. The Service is simply not required to issue import permits to Plaintiff's members, even if the Tanzania findings are remanded to the agency. Consequently, Plaintiff's challenges to the Tanzania findings are not redressable and its claims should be dismissed for lack of standing.[5]

### B.   Plaintiff's Challenge to the Zimbabwe Enhancement Finding is Not Ripe.

This Court lacks subject matter jurisdiction over Plaintiff's claims challenging the Service's April 2014 enhancement finding for Zimbabwe (Counts I-III) because those claims are prudentially unripe for judicial review.[6] This finding is not fit for judicial review at this time because the finding was interim in nature and the Service will make a final finding based on new information it has received from Zimbabwe. Plaintiff will not suffer hardship by waiting to challenge the final finding because its members can continue to hunt elephants in Zimbabwe, and if the Service is able to make an enhancement finding for Zimbabwe, they will be allowed to import trophies taken during the interim suspension.

---

[5] In essence, Plaintiff is not challenging final agency action. Federal Defendants do not pursue this final-agency-action argument further because of the Court's limitations on this opposition brief. However, for similar reasons, Plaintiff's declarants also have not shown causation or imminence as their failure to apply for import permits is the immediate cause of their inability to import a sport-hunted trophy. Further, Federal Defendants note that, under CITES, before an import permit may issue, the export country also must determine that it can make certain findings. Thus, even if the Service finds that it can make positive findings for Tanzania, an import permit is not assured. *See* Van Norman Decl. at ¶ 7.

[6] Plaintiff's Zimbabwe claims also are constitutionally unripe given that none of Plaintiff's declarants has indicated that he is currently ready to import a trophy from Zimbabwe taken after April 4, 2014. *See Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1431 (D.C. Cir. 1996) (finding challenge to line-item veto constitutionally unripe where the "veto power [wa]s not only unexercised, but [wa]s as yet unavailable."); *see also* Van Norman Decl. at ¶ 17 (discussing the fact that many hunters are unable to import trophies within a year of their hunt).

The Court cannot consider the merits of Plaintiff's claims if they are not prudentially ripe for review. *See In re Aiken County*, 645 F.3d 428, 434 (D.C. Cir. 2011) (explaining that the "ripeness doctrine, even in its prudential aspect, is a threshold inquiry"). Moreover, "Courts in this circuit regularly dismiss cases for the absence of a ripe case or controversy" rather than holding the case in abeyance. *Roman Catholic Archbishop of Washington v. Sebelius*, 920 F. Supp. 2d 8, 12-13 (D.D.C. 2013) (citations omitted). To determine whether Plaintiff's claims are prudentially ripe, the Court "balances 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Nat'l Treasury Employees Union*, 101 F.3d at 1427-28 (*quoting Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

### 1. Plaintiff's Zimbabwe Claims Are Not Fit for Judicial Decision.

To evaluate the fitness prong of the *Abbott Labs* test, courts consider whether the issue is "purely legal," as opposed to reliant on agency expertise, and whether the challenged action is "final" and not dependent on future uncertainties or intervening agency rulings. *Abbott Labs.*, 387 U.S. at 152; *see also Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998) ("fitness" of the issue requires consideration of whether the case "would benefit from further factual development" and "whether judicial intervention would inappropriately interfere with further administrative action"). "These considerations protect 'the agency's interest in crystallizing its policy before that policy is subjected to judicial review and the court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting.'" *Marcum v. Salazar*, 694 F.3d 123, 129 (D.C. Cir. 2012) (*quoting Eagle–Picher Indus., Inc. v. EPA,* 759 F.2d 905, 915 (D.C. Cir. 1985)); *see also Cronin v. FAA*, 73 F.3d 1126, 1131 (D.C. Cir. 1996) ("The court's interests in avoiding unnecessary adjudication and in deciding issues in a concrete setting . . . militate in favor of postponing review if, for example, the court finds that resolution of the

dispute is likely to prove unnecessary or that the court's deliberations might benefit from letting the question arise in some more concrete form.") (internal citations omitted).

Here, the record before the Court demonstrates that Plaintiff's Zimbabwe claims are not fit for review at this time. The Service issued a finding in April 2014 that it "is unable to find that the killing of an elephant in Zimbabwe during the 2014 hunting season for the purpose of importing into the United States will enhance the survival of the species." Pl.'s Ex. D at 1. The Service explained that its finding was based primarily on a "lack of recent data on what is occurring in Zimbabwe" but also that the information it had showed that the elephant population in Zimbabwe has declined and that the poaching problem is not under control. *Id.* at 7. The Service said that it was attempting to gather additional information from Zimbabwe and other partners, non-governmental organizations, and entities to support a positive finding. *Id.* To that end, the Service sent a letter to the Zimbabwe Parks and Management Authority on April 4, 2014 asking a series of questions to address the ESA import criteria. Pl.'s Exs. E and F. Zimbabwe responded on April 17, 2014, providing a 32-page response and other documents. Pl.'s Ex. G. In addition, Zimbabwe sent a box of additional documents, which the Service received on May 8, 2014, and the Service met with a representative from Zimbabwe on May 8, 2014. Van Norman Decl. at ¶¶ 31-32. The Service has publicly stated that its April finding is an interim decision and that it is in the process of making a final finding based on the new information it has received. Van Norman Decl. at ¶ 35; 79 Fed. Reg. at 26,987.

In light of these facts, it is clear that the challenged finding is not final, but rather is an interim decision based, in part, on a lack of information. The finding is under continuing consideration based on new information and a final finding will be issued shortly. The Service may ultimately determine that it is able to find that importing sport-hunted elephant trophies

from Zimbabwe will enhance the survival of the species, making review of the challenged interim finding unnecessary. Moreover, even if the Service's final determination continues to be that it is unable to make an enhancement finding for Zimbabwe, the Court would benefit from letting the question arise in a more concrete form. Consequently, Plaintiff's Zimbabwe claims are not fit for judicial decision. *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).

