# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **Safari Club International,**<br><br>Plaintiff,<br><br>v.<br><br>**S.M.R. Jewell,** in her official capacity as Secretary of the United States Department of Interior, et al.,<br><br>Defendants. | Case No. 14-cv-00670-ABJ |

## DECLARATION OF TIMOTHY J. VAN NORMAN

I, Timothy J. Van Norman, hereby declare as follows:

1.  I am the Chief, Branch of Permits, the Division of Management Authority (DMA), of the United States Fish and Wildlife Service (FWS). As Chief, Branch of Permits, I am responsible to the FWS Director for the issuance of permits and certificates to import, export, and re-export species that are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES) and by various other wildlife conservation laws, including the Endangered Species Act (ESA).

2.  The African elephant *(Loxodonta africana)* is listed under the ESA as a threatened species (50 CFR § 17.11(h)) with a special rule (50 CFR § 17.40(e)) issued under the authority of ESA Section 4(d), 16 U.S.C. § 1533(d). As relevant here, the special rule

1

contains four conditions that must be met before the import of sport-hunted trophies is allowed in the United States. One of the four conditions is that FWS must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species (Enhancement Finding); 50 CFR § 17.40(e)(3)(iii)(C). The Branch of Permits is responsible under the ESA special rule for African elephants, for authorizing the import of sport-hunted elephant trophies by making the Enhancement Findings.

3. In evaluating whether sport hunting of an elephant from a particular country contributes to the enhancement of African elephants, my office looks at a number of factors. We evaluate whether the country has a current national or regional management plan and if the country has the resources and political will to enact the plan. We review the plans to determine if they have clear, achievable objectives. We look at which government entities implement the plan and how often is it reviewed and updated. We also look at whether the plan incorporates an adaptive management approach so that enacting agencies can quickly respond to changing environmental or social issues.

4. We also evaluate the status of the elephant population in that country and trends over time. In particular, we are interested in population numbers, sex and age-class distribution, and mortality rates (both natural and human-induced). We look to determine if there are standardized surveys being conducted and, if so, the timing, census methodology, and coverage of those surveys. Since elephant populations can move across international borders, we look to see what level of cooperation there is between neighboring countries in management and surveying efforts for shared populations. We also evaluate how poaching is accounted for within survey efforts.

5. As with any wildlife species, the policies on how a country's central and regional governments address management efforts, human-elephant conflicts, poaching, and sport hunting greatly affect the long-term survival of elephant populations. While recognizing that there may be limited resources available for elephant management, we consider what national policies are in place to address human-elephant conflicts and problem elephant control. We are interested in policies on culling surplus animals and removal of nuisance animals. We look at what other offtakes may be occurring, such as domestic harvesting of elephants for local consumption or use. We also look at the amount of protected area that is either set aside for elephants or managed for elephant populations and the level of protection provided. All of these are relevant to being able to assess whether the additional removal of elephants for sport hunting and associated import of trophies will enhance the survival of the species.

6. Finally, we consider how sport hunting has been incorporated into the country's national/regional management strategies and the effectiveness of implementing hunting programs. We look at whether the hunting program generates revenue for use in elephant management efforts or if it goes to a general treasury fund. We evaluate if sport hunting provides a benefit to local communities through employment, community development projects, or other avenues. We assess how hunting quotas are established and distributed. We also look to land tenure issues to determine if concession areas, areas managed by regional or national government, are tendered in a manner that would foster long-term sustainability of elephant populations.

7. African elephants in Tanzania are listed in Appendix I of CITES. In accordance with Article III of the CITES Treaty, a CITES export permit must be issued by the

CITES Management Authority of the exporting country and a CITES import permit must be issued by the CITES Management Authority of the importing country. In order to issue a CITES export permit for a sport-hunted trophy, the Tanzanian CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the CITES Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the CITES Management Authority must find that the specimen was not obtained in contravention of the laws of the exporting country (i.e., was legally acquired). To issue the corresponding CITES import permit for a trophy to be imported into the United States, the U.S. CITES Scientific Authority, FWS's Division of Scientific Authority (DSA), would need to make a finding that the import was for purposes that are not detrimental to the species. The U.S. CITES Management Authority, my office, would have to make a finding that the import was not for primarily commercial purposes.

8. In addition, to authorize the import from Tanzania under the ESA, my office would have to make the required Enhancement Finding.

