# Exhibit 3



| Form No. | Estimated number of respondents | Estimated number of responses | Frequency of response | Average hours per response | Total estimated burden |
|---|---|---|---|---|---|
| HUD–52670–A Part 3 .................................................. | .................... | .................... | .................... | 0.125 | |
| HUD–52670–A Part 4 .................................................. | .................... | .................... | .................... | 0.125 | |
| HUD–52670–A Part 5 .................................................. | .................... | .................... | .................... | 0.125 | |
| HUD–52670–A Part 6 .................................................. | .................... | .................... | .................... | 0.125 | |
| Total HUD–Form 52670 .............................................. | 22,731 | 272,772 | Monthly ........... | 1.125 | 306,869 |
| HUD–52671–A .............................................................. | 321 | 3,852 | Monthly ........... | 1.33 | 5,123 |
| HUD–52671–B .............................................................. | 11 | 132 | Monthly ........... | 1.33 | 176 |
| HUD–52671–C .............................................................. | 2,742 | 44,904 | Monthly ........... | 1.33 | 59,722 |
| HUD–52670–D .............................................................. | 38 | 456 | Monthly ........... | 1.33 | 607 |
| HUD–92742 .................................................................. | 12 | 12 | Annually .......... | .50 | 6 |
| HUD–92743a ................................................................ | 12 | 12 | Annually .......... | .25 | 3 |
| Total ...................................................................... | 25,867 | 322,140 | .................... | .................... | 372,506 |

**B. Solicitation of Public Comment**

This notice is soliciting comments from members of the public and affected parties concerning the collection of information described in Section A on the following:

(1) Whether the proposed collection of information is necessary for the proper performance of the functions of the agency, including whether the information will have practical utility;

(2) The accuracy of the agency's estimate of the burden of the proposed collection of information;

(3) Ways to enhance the quality, utility, and clarity of the information to be collected; and

(4) Ways to minimize the burden of the collection of information on those who are to respond; including through the use of appropriate automated collection techniques or other forms of information technology, e.g., permitting electronic submission of responses.

HUD encourages interested parties to submit comment in response to these questions.

**Authority:** Section 3507 of the Paperwork Reduction Act of 1995, 44 U.S.C. Chapter 35.

Dated: May 6, 2014.

**Colette Pollard,**
*Departmental Reports Manager.*
[FR Doc. 2014–10868 Filed 5–9–14; 8:45 am]
**BILLING CODE 4210–67–P**

**DEPARTMENT OF THE INTERIOR**

**Fish and Wildlife Service**

**[FWS–HQ–IA–2014–N086; FXIA16710900000–145–FF09A30000]**

**Interim Suspension of Imports of Elephant Trophies From Zimbabwe**

**AGENCY:** Fish and Wildlife Service, Interior.
**ACTION:** Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies.

**SUMMARY:** On April 4, 2014, the U.S. Fish and Wildlife Service (Service) announced an interim suspension on importation of sport-hunted African elephant trophies taken in Zimbabwe during the 2014 season (on April 17, 2014, the Service revised this finding, primarily to clarify that the suspension applied only to elephants hunted on or after April 4, 2014). The decision to suspend importation of African elephant trophies taken in Zimbabwe was due primarily to the Service having insufficient information on the status of elephants in Zimbabwe and the current management program in Zimbabwe to determine that the killing of the animal whose trophy is intended for import into the United States would enhance the survival of the species.

**DATES:** The temporary suspension described in this document went into effect April 4, 2014, and will remain in effect until we provide further notice.

**ADDRESSES:** Timothy J. Van Norman, Chief, Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service, 4401 North Fairfax Drive, Room 212, Arlington, VA 22203; fax (703) 358–2280; or email *DMAFR@fws.gov*.

**FOR FURTHER INFORMATION CONTACT:** Timothy J. Van Norman, (703) 358–2104 (telephone); (703) 358–2280 (fax); *DMAFR@fws.gov* (email).

