SAFARI CLUB INTERNATIONAL v. SALLY M. R. JEWELL, *et al.*

Safari Club International's Motion and Memorandum in Support for Leave to Submit Supplemental Declarations with Preliminary Injunction Reply Brief

Case No.: 14-cv-00670 (ABJ)

# Exhibit DDD

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

SAFARI CLUB INTERNATIONAL      )
                                )
    Plaintiff,                  )  Civ. No. 14-cv-00670(ABJ)
                                )
v.                              )
                                )
SALLY M. R. JEWELL, et al.      )
                                )
    Defendants                  )
                                )

## DECLARATION OF CHARLES JONGA

I, Charles Jonga, being first duly sworn on oath, depose and state as follows:

1. I am the Director of the Community Areas Management Program for Indigenous Resources (CAMPFIRE).

2. CAMPFIRE is a program that combines local communities in Zimbabwe and hunters for the benefit and conservation of wildlife in the area, including elephants. Through the program, local communities are encouraged to conserve and manage wildlife species so that hunters may sustainably harvest the animals. In return, the communities receive economic benefits from sport hunting.

3. Since its establishment, the program has made considerable achievements in mitigating widespread antagonism towards wildlife due to crop losses in rural areas, especially from elephants. The program has created appropriate structures and institutions under which communities generate revenues from the sustainable utilization of wildlife, and legitimately manage and disburse these revenues for their benefit.

4. An average of 90% of CAMPFIRE revenue annually comes from hunting. Elephant trophy hunting contributes more than 70% of CAMPFIRE's annual revenue. On average $2 million per year in net income directly benefits local communities, and most of this is derived from the lease of sport hunting rights to commercial safari operators in 49 CAMPFIRE hunting concessions. A lesser proportion of income is generated from sales of hides and ivory, tourism leases on communal land, and other natural resource management activities.

5. Forty-five percent of gross hunting revenues in the CAMPFIRE areas goes to CAMPFIRE, while 55% goes to the safari operators. Cumulatively, $89 million went to CAMPFIRE and safari operators from 1989 to 2006. In those years, CAMPFIRE received a total of $40 million.

6. In all CAMPFIRE districts, revenue from hunting is used to support various management activities such as; fire awareness and purchase of fire-fighting equipment; opening of roads and fireguards; training of committees; look and learn tours to other CAMPFIRE districts; purchase of communication equipment; purchase of firearms for Resource Monitors; and rehabilitation of water supply systems to hunting areas. CAMPFIRE thus contributes to job creation, empowerment, and diversification of livelihoods for rural communities. Substantial investments are also made annually by Rural District Councils and safari operators in problem animal control and anti-poaching. CAMPFIRE employs a total of 256 resource monitors and game scouts that conduct anti-poaching efforts.

7. The Rural District Councils (RDCs) are a district level administrative authority for the management of CAMPFIRE. The RDCs are given the authority to manage wildlife for sustainable use by the government. They make administrative decisions in consultation with the communities, such as which safari operators are allowed to operate within the CAMPFIRE areas.

8. According to the CAMPFIRE Revenue Sharing Guidelines, which were incorporated into the Constitution of the CAMPFIRE Association in 2007, at least 55% of revenues should be distributed to producer communities, no more than 26%, and 15% for wildlife management operations, including anti-poaching efforts, and overheads (respectively) go to the RDC level, and 4% goes to the CAMPFIRE Association.

9. Each hunter who hunts in CAMPFIRE areas pays a trophy fee for every animal they take. Those trophy fees directly contribute to CAMPFIRE's income. Trophy fees constitute the largest single portion of CAMPFIRE's income. Safari operators do not receive any benefit from the trophy fees.

10. Without the ability to actually import the trophies, U.S. hunters will not pay the trophy fees. Elephants generate the highest trophy fees by far – even compared to lions, Cape buffalo, etc. The trophy fees are immediately paid to CAMPFIRE and the communities once a hunt is completed. Fifty-five percent of the trophy fees go directly to community bank accounts (and not through the RDCs).

11. The CAMPFIRE program relies heavily on U.S. sport-hunters. Of the 167 hunts booked in CAMPFIRE areas in 2014, 106 were booked by U.S. hunters. If those 106 hunts are cancelled or rescheduled, this will result in an immediate loss of income for the CAMPFIRE program and cripple its wildlife management and anti-poaching operations.

12. The communities are confused by the trophy importation ban. In some instances, they do not know if it is still legal for U.S. hunters to hunt elephants.

13. The loss of the income stream from trophy fees will certainly increase the loss of confidence by communities in wildlife management, and consequently threaten tolerance and survival of the elephant. Community antipathy to wildlife and the reciprocal costs to wildlife is set to increase, especially through retaliatory killing or self-help problem animal control and commercial poaching to feed international syndicates. Communities are disillusioned with the suspension of elephant trophy imports into the US, and are more likely than ever before to succumb to the temptation to open up more land for rain-fed agriculture in areas generally unsuitable for cropping leading to massive land degradation. The disruption of hunting revenue inflows and investment into the protection of wildlife and direct incentives at community level is a sure way to increase elephant poaching and human encroachment into wildlife areas.

14. The government of Zimbabwe and key stakeholders are currently engaged in a process to address CAMPFIRE's challenges and revive the program as a successful vehicle and flagship model for community-based conservation and economic development at district and national levels. The sudden loss of income from elephant hunts does not only scuttle these efforts, but also poses an unprecedented threat to all future conservation efforts of the African elephant in the rural areas of Zimbabwe.

15. In recognition of CAMPFIRE's efforts, Safari Club International Foundation has supported CAMPFIRE with a bull elephant tag donation each year since 2012. This has come in handy as CAMPFIRE operations are presently funded from limited trophy hunting income, with no support from any external funders. The tag donations, in the amount of nearly $100,00 cumulatively, has supported training of community game scouts, annual meetings of district level CAMPFIRE Coordinators, and CAMPFIRE Association's participation at crucial regional and international wildlife conservation for a, such as the Annual African Wildlife Consultative Forum.

16. CAMPFIRE has already received $42,000 from the 2014 tag auction, but under the circumstances, the hunt cannot be delivered. Should the hunt be deferred to next year, this means that there will be no revenue from a 2015 hunt, thereby

severely crippling CAMPFIRE's ability to fulfill is capacity building and knowledge sharing role for many years to come. The marketability of future hunts is also damaged because U.S. hunters will not be willing to pay the same amount as they previously did due to the uncertainty of U.S. importation regulations.

17. I submit this declaration in support of Safari Club International's efforts to challenge the U.S. Fish and Wildlife Service's decision to prohibit the importation of sport-hunted elephant trophies from Zimbabwe and Tanzania in 2014.

In accordance with 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated this 9th day of May, 2014, at WASHINGTON DC.

_____
Charles Jonga