# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| SAFARI CLUB INTERNATIONAL | ) | |
| | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. No. 14-cv-00670(ABJ) |
| SALLY M. R. JEWELL, in her official | ) | |
| capacity as Secretary of the U.S. | ) | |
| Department of the Interior; | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| an agency of the United States; | ) | |
| DANIEL ASHE, in his official capacity as | ) | |
| Director of the U.S. Fish and Wildlife Service; and | ) | |
| U.S. FISH AND WILDLIFE SERVICE, | ) | |
| an agency of the United States, | ) | |
| | ) | |
| | ) | |
|     Defendants. | ) | |

**PLAINTIFF SAFARI CLUB INTERNATIONAL'S REPLY TO FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION[1]**

---

[1] On May 13, 2014, Federal Defendants filed both an Opposition to Safari Club's Motion for a Preliminary Injunction ("Opposition") and a Motion to Dismiss.  The Opposition and Memorandum in Support of the Motion to Dismiss were combined in the same document.  This Reply brief responds only to Federal Defendants' Opposition.  Safari Club will file their opposition to Federal Defendants' Motion to Dismiss within the 14 day period provided by Local Civil Rule 7(b) in accordance with the page limitations provided by Local Civil Rule 7(e), but will attempt to do so as expeditiously as possible in an effort to prevent delay to the resolution of Safari Club's Motion for a Preliminary Injunction.

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 1

I.   This Court Possesses Subject Matter Jurisdiction to Review Safari Club's Claims ........... 1

   A.   Safari Club Has Standing to Challenge the Tanzania Findings ....................................... 1

      1.   Safari Club Need Not Show That Its Members Have Applied for CITES or ESA Permits to Demonstrate Standing for the Challenge to the Importation Ban for Tanzania ................................................................................................ 1

      2.   Safari Club Has Shown That the Relief Requested Will Likely Redress Its Members' Injuries from Importation Ban for Tanzania ....................................... 4

   B.   Safari Club's Challenge to the Importation Ban for Sport-Hunted Elephants From Zimbabwe is Ripe .......................................................................................... 6

      1.   Safari Club's Claims Are Fit for Judicial Decision ............................................ 10

      2.   Safari Club Will Suffer Hardship if the Court Withholds Consideration of Relief for the Challenge to the Importation Ban for Zimbabwe ........................ 11

II.   Safari Club Has Satisfied Its Burden for Preliminary Injunctive Relief ........................... 14

   C.   Safari Club Has Demonstrated Irreparable Harm From the Importation Bans .............. 14

      1.   Safari Club's Members' Inability to Import Elephant Trophies Constitutes Irreparable Harm ............................................................................................ 15

      2.   Safari Club's Economic Harm is Concrete and a Direct Result of Federal Defendant's Actions ........................................................................................ 18

      3.   The Harm to Safari Club's Interests in African Elephant Conservation is Irreparable ...................................................................................................... 20

CONCLUSION ................................................................................................................. 24

**INTRODUCTION**

Safari Club International ("Safari Club") has asked this Court for a preliminary injunction to temporarily restore the status quo and revoke bans imposed by Federal Defendants Sally M.R. Jewell *et al.* ("Federal Defendants") on the importation of sport-hunted elephants from Zimbabwe and Tanzania ("importation bans").  In accordance with this Court's Order, this Reply addresses only two issues; 1) that Safari Club and its members have suffered irreparable harm from the importation bans and 2) that this Court has jurisdiction to review Safari Club's claims.

**ARGUMENT**

   **I.**   **This Court Possesses Subject Matter Jurisdiction to Review Safari Club's Claims**

      A.   Safari Club Has Standing to Challenge the Tanzania Findings

          1.   Safari Club Need Not Show That Its Members Have Applied for CITES or ESA Permits to Demonstrate Standing for the Challenge to the Importation Ban for Tanzania

Federal Defendants are incorrect in their assertion that Safari Club lacks standing to challenge the importation ban for Tanzania without proving that one or more of its members have actually applied for and been denied a permit for the importation of an elephant from Tanzania.  These arguments demonstrate that Federal Defendants do not understand the nature of Safari Club's claims.  In this litigation, Safari Club does not challenge the denial of any specific or individual permit for the importation of a sport-hunted elephant.  The causes of action that Safari Club raises in this suit would not be resolved by a challenge to an individual permit denial.

Instead, Safari Club's Complaint asserts three challenges related to the process by which Federal Defendants decided to ban importation for Tanzania.  Federal Defendants a) violated Administrative Procedure Act ("APA") rulemaking requirements by depriving Safari Club and its members of a meaningful opportunity to participate in the decision-making process related to the importation ban for all individuals who have plans to import elephant trophies taken from

Tanzania in 2014 (Count IV); b) violated APA rulemaking requirements by depriving Safari Club and its members of a meaningful opportunity to participate in the decision to modify the regulatory requirements for the importation of African elephants from Tanzania (Count V); and c) failed to comply with a pre-existing interpretation of its own regulations when it applied the wrong non-detriment standard to the importation of elephants from Tanzania (Count VI).

Finally, because Safari Club's causes of action concerning Tanzania are procedural, Safari Club can rely on procedural standing to pursue these claims. Because they have been deprived of their meaningful opportunity to participate in the process by which the ban on the importation of African elephants was decided, Safari Club does not need to prove that its members would actually receive permits if the process had complied with the law. Safari Club need only show that its members have a concrete procedural interest harmed by the Federal Defendants' decision to ban the importation of elephant trophies from Tanzania in 2014. *Lujan v. Defenders of Wildlife*, 504 U.S, 555, fn7 (1992); *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) ("in cases in which a party has been accorded a procedural right to protect his concrete interests, the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury.") (citation omitted).

