SAFARI CLUB INTERNATIONAL v. SALLY M. R. JEWELL, *et al.*

Plaintiff Safari Club International's Reply to Federal Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction

Case No.: 14-cv-00670 (ABJ)

# Exhibit 2

January 8, 2014

## INFORMATION MEMORANDUM FOR THE DIRECTOR

**FROM:** Bryan Arroyo

**CC:** Steve Guertin, Deputy Director

**SUBJECT:** Suspension of imports of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014

### I.     SUMMARY

Based on our review of the best available information, the U.S. Fish and Wildlife Service (Service) will be unable to make positive findings required under the Convention on International Trade in Endangered Species (CITES) or the Endangered Species Act (Act) to allow the import of sport-hunted African elephant trophies taken in Tanzania and Zimbabwe during calendar year 2014. The required findings are currently being finalized and will be completed by late February 2014.

In Tanzania, recent information indicates a significant elephant population decline, primarily due to poaching for ivory. In addition, we have growing concerns over the ability of the Government of Tanzania to successfully manage its elephant hunting program to ensure that it provides a clear benefit to the survival of elephants within the country. Given this information, the Division of Scientific Authority (DSA) will not be able to find that the import of sport-hunted elephant trophies taken in Tanzania will be for purposes that are not detrimental to the survival of the species, as required under CITES. Likewise, the Division of Management Authority (DMA) will not be able to find that the "the killing of the animal whose trophy is intended for import would enhance the survival of the species" as required by the Act's special rule for African elephants contained in 50 CFR 17.40(e). We recognize that sport hunting, as part of a sound management program, can provide benefits to conservation and that sport hunting of elephants is not the primary cause of the decline of elephant populations in Tanzania. However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management practices, we are concerned that additional killing of elephants, even if legal, is not sustainable and is not supporting effective management and community programs that enhance the survival of the species in Tanzania.

For Zimbabwe, credible information about the status of elephants is extremely limited. However, indications are that Zimbabwe's elephant population is also being affected by the African elephant poaching crisis. In addition, there do not appear to be adequate governmental controls in place in Zimbabwe to ensure that the "killing of the animal whose trophy is intended for import would enhance the survival of the species" as required by the special rule for elephants. Consequently, DMA is unlikely to be able to make such a determination. While recognizing the potential benefits that the sport hunting of elephants could provide to elephant conservation, we have insufficient information to determine how sport hunting is supporting effective management and community programs that enhance the survival of the species in Zimbabwe.

1

We are raising this issue at this time due to the need for early engagement with the sport-hunting community to maintain positive relations and create opportunities for cooperative action to affect change. There are key hunting conventions upcoming where African elephant hunts costing tens of thousands of dollars, including in Tanzania and Zimbabwe, are booked by hunters, including the Dallas Safari Club Convention (January 9-12, 2014) and the Annual Safari Club International Convention (February 5-8, 2014). We recommend that high-level outreach be considered prior to these meetings. We recommend that outreach to the sport-hunting community be undertaken before any messages about suspension of elephant trophy imports from Tanzania and Zimbabwe are disseminated broadly.

As we finalize our negative findings, we will identify specific actions that can be taken by Tanzania and Zimbabwe that might allow the Service to reconsider its findings in the future. These actions, in addition to being provided to the Governments of Tanzania and Zimbabwe, could be shared with our Federal Government partners and leaders in the sport-hunting community with the idea that collaboration and partnership will be important to effect positive changes.

## II. DISCUSSION

Import of African elephant hunting trophies into the United States is subject to FWS regulations implementing CITES and the ESA. The African elephant is listed as threatened (throughout its range) under the ESA and trade in African elephant specimens is regulated by a special rule under Section 4(d) of the Act (50 CFR 17.40(e)). The special rule allows for import of African elephant hunting trophies without an ESA permit, provided they are accompanied by the necessary CITES permits and a determination has been made that "the killing of the animal whose trophy is intended for import would enhance survival of the species." The African elephant population of Tanzania is listed in CITES Appendix I; therefore, elephant hunting trophies from Tanzania must be accompanied by a CITES export permit, issued by the country of origin, and a CITES import permit, issued by FWS. The African elephant population of Zimbabwe is listed in CITES Appendix II; therefore, only the CITES export permit issued by the country of origin is required. [Our regulations (50 CFR 17.8) also provide for the noncommercial import of any other threatened, CITES Appendix-II wildlife without an ESA permit when certain conditions are met.]