### 2.    Plaintiff Will Not Suffer Hardship if the Court Withholds Consideration of the Zimbabwe Claims.

To overcome the strong "institutional interests in the deferral of review" here, Plaintiff must demonstrate that postponement of review will impose a hardship on it that is "immediate and significant." *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007). "Consideration of hardship that might result from delaying review 'will rarely overcome the finality and fitness problems inherent in attempts to review tentative positions.'" *Am. Petroleum Inst.*, 683 F.3d at 389 (*quoting Pub. Citizen Health Research Grp. v. FDA*, 740 F.2d 21, 31 (D.C. Cir. 1984)).

In this case, the allegations of harm Plaintiff has made are insufficient to demonstrate hardship that is immediate and significant enough to overcome the problems inherent in reviewing the Service's interim finding. Plaintiff has alleged that its hunter members are harmed by the finding because their inability to import sport-hunted African elephant trophies taken in Zimbabwe has disrupted these members' planned hunts and, in some cases, caused them to lose money based on their decision to cancel those hunts or spend money on hunts they may have chosen not to take if they had known they would be unable to import their trophy. *See*, *e.g.*, Grieb Decl., Pl.'s Ex. U at ¶ 11 (went on hunt and learned of Service decision while in Zimbabwe); Capozza Decl., Pl.'s Ex. AA at ¶ 10 (cancelled hunt planned for August 2014). However, contrary to these allegations, the Service's finding has no impact on these hunters' ability to hunt elephants in Zimbabwe; the finding only prevents importation of any resulting

trophy. *See, e.g.*, 79 Fed. Reg. at 26,987-98. Moreover, although it is true that these hunters currently are unable to import sport-hunted elephant trophies taken from Zimbabwe after April 4, 2014, the Service has explained that if it is able to make an enhancement finding for Zimbabwe based on the new information it is evaluating it will allow trophies taken after April 4 to be imported. Van Norman Decl. at ¶ 36; 79 Fed. Reg. at 26,987. Furthermore, "a possible financial loss is not by itself a sufficient interest to sustain a judicial challenge to governmental action," *Abbott Labs*, 387 U.S. at 153.

Plaintiff's allegations that its outfitter or hunting guide members are harmed by the finding because of possible financial losses due to cancellations of hunting trips by U.S. hunters similarly are unavailing. *See*, *e.g.*, Pole Decl., Pl.'s Ex. LL at ¶ 11; Duckworth Decl., Pl.'s Ex. RR at ¶ 14. Only a few of the many hunter-declarants has actually cancelled a hunt, and even the hunters who have cancelled have said they will hunt other species. Capozza Decl., Pl.'s Ex. AA at ¶ 10; Holdridge Decl., Pl.'s Ex. R at ¶ 6; Tarpley Decl., Pl.'s Ex. TT at ¶ 7. The outfitter and guide declarations themselves further defeat their own claims of harm when they explain that hunters from other countries may purchase the hunts abandoned by U.S. hunters. *See*, *e.g.*, Pole Decl., Pl.'s Ex. LL at ¶ 13; Duckworth Decl., Pl.'s Ex. RR at ¶ 15. And any claim that it is difficult for these members to plan their businesses is insufficient to constitute the requisite hardship for ripeness purposes. *Nat'l Parks Hospitality Ass'n v. U.S. Dep't of the Interior*, 538 U.S. 803, 811 (2003); *Bethlehem Steel Corp. v. EPA*, 536 F.2d 156, 162-163 (7th Cir. 1976) ("[C]laims of uncertainty in…business and capital planning are not sufficient to warrant our review of an ongoing administrative process….They do not involve injuries on the order of the concrete immediate business costs."); *Diamond Shamrock Corp. v. Castle,* 580 F.2d 670, 673

(D.C. Cir. 1978) (challenge to EPA regulations not ripe even though plaintiffs faced "acute dilemma" in capital planning to comply with new permitting requirements).

Plaintiff's claims of harm based on the alleged impact on African elephant conservation in Zimbabwe are similarly insufficient to satisfy its burden to demonstrate hardship for ripeness purposes. Plaintiff's declarants claim that their conservation interest in Zimbabwean elephants will be harmed by the suspension of importation of elephant trophies from that country because poachers will not be deterred by hunters in the field, money paid by U.S. hunters will not go to elephant conservation efforts, and villagers will not benefit from the hunting and so will not have an incentive to stop poaching. *See, e.g.*, Holdridge Decl., Pl.'s Ex. R at ¶ 7 (stating his belief that legal hunters deter poaching in Zimbabwe); Oosterhuis Decl., Pl.'s Ex. MM at ¶ 13 (expressing concern about impact on local communities). Such speculative claims are insufficient to meet the "immediate" and "direct" harm required for the hardship prong of the ripeness inquiry. *State Farm Mut. Auto. Ins. Co. v. Dole*, 802 F.2d 474, 481-82 (D.C. Cir. 1986). It is just as possible that the suspension will have a conservation benefit by spurring the Zimbabwean government to increase its efforts to prevent poaching and better manage its elephant population in an effort to have the suspension lifted. Moreover, as explained above, these claims are diminished if not defeated entirely by the statements that hunters from other countries will likely take over any spots abandoned by U.S. hunters.

In sum, Plaintiff's challenge to the Service's interim enhancement finding for Zimbabwe is neither fit for judicial review nor will Plaintiff suffer "immediate and significant" hardship in waiting to challenge the final enhancement finding that the Service is in the process of making based on new information it has received. Consequently, these claims are prudentially unripe and the Court should dismiss them for lack of jurisdiction.

## II.     PLAINTIFF HAS NOT SATISFIED ITS BURDEN FOR PRELIMINARY INJUNCTIVE RELIEF.

### A.     Standard for Preliminary Injunctive Relief

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). Plaintiff has the burden of proving the need for injunctive relief; Defendants bear no burden to defeat the motion. *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442-43 (1974). Moreover, because preliminary injunctive relief is an extraordinary remedy, the power to issue such an injunction "should be sparingly exercised." *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969) (quotation omitted).