9. In the case of imports of sport-hunted elephant trophies taken in Tanzania during the 2014 hunting season, DSA advised my office that it was not able to make the required non-detriment finding under CITES (please see the declaration submitted by Dr. Rosemarie Gnam on May 13, 2014, for additional information).

10. While my office was able to make a finding under CITES that the import of a personally hunted elephant trophy from Tanzania by a U.S. citizen or resident would not be for primarily commercial purposes, I was not able to make a positive Enhancement

4

Finding under the ESA. Please refer to the March 27, 2014, Enhancement Finding for the agency's specific rationale.

11.     The March 27, 2014, Enhancement Finding is valid only for elephants taken in the 2014 Tanzania hunting season, which begins in July. It does not replace the previous positive enhancement finding, made on May 6, 1997, which is still applicable to any elephant taken in Tanzania before the 2014 hunting season. While I believe we have made an effort to obtain all relevant information and data before making this finding, it is possible that additional information that was not available to us at the time the finding was made will become available. If such information does become available, my office would evaluate the data to determine if the March 27, 2014, finding should be amended or replaced.

12.     Regardless of whether the March 27, 2014, finding is amended or replaced based on new information, my office will make a new enhancement finding that would cover the 2015 Tanzania elephant hunting season.

13.     Since Tanzanian elephants are listed as Appendix-I specimens under CITES and therefore require a U.S. import permit to be legally imported into the United States, the FWS has established a permit application process whereby individuals wishing to import a sport-hunted trophy are required to submit an "Import of Sport-hunted Trophies of Southern African Leopard, African Elephant, and Namibian Southern White Rhinceros" application, form 3-200-19, to my office for consideration. Once received, information about the applicant, the activity that they are requesting to carry out (in this case, import of a trophy), and the species of trophy would be entered into the FWS's Servicewide Permit Information and Tracking System (SPITS), the computer system used by my

5

office to track and finalize all applications submitted to DMA. The application would be assigned to one of my staff for processing, which consists of reviewing the submitted information and other available information to determine whether the applicant has met all of the issuance criteria under CITES, that are the responsibility of the U.S. Management Authority, and the conditions of the special rule under the ESA.

14. For several species listed under CITES and the ESA, DSA and my office each may make a single finding that would apply to all applications received within a given time period for given activities that are otherwise prohibited under the ESA or CITES. These findings, called either general advices or findings, would be used for any applications that are received requesting to engage in the given activity. This is the case with elephant trophy imports from Tanzania. These findings would apply to any application that is received by FWS in which authorization is requested to import a sport-hunted elephant trophy taken in Tanzania during the 2014 hunting season. At the time the March 27, 2014, Enhancement Finding was made for Tanzania, my office had received three applications from U.S. hunters requesting authorization to import a sport-hunted elephant trophy from Tanzania that was planned to be hunted in 2014. On April 21, 2014, a fourth application to import an elephant trophy from Tanzania that was planned to be hunted in 2014 was received by my office. It is not unusual for U.S. hunters to apply well before they travel to Africa to hunt to request the required import permit from my office. By applying before traveling, the hunter can, in many cases, make adjustments to their hunting trip, if desired, based on the FWS determination on whether a permit can be issued.

15.     None of these applicants provided any additional information or any information that my office or DSA had not already considered. Therefore, based on the finding produced by DSA and the Enhancement Finding made by my office, we denied two of the applications on April 4, 2014, and one on May 7, 2014. The fourth application was denied on May 12, 2014.

16.     CITES import permits are valid for one year. An import must be completed (i.e., cleared by FWS wildlife inspectors at the port of import) before the permit expires. If a permit expires before it can be used, the permittee could request that the permit be reissued for an additional one year. Reissuance of a permit, however, can only be authorized if the activity remains the same and the import has not already occurred. Therefore, a U.S. hunter that successfully hunted an elephant in 2012, but was unable to import the trophy within a year of receiving the import permit, could request that the permit be reissued. However, a U.S. hunter who applied for an import permit in 2012, but was not successful in hunting an elephant in that year, could not have the 2012 permit reissued.

17.     Approximately 25% of all trophy import permits issued by my office in the last 4 years were renewed after the permit expired. Since import permits are valid for one year, it is clear that at least 25% of U.S. hunters that had received an import permit were unable to import the trophy within one year of obtaining the import permit.