**SUPPLEMENTARY INFORMATION:**

**Background**

The African Elephant (*Loxodonta africana*) is listed as threatened under the Endangered Species Act (ESA), 16 U.S.C. 1531 *et seq.,* and is regulated under a special rule found at 50 CFR 17.40(e). The special rule includes specific requirements for the import of sport-hunted trophies, including marking requirements for ivory. Under § 17.40(e)(3)(iii)(C), in order for the U.S. Fish and Wildlife Service (Service) to authorize the import of a sport-hunted elephant trophy, the Service must find that the killing of the animal whose trophy is intended for import into the United States would enhance the survival of the species.

Zimbabwe has had an active elephant hunting program for more than 20 years and imports of elephant trophies into the United States have occurred at least since 1997, when the Zimbabwe elephant population, along with populations in Botswana and Namibia, was downlisted to Appendix II of the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). When the population was downlisted, the Service published a **Federal Register** notice that acknowledged that, as these elephants were classified as an Appendix II population, no U.S. import permit would be required to import trophies. However, we did state that in accordance with the special rule under the ESA, the requirement for an enhancement finding would continue to apply (62 FR 44627, 44633, August 22, 1997). In that **Federal Register** notice, we stated that in making the required enhancement finding for import of sport-hunted trophies, the Service would review the status of the elephant population and the total management program for elephants in each country to ensure the program was promoting the conservation of the species. The notice also stated that the Service would make such findings on a periodic basis upon receipt of new information on the species' population or management. If, based on new information, the conditions of the special rule are no longer met, the Service explained that it would publish a notice in the **Federal Register** of any change.

**Need for Current Data**

Although African elephant conservation issues have received significant attention within CITES over the last 10 or more years, the Service

has limited information on elephant management programs, efforts to control poaching, and the effects of legal hunting in Zimbabwe. While the Service is aware of a 1997 national elephant management plan, we are not aware of any updates to the plan, or whether an adaptive management approach has been taken in implementing the plan. In 2007, the Service sent a letter to the Parks and Wildlife Management Authority of Zimbabwe requesting additional information. While we did receive some information at that time, we have not received any additional updates directly from government officials since that time. Service representatives have met in person with Zimbabwean representatives at various times in the past 6 years, but again, little new or additional information has been obtained. As stated, with African elephants being a prominent species within CITES discussions, the Service has received information through documents produced in association with CITES activities. However, this information has focused more on the ivory trade and poaching, with less about regulatory mechanisms in place that would allow for appropriate management of elephants, sustainable utilization of elephants, and how elephant management is integrated into human communities to reduce human–elephant conflicts and support elephant populations.

According to the International Union for Conservation of Nature *(IUCN) Species Survival Commission, African Elephant Database report ''2013Africa''*, the elephant population in Zimbabwe in 2007 was 84,416, but as of 2013, that population had been reduced to 47,366. However, until very recently, the Government continued to provide population estimates exceeding 100,000 elephants. The summary in the IUCN report indicates that, of recent surveys, only about 1% of the country has been covered by more reliable aerial or ground surveys for population estimates, while about 50% was covered by less accurate sample counts or dung counts. For a substantial portion of the country, no recent surveys have occurred, and most estimates are based on 2001 figures. Even problem areas such as Hwange National Park where poaching appears to have significantly reduced the numbers of elephants do not appear to have been surveyed since 2001.

Several areas that were covered in the current surveys (2006–2010) indicate a substantial decline in the population; whether this decline is related to habitat degradation or poaching is unknown. Figures presented at the 16th Meeting of the Conference of the Parties to CITES in Bangkok, Thailand, March 3–14, 2013, indicates that, from 2002–2011, the number of elephants illegally killed annually increased significantly. While the numbers for 2012 and 2013 are not yet available, the trend would indicate a higher percentage of illegal killings and a population in decline. However, without further information, the Service is unable to determine the reliability of these numbers and what influence such a decline, if accurate, is having on the elephant population and its habitat in Zimbabwe.

The Service recognizes that Zimbabwe has established the Parks and Wild Life Act, as well as other laws and regulations, which provide a strong legal basis for regulating utilization and management of elephants within the country. However, with the limited information available to the Service at the time the decision to suspend imports occurred, it is not clear if resources and governance are adequate to successfully implement and enforce the established regulations. Based on available information, it appears that the Zimbabwe Parks and Wildlife Department receives no funding from the central Zimbabwean Government and must rely primarily on hunting revenues. A 2013 CITES Panel of Experts raised concerns as to the status of the Zimbabwe Parks and Wildlife Department relating to its weak financial base, lack of management skills, inadequate and old equipment, and poor infrastructure. However, the Service has little information as to funding levels or the available financial base, management skills, equipment, or infrastructure.