Safari Club members do not need to apply for ESA importation permits to demonstrate a particularized and concrete injury traceable to the Tanzania findings. These violations and the resulting decision to ban importation cause harm to all those who have made plans to hunt elephants in Tanzania with the expectation that they will be able to import their successfully hunted elephants into the United States. The importation ban affects hunters long before they go to Tanzania to hunt an elephant. Those who have invested time, financial resources, energy and

an emotional commitment to an elephant hunt are harmed by the decision that they can no longer bring their elephant home with them.  Their hunt has already decreased in recreational and financial value due to the imposition of the importation ban.  Nevertheless, Federal Defendants suggest that, because the U.S. Fish and Wildlife Service ("FWS") has left the door open to individual hunters to produce their own evidence that the FWS should make non-detriment and enhancement finding for elephant importation from Tanzania, Safari Club members will not know for sure that they are unable to import their trophies until they submit an application for an import permit and have that permit denied. Putting aside the ostensible futility of an individual obtaining and producing sufficient information to provide what the government of Tanzania could not, this new procedure offered by Federal Defendants, demonstrates another facet of Safari Club members' harm.

Before the importation bans were implemented, an individual seeking to import an elephant submitted his or her application to the FWS for an import permit with the knowledge that Federal Defendants had already determined that the sport hunting of the elephant enhanced the survival of the species and that the importation of the elephant was not detrimental to the species' survival.  That determination was presumably made by the FWS for all import permit applicants every year for the last 21 years.[2]  Each hunter did not have to research, acquire, gather, or otherwise provide this information on an individual basis.  After the implementation of the importation bans, individuals who want to import elephants from Tanzania now bear the burden themselves of producing new information to satisfy both of these criteria.

---

[2] Safari Club assumes that the FWS has been making such findings since 1993 because imports have been allowed since that time; however, so far, in response to a Freedom of Information Act Request Safari Club submitted to the FWS on April 8, 2014, the FWS has not provided Safari Club with non-detriment findings prior to 2008.

Federal Defendants suggest that Safari Club members are able to remedy their own harm by submitting "new information sufficient to support the positive findings needed to support an ESA or CITES import permit."  Opposition at 12, n. 3.   By making this argument, Federal Defendants acknowledge that they have increased the evidentiary burden for individuals seeking to import sport-hunted elephants from Tanzania. Now that the FWS has implemented the importation ban for Tanzania, it has newly tasked each individual applicant with the obligation to personally collect and submit the data necessary for the FWS to make the enhancement and non-detriment findings for the species.  Whether or not Safari Club members would be successful in providing information to persuade the FWS to overturn the importation ban for the purpose of their individual elephant, the simple act of requiring individual Safari Club members to do so, for the first time in 21 years, in order to have their permit applications seriously considered, is ample evidence of harm in itself.

> 2.   Safari Club Has Shown That the Relief Requested Will Likely Redress Its Members' Injuries from Importation Ban for Tanzania

Federal Defendants' arguments concerning redressability further demonstrate a failure in their understanding of Safari Club's claims.  At the outset, Safari Club has not asked this Court to direct Federal Defendants to issue permits to Safari Club members or to waive the permit requirement for those importations.  Instead, Safari Club has asked this Court to enjoin the illegal importation ban and order Federal Defendants to act in accordance with law.

If this Court provides the declaratory and injunctive relief that Safari Club seeks, Safari Club and its members will be given a meaningful opportunity to participate in the decision-making process by which Federal Defendants conduct the analyses and make permit decisions. Moreover, if Safari Club succeeds in its claims concerning the importation ban for Tanzania,

Federal Defendants will be required to apply legally supportable review criteria to the applications for permits that Safari Club members submit.  Consequently, if this Court issues a declaration that Federal Defendants illegally imposed an importation ban for Tanzania and enjoins that importation ban, Safari Club and its members' injuries will be redressed.   For example, if in accordance with Count IV of Safari Club's Complaint, this Court enjoins the importation ban and declares that Federal Defendants must conduct APA rulemaking before deciding upon and issuing such a ban, Safari Club and its members will have a meaningful opportunity to participate in the decision-making process concerning the need for such a ban. Similarly, if in accordance with Count V of Safari Club's Complaint, this Court declares that Federal Defendants could not legally impose an enhancement finding requirement for the importation of sport-hunted elephants from Tanzania in the absence of an APA rulemaking process and enjoins the ban that relied on that illegal rulemaking, Federal Defendants will not be able to require an enhancement finding for permits for the import of elephants from Tanzania without first complying with its APA obligations.  In such case, Safari Club and its members will be able to provide meaningful comment on whether an enhancement finding is necessary for the importation of elephants from Tanzania.  Finally, if in accordance with Count VI of Safari Club's complaint, this Court declares that Federal Defendants applied the incorrect non-detriment finding standard to the importation of elephants from Tanzania, Federal Defendants will not be able to apply that incorrect standard to the applications that Safari Club members submit.  When making future non-detriment findings, Federal Defendants will be required to apply the correct standard.  Under such circumstances, it is likely that Safari Club members will once again be able to obtain their permits and enjoy the fruits of their hunt.

B. Safari Club's Challenge to the Importation Ban for Sport-Hunted Elephants From Zimbabwe is Ripe

Safari Club challenged a final decision that is currently prudentially ripe for review.[3]  On April 4, 2014, Federal Defendants banned the importation of sport-hunted elephants from Zimbabwe, and did so without first formally requesting information from Zimbabwe about the status and conservation of the country's elephants and without giving the public the opportunity to meaningfully participate in their decision-making process.  Regardless of the number of times that Federal Defendants later refer to their decision as "suspending" importation, or "temporary" or "interim," Federal Defendant's decision that it could and would shut down importation from Zimbabwe without directly seeking information from Zimbabwe and/or input from the public continues to be a final, challengeable decision.