*Tanzania:* Tanzania's CITES annual export quota for elephants is 400 tusks (200 elephants). In the past, Tanzania typically has not exported its full quota. To issue a CITES Appendix-I import permit for sport-hunted elephant trophies taken in Tanzania, DSA must make a finding that the import is for purposes that are not detrimental to the survival of the species. In addition, under the special rule for African elephants, DMA must determine that the killing of the animal whose trophy is intended for import would enhance the survival of the species.

The Selous-Mikumi ecosystem was once an elephant stronghold, representing the second largest elephant population in Africa and about 40% of Tanzania's total elephant population. However, an October 2013 population survey conducted in that ecosystem indicates an 80% population decline has occurred in the last 3 years, from ~40,000 to ~13,000. In addition, while updated numbers are not readily available for many other areas in Tanzania, all indications are that those

2

populations have experienced similarly drastic declines. With the precipitous decline of African elephants in the Selous-Mikumi ecosystem, and strong indications of similar declines in other Tanzanian populations, it is no longer possible for us conclude the national elephant population of Tanzania is stable.

According to an analysis of data from the Elephant Trade Information System (ETIS, a global illegal elephant trade tracking system) presented at CITES CoP16, both Zimbabwe and Tanzania are implicated as significant players in the illegal ivory trade. This is particularly true for Tanzania. In the ETIS analysis presented at CoP15, Tanzania was already identified as a country of concern with respect to large consignments of illicit ivory leaving the African continent. In the intervening three years, the ETIS data show that both Kenya and Tanzania continue to be the primary conduits for large shipments of ivory exported to Asia, together accounting for nearly half of the 34 large-scale ivory seizures by number and 58% of the associated weight of such seizures during the period 2009-2011. These two countries have been implicated in 16 of the world's largest ivory shipments, totaling some 35 tonnes of ivory, interdicted at, or successfully moved through, their Indian Ocean seaports of Mombasa, Dar es Salaam, and Zanzibar.

The CITES program known as Monitoring the Illegal Killing of Elephants (MIKE) also reported at CITES CoP16. MIKE monitors sites throughout Asia and Africa, and evaluates relative poaching levels based on the Proportion of Illegally Killed Elephants (PIKE), which is calculated as the number of illegally killed elephants found divided by the total number of elephant carcasses encountered by patrols or through other means, aggregated by year for each site. The data presented at CoP16 suggest an ongoing increase in levels of illegal killing of elephants since 2006, with 2011 displaying the highest levels of poaching since MIKE records began in 2002. This increase between 2010 and 2011 is statistically significant. Prior to 2011, 2010 had the highest levels on record. PIKE levels were above 0.5 in all four subregions in 2011, meaning that more than half of elephants found dead were deemed to have been illegally killed. A PIKE of 0.5 or higher exceeds maximum birth rate and means that the elephant population is very likely to be in net decline.

In Selous, Tanzania's sole World Heritage Site that is also a MIKE site, the 2011 PIKE was .64, a nearly 27% increase over the 2002-2010 average of .50. In Ruaha Rungwa, another MIKE site with a significant elephant population, the 2011 PIKE was .94, the highest ever recorded for that site.

In addition to concerns over the elephant population trend within Tanzania, there have been numerous recent reports of questionable government activities in regard to how the elephant hunting program is being managed, how hunting concessions are awarded and for how long, and how funds generated by the hunting program are used. While it is possible that a well-managed hunting program could provide conservation benefits to the species, there are clear indications that Tanzania's program is not being managed in a manner where the participation of U.S. hunters provides the benefits called for under the ESA. One recent news report reiterates our concerns. On December 20, 2013, *The Citizen*, a Tanzanian news outlet, reported that President Jakaya Kikwete had fired four ministers— the Ministers for Home Affairs, Defense and National Service, Natural Resources and Tourism, and Livestock Development and Fisheries—for failing to effectively manage the infamous *Operesheni Tokomeza Ujangili*, a government anti-poaching campaign that was suspended indefinitely due to claims of civilian abuse, torture, extortion, and

3

murder. These reports led to further concerns about Tanzania's ability to safeguard their elephant population and implement effective sport-hunting programs such that the elephant populations are enhanced by those programs.