To prevail on a motion for preliminary injunction, a plaintiff must satisfy a four-part test: (1) there must be a substantial likelihood of success on the merits; (2) there must be a showing of irreparable injury if an injunction is not granted; (3) an injunction must not substantially injure other parties; and (4) the public interest must be furthered by the proposed injunction. *See, e.g., Cityfed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995). The four factors typically have been evaluated on a "sliding scale," whereby if the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009) (*citing Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999)). It is unclear whether the "sliding scale" survives in light of the Supreme Court's decision in *Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008).[7] *See Sherley v. Sebelius*, 644 F.3d

---

[7]   In *Winter*, the Supreme Court struck down the standard applied by the Ninth Circuit that a preliminary injunction may be entered where there is only a "possibility" of irreparable harm if plaintiff has demonstrated a "strong likelihood" of prevailing on the merits. 555 U.S. at 20-21 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent

388, 392-93 (D.C. Cir. 2011) ("[W]e read *Winter* at least to suggest if not to hold that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.") (internal quotation marks omitted); *see also Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("*Munaf* [*v. Geren* 553 U.S. 674, 690 (2008)] made clear that a likelihood of success is an independent, free-standing requirement for a preliminary injunction."). However, the Court need not decide this issue, because the Court may deny a preliminary injunction based solely on a plaintiff's failure to demonstrate irreparable harm. *Sierra Club v. U.S. Army Corps of Eng'rs*, -- F. Supp. 2d ---, 13-CV-1239 (KBJ), 2013 WL 6009919, at *22 (D.D.C. Nov. 13, 2013) (*citing GEO Specialty Chem., Inc. v. Husisian,* 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.")); *see also Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 75 (D.D.C. 2013) (even under a sliding scale approach, plaintiffs must show they will suffer irreparable harm).[8]

The irreparable injury requirement "erects a very high bar for a movant." *Coal. for Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008); *see also Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)

---

with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."). While *Winter* did not explicitly address other variations on the "sliding scale" approach, it described the four-part test for the granting of a preliminary injunction as follows: "A plaintiff seeking a preliminary injunction must establish that he is *likely to succeed on the merits*, that he is *likely to suffer irreparable harm* in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 19-20 (emphasis added).

[8] Because of the Court's order limiting briefing to subject matter jurisdiction and irreparable harm, this brief will not address issues related to the public interest or the balance of harms such as Federal Defendants' harm from threats to elephant conservation in Tanzania and Zimbabwe if an injunction is issued. Federal Defendants, of course, are prepared to brief these issues should the Court request briefing.

(The D.C. Circuit "has set a high standard for irreparable injury."). "[T]he injury must be both certain and great; it must be actual and not theoretical." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). In addition, the alleged injury must be so imminent "that there is a clear and present need for equitable relief to prevent irreparable harm." *Chaplaincy*, 454 F.3d at 297 (*quoting Wisc. Gas*, 758 F.2d at 674).

The alleged harm cannot be based on speculation of future injury. A plaintiff must show that the alleged injury is likely to occur. *Wisc. Gas*, 758 F.2d at 674; *see also Am. Meat Inst.*, 968 F. Supp. 2d at 77 (a plaintiff must show that "the harm is certain to occur in the near future."). "Injunctive relief 'will not be granted against something merely feared as liable to occur at some indefinite time.'" *Wisc. Gas*, 758 F.2d at 674 (*quoting Conn. v. Mass.*, 282 U.S. 660, 674 (1931)). "Bare allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Id.* (emphasis in original); *see also Am. Meat Inst.*, 968 F. Supp. 2d at 77. Claims about what plaintiffs "expect" to happen, what people are "likely" to do, and what "could" happen do not demonstrate certain or actual harm. *Id.* at 78. Even if a plaintiff submits a large number of "declarants willing to speculate about the potential impact" of the activity complained of, "without more than such blanket, unsubstantiated allegations of harm, there is no strength in these numbers." *Id.* at 77.

In addition, "the D.C. Circuit has made clear that one who moves for a preliminary injunction 'must show that the alleged harm will *directly* result from the action which the movant seeks to enjoin.'" *Id.* at 81 (*quoting Wisc. Gas*, 578 F.2d at 674) (emphasis in original). If the alleged harm does not flow directly from the activity complained of, but instead results from independent market variables, including how third parties may act, it cannot form the basis of irreparable harm. *Id.* at 80-81.

Further, no litigant "can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). Accordingly, if the alleged harm results from a choice made by the party suffering the alleged harm, it cannot form the basis of irreparable harm. *Lee v. Christian Coal. of Am., Inc.*, 160 F. Supp. 2d 14, 33 (D.D.C. 2001) ("The case law is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.") (citations omitted); *see also Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102 (D.D.C. 2012) (no irreparable harm when plaintiffs could avoid harm).

### B.  Plaintiff Has Not Shown Irreparable Harm From the Service's Decisions.

Plaintiff claims that it will suffer three types of irreparable harm from the findings. First, Plaintiff claims that its members will suffer harm because they or their clients may not be able to sport-hunt elephants or import trophies from their hunts. Second, Plaintiff claims that its members may suffer financial losses if they or their clients cancel or fail to book hunts. Finally, Plaintiff claims that its members' interest in elephant conservation in Tanzania and Zimbabwe will suffer as a result of hunters cancelling or not booking hunts.

However, Plaintiff has failed to satisfy its burden of demonstrating that the Service's findings are likely to cause irreparable harm. The harms alleged are vague and uncertain and based on speculation of future injury. Some of the harms alleged also are self-inflicted, such as a hunter's own decision to cancel his hunt. In addition, Plaintiff has not demonstrated that the harms claimed are irreparable.[9] Therefore, Plaintiff's request for a preliminary injunction should be denied.[10]

---

[9] For many of the same reasons that Plaintiff lacks standing to challenge the Tanzania findings, the harm that allegedly flows from Plaintiff's Tanzania-based claims is not irreparable because any harm flows from Plaintiff's declarants' choice not to apply for an import permit. *See Sierra*

### 1.   Plaintiff's Members' Inability to Import Elephant Trophies Does Not Constitute Irreparable Harm.

Plaintiff claims that its members will be harmed because currently they cannot bring back an elephant trophy from Zimbabwe or Tanzania. However, the inability to import elephant trophies until Plaintiff's claims are resolved on the merits does not constitute irreparable harm. Any present harm to the two hunters who have already killed elephants in Zimbabwe can be remedied if the Service is able to make a final enhancement finding for that country or if the finding is found to be inconsistent with governing laws.[11] Any future harm Plaintiff's other hunter members may suffer due to their inability to import a trophy is speculative and the result of choices made by those members.