18.     As identified in the FWS regulations on permitting (50 CFR part 13), when an application is denied, the applicant is sent a letter identifying why the application was denied and notifying the applicant that they have the option to have the decision reconsidered by the Chief, Division of Management Authority. The applicant is informed

that the request for reconsideration must be submitted within 45 days of the date of the FWS's denial letter. Further, the applicant is instructed that if my office misunderstood or misinterpreted the information that was provided with the application, the applicant could clarify the information.

19. Once the Service receives a request for reconsideration, my office would review any additional or clarifying information. If the original denial involved a negative finding from DSA, the request for reconsideration would be provided to DSA as well. Once my office, and DSA if appropriate, has reviewed the request, we would formulate a recommendation on whether the original denial should be overturned or upheld. This recommendation, along with all application material, is provided to the Chief of the Division of Management Authority for consideration. If our recommendation is to overturn the original denial and/or the Division Chief believes that the original denial should be overturned, my office would issue the required import permit. If the Division Chief supports the original denial, a second letter is sent to the applicant informing them that their request for reconsideration has been denied. The applicant is again given 45 days to appeal the decision to the FWS Director.

20. Once FWS receives an appeal request for an application that was denied at reconsideration, my office, along with DSA if appropriate, would formulate a recommendation that would be provided to the Director for consideration. If the Director decides to overturn the previous denial decisions, my office would issue the required permit. If the Director upholds the previous denials, a letter would be sent to the applicant informing them of the final Agency decision to deny their appeal.

21. Despite the suspension and permit denials, individual permit applications under both CITES and the ESA to import sport-hunted elephant trophies from Tanzania will be considered on a case by case basis for 2014 and permits will be granted if the applicants can provide evidence that the findings under both laws can be made.

22. Typically, FWS does not make public announcements on the findings made by the DSA or my office. Applications are processed by DMA on a case-by-case basis as they are received. However, in the case of Tanzania elephant trophies, we decided to make a public announcement of our findings so that U.S. hunters would have the most current information, which could be useful when arranging to travel to Tanzania to hunt. The April 4, 2014, announcement informed hunters that while they could still hunt elephants in Tanzania in 2014, FWS was currently unable to making the findings that would allow it to issue permits to import their trophies. FWS also stated that it would make new findings for 2015 or upon receipt of new information that demonstrates an improved situation for elephants in Tanzania. While it is possible that FWS could revise its 2014 findings, such revision would only occur if an applicant, the Government of Tanzania, a non-government organization, or some other person or entity was able to provide additional information that would demonstrate that the import of an elephant trophy taken in Tanzania in 2014 would meet the issuance criteria under the ESA and CITES.

23. African elephant in Zimbabwe are listed in Appendix II of CITES. In accordance with Article IV of the CITES Treaty, a CITES export permit must be issued by the CITES Management Authority of the exporting country, but no CITES import permit is required to be issued by the importing country. In order to issue a CITES export permit

for a sport-hunted trophy, the Zimbabwe CITES Authorities would need to make two findings, in addition to any stricter domestic legislation that might apply to exports: 1) the Scientific Authority must find that the export would not be detrimental to the survival of the species; and 2) the Management Authority must find that the specimen was not obtained in contravention of the laws to the exporting country (i.e., was legally acquired).

24. While no import permit, either under CITES or the ESA, is required, my office must make a finding under the ESA that the killing of the animal whose trophy is intended for import would enhance the survival of the species consistent with the requirements of the special rule. If my office determines that imports of sport-hunted elephant trophies from Zimbabwe do not meet this criterion, imports cannot occur.

25. On April 4, 2014, I signed a finding that stated that, at that time, we could not make the required Enhancement Finding under the ESA and that, until additional information was obtained, no elephant trophies taken during the 2014 season could be imported. On April 17, 2014, the finding was revised to clarify that the finding only applied to elephants taken on or after April 4, 2014. Any elephant taken before April 4, 2014, could be imported under the previous enhancement finding dated July 2, 1997. The April 17, 2014, finding is an interim finding that will be valid until a final finding is made by my office.

26. Under section 9(c)(2) of the ESA, individuals that are importing a threatened species that are also listed in Appendix II of CITES for personal use, and that meet all provisions of CITES, do not need to obtain an ESA import permit. This provision, however, can be overridden by a special rule established under section 4(d) of the ESA.