Without current data on population numbers and trends, government efforts to manage elephant populations, government efforts to address human-elephant conflicts and poaching, and the state of the hunting program within the country, the Service is currently unable to make a finding that sport-hunting in Zimbabwe is enhancing the survival of the species and that imports of trophies from that sport hunting would meet the criteria established under the ESA for African elephants. However, we recognize that our inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species. Therefore, the Service is actively pursuing additional information from the Government of Zimbabwe, as well as other sources, in an effort to make a final determination on whether African elephant sport-hunted trophies taken in 2014 could be imported into the United States.

**Recent Action**

Until sufficient additional information can be obtained, the Service has established an interim suspension on imports of elephant trophies taken from Zimbabwe on or after April 4, 2014, the date the suspension was announced through a press release and posting on the Service's Web page. Until the Service is able to issue a finding that the sport hunting of African elephants in Zimbabwe enhances the survival of the species, U.S. hunters are on notice that, while no ESA permit is currently required for the import of sport-hunted trophies, such imports cannot occur at this time. The current enhancement finding has been posted at *http://www.fws.gov/international/pdf/enhancement-finding-2014-elephant-Zimbabwe.PDF*. In addition, the press release announcing the interim suspension and frequently asked questions is available at on the Service's Web page (*www.fws.gov/international*).

The Service has requested the information necessary to make a final decision from the Government of Zimbabwe. After the Service has an opportunity to review new information and obtain additional information, if necessary, we will make a final decision. If the Service finds that sport hunting of African elephants in Zimbabwe enhances the survival of the species, the suspension will be lifted. If, after reviewing the new information, the Service finds that sport hunting of African elephants in Zimbabwe does not enhance the survival of the species, the suspension will continue until the Service receives new information in the future that would allow it to make a positive enhancement finding. Either way, the final finding will be published in the **Federal Register** and made available on the Service's Web page.

**Interim Suspension**

This suspension does not prohibit U.S. hunters from traveling to Zimbabwe and participating in an elephant hunt. The ESA special rule for African elephants does not prohibit take (e.g., hunting) outside the United States, but it does prohibit import of sport-hunted trophies unless all requirements have been met. Therefore, it is possible that a hunter that hunted in Zimbabwe and took an elephant after April 4 could import his or her trophy at a later date if the Service can determine in the final finding that imports meet the criteria under the ESA. Nonetheless, the Service cannot ensure that such imports will ever be authorized in the future.

Further, this suspension on imports does not affect elephant taken in Zimbabwe prior to April 4, 2014. Elephants hunted in previous hunting seasons are still eligible to be imported, provided all CITES and other import requirements are met.

Dated: May 7, 2014.

**Timothy J. Van Norman,**
*Chief, Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service.*

[FR Doc. 2014–10890 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–55–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

[LLCON06000–L16100000.DQ0000]

### Notice of Resource Advisory Council Meeting for the Dominguez-Escalante National Conservation Area Advisory Council

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice of Public Meeting

**SUMMARY:** In accordance with the Federal Land Policy and Management Act of 1976 and the Federal Advisory Committee Act of 1972, the U.S. Department of the Interior, Bureau of Land Management (BLM) Dominguez-Escalante National Conservation Area (NCA) Advisory Council (Council) will meet as indicated below.

**DATES:** The meeting will be held on Wednesday, July 23, 2014, from 3 p.m. to approximately 6 p.m. Any adjustments to this meeting will be posted on the Dominguez-Escalante NCA Resource Management Plan (RMP) Web site: *http://www.blm.gov/co/st/en/nca/denca/denca_rmp.html.*

**ADDRESSES:** The meeting will be held in Conference Room 40 at the Mesa County Central Services Building, 200 S. Spruce Street, Grand Junction, CO 81501.