Two factors determine whether agency action qualifies as "final."  First, the action must represent the "'consummation'" of the agency's decisionmaking process," and second, the action

---

[3] Safari Club's claims are also constitutionally ripe as two Safari Club members offered declarations explaining that they had already hunted elephants in Zimbabwe and that they wish to import their trophies.  Federal Defendants incorrectly rely on the declaration of Tim Van Norman for the suggestion that it may be a long time before those Safari Club members are ready to import their trophies.  Mr. Van Norman's declaration states that many hunters are "unable to import the trophy within one year of ***obtaining the import permit***," Van Norman Decl. at 17 (emphasis added).  First of all, no importation permits are required for elephants from Zimbabwe, so Mr. Van Norman's statement is irrelevant to the issue of Zimbabwe elephant importation.  Even if permits were required, Federal Defendants fail to explain that the FWS recommends that hunters obtain their permits in advance of leaving for their hunts.  In a fact sheet on its website entitled "Importing Your Leopard or African Elephant Sport-hunted Trophy," the FWS instructs hunters: " If an import permit is required for your trophy, we recommend that you apply at least 60 days before your departure date using application form 3-200-19 (http://1.usa.gov/1hdcjno). However, for Appendix-I elephants or leopards you should allow additional time to ensure that the Service can issue the required import permit." http://www.fws.gov/international/pdf/factsheet-import-leopard-elephant-sport-hunted-trophy-2013.pdf.  Consequently, many hunters who follow the FWS's advice may have their permits in hand long before they travel to Africa for their hunt.  The fact that the permit may expire within one year of the date that the hunter acquired it is not relevant to the question of how soon the individual will want to or is able to import his elephant after a successful hunt.

must be one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  When Federal Defendants announced on April 4, 2014, that it was banning the importation of sport-hunted elephants from Zimbabwe without first obtaining information about the country's elephants directly from Zimbabwe itself, they made a final decision.  It represented the consummation of findings by several branches of the FWS.  It reversed an enhancement finding that had been in place for years.  The decision immediately terminated Safari Club members' rights to import African elephants from Zimbabwe.

Early evidence of the decision-making process appeared in a January 3, 2014 memorandum authored by Rosemarie Gnam, Chief FWS Division of Scientific Authority and Roddy Gabel, Chief FWS Division of Management Authority (later placed under the signature of Bryan Arroyo, FWS Deputy Director for International Affairs, on January 8, 2014) to FWS Director Daniel Ashe.  In that memorandum the two chiefs explained that that the FWS "will be unable to make positive findings" required under CITES and the ESA "to allow the import of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014."  Ex. 2 to Seidman Decl., Ex. EEE.  The two FWS chiefs noted the finality of their decisions:  "The required findings are currently being ***finalized*** and will be ***completed*** by late February 2014."  *Id*. (emphasis added).  The chiefs also recommended several opportunities for the FWS to seek information directly from Zimbabwe and from the hunting community before moving forward with the trophy importation decision:

> We are raising this issue at this time due to the need for early engagement with the sport-hunting community to maintain positive relations and create opportunities for cooperative action to affect change.  There are key hunting conventions upcoming where African elephant hunts costing tens of thousands of dollars, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the Annual Safari

Club International Convention (February 5-8, 2014).  We recommend that high-level outreach be considered prior to these meetings.  We recommend that outreach to the sport-hunting community be undertaken before any messages about suspension of elephant trophy imports from Tanzania and Zimbabwe are disseminated broadly.

As we *finalize* our negative findings, we will identify specific actions that can be taken by Tanzania and Zimbabwe that might allow the Service to reconsider its finding in the future.  These actions, in addition to being provided to the Governments of Tanzania and Zimbabwe, could be shared with our Federal Government partners and leaders in the sport-hunting community with the idea that collaboration and partnership will be important to effect positive changes.

*Id*. at 2 (emphasis added).  On April 4, 2014, Federal Defendants finalized and implemented their decision to not allow importation of elephants from Zimbabwe for 2014.  They did so despite the fact that Director Ashe did not act on the recommendations he received from the chiefs and from Deputy Director Arroyo.  Federal Defendants took action despite making no effort prior to April 4, 2014 to communicate with Zimbabwe about the plan to ban importation.  Federal Defendants did not notify Zimbabwe or request information directly from the Zimbabwe Parks and Wildlife Management Authority ("ZimParks") until the very day that the ban was imposed and announced on the FWS website.  It was not until that date that the FWS sent ZimParks a set of questions that would provide the FWS with data that the FWS now deems "*necessary* to make a final decision." 79 Fed. Reg. 26986, 26987 (May 12, 2014) (emphasis added).

Federal Defendants argue that their decision is merely an "interim" determination."  79 Fed. Reg. 26987 (May 12, 2014) (emphasis added).  Similarly, Tim Van Norman, in his declaration attached to Federal Defendants' Opposition, characterizes the importation ban as "temporary."  However, Federal Defendants' own classifications of the nature of their decisions are not binding on this Court.  *Isbrandtsen Co. v. U.S.*, 211 F.2d 51, 55 (D.C. Cir. 1954) (Whether or not the statutory requirements of finality are satisfied in any given case depends not

upon the label affixed to its action by the administrative agency but rather upon a realistic appraisal of the consequences of such action.").

Federal Defendants' self-serving characterizations mean little. The agency's assessments of the decision's finality should not dictate the result.