We have made positive findings and issued permits to allow the import of sport-hunted elephant trophies from Tanzania for more than 15 years. Recently, these findings have been based on information in the report of a Panel of Experts convened to evaluate Tanzania's CoP15 (2010) proposal to down list their elephant population from CITES Appendix I to Appendix II; the proposal was rejected. Despite reports of poaching and other wildlife management issues in Tanzania, available information had indicated that legal sport hunting within the declared quotas was not causing a population declines and, because of revenues generated by sport hunting, had the potential to provide conservation benefits to the species. However, given recent population survey numbers, it appears that the illegal offtake is so great that the legal offtake could be contributing to the ongoing population decline and may be detrimental to the survival of the species in Tanzania. Likewise, due to questionable management practices within the hunting program, it is now difficult to find that the killing of the animal whose trophy is intended for import would enhance the survival of the species, as required by the Act.

*Zimbabwe:* Zimbabwe's CITES annual export quota for elephants is 1,000 tusks (500 elephants). Although no U.S. CITES or ESA permits are required for the import of sport-hunted trophies from Zimbabwe, the special rule for African elephants requires that a determination be made that the killing of the animal whose trophy is intended for import would enhance the survival of the species. So, the Service does have the ability to suspend the import of elephant hunting trophies if it is unable to determine that the imports provide a clear benefit to the survival of the species within Zimbabwe.

While some popular reports continue to name Zimbabwe as the African country with the third-largest elephant populations, the current status of elephants in Zimbabwe is unknown. The International Union for Conservation of Nature (IUCN) reports that only a small portion of Zimbabwe's elephant habitat has been surveyed in recent years, resulting in an overall degradation in the quality of data. It is feared that due to government dysfunction and lack of effective protection, Zimbabwe's elephants have experienced severe declines in the past decade.

Further, MIKE data support the hypothesis that elephant populations in Zimbabwe are significantly declining. In Chewore, Zimbabwe's only World Heritage Site that is also a MIKE site; the 2011 PIKE was .67, a 180% increase over its 2002-2010 average of .24. In Nyami Nyami, Zimbabwe's only other MIKE site, the PIKE was .81, much higher than what could be considered a biologically sustainable level of poaching.

Without reliable population estimates, it is unclear how Zimbabwe's hunting offtake is determined to be biologically sustainable. Reports indicate that questionable hunting practices are taking place, including the shooting of female elephants, sport-hunting of crop-raiding animals, and accusations of hunting within protected areas.

Along with unknown population levels, we are concerned about the status of Zimbabwe's once well-managed hunting and community resource conservation programs. Recent information indicates that the newly appointed Minister of the Environment, Water, and Climate recognizes

4

deficiencies within Zimbabwe Parks and Wildlife Management Authority (ZPWMA) and the need to reinvigorate the country's Communal Areas Management Programme for Indigenous Resources (CAMPFIRE). In addition, there have been reports of government corruption, including politicization of hunting quota distribution and abuse of ration quotas (internal ZPWMA program to provide game meat to government employees), as well as purported direct and indirect participation in wildlife trafficking by Zimbabwean politicians, defense forces, and intelligence officers. Poaching is believed to be widespread. Recently, poachers used cyanide to poison over 90 elephants in Hwange National Park.

The U.S. Government has sanctions in place for individuals who are senior officials of the Government of Zimbabwe, have participated in human rights abuses related to political repression, and/or have engaged in activities facilitating public corruption by senior officials of the Government of Zimbabwe. U.S. sanctions also target entities owned or controlled by the Zimbabwean government or officials of the Zimbabwean government. Popular articles and unofficial reports indicate that Zimbabwean government officials may be financially linked to sport hunting in Zimbabwe, which raises concern about whether money intended to enhance the survival of elephants is being used for that purpose. An undated Safari Club International Foundation fact sheet that cites a 2007 report estimates that elephant hunting contributes $12 million annually to the economy in Zimbabwe. It is unclear how this money is being used, or if it provides any benefits to elephant conservation efforts within Zimbabwe. The lack of credible data undermines our ability to make positive findings with regard to whether sport hunting enhances the survival of the species.

In the past, we have not used the requirements of the elephant special rule as the basis for suspending imports for an Appendix-II population and have allowed elephant trophies to be imported from Zimbabwe since 1997. At this time, the other Appendix-II African elephant populations in South Africa, Botswana, and Namibia are stable or increasing. Because no U.S. permits are required for elephant trophies from Zimbabwe, outreach will be an important factor to ensure that the sport-hunting community is made aware of any prohibitions on imports.

**PREPARED BY:** Rosemarie Gnam, Ph.D., Chief, Division of Scientific Authority, and Roddy Gabel, Chief, Division of Management Authority.

**DATE:** January 3, 2014