The Service's findings do not prohibit elephant hunting by U.S. citizens in Zimbabwe and Tanzania. *See* 79 Fed. Reg. at 26,987. Indeed, Plaintiff's declarations recognize that hunting elephants by U.S. citizens in Zimbabwe and Tanzania is still legal. *See* Beardmore Decl., Pl.'s Ex. L at ¶ 24 ("[T]he hunt I paid for is still perfectly legal and absolutely necessary.").

---

*Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) ("It would make little sense for a court to conclude that a plaintiff has shown irreparable harm when the relief sought would not actually remedy that harm."). However, assuming, *arguendo*, that the Court finds that Plaintiff does have standing with respect to Plaintiff's Tanzania-based claims and can order effective relief in response to Plaintiff's Motion for Preliminary Injunction, the following section explains why Plaintiff has not demonstrated irreparable harm such that a preliminary injunction may be granted.

[10] Plaintiff also claims that it will be irreparably harmed by the findings. Pl.'s Br. at 28. However, Plaintiff's allegations are even more speculative than those of its members. The allegations fail to demonstrate how SCI as an organization will be harmed by the findings separate and apart from the alleged harm to its members. Therefore, alleged harm to SCI cannot support a preliminary injunction.

[11] While hunting season in Zimbabwe is currently underway, it does not begin in Tanzania until July. Therefore, no Tanzania hunters presently have been affected by the findings.

Although two of Plaintiff's members cannot presently import trophies taken after April 4, 2014, these members have not suffered irreparable harm. If the Service determines that it can make an enhancement finding for Zimbabwe for 2014, these hunters will be able to import their trophies. The Federal Register Notice published by the Service makes this clear:  "it is possible that a hunter that hunted in Zimbabwe and took an elephant after April 4 could import his or her trophy at a later date if the Service can determine in the final finding that imports meet the criteria under the ESA." 79 Fed. Reg. at 26,987. If this Court overturns the findings, any harm suffered by those declarants who have killed an elephant but have been unable to import a trophy can be rectified and, therefore, is not irreparable.[12] Thus, the alleged harm is not irreparable because it can be rectified at a later time. *See Chaplaincy*, 454 F.3d at 298 (alleged harm cannot be irreparable if relief is available after a determination on the merits; harm must be "beyond remediation"); *Wisc. Gas*, 758 F.2d at 674 (same).

The declarations of the two members demonstrate that any harm they have suffered by being unable to import a trophy at the present time is not irreparable. Michael Grieb and Thomas Whaley were in Zimbabwe when the findings were issued. Grieb Decl., Pl.'s Ex. U at ¶ 7; Whaley Decl., Pl.'s Ex. FF at ¶ 10. Both killed an elephant during their hunt. *Id.* Mr. Grieb hunted from March 30 until April 14 and killed an elephant on April 7. Grieb Decl., Pl.'s Ex. U at ¶ 7. He is currently storing his elephant in Zimbabwe. *Id.* at ¶ 7. Similarly, Mr. Whaley hunted from April 1 until April 24. Whaley Decl., Pl.'s Ex. FF at ¶ 10. He killed an elephant and is storing the skin and the tusks in Zimbabwe. *Id.* at ¶ 15.[13] Neither Mr. Grieb nor Mr. Whaley has

---

[12]  It can take months after an elephant has been taken before the trophy is ready to be imported in the U.S.  Van Norman Decl. ¶ 17.

[13]  Mr. Whaley's declaration fails to indicate when he killed the elephant. If he did so before April 4, he will be able to import his trophy into the United States. Pl.'s Ex. D at 1.

indicated when their trophies will be ready for importation. If this Court overturns the Zimbabwe enhancement finding or the Service is able to make a positive enhancement finding for Zimbabwe for 2014, Mr. Greib and Mr. Whaley can import their trophies at that time.

Plaintiff also claims that its other members that have hunting trips planned to Tanzania and Zimbabwe will suffer harm because the inability to bring back a trophy affects these members' desire to hunt or will lessen their pleasure from the hunt. As demonstrated by Plaintiff's numerous declarations, the findings made by the Service actually have not deterred hunters from their plans to hunt in Zimbabwe and Tanzania. Many of the hunters that submitted declarations have gone or plan to go on their hunts as scheduled. For example, Scott Dinger planned an elephant hunt in Zimbabwe for April 18 through April 28. Dinger Decl., Pl.'s Ex. EE at ¶ 8. The findings were issued prior to his departure. He still hunted and indicated that "[e]ven though I will not be able to import my trophy, I will at least have the memories of the hunt, and I will have done my part to promote the survival of the species." *Id.* at ¶¶ 8, 14. Similarly, prior to the findings, Martin Vick planned to hunt elephants in Zimbabwe from April 16 to May 4. Vick Decl., Pl.'s Ex. II at ¶ 9. He stated, "[e]ven though I will not be able to import the trophies, I am still going on my elephant hunt this month . . . ." *Id.* at ¶ 17. Mr. Vick further stated that, "[t]o me, it is not entirely about bringing home the trophies. I enjoy the hunt and value being part of the effort to conserve elephants." *Id.* at ¶ 17. Richard Netzley is scheduled for an elephant hunt in June in Zimbabwe. Netzley Decl., Pl.'s Ex. Z at ¶ 9. He stated that he will still hunt: "[a]lthough I will be deprived of an important aspect of my experience, I will be doing my best to support the protection of the elephant population in Zimbabwe . . . ." *Id.* at ¶ 10. *See also* Rhyne Decl., Pl.'s Ex. BB at ¶ 7 (went on elephant hunt in Zimbabwe in April 2014); Cheek Decl., Pl.'s Ex. N at ¶

13 (will go on hunt in July 2014). Therefore, Plaintiff has not shown that the desire to hunt will be significantly affected or that the hunters will not value their experience.