27.     While the special rule for African elephant does not require the issuance of a permit for the import of an elephant trophy from Zimbabwe, it does state that the FWS must make a finding that the killing of the animal whose trophy is intended for import would enhance the survival of the species.

28.     Therefore, while the FWS does not issue an ESA import permit for Zimbabwe elephant trophy imports, we are required to make a positive enhancement finding. Since there is no permit application process, as there is with Tanzania elephants, we are unable to communicate directly with individual hunters to inform them that, while they could legally hunt a Zimbabwe elephant during the 2014 hunting season, they would be unable to import the trophy if taken after April 4. The most appropriate venue to communicate this information, therefore, would be through a press release and posting on the Service's web page, and direct notice to organizations representing hunters.

29.     On April 4, 2014, the FWS issued a press release and posted a notice on its web page announcing the decision of the interim suspension on imports of sport-hunted elephant trophies from Zimbabwe (the posting was updated after the enhancement finding was revised on April 17). The press release and web posting stated that the suspension would stay in place until the FWS received information that would allow it to make a final determination.

30.     On April 4, 2014, I sent a letter to the Director General of the Zimbabwe Parks and Wildlife Management Authority with a number of questions that would assist DMA to make a final determination on trophy imports. The letter was e-mailed to the Director General and a copy was provided to the U.S. State Department for transmission through the U.S. Embassy in Harare. While I did not receive a confirmation that the Director

11

General received the letter, I did receive communication from the U.S. Embassy in Harare on April 11, 2014, that indicates that the Zimbabwe Parks and Wildlife Management Authority was aware of the interim suspension and was working on a response.

31.    On April 14, via an e-mail from the U.S. Embassy in Harare, I received a letter from the Director General acknowledging the receipt of my letter and stating that his agency was working on a response. On April 17, 2014, again through the U.S. Embassy in Harare, I received several documents from the Director General, including a 32-page response to my April 4 questions. I also received a box of reports and other supporting documentation via the Embassy on May 8, 2014. On May 8, 2014, Matt Eckert, a senior staff member of Safari Club International Foundation, delivered a second box of the same supporting material to my office. The Director General accompanied Mr. Eckert. Mr. Eckert asked if we could meet to discuss the suspension and the responses that the Zimbabwe Parks and Wildlife Management Authority had provided me. Although I had not reviewed the supporting documentation sent through the U.S. Embassy at that time, I agreed to meet with the Director General to discuss the April 17 response from Zimbabwe.

32.    This discussion, lasting approximately 1 ½ hours, consisted primarily of the Director General providing a clarification of statements made in the 32-page response, as well as responding to some questions posed by the Director General to me. The Director General appeared particularly interested in discussing more recent survey data on elephant populations, distribution of elephants within Zimbabwe, and the economic impact the interim suspension would have on the public and private sector within

Zimbabwe. The Director General expressed particular concern over the impact the interim suspension would have on local communities that rely on hunting, particularly elephant hunting, for their livelihoods.

33. I am now reviewing the 32-page response to my April 4 questions, as well as the supporting documentation provided by the Zimbabwe Parks and Wildlife Management Authority. In addition, since the April 4 announcement, I have received a large number of letters and comments, primarily via e-mail, from professional hunter associations in Zimbabwe, individual safari outfitters, and non-government organizations with additional supporting information. It is my intent to review all of this material within the next two weeks in order to make a final determination on whether the April 4 interim suspension should be lifted. There is a possibility that, after reviewing the provided material, I will need to have additional communication with the Director General or his staff to clarify certain information.

34. On May 12, 2014, a notice was published in the **Federal Register** also announcing the interim suspension (79 FR 26987, May 12, 2014).

35. Assuming that subsequent communication with the Zimbabwe Parks and Wildlife Management Authority can be conducted in an expedited manner, I intend to complete a final determination by mid-July at the latest. At that time, another announcement will be made, through both public media and the **Federal Register**, announcing the decision.

36. As stated in the May 12, 2014, **Federal Register** notice, if my office is able to make a positive Enhancement Finding for Zimbabwe for 2014, hunters will be able to import their sport-hunted elephant trophies taken from Zimbabwe after April 4, 2014 at that time.

Pursuant to 28 U.S. C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Arlington, Virginia, on this  13  day of May, 2014.

Timothy J. Van Norman
Chief, Branch of Permits
Division of Management Authority
U.S. Fish and Wildlife Service
Department of the Interior