**FOR FURTHER INFORMATION CONTACT:** Collin Ewing, Advisory Council Designated Federal Official, 2815 H Road, Grand Junction, CO 81506. Phone: (970) 244–3049. Email: *cewing@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact the above individual during normal business hours. The FIRS is available 24 hours a day, seven days a week, to leave a message or question with the above individual. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** The 10-member Council advises the Secretary of the Interior, through the BLM, on a variety of planning and management issues associated with the RMP process for the Dominguez-Escalante NCA and Dominguez Canyon Wilderness.

Topics of discussion during the meeting may include informational presentations from various resource specialists working on the RMP as well as Council reports on the following topics: recreation, fire management, land-use planning process, invasive species management, travel management, wilderness, land exchange criteria, cultural resource management and other resource management topics of interest to the Council that were raised during the planning process.

These meetings are anticipated to occur quarterly and may occur as frequently as every two weeks during intensive phases of the planning process. Dates, times and agendas for additional meetings may be determined at future Council meetings and will be published in the **Federal Register**, announced through local media and on the BLM's Web site for the Dominguez-Escalante planning effort, *www.blm.gov/co/st/en/nca/denca/denca_rmp.html.*

These meetings are open to the public. The public may present written comments to the Council. Each formal Council meeting will have time allocated at the middle and end of each meeting to hear public comments. Depending on the number of persons wishing to comment and time available, the time for individual oral comments may be limited at the discretion of the chair.

**Ruth Welch,**
*BLM Colorado Acting State Director.*

[FR Doc. 2014–10786 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–JB–P**

## DEPARTMENT OF THE INTERIOR

### Bureau of Land Management

[LLNVC02000 L57000000.BX0000; 241A; MO# 4500063716]

### Temporary Closures of Public Land in Washoe County, NV

**AGENCY:** Bureau of Land Management, Interior.

**ACTION:** Notice.

**SUMMARY:** As authorized under the provisions of the Federal Land Policy and Management Act of 1976, certain public land near Stead, Nevada, will be temporarily closed to all public use to provide for public safety during the 2014 Reno Air Racing Association Pylon Racing Seminar and the Reno National Championship Air Races.

**DATES:** The temporary closure periods are June 11 through June 14, 2014, and September 6 through September 14, 2014.

**FOR FURTHER INFORMATION CONTACT:** Leon Thomas, 775–885–6000, email: *l70thoma@blm.gov.* Persons who use a telecommunications device for the deaf (TDD) may call the Federal Information Relay Service (FIRS) at 1–800–877–8339 to contact Mr. Thomas during normal business hours. The FIRS is available 24 hours a day, 7 days a week, to leave a message or question for Mr. Thomas. You will receive a reply during normal business hours.

**SUPPLEMENTARY INFORMATION:** This closure applies to all public use, including pedestrian use and vehicles. The public lands affected by this closure are described as follows:

**Mount Diablo Meridian**

T. 21 N., R. 19 E.,
  Sec. 8, E½E½, NW¼NE¼;
  Sec. 16, SW¼SW¼NE¼, NW¼, W½SE¼.

The area described contains 450 acres, more or less, in Washoe County, Nevada.

The closure notice and map of the closure area will be posted at the BLM Carson City District Office, 5665 Morgan Mill Road, Carson City, Nevada and on the BLM Web site: *http://www.blm.gov/nv/st/en/fo/carsoncity_field.html.* Roads leading into the public lands under the closure will be posted to notify the public of the closure. Under the authority of Section 303(a) of the Federal Lands Policy and Management Act of 1976 (43 U.S.C. 1733(a)), 43 CFR 8360.9–7 and 43 CFR 8364.1, the Bureau of Land Management will enforce the following rules in the area described above: All public use, whether motorized, on foot, or otherwise, is prohibited.

*Exceptions:* Closure restrictions do not apply to event officials, medical and rescue personnel, law enforcement, and agency personnel monitoring the events.

*Penalties:* Any person who fails to comply with the closure orders is subject to arrest and, upon conviction, may be fined not more than $1,000 and/or imprisonment for not more than 12 months under 43 CFR 8360.0–7. Violations may also be subject to the provisions of Title 18, U.S.C. 3571 and 3581.

**Authority:** 43 CFR 8360.0–7 and 8364.1.

**James W. Schroeder,**
*Acting Field Office Manager, Sierra Front Field Office.*

[FR Doc. 2014–10834 Filed 5–9–14; 8:45 am]

**BILLING CODE 4310–HC–P**