> The principle of finality in administrative law is not, however, governed by the administrative agency's characterization of its action, but rather by a realistic assessment of the nature and effect of the order sought to be reviewed.

*Fidelity Television Inc., v. FCC*, 502 F.2d 443, 448 (D.C. Cir. 1974) (internal citations omitted). The fact that Federal Defendants have reserved the ability to revoke or change their decision does not undermine its finality. *General Elec. Co. v. E.P.A*., 290 F.3d 377, 380 (D.C. Cir. 2002) ("The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment. If the possibility (indeed, the probability) of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule—and particularly one that must be updated periodically to reflect advances in science—would ever be final as a matter of law.") (internal citations omitted). A decision considered by an agency to be an "interim" determination can qualify as final agency action if implemented in its current version and applied in a binding manner even while the agency continues to take comments from the public. *National Min. Ass'n. v. Jackson*, 768 F. Supp. 2d 34, 45 (D.D.C. 2011) (EPA interim guidance memo held to be final agency action). "It is the effect of the action and not its label that must be considered." *Abramowitz v. EPA,* 832 F.2d 1071, 1075 (9th Cir. 1987).

Regardless of Federal Defendants' characterization of the decision, the importation ban constitutes the consummation of Federal Defendants' decision-making process with regard to whether it has the authority to immediately implement a cessation of importation 1) without

advance notice or an opportunity for the public to participate in the decision-making and 2) without requesting or obtaining data, deemed necessary for the decision, from the most reliable source of that data.  It is also the culmination of Federal Defendant's decision-making process concerning whether an enhancement of survival finding must be made for elephants from Zimbabwe despite their status as an Appendix II species without first complying with APA notice and comment opportunities for its change of regulation.  Federal Defendants made each of these decisions, and have expressed no intention of changing them.

1.   Safari Club's Claims Are Fit for Judicial Decision

Once again, in its argument that Safari Club's claims are not fit for judicial review, Federal Defendants misconceive the nature of Safari Club's claims.  Fitness for review depends on (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented.  *Ohio Forestry Assn v. Sierra Club*, 523 U.S. 726, 733 (1998).  Federal Defendants erroneously argue that this Court's determination of the legality of Federal Defendants' actions will "benefit from further factual development."  *Abbott Labs,* 387 U.S. at 152.  In making these arguments, Federal Defendants focus on whether Federal Defendants will continue the existing importation ban once they review the information that they received from Zimbabwe.

In disputing the fitness of Safari Club's claims, Federal Defendants ignore the fact that Safari Club's challenges are directed at the process underlying Federal Defendants' decision to impose the importation ban.  Safari Club's claims are based on legal arguments and the documents in the record.  First, Safari Club challenged the legality of Federal Defendants decision that it had the authority to immediately impose an importation ban for Zimbabwe on

10

April 4, 2014 without consideration of the relevant factor that it lacked information obtainable

directly from the most reliable source of information about Zimbabwe's elephants (Count I).

Second, Safari Club challenged the propriety of Federal Defendants failure to afford the public

an APA based opportunity to participate in the decision-making concerning the importation of

Zimbabwe's elephants. (Count II).  Finally, Safari Club challenged Federal Defendants'

application of an enhancement of survival requirement that Federal Defendants changed without

submitting the change to the public for notice and meaningful comment.  Since Federal

Defendants modified the enhancement of survival requirement without conducting proper APA

rulemaking, and since that illegal enhancement standard was the basis of the importation ban, all

future decisions regarding the importation of Zimbabwe's elephants will be subject to that same

illegal standard.  Therefore, regardless of whether Federal Defendants consider additional data or

revise their decision regarding the importation ban at some point in the future, the challenges that

Safari Club has made in this litigation are not dependent on that additional information and are

currently fit for review.

      2.   Safari Club Will Suffer Hardship if the Court Withholds Consideration of
              Relief for the Challenge to the Importation Ban for Zimbabwe

Contrary to Federal Defendants' erroneous assumptions, Safari Club and its members

will suffer from any further delay of the resolution of its challenges to Federal Defendants'

decision-making concerning the importation of Zimbabwe's elephants.  The PI Memo and 45

declarations attest to the concreteness and immediacy of the hardship.

The cases cited by Federal Defendants that set a standard for the type of hardship that

must overcome a potential delay for the agency's own attempt to resolve the issue do not apply

to Safari Club's claims.  As indicated in the sections above, Safari Club has challenged final, as

opposed to tentative, agency positions.  Therefore, Safari Club has no obligation to overcome

"institutional interests in the deferral of review" application to interim decisions. *Devia v. NRC*, 492 F.3d 421, 427 (D.C. Cir. 2007).

Federal Defendants are correct that the importation ban does not prevent hunters from continuing to hunt elephants in Zimbabwe, even though reducing or eliminating that hunting is Federal Defendants' desired outcome.  Q&A, Ex. B at 2.  Nevertheless, the importation ban has dramatically changed the nature of that hunt.  The opportunity to hunt elephants in Zimbabwe is no longer the same hunt that Safari Club members aspired to, planned, and paid for.  Now the hunt is one in which the hunter, even if successful, will not be able to return with his or her elephant.  A major element in the continued enjoyment of the hunt is gone.

The fact that Federal Defendants "may" reverse their decision sometime before or during 2015 does not remedy the uncertainty or the current impediment to the full enjoyment of the hunt.  In fact, the uncertainty from Federal Defendants' present prevarication has brought its own measure of harm – Safari Club members with imminent 2014 hunts must quickly decide whether to abandon elaborate plans and large investments in order to conserve funds and/or try to reschedule an elephant hunt in one of the few remaining countries from which he can still hunt and import an elephant.