Several declarations submitted by Plaintiff simply allege that the hunter *may* cancel his hunt or that he is unsure about what to do. *See, e.g.*, Rawson Decl., Pl.'s Ex. P at ¶ 17 ("I *may attempt to cancel*"); Buch Decl., Pl.'s Ex. T at ¶ 17 ("I *am not sure* what to do at this point."); Condon Decl., Pl.'s Ex. V at ¶ 20 ("I *will likely* cancel my hunt."); Nice Decl., Pl.'s Ex. W at ¶ 11 ("*may decide* to cancel"); Johnson Decl., Pl.'s Ex. VV at ¶ 12 ("I am *considering cancelling* my hunt."); Taylor Decl., Pl.'s Ex. DD at ¶ 19 ("I am *still considering* my options with my outfitter."); McDonnold Decl., Pl.'s Ex. JJ at ¶ 8 ("I *do not know* if I will continue with my hunt."); Bridges Decl., Pl.'s Ex. CC at par. ¶ 11 ("I have *not yet decided* if I will cancel my 2014 elephant hunt and seek a refund.") (emphasis added for all). However, such speculation of what these declarants may do in the future is not sufficient to form a basis for irreparable harm.

Further, Plaintiff's declarations demonstrate that its members hunt in order to do more than simply bring home a trophy. For example, Robert Rhyne indicated that he hunts for his personal enjoyment, to provide meat to local communities, and to help combat poaching. Rhyne Decl., Pl.'s Ex. BB at ¶ 9; *see also* Dinger Decl., Pl.'s Ex. EE at ¶ 14 (desires to promote the survival of the species); Vick Decl., Pl.'s Ex. II at ¶ 9 (enjoys the hunt and values being part of the effort to conserve elephants); Netzley Decl., Pl.'s Ex. Z at ¶ 10 (wants to support the protection of the elephant population in Zimbabwe). Such sentiments from Plaintiff's members demonstrate that the findings do not deprive them of the benefits they seek from hunting elephants in Zimbabwe and Tanzania.

Moreover, any harm suffered as a result of choices made by Plaintiff's members cannot constitute irreparable harm. *See Lee*, 160 F. Supp. at 33; *Safari Club*, 852 F. Supp. 2d at 123. For

example, a hunter's choice not to go on his hunt cannot constitute irreparable harm. Only two of

Plaintiff's 42 declarants indicated that they have already cancelled their scheduled elephant

hunt.[14] Capozza Decl., Pl.'s Ex. AA at ¶ 10; Holdridge Decl., Pl.'s Ex. R at ¶ 6. Both will still

hunt, but chose to go on a hunt different from the one they originally scheduled. *Id.* Because Mr.

Capozza and Mr. Holdridge are choosing not to hunt elephants as they originally had planned,

any harm they may suffer from their choice cannot constitute irreparable harm. And any

reduction in value to the other hunters that choose to continue with their planned hunts to

Zimbabwe or Tanzania, aware that they may not be able to import any trophy, is self-inflicted,[15]

not irreparable harm sufficient to warrant a preliminary injunction.

### 2. Plaintiff's Alleged Economic Harm is Speculative and Not Irreparable.

Plaintiff's allegations of economic harm similarly are insufficient to support preliminary

injunctive relief, because Plaintiff has not shown that any economic harm its members may

suffer as a result of the Service's decisions is "certain and great" and "actual and not theoretical."

*Wisc. Gas,* 758 F.2d at 674 (It is well-settled that economic loss alone will rarely constitute

irreparable harm, unless it is "certain and great" and "actual and not theoretical."); *Mylan*

*Pharm., Inc. v. Shalala,* 81 F. Supp. 2d 30, 42–43 (D.D.C. 2000) (observing that "[c]ourts within

the Circuit have generally been hesitant to award injunctive relief based on assertions about lost

---

[14]  One other declarant has stated he will cancel, but has not shown what efforts he has made to do so. Tarpley Decl., Pl.'s Ex. TT at ¶ 7.

[15]  None of Plaintiff's declarants have shown that they cannot reschedule their hunt to another country from which they could import an elephant trophy. One of Plaintiff's declarants merely indicates that "[a]lthough elephant importation remains open for hunting in other countries, it is likely that the prices for these hunts will escalate due to the increased demand for these hunts." Rawson Decl., Pl.'s Ex. P at ¶ 18. This statement is too vague and lacks any details showing that rescheduling hunts to another country is not a viable option.

opportunities and market share"). Indeed, even if the economic harm could be substantial, economic harm constitutes irreparable harm only if it is so great as to threaten the plaintiff's "very existence." *RCM Technologies, Inc. v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 2d 39, 47 (D.D.C. 2009) ("Although the Court appreciates that the economic harm realized by plaintiffs like RCM on account of CIS's alleged policy could be substantial, the Court is not persuaded that the economic harm will be so great as to threaten RCM's 'very existence.'"); *Am. Meat Inst.*, 968 F. Supp. 2d at 75-76 (*citing Coal. for Common Sense*, 576 F. Supp. 2d at 168) ("To successfully shoehorn potential economic loss into a showing of irreparable harm, a plaintiff must establish that the economic harm is so severe as to 'cause extreme hardship to the business' or threaten its very existence.")), *aff'd*, 13-5281, 2014 WL 1257959 (D.C. Cir. Mar. 28, 2014). Even if a plaintiff asserts unrecoverable economic losses, "[t]he injury must be more than simply irretrievable; it must also be serious in terms of its effect on the plaintiff." *Gulf Oil Corp. v. Dep't of Energy,* 514 F. Supp. 1019, 1026 (D.D.C. 1981).

### a.     The Declarant-Hunters Will Not Suffer Irreparable Harm Based on Economic Loss.

Plaintiff submits many declarations from hunters who testify about their plans for hunting trips to Tanzania and Zimbabwe. Plaintiff claims its members already have made expenditures in 2014 and speculate that they may be unable to obtain refunds if they decide to cancel their planned hunts. In analyzing these claims of economic harm, it is important to differentiate what actions the Service did and did not take with respect to sport-hunted elephant trophies from Tanzania and Zimbabwe.

First, the Service did not enjoin the elephant hunting season in Tanzania or Zimbabwe or prevent U.S. hunters from traveling to those countries to hunt elephants. Second, the Service has not prevented sport-hunting outfitters from offering elephant hunting expeditions in Tanzania or

Zimbabwe. Third, it has not prevented anyone from legally killing elephants, skinning those elephants, curing the skin, or using taxidermy services to preserve an elephant trophy.