In fact, the possibility that Federal Defendants "might" retroactively reverse their illegal importation ban provides little comfort based on Federal Defendants' track record concerning decisions regarding the importation of elephants and other matters related to ivory.  For example, in the Federal Register Notice of May 7, 2014 (published May 12, 2014), Federal Defendants make clear that reversal of the importation ban is little more than "possible."  79 Fed. Reg. 26986, 26987.  "Nonetheless, the Service cannot ensure that such imports will *ever* be authorized in the future."  *Id*. (emphasis added).

In addition, Federal Defendants 'recent decision-making in matters concerning the importation of African elephants has been remarkably inconsistent and unreliable.  The fact that the importation ban decision itself has been a moving target since Federal Defendants first announced it on April 4, 2014, demonstrates not only the arbitrariness with which Federal Defendants have been making decisions, but also the inability of the public to rely on the legality or the timeliness of Federal Defendants' pronouncements.  For example, Federal Defendants implemented the original importation ban, announced on April 4, 2014, to apply from January 1, 2014 through December 31, 2014, even though that decision imposed a retroactive ban on individuals who had already hunted elephants during a period of time when importation was legal.  However, on April 17, 2014, Federal Defendants revoked the retroactive portion of the ban.  In a similar manner, Federal Defendants "corrected" errors concerning the manner in which it announced the ban to the public.  On April 4, 2014, Federal Defendants issued a Press Release of the ban on the FWS website only, despite the fact that this violated Federal Defendants' own express commitment to publish any changes to its position on enhancement of survival for Zimbabwe elephants in the Federal Register.  62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).  After realizing their error, Federal Defendants acknowledged their obligation regarding notice of the change and published a notice in the Federal Register on May 7, 2014 (published May 12, 2014).

Tim Van Norman's statements that he "intends to complete a final determination" on possible changes to the importation ban by "mid-July at the latest" give little indication of when such decision might actually be announced or implemented.  Van Norman Decl., ¶35.  His assurances that he will conduct such review within the next two months do nothing to alleviate the harm of Safari Club members who must imminently decide whether to go through with a hunt that is set to take place before mid-July.  *See e.g.*, Taylor Decl., Ex. DD, ¶ 19 (Hunt starts

May 17, 2014); Cheek Decl., Ex. N, ¶ 13 (July); Adams Decl., Ex. ZZ, ¶ 13 (May 20 – June 10);

Berry Decl., Ex. S, ¶ 7 (June) Beardmore Decl., Ex. L, ¶ 19 (June).

Any delay in the resolution of this case in order to give Federal Defendants an opportunity to "get it right" themselves will only further exacerbate the harms that Safari Club members continue to endure.  Instead of forcing Safari Club members and other members of the hunting community to suffer under the Federal Defendants' premature and unsupported decision, the FWS should have obtained the information "necessary" for deciding whether to change its longstanding enhancement finding.

In the sections to follow, Safari Club will more fully address both the harms that Safari Club and its members are suffering and will continue to suffer.

## II.  Safari Club Has Satisfied Its Burden for Preliminary Injunctive Relief

### A.   Safari Club Has Demonstrated Irreparable Harm From the Importation Bans

Safari Club and its members have suffered and continue to suffer several different types of harm that are more than sufficient to satisfy the stringent requirements for emergency injunctive relief.  A plaintiff who moves for a preliminary injunction must substantiate that irreparable injury is *likely* to occur.

> The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future.  Further, the movant must show that the alleged harm will directly result from the action which the movant seeks to enjoin.

*Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1975).

The harm to Safari Club members' non-economic, recreational interest in importing the elephants they successfully hunt is immediate and concrete and is directly caused by Federal Defendants' decision to impose the bans.  Federal Defendants may not reject Safari Club

members' losses simply because some of them are financial or economic.  Federal Defendants decided to impose the importation bans with full knowledge of the economic harms that their decisions would cause and consequently they cannot reject them as the basis of Safari Club's motion for preliminary relief.  Finally, the loss to the conservation of elephants is a harm that Federal Defendants themselves have acknowledged and also cannot reject as the basis of Safari Club's showing of irreparable harm.

> 1.   Safari Club's Members' Inability to Import Elephant Trophies Constitutes Irreparable Harm

The importation bans prohibit hunters from importing their successfully hunted elephants.  At the time that Safari Club filed its PI Motion, two Safari Club members had already successfully hunted elephants that they now cannot import into the United States.  Grieb Decl., Ex. U, ¶ 12; Whaley Decl., Ex. FF, ¶ 15.  Consequently, these Safari Club members have already sustained harm as they are being forced to store their elephants and wait for a resolution of this litigation.  For them, the ban means being deprived of the ability to import the elephant they successfully hunted, and a denial of injunctive relief means a delay in being able to bring home, protect, display and enjoy the symbols of their difficult, strenuous and successful hunts.

Numerous declarations submitted from Safari Club members with hunts planned during the next few months demonstrate that other Safari Club members are now or will soon be in the field.   A preliminary injunction against the importation bans can prevent similar harms to these members.  *See e.g.*, Taylor Decl., Ex. DD, ¶ 19 (**Hunt starts May 17, 2014**); Cheek Decl., Ex. N, ¶ 13 (**July**); Adams Decl., Ex. ZZ, ¶ 13 (**May 20 – June 10**); Berry Decl., Ex. S, ¶ 7 (**June**) Beardmore Decl., Ex. L, ¶ 19 (**June**).  Many more are attempting to decide whether they should proceed with their hunts or cancel.  *See e.g.*, McDonnold Decl., Ex. JJ, ¶ 8; Rawson Decl., Ex. P,

¶ 17; Ingersoll Decl., Ex. Q, ¶ 9; Condon Decl., Ex. V, ¶ 20.  Some have already cancelled their elephant hunts.  Holdridge Decl., Ex. R, ¶ 6; Capozza Decl., Ex. AA, ¶ 19.