There is no evidence in Plaintiff's declarations that the potential inability to import a sport-hunted trophy (if the declarant is successful in his elephant hunt) has caused irreparable, substantial financial harm. Instead, the declarations reveal that several hunters have already proceeded with their hunts or plan to do so. *See, e.g.*, Dinger Decl., Pl.'s Ex. EE at ¶ 14; Vick Decl., Ex. II at ¶¶ 16-18. And, while many of Plaintiff's declarants are deciding whether to cancel their own elephant hunts purportedly because of the Service's "ban" on the importation of African elephants from Tanzania or Zimbabwe, the potential economic harm from unrefundable fees for these voluntarily cancelled hunting trips is not an economic harm caused by the Service, and therefore is insufficient to justify allegations of irreparable harm. As noted above, self-inflicted injury in the form of cancelling a hunt is insufficient to support a claim of irreparable harm. *Lee*, 160 F. Supp. 2d at 33. Moreover, this potential economic harm is based on the declarants' uncertainty about their own actions or those of outfitters or African governments. *See, e.g.*, Didado Decl., Pl.'s Ex. M at ¶¶ 12-13 (explaining that he has not yet decided to cancel his hunt); Condon Decl., Pl.'s Ex. V at ¶¶ 19-20 (unsure whether he will cancel, unsure whether travel insurance will refund trip if cancelled, and speculates about the cost of cancelling); Johnson Decl., Pl.'s Ex. VV at ¶ 13 ("I have not discussed the trophy importation ban with my outfitter yet. Some of the money spent on airfare is non-refundable. … All of these hunts are now in limbo and may be cancelled due to the trophy importation ban imposed by the U.S. Fish and Wildlife Service."). Speculation about third parties' actions is also insufficient to support a claim of irreparable economic harm. *See Am. Meat Inst.*, 968 F. Supp. 2d at 77 ("As Defendants rightly argue, 'bare allegations and fears about what *may* happen in the future' … are not

31

sufficient to support a claim of irreparable injury"); *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989) (court can reject as "overly speculative those ... [allegations] which are predictions of future events (especially future actions to be taken by third parties) ...").

Finally, even those hunters who have taken steps toward cancelling their own hunts have not provided any substantial and concrete evidence of the costs they allegedly will incur. For example, Plaintiff's declarants do not quantify the economic losses they could suffer by cancelling these hunts, or address whether these possible economic losses are covered by insurance, or explain whether some of the non-refundable fees will be used towards other hunting trips. *See, e.g.*, Holridge Decl., Pl.'s Ex. R at ¶ 6 (explained that he had to change airline and other reservations for an unspecified amount and was able to use his deposit toward a different hunt); Capozza Decl., Pl.'s Ex. AA at ¶¶ 10, 19, 20 (cancelled his trip, but was able to rebook another one and does not provide any estimate of financial loss and does not say that he lost any money); Perry Decl., Pl.'s Ex. GG at ¶ 9 (claiming that it "appears I am going to lose at least $10,000 of the original deposit that went to securing the elephant hunt," but he is still trying to apply his deposit to hunts of other animals and does not provide evidence of any concrete financial loss). These information gaps provide further reasons that Plaintiff's claims of economic harm are insufficient to demonstrate irreparable harm. For economic harm to constitute irreparable injury, the plaintiff must "adequately describe and quantify the level of harm its members face." *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 336 (D.D.C. 2012) (*quoting Nat'l Ass'n of Mortgage Brokers v. Bd. Of Governors of Fed. Reserve Sys.,* 773 F. Supp. 2d 151, 181 (D.D.C. 2011)).

For all these reasons, Plaintiff's hunter-declarants' claims of economic harm fail to establish irreparable harm sufficient to justify its request for a preliminary injunction.

**b.      Hunting Outfitters Will Not Suffer Irreparable Financial Loss
from the Findings.**

Similarly, Plaintiff's outfitter declarants claim that they will lose money because hunters
are considering cancelling hunts, but they do not provide evidence of actual, immediate, and
substantial losses. Therefore, these speculative allegations are likewise insufficient. *See, e.g.*,
Pole Decl., Pl.'s Ex. LL at ¶¶ 11, 13 (claiming that he will lose over $300,000 if all planned
hunts are cancelled, but it does not appear the hunts have been cancelled); Oosterhuis Decl., Pl.'s
Ex. MM at ¶¶ 14-15 (explaining that he has tried to cancel his own clients' hunts, but cannot
receive refunds from the government and that his firm is contemplating issuing its own refunds);
Carter Decl., Pl.'s Ex. NN at ¶¶ 18-19 (explaining that he has "lost" several hunts booked in the
next several years, but not providing any estimate of financial loss); Barth Decl., Pl.'s Ex. OO at
¶ 13 (explaining that three hunters have cancelled hunts since the import "ban," and expressing
unsubstantiated fears that the "ban will ultimately destroy my business if not revoked"); Pieters
Decl., Pl.'s Ex. PP at ¶ 17 (providing no concrete, substantial figure of financial loss or any
evidence of a cancelled hunt for which he can find no replacement); Cooke Decl., Pl.'s Ex. QQ
at ¶ 17 (speculating that the import "ban" will hurt his business because "[f]or 2014, I will have
[] elephant hunts on my hands that U.S. hunters will not want" and similarly for 2015 and 2016,
but not averring that he could not resell the hunts); Duckworth Decl., Pl.'s Ex. RR at ¶¶ 14-15
(providing no evidence that U.S. hunters have cancelled their hunts); De Vries Decl., Pl.'s Ex.
SS at ¶¶ 14-15 (explaining that 80% of his current hunting clientele is made of U.S. hunters and
that if all those hunters cancelled, he would lose approximately $500,000, but not claiming any
actual loss, beyond an unspecified amount for one hunter who went home mid-hunt); Angelides
Decl., Pl.'s Ex. YY at ¶ 13 (explaining "I am not a big elephant outfitter, so the harm to my

personal business will be minimal. However, I am likely not going to pursue obtaining the rights to hunt in a new area for elephants, and my business will not grow.").