The harm that members who have not yet hunted their elephants suffer is not speculative. These members have hunts scheduled for concrete future dates.  The loss to the full enjoyment of their hunt and inability to bring home the elephant that they successfully hunt is imminent.  A preliminary injunction is designed to prevent imminent harm, not just to reverse harm that has already occurred.  *Am. Meat Inst.*, 968 F. Supp. 2d 38, 75 (D.D.C. 2013).

The opportunity to bring home the elephant from a successful hunt has great emotional significance to the hunter.[4]  An individual hunter's physical symbol of his or her successful hunt cannot be purchased or replaced.  The loss of the ability to possess, display, protect and enjoy that elephant is exactly the type of harm that cannot be remedied at law and can only be rectified or prevented through injunctive relief.

Federal Defendants' disingenuously argue that injunctive relief is unavailable to prevent those who are considering cancelling their hunts from having to do so, because such losses would be "self-inflicted."  Federal Defendants conveniently forget that their intended purpose for the importation bans was to effect such cancellations and to reduce the take of elephants that is "additional to" elephants killed by poachers.  The press release that Federal Defendants published on the FWS website stated:

> Sport hunting, as part of a sound management program, can provide benefits to conservation. Yet, given the current situation in Tanzania, and given the uncertainty with regard to elephants in Zimbabwe, the Service is not assured that the benefits of sport hunting will be realized in those countries. Further, the

---

[4] McDonnold Decl., Ex. JJ, ¶ 8; Rawson Decl., Ex. P, ¶ 17; Beardmore Decl., Ex. L, ¶ 16; Holdridge Decl., Ex. R, ¶ 6; Berry Decl., Ex. S, ¶ 7; Vick Decl., Ex. I, ¶ 18; Condon Decl., Ex. V, ¶ 20; Nice Decl., Ex. W, ¶ 11; Sakuta Decl., Ex. WW, ¶ 7; Johnson Decl., Ex. VV, ¶ 12; Whaley Decl., Ex. FF, ¶ 16; Perry Decl., Ex. GG, ¶ 9; Tarpley Decl., Ex. TT, ¶ 7; McCall Decl., Ex. HH, ¶ 7.

16

Service is concerned that ***additional killing of elephants*** in Tanzania, even if legal, is not sustainable at this time, and the same may be true for Zimbabwe.

http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B.

In addition, Federal Defendants expressly encouraged U.S. hunters to cancel their hunts.  The Question and Answer webpage on the FWS website offered the following hypothetical question and response:

> **I have already purchased a hunt in Tanzania or Zimbabwe. How do I get my money back?**
>
> We encourage you to contact your hunting outfitter to discuss options. While you can still participate in a hunt in 2014, you currently are not able to import the trophy. In addition, given the current conservation concerns for elephants in Tanzania and Zimbabwe, ***we strongly advise that you reconsider taking part in an elephant hunt in either of these countries at this time.***

Q&A, Ex. B at 2 (emphasis added).  As Federal Defendants purposely implemented the importation bans with the intention of discouraging hunters from going to Zimbabwe and Tanzania to hunt elephants and thereby reducing the "additional killing of elephants" in those two countries, Federal Defendants were the catalysts for Safari Club's harms.  As the harms being suffered by Safari Club members were the intended result of the importation bans, Federal Defendants cannot credibly argue that the harms suffered due to a decision to cancel their hunts are "self-inflicted."

Alternatively, those that choose not to cancel – for such reasons as they disagree with Federal Defendants' insupportable assumption that the removal of U.S. hunters will benefit conservation of elephants in Zimbabwe and Tanzania, or that they wish to support elephant conservation in those countries to the extent possible despite the importation bans – continue to suffer irreparable harm whether or not they enjoy other aspects of their hunts.

The possibility that Federal Defendants might reverse their decision with respect to Zimbabwe or Tanzania at some point in the future is not a concrete avenue of redress for Safari Club's members' injuries. It does not help those who are trying to make informed decisions about whether to continue with their planned hunts. It does not ensure that those with successfully taken elephants will ever be able to bring them home. "[T]he Service cannot ensure that such imports will ever be authorized in the future." 79 Fed. Reg. 26987 (May 12, 2014). Moreover, Safari Club's injuries cannot be sufficiently redressed by waiting for the complete resolution of this litigation. During the period of time that it will take to fully litigate this case, many Safari Club members will be forced to choose whether to cancel their hunts. Others will hunt but their enjoyment will be diminished by the uncertainty of whether they will ever be able to bring their trophies home. Those that cancel because of the uncertainty will be unquestionably deprived of a hunt of a lifetime. None of these decisions are self-inflicted. All are direct and intended consequences caused by Federal Defendants.

2.    Safari Club's Economic Harm is Concrete and a Direct Result of Federal Defendant's Actions

Safari Club members, both hunters and safari operators, have asserted economic harms that are not speculative. This Court can consider Safari Club's economic losses as a component of their irreparable harm because (1) Safari Club's members' economic harms are not recoverable via later legal action against Federal Defendants, and (2) Safari Club does not rely solely on economic harm as the basis for its preliminary injunction motion.

Safari Club members have and will continue to be harmed by Federal Defendants' decision to ban the importation of elephants from Tanzania and Zimbabwe in 2014. Neither Safari Club nor its members will be able to recover, through an award of damages, the monies

18

already lost and soon-to-be lost due to the bans.  Federal Defendants incorrectly argue that Safari Club must demonstrate economic losses that threaten the existence of Safari Club's or one of its member declarants' businesses.  That standard applies only to recoverable loss which is unavailable to Safari Club and its members.  *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.D.C. 1985); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958).