These claims of economic harm are insufficient to establish irreparable harm for many of the same reasons as those of the individual hunters. First, based on the declarations from individual hunters, it appears that most hunters have still not cancelled their trips and several are planning to continue with their hunting plans, so the outfitters' claims of cancellations are speculative and likely exaggerated. Second, any claims of economic harm from U.S. cancellations are overstated to the extent that, as the outfitters note, if U.S. hunters decide to cancel their own hunts, the outfitters will seek clients from other markets, *see infra*, including in the east, where, as one outfitter explained, hunting demand is strong. Cooke Decl., Pl.'s Ex. QQ at ¶ 18. Third, any potential financial loss to outfitters is caused by the voluntary actions of third parties who cancel their own hunts—not harm caused by the Service's actions. As noted above, this is insufficient to support irreparable harm. *United Transp. Union*, 891 F.2d at 912. Fourth, even if the outfitters could demonstrate concrete, non-speculative economic loss, they have not provided concrete and specific evidence of losses sufficient to destroy their businesses, which is the standard in the D.C. Circuit. *Am. Meat Inst.*, 852 F. Supp. 2d at 78-79 (explaining that allegations that a company may go out of business must be based on immediate injury and proved with an accounting of the business's assets); *see also Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 n.2 (D.C. Cir. 1977). While the declarants have speculated that they may face significant economic loss, they have not demonstrated that the existence of their businesses is imperiled by any voluntary actions on the part of hunters, let alone by any actions of the Service.

Likewise, Plaintiff's claim that the Service's decisions will somehow cause the prices of hunts to fall is pure speculation and, moreover, is not entitled to significant weight as it is improper expert testimony. *See* Fed. R. Evid. 702. For example, Mr. Whaley, a hunter, states that the findings "will cause the prices of hunts to fall in both Zimbabwe and Tanzania. U.S. citizens will either cancel or not book hunts for these countries or will pay less for hunts from which they cannot import their [trophies]." Whaley Decl., Pl.'s Ex. FF at ¶ 19. Mr. Whaley provides no basis for his claims. In fact, his claims are contrary to the other declarations submitted by Plaintiff, which show that no one has attempted to cancel his hunt without actively trying to reschedule another hunt. Capozza Decl., Pl.'s Ex. AA at ¶¶ 10, 19, 20; Perry Decl., Pl.'s Ex. GG at ¶ 9; Holridge Decl., Pl.'s Ex. R at ¶ 6. Moreover, other outfitters have noted that Russia and China are good markets for selling hunts, and therefore, they will attempt to resell them. Cooke Decl., Pl.'s Ex. QQ at ¶ 18. Plaintiff itself contends that the Service's actions will have no impact on the number of elephant hunters. Pl.'s Br. at 21 n.7. Additionally, whatever price decreases may occur do not *directly* flow from the Service's actions and are, therefore, insufficient to demonstrate irreparable harm. *See also Am. Meat Inst.*, 968 F. Supp. 2d at 80-81 (finding irreparable harm allegations based on "independent market variables" and how customers "might react" insufficient because they do not prove direct harm from the agency's actions). For all these reasons, Plaintiff's outfitters' claims of economic harm fail to establish irreparable harm sufficient to justify its request for a preliminary injunction.

### 3.     The Alleged Harm to Plaintiff's Conservation Interest in African Elephants in Tanzania and Zimbabwe is Not Irreparable.

Plaintiff next tries to show that maintaining the Service's findings for Tanzanian and Zimbabwean elephants until this case can be decided will impair the species' conservation. Pl.'s Br. at 18-20, 22-25, 26. Or more properly, Plaintiff alleges that allowing the findings to remain

in place will injure their interest in these species (since Article III remedies must redress an "injury to the plaintiff," not an "injury to the environment."). *See Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180-81 (2000). However, Plaintiff has not demonstrated harm that is certain, great, and irreparable. Instead, Plaintiff's allegations of harm to elephant conservation are speculative, any harm is self-inflicted, and any harm is remediable.

Plaintiff's members claim that their interest in conserving elephants will be harmed by the Service's decisions because legal sport-hunting deters poachers, increases local tolerance for elephants, and directly funds elephant conservation efforts through hunting fees. Many of Plaintiff's declarants make bald allegations, unsupported by any evidence whatsoever. For example, one declarant says "*I believe* that the presence of legal hunters in Zimbabwe and Tanzania is a deterrent to poaching in these areas." Holdridge Decl., Pl.'s Ex. R. at ¶ 7 (emphasis added). Other declarants similarly allege that funding to support anti-poaching efforts and local communities will dry up as a result of the Service's decisions, but these allegations are based on hearsay and the declarants have no personal knowledge of any actual funding. *See*, *e.g.*, Didado Decl., Pl.'s Ex. M at ¶ 7 (told that poachers are less active when outfitters and hunters are in the concessions); Sakuta Decl., Pl.'s Ex. WW at ¶ 8 (told that people in Tanzania know that the suspension is bad for elephant conservation). Such speculative allegations are insufficient to show irreparable harm. *Chaplaincy*, 454 F.3d at 297-298 (D.C. Cir. 2006) ("injury 'must be both certain and great; it must be actual and not theoretical'") (*quoting Wisc. Gas*, 758 F.2d at 674). These allegations are further undermined by the fact that only two of the many declarants has actually cancelled his hunting trip, and therefore there is no indication that there will be significantly fewer hunters in the field or less money spent on conservation efforts. Capozza

Decl., Pl.'s Ex. AA at ¶ 10; Holdridge Decl., Pl.'s Ex. R at ¶ 6;[16] *but see* Beardmore Decl., Pl.'s Ex. L at ¶ 24 ("I refuse to seek refunds); Netzley Decl., Pl.'s Ex. Z at ¶ 10 ("I will still hunt elephant"); Cheek Decl., Pl.'s Ex. N at ¶ 13 ("I am prepared to go forward with the hunt"); Vick Decl., Ex. II at ¶ 17 ("I am still going on my elephant hunt").