The "serious in terms of effect" standard also does not apply to Safari Club's economic injuries as courts have applied that standard in cases in which economic injury is the only harm the parties have alleged. *Coal. for Common Sense in Gov't Procurement v. U.S.*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008) As Safari Club's members are harmed by a combination of recreational, conservation and economic injuries, the "serious in terms of effect" standard cannot apply.

As indicated above, contrary to Federal Defendants' assertions, the financial harms resulting from the cancellations are not self-inflicted, but instead were set in motion and expected by Federal Defendants.  When Federal Defendants encouraged hunters to cancel their hunts in Zimbabwe and Tanzania for 2014, they became the direct catalyst for Safari Club's economic harms.  Q&A at 2, Ex. B.

In the Memorandum to the Director prepared on January 3, 2014 by two chiefs of the FWS, Federal Defendants documented their knowledge of the financial stake that hunters make in elephants that would be put at risk by the impending trophy importation ban:

> There are key hunting conventions upcoming where African elephant hunts ***costing tens of thousands of dollars***, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the Annual Safari club International Convention (February 5-8, 2014).

Ex. 2 to Decl. of Anna M. Seidman, Ex. EEE (emphasis added).

It is true that Federal Defendants did not enjoin sport hunting of elephants in Tanzania or Zimbabwe, prevent outfitters and professional hunters from selling such hunts or prevent the legal killing or taxidermy of such elephants (because they lack the authority to make such decisions for a species under the jurisdiction of another country).  It is also true that Federal Defendants shut down importation of elephants in those countries and encouraged hunters to cancel their hunts with full knowledge of the economic impacts that their actions would cause.

The economic harms that Safari Club members have suffered and will continue to suffer as a result of cancellations of these hunts are by no means speculative.  These harms are a calculated casualty that Federal Defendants decided the hunting community would and should sustain.  Similarly, the loss of bookings already sustained by outfitters, professional hunters and booking agents increases as the importation bans persist.  As long as U.S. hunters cannot import their elephants and/or are not sure that they will ever be able to import their elephants, some if not many will cancel their hunts.  Those cancellations will result in business losses to the individuals who rely on those hunts for their livelihoods and will be a direct consequence fully intended by Federal Defendants.

As a result of the importation bans and Federal Defendants' encouragement that U.S. hunters cancel their hunts, outfitters will inevitably sustain financial loss.  Despite their efforts to resell hunts to minimize their losses, the financial harms that the hunting businesses sustain were a direct, intended and expected consequence of Federal Defendants' actions.

> 3.   The Harm to Safari Club's Interests in African Elephant Conservation is
> Irreparable

When Federal Defendants imposed immediate bans on the importation of African elephants from Zimbabwe and Tanzania, they knowingly and purposefully created a situation

that would deprive Zimbabwe and Tanzania of a significant if not the primary source of funding for African elephant conservation.  Federal Defendants, in their Opposition, attempt to distance themselves from the reality of the situation they created.  Safari Club has provided statements from members who have contributed to elephant conservation and have witnessed or participated in the mechanisms by which U.S. funds are used to fight poaching, improve habitat and develop social tolerance for the species.  Safari Club has also provided statements from experienced professional hunters, outfitters and booking agents who are familiar with the hunting market and with the amounts that hunters from various countries are willing to pay for elephant hunts. Nevertheless, Federal Defendants inappropriately attack Safari Club's assertion of irreparable harm to elephant conservation as being too conjectural and self-inflicted.  However, Federal Defendants' own statements lend credence to Safari Club's irreparable harm assertions.

Just as their own documents provided the basis for Safari Club's claims of economic harm, Federal Defendants' own statements bolster Safari Club's conservation-based irreparable harm allegations.  In fact, Federal Defendants have relied on hunting and importation as the basis of elephant conservation in Zimbabwe and Tanzania for most of the last two decades.

For example in Federal Defendants' 2014 Enhancement Finding for Tanzania, Federal Defendants explained:

> U.S. hunters are the primary recipients of licenses in Tanzania.  It is the belief of these hunters, as well as the [Division of Management Authority], that the funds generated from these licenses are being used for conservation purposes.

2014 Enhancement Finding for Tanzania, Ex. J at 8-9.  Even though Federal Defendants decided they could not issue a positive enhancement finding in 2014 for Tanzania due to concerns over what percentage of the proceeds from U.S. hunting was being dedicated to conservation, Federal Defendants nevertheless acknowledged that *some* portion of the money generated by U.S.

hunters continues to fund elephant conservation.  *Id.*  In its 2013 Non-detriment Finding for

Tanzania, Federal Defendants offered greater detail about the role that U.S. sport hunting

revenue plays in Tanzania's elephant conservation:

> According to the Ministry of Natural Resources and Tourism *(in litt.,* 2008), 25%
> of the revenue accrued from the sport hunting of elephants goes to the
> conservation and protection of African elephants and other wildlife species
> through the Tanzania Wildlife Protection Fund, and 25% of the game fees
> received from hunters is given to the local communities in the areas where
> the sport hunting took place. More than 90% of the revenue of the Tanzania
> Wildlife Protection Fund is generated from fees associated with sport-hunting
> activities. Law enforcement for wildlife and wildlife products, including ivory, is
> primarily undertaken by a special antipoaching unit, which is largely subsidized
> by the Tanzania Wildlife Protection Fund (CoPI6 Prop, 11).