Even the safari outfitter and guide declarants that may have personal knowledge of some of the funding that supports elephant conservation in Tanzania and Zimbabwe are speculating as to the impact of the Service's decisions on conservation in these countries. Many of these declarants acknowledge that hunters from other countries may fill any slots vacated by U.S. hunters that may choose to cancel their hunts if they are unable to import an elephant trophy. Pole Decl., Pl.'s Ex. LL at ¶ 13 ("We will attempt to sell our elephant hunts to non-U.S. hunters if necessary."); Peiters Decl., Pl.'s Ex. PP at ¶ 17 ("Businesses like mine will attempt to sell cancelled or unsold elephant hunts to non-U.S. hunters."); Cooke Decl., Pl.'s Ex. QQ at ¶ 18 ("I will have to try to sell these hunts to citizens of other countries."); Duckworth Decl., Pl.'s Ex. RR at ¶ 15 ("We will obviously attempt to sell the elephant hunts to non-U.S. hunters."); De Vries Decl., Pl.'s Ex. SS at ¶ 14 ("We will now have to market in other countries."). If there is not a drop in the number of hunters, any deterrent effect of hunters in the field will be maintained, as will the amount of meat available to the local communities. In addition, while some declarants allege that non-U.S. hunters will pay less for hunts, meaning less money to elephant conservation, these allegations are unsupported and, as noted above, not necessarily based on any actual cancellations by U.S. hunters.

---

[16] As noted above, one other declarant has indicated an intent to cancel, but has not shown what efforts he has made to do so. Tarpley Decl., Pl.'s Ex. TT at ¶ 7. Moreover, all three declarants have stated that they intend to hunt other animals instead of elephants and so they also may be in the field, which under their theory of hunting-as-conservation, will allow them to deter poachers.

Moreover, Plaintiff's allegations of harm to elephant conservation are contradicted by the information available to the Service.[17] In the enhancement finding for Tanzania, the Service explained that Tanzania's Wildlife Management Areas "have a low capacity for generating income for socio-economic development, and as such, do not provide an incentive to local communities to support or even tolerate wildlife as a potential source of renewable revenue." Pl.'s Ex. J at 8. The Service also explained that the country's Wildlife Division, which is responsible for the management and protection of Game Reserves, is inadequately funded and has not been able to meet its obligations, including anti-poaching efforts. *Id.* at 9. In addition, the Service concluded that while hunters and the Service believe that funds generated from license fees are being used for conservation purposes, "if … only a limited portion of these funds are actually utilized for conservation, it raises further concerns that U.S. hunters are not actually contributing the level of conservation funding they are led to believe." *Id.* at 9-10.

In addition to being speculative, Plaintiff's hunter members' alleged harm to their conservation interest in elephants is also self-inflicted. The Service has reiterated that its decisions have no impact on anyone's ability to continue to hunt elephants in Tanzania and Zimbabwe. 79 Fed. Reg. at 26,987. Thus, to the extent that hunters cancel hunts or fail to book hunts to these countries because of an inability to import their trophies, that is the hunters' choice and any resulting impact to elephant conservation is based on those choices. The courts will not grant an injunction to protect Plaintiff from its members' own decisions because no litigant "can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam). The D.C. Circuit has consistently held that such "self-inflicted harm doesn't satisfy the basic requirements for standing": it "does not amount to an

---

[17] The allegations are also contradictory.  One outfitter notes that Botswana is experiencing an overpopulation of elephants despite its hunting ban. Carter Decl., Pl.'s Ex. NN at ¶ 13.

'injury' cognizable under Article III" and, even if it did, "it would not be fairly traceable to the defendant's challenged conduct." *Nat'l Family Planning & Reprod. Health Ass'n v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (citations omitted). Similarly, the law is "well-settled that '[a] preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted." *Lee*, 160 F. Supp. 2d at 33 (citations omitted).

Plaintiff's members decisions not to obtain a permit required by law also does not constitute irreparable harm. *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003) ("If the license can be had, then the lack of an injunction does not lead to irreparable harm. Injury caused by failure to secure a readily available license is self-inflicted, and self-inflicted wounds are not irreparable injury."); *see also Kaplan v. Board of Educ.*, 759 F.2d 256, 259 (2d Cir. 1985) (holding that plaintiff board members' threat to "resign or face dismissal rather than comply with the [challenged] regulation" did not constitute irreparable harm necessary to enjoin the regulation); *Safari Club Int'l*, 852 F. Supp. 2d at 123 (finding that harm was not irreparable where plaintiff's declarants chose not to apply for permits that would have allowed them to continue their activities related to captive members of three African antelope species). Because none of Plaintiff's declarants has even applied for the required permits to import elephant trophies from Tanzania, they should not be heard to complain that their hunting or conservation interests are "irreparably harmed" by the Tanzania findings. The Service has stated that it will consider each permit application on a case-by-case basis. Van Norman Decl. at ¶ 21. If there is information to support allowing importation of sport-hunted elephant trophies from Tanzania to continue, then its members should provide that information to the Service in the context of a permit application.

Finally, to the extent Plaintiff's members will suffer any harm to their conservation interests, that harm is not "beyond remediation." *Chaplaincy*, 454 F.3d at 297. Plaintiff's declarants allege no harm to conservation that rises above the purely speculative; however, to the extent such harm is alleged, Plaintiff's declarants also offer no timeframe within which the harm is proposed to occur. None of the declarants assert that the alleged ban or suspension on imports of sport-hunted elephant trophies from Zimbabwe and Tanzania will so harm the conservation of these animals that a favorable decision from this Court overturning the findings would not be able to cure it. The possibility that adequate corrective relief is available at a later date weighs heavily against Plaintiff's claim of irreparable harm. *Chaplaincy*, 454 F.3d 297-98.

## <u>CONCLUSION</u>

For the foregoing reasons and based on attached exhibits, Federal Defendants respectfully request that the Court grant their Motion to Dismiss. Alternatively, Federal Defendants respectfully request that the Court deny Plaintiff's Motion for Preliminary Injunction.

Dated: May 13, 2014                    Respectfully submitted,

ROBERT G. DREHER,
Acting Assistant Attorney General
SETH M. BARSKY, Chief
KRISTEN L. GUSTAFSON, Assistant Chief

_____*/s/ Meredith L. Flax*_____
MEREDITH L. FLAX, Senior Trial Attorney
(D.C. Bar No. 468016)
CHRISTINE HILL, Trial Attorney
(D.C. Bar No. 461048)
ANDREA GELATT, Trial Attorney
(Cal. Bar. No. 262617)
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station
P.O. Box 7611

Washington, DC 20044-7611
Phone: (202) 305-0404
Fax: (202) 305-0275
meredith.flax@usdoj.gov

**_Counsel for Federal Defendants_**

<u>Of Counsel</u>:
Holly Wheeler
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.