2013 Non-detriment Finding for Tanzania, Fed. Def's Ex. 2 at 57.

In their 2014 Enhancement Finding for Zimbabwe, Federal Defendants explained that

revenue generated through sport-hunting continues to be the ***only*** source of funding for the

country's Parks and Wildlife Management Authority ("ZimParks") (Zimbabwe's equivalent of

the U.S. Fish and Wildlife Service).

> However, only revenues generated through sport-hunting conducted on state and
> private lands are used to finance ZimParks and to our knowledge, no other
> government funding is provided.

2014 Enhancement Finding for Zimbabwe, Ex. D at 4-5*; see also* 79 Fed. Reg. 26986, 26987

(May 12, 2014).

On April 4, 2014, Federal Defendants made a decision that they knew would deprive

Zimbabwe and Tanzania of a portion of that conservation funding.  Federal Defendants went as

far as to encourage U.S. hunters not only not to import their elephants from the two countries,

but to cancel their hunts.  In short, Federal Defendants took conscious steps to deprive

Zimbabwe and Tanzania of U.S. hunter revenues. Federal Defendants cannot have it both ways.

They cannot acknowledge the connection between U.S. hunters and elephant conservation for

their own decision-making purposes but deny the connection when Safari Club relies on it to prove that the absence of U.S. sport-hunting revenues will be harmful to elephant conservation. Federal Defendants cannot take affirmative steps to encourage U.S. hunters not to invest their financial resources in Zimbabwe and Tanzania and then pretend that the absence of those funds will have no impact on African elephant conservation.  Federal Defendants certainly cannot assert that the absence of U.S. revenues to be used for anti-poaching, habitat improvement and social tolerance projects is a self-inflicted injury when Federal Defendants imposed a ban that they knew would result in fewer U.S. elephant hunters in the two countries and expressly encouraged U.S. hunters to cancel their hunts.

While Federal Defendants attempt to refute Safari Club's conservation based harms by quoting from the least conclusive portions of some of Safari Club's declarations, Federal Defendants fail to address the more concrete statements Safari Club provided to prove the harm that the importation bans has caused and will cause to their conservation interests.  For example, Hermanus De Vries described his hunting company's role in discovering the poaching incident and financing the operation that tracked down and caught the poachers that poisoned over 100 elephants in Hwange National Park in Zimbabwe.  He stated:: "Without the U.S. hunters that pay a premium to hunt elephants, we would not have had enough money to fund this operation.  We also would not have been in the area to uncover the incident."  De Vries Decl., Ex. SS, ¶ 11. John Barth, who has sold and outfitted between 5-25 elephant hunts each year for the last 15 years, explained that U.S. hunters pay higher prices for elephant hunts than their counterparts from other countries.  Barth Decl., Ex. OO, ¶ 14.  Barth further stated:

> In the hunting concessions we hunt in Zimbabwe and used to hunt in Botswana, revenue generated from trophy hunting is the only source of conservation dollars being brought into the region.  The revenue pays for simple things like food, shelter and supplies for anti-poaching teams.  It pays for diesel fuel to run pumps

23

at water wells where animals drink, and it pays the local communities for the crops lost from elephant damage.

*Id.,* ¶ 9.  Federal Defendants also fail to reference the CAMPFIRE Program, one of the most significant and successful conservation strategies operating in Zimbabwe.  CAMPFIRE operations are referenced in six of the declarations that Safari Club submitted in support of its PI Motion.  Grieb Decl, Ex. U, ¶ 10;  Capozza Decl., Ex. AA,  ¶ 13; Pole Decl., Ex. LL, ¶ 8; Pieters Decl., Ex. PP, ¶ 12; De Vries Decl., Ex. SS, ¶¶ 12, 13; Cheek Decl., Ex N, ¶¶ 12, 14; *see also* Declaration of Charles Jonga, attached as Exhibit DDD ("The CAMPFIRE program relies heavily on U.S. sport-hunters.  Of the 167 hunts booked in CAMPFIRE areas in 2014, 106 were booked by U.S. hunters.")

Even if Safari Club's declarations cannot quote the exact number of hunters who will cancel their hunts or the exact amount of money that will not be invested by U.S. hunters in Tanzania and Zimbabwe during 2014 because of the importation bans, this Court has ample evidence to determine that U.S. hunters, who pay more for elephant hunts than hunters from other countries, are cancelling their hunts and that the loss of *any* U.S. hunters will result in less revenue being generated for African elephant conservation in the two countries.  The only way to prevent more cancellations and a further decrease in revenue for conservation and to expeditiously prevent harm to elephants is for this Court to immediately enjoin the importation bans for the duration of this litigation.

## CONCLUSION

Safari Club has demonstrated that it has standing to pursue its claims and that this case is ripe.  Consequently, this Court has jurisdiction to review this matter.  In addition, Safari Club has demonstrated the irreparable harm necessary for preliminary injunctive relief.  For these reasons,

Safari Club respectfully requests that this Court grant Safari Club's Motion and that the Court issue an injunction requiring Federal Defendants to remove the ban that prevents Safari Club members and others from importing their elephant trophies from Zimbabwe and Tanzania.


Dated: May 16, 2014                           Respectfully submitted,


                                              /s/Anna M. Seidman
                                              Anna M. Seidman
                                              D.C. Bar No. 417091
                                              Douglas Burdin
                                              D.C. Bar No. 434107
                                              Jeremy Clare
                                              D.C. Bar No.  1015688
                                              501 2nd Street NE
                                              Washington, D.C.
                                              Tel: 202-543-8733
                                              Fax: 202-543-1205
                                              aseidman@safariclub.org
                                              dburdin@safariclub.org
                                              jclare@safariclub.org