# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL )<br>501 2nd Street NE )<br>Washington, DC 20002; and )<br>NATIONAL RIFLE ASSOCIATION OF )<br>AMERICA )<br>11250 Waples Mill Rd, 5N )<br>Fairfax, VA 22030 )<br> )<br>        Plaintiffs, )<br> )<br>v. )<br> )<br>SALLY M. R. JEWELL, in her official )<br>capacity as Secretary of the U.S. )<br>Department of the Interior; )<br>U.S. DEPARTMENT OF THE INTERIOR, )<br>an agency  of the United States; )<br>DANIEL ASHE, in his official capacity as )<br>Director of the U.S. Fish and Wildlife Service; and )<br>U.S. FISH AND WILDLIFE SERVICE, )<br>an agency of the United States )<br>1849 C Street, NW )<br>Washington, DC 20240, )<br> )<br>        Defendants. ) | Civ. No. 14-cv-00670 (ABJ) |

## [PROPOSED] SECOND AMENDED AND SUPPLEMENTED COMPLAINT FOR DECLARATIVE AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      For decades U.S. hunters have been able to hunt African elephants in Zimbabwe and Tanzania and import their sport-hunted elephants into the United States.  This hunting and importation supported elephant conservation by increasing the value of African elephants for local communities, discouraging poaching for ivory and/or food and providing financial resources for elephant protection.  On April 4, 2014, without warning or public input, all this

1

abruptly ended. The U.S. Fish and Wildlife Service ("FWS"), an agency of the U.S. Department of the Interior, abruptly and immediately suspended the importation of legally sport-hunted African elephant trophies from Zimbabwe and Tanzania ("importation bans").  Subsequently, the FWS published a Federal Register notice that announced the decision for Zimbabwe's elephants, admitted errors in their decision-making process, characterized the Zimbabwe importation ban as "temporary," promised a new decision on whether to lift the ban by mid-July and left the illegal ban in place.  On July 23, 2014, the FWS announced that it would not lift the Zimbabwe importation ban.  The FWS posted its new decision, dated July 22, 2014, on its website and published that decision in the Federal Register on July 31, 2014.

2.      With this Complaint, Plaintiffs, Safari Club International and National Rifle Association of America ("SCI/NRA"), challenge the April 4, 2014 and July 22, 2014 actions of Defendants Sally M. R. Jewell, in her official capacity as Secretary of the U.S. Department of the Interior; the U.S. Department of the Interior; Daniel Ashe, in his official capacity as Director of the U.S. Fish and Wildlife Service; and the U.S. Fish and Wildlife Service ("Federal Defendants").

3.      In establishing the Zimbabwe elephant importation ban, Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion by 1) relying on "limited" data and "anecdotal" evidence and failing to obtain accurate and substantiated information before making and implementing a decision to ban the importation of elephants from Zimbabwe on April 4, 2014; 2) enforcing an unauthorized and baseless "temporary" ban on importation of elephants from Zimbabwe between April 4, 2014 and July 31, 2014; 3) applying an arbitrary standard of enhancement when determining if sport-hunting enhances the survival of Zimbabwe's elephants; 4) failing to follow their own stated procedures for changing their

position on whether sport hunting of elephants in Zimbabwe enhances the survival of the species; 5) imposing an importation ban for elephants from Zimbabwe on July 31, 2014 based on lack of information rather than upon "new" information; 6) determining on July 22, 2014 that Zimbabwe elephant conservation and management laws, plans and strategies provided insufficient proof that the importation of sport hunted elephants enhances the survival of the species despite the contradictory finding that those same laws, plans and strategies demonstrated sufficient proof of enhancement of survival from August 22, 1997 through April 3, 2014; 7) failing to give the public notice of and an opportunity to comment on the change in importation status and standards used for determining enhancement of survival; and 8) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Zimbabwe is necessary for the importation of sport-hunted elephants from populations listed on Convention for International Trade in Endangered Species of Wild Fauna and Flora ("CITES") Appendix II without first providing notice of the requirement and an opportunity for the public to comment.

4.      In establishing the Tanzania elephant importation ban, Federal Defendants acted arbitrarily and capriciously, violated the law, and abused their discretion by 1) failing to give the public notice and the opportunity to comment on the Tanzania elephant importation ban; 2) imposing and enforcing a requirement that a finding that enhancing the survival of the African elephant in Tanzania is necessary for the importation of sport-hunted elephants without first providing notice of the requirement and an opportunity for the public to comment; and 3) applying an incorrect non-detriment finding analysis for the importation of African elephants from Tanzania.

5.      Federal Defendants' actions violate the Endangered Species Act ("ESA") and the Administrative Procedure Act ("APA").

3

6.     Declaratory and injunctive relief is required to remedy the harm that the adoption and implementation of the importation bans have caused and will continue to cause.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action under the APA, 5 U.S.C. §§ 702, 706 (judicial review of final agency action and inaction) and 28 U.S.C. § 1331 (federal question jurisdiction).  The Court can grant declaratory and injunctive relief under 28 U.S.C. § 2201, 28 U.S.C. § 2202, and 5 U.S.C. §§ 701-706.

8.     Venue is proper in the District of Columbia under 28 U.S.C. § 1391(e) as this action is brought against agencies of the United States and against officers of agencies of the United States in their official capacities.  Decisions and actions challenged here were made, at least in part, in this District; Safari Club and the NRA each maintain an office in this District; and no real property is involved.

9.     Members of SCI/NRA are hunters, outfitters, professional hunters, booking agents, taxidermists and others who hunt, guide, arrange for hunts and otherwise rely on hunting for their personal, professional and conservation interests in African elephants and who rely on the ability of U.S. hunters to import sport-hunted African elephants from Zimbabwe and, Tanzania into the United States to fulfill those interests.  Members of SCI/NRA also rely on the ability of U.S. hunters to import sport-hunted African elephants from South Africa and Namibia, two other countries from which CITES allows the export of sport-hunted African elephants.

10.     The judicial review provisions of the APA waive the Federal government's sovereign immunity.  5 U.S.C. § 702.

## PARTIES

11.     Safari Club International, a nonprofit IRC § 501(c)(4) corporation, has

approximately 50,000 members worldwide.  Safari Club's mission is to protect the freedom to

hunt and to promote wildlife conservation worldwide.  Safari Club's purposes include the

following:

- To advocate, preserve and protect the rights of all hunters;
- To promote safe, legal and ethical hunting and related activities;
- To engage in advocacy within the limits imposed by law and regulation, to monitor, support, educate or otherwise take positions on local, national and international legislative, executive, judicial or organizational endeavors that foster and support these purposes and objectives; and
- To inform and educate the public concerning hunting and related activities.

12.     Safari Club works in coordination with the Safari Club International Foundation

("SCIF"), a nonprofit IRC § 501(c)(3) corporation.  SCIF's mission is to fund and manage

worldwide programs dedicated to wildlife conservation, outdoor education and humanitarian

services.  SCIF's purposes include the following:

- To conduct and support scientific and technical studies in the field of wildlife conservation, to assist in the design and development of scientifically sound wildlife programs for the management of wildlife and sustainable use hunting, and to demonstrate the constructive role that hunting and hunters play in the conservation of wildlife and in preserving biodiversity worldwide; and
- To carry out and to support education programs on wildlife conservation, ecology and natural resource management that include a demonstration of the constructive role that hunting and hunters play in natural resource conservation and land management.

13.     Safari Club promotes the principles and practice of sustainable use conservation.

Safari Club and Safari Club members' interests include the sound sustainable use conservation of

African elephants in Zimbabwe, Tanzania, South Africa and Namibia.  Safari Club members

have an interest in their ability to hunt those elephants and to import the elephants from

successful hunts.  Other Safari Club members have an interest in guiding those hunts and being

able to sell to U.S. residents elephant hunts that take place in Zimbabwe, Tanzania, South Africa and Namibia. Still other Safari Club members have an interest in arranging those hunts, performing the taxidermy on sport-hunted elephants from successful African elephant hunts and conducting other types of business related to African elephant hunting in Zimbabwe, Tanzania, South Africa and Namibia. Safari Club members have an interest in the continued ability to participate in the sustainable use conservation of the African elephant, in the long-term survival of the African elephant species, and in preventing poaching from threatening the survival of the species.

14.     Safari Club and members of Safari Club are harmed and aggrieved by the abrupt suspension of the importation of legally sport-hunted African elephants from Zimbabwe and Tanzania. For many, the opportunity to hunt elephant in Zimbabwe and Tanzania is an event of a lifetime that will never be repeated. Most Safari Club members who want to participate in an African elephant hunt wish to bring back the elephant from their successful hunt as a prized memento of a treasured experience. A hunter's inability to import his legally sport-hunted African elephant deprives the hunter of an element of the hunting experience to which he or she attributes great value. A great number will not invest in an expensive elephant hunt if they cannot import the symbol of their successful hunt. Many Safari Club members booked upcoming hunts in these countries years in advance, invested significant funds towards the trip, and have been or will be unable to recover the funds already expended if and when they cancel their bookings. Many SCI members experienced greater uncertainty when the Federal Defendants characterized the April 4, 2014 importation ban for Zimbabwe as "temporary" and "interim." These characterizations made it difficult for them to decide whether to cancel their upcoming hunts or to wait until Federal Defendants decided whether to lift the ban.

15.     Other Safari Club members are outfitters, professional hunters and booking agents who provide African elephant hunts to U.S. residents.  These Safari Club members have been and will continue to be harmed and aggrieved by the abrupt suspension of African elephant importation for 2014.  These Safari Club members have lost clients and bookings due to the importation bans.  Their livelihoods and ability to remain in business have been drastically affected due to the reduction in the value of elephant hunts, cancellations by U.S. hunters and the lack of interest from U.S. hunters to book future hunts.

16.     Still other Safari Club members are taxidermists and other craftsmen who rely on U.S. hunters for business related to their successfully hunted African elephants.  The loss of U.S. hunters and the inability of U.S. hunters to import their elephants into the U.S. is significantly harming these Safari Club members' businesses and livelihoods.

17.     Safari Club and Safari Club members are aggrieved by the harm that the suspension of elephant importation is causing to African elephant conservation in Zimbabwe and Tanzania.  Safari Club members support sustainable use conservation generally and the role that hunting plays in African elephant conservation specifically.  The elephant importation bans have diminished the number of hunters and outfitting operations present in the field in elephant range in Zimbabwe and Tanzania, which is consequently erasing a major deterrent to poaching in these areas.  Fewer U.S. hunters means a reduction in the revenue and elephant meat (contributed by sport-hunters) going to local communities in Zimbabwe and Tanzania.  This loss of a source of income and food increases the incentives for poaching both by those who kill elephants only to sell the ivory and those who kill elephants only to provide food for their families and communities.

18.     The inability to import sport-hunted elephants and the reduction of demand by U.S. hunters is diminishing the value of elephants to all but the poachers.  This loss of value is reducing the tolerance of local communities for the destructive tendencies of elephants and is encouraging local communities to kill the elephants themselves or facilitate their removal by poachers.  Safari Club members are being harmed by the loss of conservation incentives and the ultimate loss of elephants that is resulting from the importation bans.

19.     Before the April 4, 2014 implementation of the elephant importation bans, Safari Club members could import sport-hunted elephants from Zimbabwe and Tanzania.  Now they cannot import any sport-hunted elephant taken after April 4, 2014, regardless of whether the elephant was hunted in accordance with the laws of the countries that have the authority to regulate the hunting of these animals.

20.     Safari Club and its members possess sufficient interests in the subject matter of this litigation to establish standing.  In addition, Safari Club and Safari Club members have suffered concrete injury in fact caused by Federal Defendants' elephant importation bans.  A court ruling declaring illegal and enjoining the bans will redress those injuries.  Safari Club members will be able to import elephants taken in Zimbabwe and Tanzania since April 4, 2014.  Safari Club members will once again import their legally sport-hunted African elephants, guide hunts, sell hunts, process elephants and otherwise engage in activities that are dependent on and/or related to the ability to import African elephants from Zimbabwe and Tanzania.  Safari Club and Safari Club members will be able to continue to participate in activities that help to encourage African elephant conservation in these two countries and to support and finance activities that discourage if not prevent poaching.  Safari Club is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

21.     The National Rifle Association of America (NRA) is a nonprofit corporation incorporated in New York in 1871, operating under § 501(c)(4) of the Internal Revenue Code, with principal offices and place of business in Fairfax, Virginia.  NRA's Federal Affairs Office is located in Washington, D.C.  Its membership includes approximately 5,000,000 individuals from the United States and many of the countries around the world.  Among its purposes and objectives are, "[t]o promote hunter safety, and to promote and defend hunting as a shooting sport and as a viable and necessary method of fostering the propagation, growth and conservation, and wise use of our renewable wildlife resources."  (NRA Bylaws Article II Section 5).

22.     The NRA has a Director of Conservation, Wildlife and Natural Resources working from its headquarters in Fairfax, Virginia.  The Director's primary responsibility is to promote the interests of the hunting community in wildlife management, healthy habitats and sustainable populations to ensure that these wildlife populations continue to be available to be enjoyed by NRA members and to protect and sustain hunters' legacy as the primary supporters of wildlife conservation.

23.     NRA and its members have a strong interest in enhancing the survival of African elephants in Zimbabwe, Tanzania, South Africa and Namibia in a manner that promotes proper wildlife management of the species.  NRA members have participated in hunts of African elephants in Zimbabwe and Tanzania and have imported their elephants or attempted to do so but were prevented after Federal Defendants' elephant importation bans went into effect just one day after the member legally harvested an African elephant.  Others have made substantial investments towards future hunts of African elephants in Zimbabwe and Tanzania that have been placed in jeopardy due to Federal Defendants' elephant importation bans.

24.     Federal Defendants' elephant importation bans have also negatively impacted NRA members participating in ancillary fields directly related to the hunting of African elephants in Zimbabwe and Tanzania. NRA members involved in the marketing, planning, outfitting and guiding hunts of African elephants in Zimbabwe and Tanzania have been forced to cancel trips and reevaluate already booked trips, resulting in current and continuous damages.

25.     Federal Defendants' elephant importation bans threaten sustainable use conservation of the African elephant species directly impacting and damaging NRA members' interests. In addition to the concrete injury in fact the bans have on the livelihood of NRA members, the long-term survival of the African elephant faces major complications associated with a decrease in NRA member assisted conservation efforts that have prevented poaching from threatening the survival of the species. Ensuring a viable population of African elephants in Zimbabwe and Tanzania through sustainable use conservations efforts is of paramount importance to NRA and its members.

26.     NRA and its members possess sufficient interests in the subject matter of this litigation to establish standing. Federal Defendants' elephant importation bans have caused current and continuous injury upon NRA members. A court ruling declaring illegal and enjoining the bans would redress those injuries. NRA members could once again import their legally sport-hunted African elephants, guide and sell hunts and otherwise engage in activities that are dependent on and/or related to the ability to import African elephants from Zimbabwe and Tanzania. These activities are of cardinal importance to the NRA and its members as they allow for direct participation and support of the African elephant populations in Zimbabwe and Tanzania through sustainable use conservation efforts. NRA is an aggrieved party and is entitled to judicial review of the actions and inactions challenged here under the APA and ESA.

27.     Defendant Sally M. R. Jewell is the Secretary of the Interior and has ultimate responsibility for the administration of the ESA and the decisions made by the parties to CITES within the United States Department of the Interior.  She is sued in her official capacity.

28.     Defendant U.S. Department of the Interior is an agency of the federal government that is authorized to administer and implement the ESA and to administer the decisions made by the parties to CITES.

29.     Defendant Daniel Ashe is the Director of the U.S. Fish and Wildlife Service.  He has responsibility for the administration and implementation of the ESA and the decisions made by the parties to CITES, including with regard to the suspension of African elephant importation from Zimbabwe and Tanzania for 2014.  He is sued in his official capacity.

30.     Defendant U.S. Fish and Wildlife Service is an agency within the Department of the Interior that is authorized to administer and implement the ESA and the decisions made by the parties to CITES.

## FACTUAL BACKGROUND

31.     African elephants (loxodonta Africana) are found throughout much of Africa. The majority of African elephants live in southern and eastern Africa, including Zimbabwe, Tanzania, South Africa and Namibia.

32.     Currently, all African elephants are listed as threatened under the ESA.  African elephants in Zimbabwe, Namibia, South Africa and Botswana are listed on Appendix II of CITES.  All other African elephants, including those in Tanzania, are listed on Appendix I of CITES.

33.     In 1977, the FWS was petitioned to list the African elephant as endangered under the ESA.  In 1978, the FWS listed all African elephants as threatened under the ESA.  43 Fed.

Reg. 20499 (May 12, 1978).  With the listing, the FWS adopted a special rule that regulates the importation of legally hunted African elephants.  50 C.F.R. § 17.40(e) ("special rule").

34.     At the seventh CITES Conference of the Parties ("COP") in 1989, the parties to CITES transferred all African elephants from Appendix II to Appendix I.  55 Fed. Reg. 5847 (Feb. 20, 1990).  Pursuant to the CITES Treaty, a country allowing the importation of members of an Appendix I species must make a finding that the "import will be for purposes which are not detrimental to the survival of the species involved." ("Non-detriment finding" or "NDF")  CITES text, Article III.

35.     The FWS received another petition in 1989 to uplist the African elephant from threatened to endangered status, but rejected it.  57 Fed. Reg. 35473 (Aug. 10, 1992).  The FWS amended the special rule to include a provision that allowed the importation of sport-hunted elephants so long as CITES requirements were fulfilled and the elephant was appropriately marked.  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992).  At the time, the parties to CITES required that an enhancement of survival determination be made by the importing country for species listed on Appendix I, including elephants.  The FWS promulgated the special rule to specifically require that same enhancement of survival requirement for the importation of a CITES Appendix I species.  *Id.*

36.     In the Federal Register notice accompanying the special rule, the FWS also recognized that sport-hunting "provide[s] important revenues for elephant conservation to range states."  *Id.*

37.     The FWS's Division of Scientific Authority ("DSA") is the designated CITES "Scientific Authority" for the United States.  Before the FWS issues a permit for the importation of a CITES Appendix I species, the DSA makes a non-detriment finding called an "advice."  The

DSA gives the advice to the FWS's Division of Management Authority, which makes the decision whether or not to grant the permit.

38.     At least as early as 1993, the DSA issued general non-detriment advices for African elephants taken from Zimbabwe and South Africa and the FWS allowed the importation of legally taken sport-hunted elephants into the United States.  At least as early as 1993, the DSA issued non-detriment advices for African elephants taken from Tanzania, Namibia and Cameroon and the FWS allowed the importation of legally taken sport-hunted elephants into the United States.  60 Fed. Reg. 12969, 12969-70 (Mar. 9, 1995).

39.     At the tenth COP in 1997, the parties to CITES transferred Zimbabwe's elephants from Appendix I to Appendix II.  The FWS adopted this change in 1998.  63 Fed. Reg. 63210 (Nov. 12, 1998); 62 Fed. Reg. 44627 (Aug. 22, 1997).  Since the parties to CITES determined that, for Appendix II species, the importing country need not make its own NDFs to authorize the importation of sport-hunted members of the species, the FWS has not made such findings for Zimbabwe's elephants and has not required hunters who import their legally sport-hunted African elephants from Zimbabwe to apply for or obtain an importation permit from the U.S. CITES text, Article IV.   62 Fed. Reg. 44627, 44633 (Aug. 22, 1997).

40.     In a Federal Register notice published in 1997, the FWS announced that it had made an enhancement finding for African elephants from Zimbabwe.  The notice was based upon a July 2, 1997 "Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe" ("1997 Zimbabwe Enhancement Finding").  The Federal Register notice stated that the enhancement finding for importation of sport-hunted elephants from Zimbabwe would "remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published notice of any change in the Federal

Register." *Id.* The FWS made the same two commitments for its determinations regarding importation of elephants from Namibia (*id.*) and South Africa. 66 Fed. Reg. 27601, 27609 (May 18, 2001).

41.     Until April 4, 2014, the FWS allowed the importation of sport-hunted elephants from Zimbabwe, Namibia, South Africa, Botswana and Tanzania.  During the eight year period from 2004 to 2011, 1,186 sport-hunted elephants were imported into the United States from Zimbabwe.  During that same eight year period, 300 sport-hunted elephants were imported into the United States from Tanzania.

42.     Each year, in accordance with CITES, the range states establish a quota for the number of sport-hunted elephants that will be allowed to be exported from their country.  For 2014, Zimbabwe's quota is 500 elephants and Tanzania's quota is 200 elephants.

43.     On April 4, 2014, the FWS announced, in a press release posted on the FWS website, an immediate suspension of the importation of sport-hunted elephants taken in Tanzania and Zimbabwe during the 2014 calendar year.

http://www.fws.gov/news/ShowNews.cfm?ID=2E6FF2A2-E10F-82BC-DAE08807810E3C6B. The FWS gave no prior notice of this decision to the public.  The FWS did not publish notice of the suspension in the Federal Register.  The FWS did not provide a public comment opportunity.

44.     The press release noted that "[l]egal, well-regulated sport hunting, as part of a sound management program, can benefit the conservation of listed species by providing incentives to local communities to conserve the species and by putting much-needed revenue back into conservation."  Neither the press release nor a brief Question and Answer ("Q and A") webpage, which the FWS published on the same day, analyzed the role that hunting plays in the conservation of Zimbabwe's elephants or described the role that sport hunters and sport hunting

plays in discouraging elephant poaching.  http://www.fws.gov/international/pdf/questions-and-answers-suspension-of-elephant-sport-hunted-trophies.pdf.

45.     The press release and Q and A webpage explained that the FWS based its decision to suspend importation for African elephants from Zimbabwe on "limited" data and "anecdotal" evidence.  Neither the FWS's press release nor the Q and A page indicated that the FWS had obtained the data or evidence for Zimbabwe's suspension from the Scientific or Management Authorities of Zimbabwe.

46.     On April 17, 2014, Federal Defendants announced a modification of the suspension of legally taken African elephants.  By telephone message and letter to Safari Club, the FWS explained that Federal Defendants had revised Zimbabwe's importation ban and had removed the retroactive portion of the ban that had banned the importation of elephants from the period between January 1, 2014 and April 4, 2014.  "We will allow the import of any trophy taken in 2014 up until April 4.  The hunter will need to be able to demonstrate to our Office of Law Enforcement that the hunt occurred before that date in order to import the trophy."  Letter, dated April 18, 2014, from Robert R. Gabel, Chief, Division of Management Authority, U.S. Fish and Wildlife Service to Nelson Freeman, Deputy Director of Governmental Affairs, Safari Club International.  The April 18, 2014 letter offered no indication or evidence that Federal Defendants were aware of any difference in the status of elephants in Zimbabwe or in Zimbabwe's elephant management between April 3, 2014, when elephants were importable, and April 4, 2014, when they were not.

47.     On April 4, 2014, Federal Defendants sent a letter to the Zimbabwe Parks and Wildlife Management Authority, seeking information about the country's elephants.  This was Federal Defendants' first request for information from Zimbabwe in seven years.  On

information and belief, during the period between August 22, 1997 and April 4, 2014, Federal Defendants had never given Zimbabwe any indication that they were considering banning the importation of Zimbabwe's elephants.

48.     On April 17, 2014, Zimbabwe responded and sent the information requested by Federal Defendants.

49.     On May 12, 2014, Federal Defendants published a Federal Register notice that announced the April 4, 2014 (and April 17, 2014) decision to ban the importation of sport-hunted elephants from Zimbabwe and Tanzania.  Federal Defendants admitted that their decision for Zimbabwe was based on limited data and anecdotal evidence.  Federal Defendants further implicitly admitted that they had failed their obligation 1) to base any change in their enhancement finding for Zimbabwe and decision on importation on "new information" and 2) to publish that change in the Federal Register.

50.     In the May 12, 2014 Federal Register notice, Federal Defendants characterized the April 4, 2014 and April 17, 2014 decisions for Zimbabwe as "temporary" and "interim" and promised to issue a decision by mid-July about whether to lift the April 4, 2014 importation ban for Zimbabwe.  Federal Defendants offered no authority for issuing and implementing a "temporary" determination and did not withdraw their illegal importation ban pending their forthcoming mid-July decision.

51.     The May 12, 2014 characterization of the April 4, 2014 importation ban for Zimbabwe increased the uncertainty faced by individuals with hunts planned for 2014.  Those individuals had to decide whether to maintain their plans in the hope that Federal Defendants would lift the ban or try to minimize their financial losses by cancelling their hunts.

52.     On July 23, 2014, on the FWS website, Federal Defendants announced their decision not to lift the importation ban for Zimbabwe.  Federal Defendants released a new "Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies" ("July 2014 Zimbabwe Enhancement Finding").  The July 2014 Zimbabwe Enhancement Finding, dated July 22, 2014, stated that Federal Defendants were unable to make a finding that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.

53.     Federal Defendants published a notice of the July 2014 Zimbabwe Enhancement Finding in the Federal Register on July 31, 2014.  Federal Defendants did not retroactively allow the importation of elephants taken in Zimbabwe from April 4, 2014 through July 31, 2014.

54.     Federal Defendants' July 2014 Zimbabwe Enhancement Finding relied on a lack of information on the elephant population in Zimbabwe.  Although the July 2014 Zimbabwe Enhancement Finding was based on a greater number of documents than the April 4 decision, Federal Defendants still attributed their importation ban decision to the absence of new population data, rather than the existence of new information about the status of Zimbabwe's elephant populations.

55.      In addition, the July 2014 Zimbabwe Enhancement Finding directly contradicted Federal Defendants' own 1997 Zimbabwe Enhancement Finding.  The July 2014 decision found insufficient the same laws, plans and strategies that Federal Defendants considered sufficient for a positive determination from 1997 through April 2014 – that the importation of sport-hunted elephants from Zimbabwe enhances the survival of the species.

56.     When addressing the role that sport-hunters and sport-hunting businesses play in elephant conservation in Zimbabwe, the July 2014 Zimbabwe Enhancement Finding acknowledged that "it is clear that outstanding conservation work is being carried out in some

areas that is funded solely or in major portions by private individuals or companies" and that these "pockets of conservation are greatly needed."  Nevertheless, the July 2014 Zimbabwe Enhancement Finding determined that the importation of sport-hunted elephants does not enhance the survival of the species.

57.     The July 2014 Zimbabwe Enhancement Finding is based upon an illegal determination.  Instead of determining **whether** the importation enhances the survival of the species, Federal Defendants based the importation ban on **how much** enhancement Federal Defendants believe sport hunting contributes.  Federal Defendants have never established the standards upon which it measures enhancement of survival for African elephants and have never offered notice of or opportunity for the public to comment on standards or the threshold necessary for a positive determination of enhancement for Zimbabwe.

58.     Federal Defendants based their elephant importation ban for Tanzania on a February 21, 2014 determination from the Scientific Authority of the FWS not to issue an NDF for elephant importation from Tanzania ("2014 Tanzania NDF") and a March 27, 2014 determination from the Management Authority of the FWS that the importation of sport-hunted elephants from Tanzania is not likely to enhance the survival of the species ("2014 Tanzania Enhancement Finding").

59.     The 2014 Tanzania NDF discussed sport hunting but was not based on "a consideration of purpose for which the specimen will be used upon import into the United States."  Instead of determining if the importation of sport-hunted elephants for the personal use of the hunters would pose a detriment to the species, the NDF advice document focused on the take of elephants generally, both for legal and illegal purposes.

> We recognize that sport-hunting, as part of a sound management program,
> can provide benefits to wildlife conservation and that sport-hunting of

elephants is not the primary cause of the decline of elephant populations in Tanzania. However, given the significant decline in the elephant population due to uncontrolled poaching and questionable management and governance, we are concerned that additional killing of elephants, even if legal, is not sustainable and will not support effective elephant population recovery efforts in Tanzania.

*Id.*

60.     The 2014 Tanzania NDF failed to examine the role that sport-hunting has in decreasing and discouraging poaching in Tanzania. The 2014 Tanzania NDF did not address how the presence of hunters, outfitters and their staff in the field provides a deterrent to poachers or how the introduction of revenue generated by the hunting and other activities of U.S. hunters encourages local communities to guard against poaching. The 2014 Tanzania NDF completely avoided this analysis and merely analyzed sport hunting as an "additional" source of take.

61.     Because U.S. hunters are no longer permitted to import their legally sport-hunted African elephants, some have cancelled their elephant hunts in Zimbabwe and Tanzania, and many more will cancel their hunts. Instead of having the desired effect – to reduce "additional" take of elephants, the ban is likely to have the opposite effect. The absence of hunters in the field is removing a major deterrent to poaching. Poachers, freed from the risk of being discovered by hunters, outfitters and their staff, are being encouraged to illegally take more rather than fewer elephants. Local residents who have generated income for their families and communities from jobs with hunting operations and other activities associated with the presence of U.S. hunters are losing that income. As a consequence, the elephants that local residents protected for the benefit of the hunters are declining in value to local communities. Poachers who offer money for protection from authorities and for the illegal killing of elephants are taking the place of hunters as the source of revenue for local communities. As a result, more elephants are at risk of being poached and fewer elephants are likely to survive.

62.     Sport hunters, with the help of their outfitters and professional hunters, donate much of the meat from the elephants they hunt to the local communities.  Poachers do not.  The loss of U.S. hunters means a loss of important food sources for local residents and increases the likelihood that local residents will themselves kill the elephants to feed their families and communities.

63.     Because the U.S. has no authority to control the number of elephants that can be taken or exported from Zimbabwe and Tanzania, the outfitters and professional hunters who depend on elephant hunts in these countries for their livelihoods are attempting to sell the cancelled hunts to other, non-U.S. hunters who are still able to import elephants into their home countries.  While some of the elephant hunts will be resold, the revenue generated from U.S. hunters will not.  Although residents of the United States are not the only hunters who pursue elephants in Zimbabwe and Tanzania, U.S. citizens often pay the highest fees for elephant hunts in Zimbabwe and Tanzania and bring in the most additional revenue to local communities by buying associated goods and services while present for the hunt.  Without the same number of U.S. hunters willing to pay for an elephant hunt, the market price for elephant hunts has and will go down.  The higher the cost of a hunt, the greater the value the animal has to the local community.  As a result, deterring Americans from hunting elephants in the two countries is lowering the value of the elephants.

64.     Because of the abruptness with which the U.S. announced the ban, some outfitters and professional hunting businesses in these two countries will not be able to survive the economic loss.  Many are likely to go out of business, leaving greater areas of the elephant range without people on the ground, who by their very presence, act as a deterrent to poaching.

65.     In some areas of Zimbabwe, elephant populations are too large for the local community to tolerate.  Because elephants damage crops and interfere with agricultural and other businesses, they are deemed a nuisance rather than a conservation asset.  Sport hunters bring value to the elephant and the revenue generated by sport hunting increases local tolerance for the species.  In addition, sport hunters help reduce overpopulations where they exist.  The loss of the U.S. hunter is eliminating local incentives to tolerate elephant behavior and is encouraging those troubled by elephants to kill the elephants themselves.

66.     Sport hunting discourages many reasons and sources for illegal elephant killings.  Without U.S. hunters in the field, the African elephant populations in Zimbabwe and Tanzania are suffering and decreasing.

67.     The elephant importation bans affect only U.S. residents who seek to import their sport-hunted elephants into the U.S.  It has no impact on the export quotas established by Zimbabwe or Tanzania, or on the number of elephants that the governments of the two countries authorize for hunting annually.  Federal Defendants' bans on U.S. importation of African elephants do not control the number of elephants taken in each of those countries each year.  Consequently, they punish those who engage in hunting and who assist in anti-poaching efforts and other elephant conservation strategies, and have little beneficial impact on reducing the risks to elephant conservation.

68.     Federal Defendants expressly implemented the importation bans for Zimbabwe and Tanzania to 1) discourage U.S. hunters from travelling to Zimbabwe and Tanzania to hunt elephants; 2) encourage U.S. hunters to cancel their planned elephant hunts in the two countries; and 3) attempt to reduce the number of elephants taken by U.S. hunters in the two countries.

# RELEVANT LAW

**A.    The Endangered Species Act ("ESA") and the Convention on International Trade in Endangered Species of Wild Fauna and Flora ("CITES")**

69.    The ESA provides the FWS with the authority to classify African elephants as a threatened species.  16 U.S.C. §1533(a)(1).

70.    The ESA does not prohibit the importation of sport-hunted animals designated as threatened.  16 U.S.C. §1538((a)(1)(A).  Instead, the FWS, acting on behalf of the Secretary of the Interior, promulgates regulations governing the importation of threatened species.  16 U.S.C. §1538(a)(1)(G).

71.    Section 4(d) of the ESA authorizes the FWS to issue regulations pertaining to threatened species under limited circumstances.  "Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species."  16 U.S.C. §1533(d).  Accordingly, the FWS may not issue regulations without specifically determining that they are "necessary and advisable for conservation."

72.    In the African Elephant Conservation Act of 1989 ("AECA"), Congress adopted specific legislation intended to focus on the conservation of the species.  16 U.S.C. § 4201 *et seq.* In the AECA, Congress directed the FWS to impose moratoriums against the importation of ivory from countries that did not meet certain criteria, but prohibited the FWS from issuing moratoriums against the importation of sport-hunted elephants:

> Sport-hunted trophies
>
> Individuals may import sport-hunted elephant trophies that they have legally taken in an ivory producing country that has submitted an ivory quota. The Secretary ***shall not establish any moratorium*** under this section, pursuant to a petition or otherwise, which prohibits the importation into the United States of sport-hunted trophies from elephants that are legally taken by the importer or the

> importer's principal in an ivory producing country that has submitted an ivory
> quota.

16 U.S.C. § 4222(e) (emphasis added).

73.     In the AECA, Congress singled out the hunting and importation of African

elephants as acts that benefit the survival of the species.  Congress specifically found that

"[t]here is no evidence that sport hunting is part of the poaching that contributes to the illegal

trade in African elephant ivory, and there is evidence that the proper utilization of well-managed

elephant populations provides an important source of funding for African elephant conservation

programs."  16 U.S.C. § 4202(9).

74.     The FWS does not rely on the AECA for its authority to regulate the importation

of sport-hunted African elephants but instead takes that authority from the ESA. 16 U.S.C. §

4241.

75.     The FWS's regulation of the importation of African elephants relies on decisions

made by both Congress, through the authority given to the FWS in the ESA, and by CITES,

through resolutions and other decisions.  50 C.F.R. § 23.1.

76.     CITES is an international agreement between governments.  During conferences

held between the party members to the agreement, the parties agree upon decisions and adopt

resolutions designed to prevent international trade in specimens of wild animals and plants from

threatening the survival of those species.

77.     The United States, Zimbabwe and Tanzania are all parties to CITES.

78.     The parties to CITES placed African elephants from Zimbabwe on Appendix II

and those from Tanzania on Appendix I.

79.     Appendix I includes species that the parties to CITES have determined are

threatened with extinction and that are or may be affected by trade of that species.  Appendix II

includes species that the parties to CITES have determined are not presently threatened with

extinction, but may become so if their trade is not regulated.  Appendix II also includes species

that the parties to CITES consider in need of being regulated so that trade in certain other

Appendix I or II species may be effectively controlled.  50 C.F.R. § 23.4

80.     The ESA and CITES direct the FWS to treat species classified as "threatened" in

different ways, depending on whether the species are listed on CITES Appendix I or II.

81.     Article III of the CITES Treaty and CITES Resolution Conf. 10.3 recommend

that, for species that are listed on CITES Appendix I, the importing country must make its own

NDFs.  The FWS has promulgated regulations that require it to make NDFs for the import of

Appendix I species.  50 C.F.R. § 23.61.

82.     Articles III and IV of the CITES Treaty and CITES Resolution Conf. 10.3

recommend that exporting countries make findings that the proposed trade of species on both

CITES Appendix I and Appendix II will not be detrimental to the survival of the species.

83.      The FWS is required to make different types of NDFs, depending on whether the

species in question is being imported or exported.  For NDFs for species being exported from the

United States, the FWS examines the potential detriment that could be caused by the "take" of

the species from the wild.  In contrast, NDFs for species being imported into the U.S. must

examine the potential detriment to the species that could be caused by the purpose for which the

animal is being imported into the U.S. The FWS has explained that "[t]he finding for the import

of an Appendix-I species is based on a consideration of purpose for which the specimen will be

used upon import into the United States."  71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  An NDF

for a sport-hunted animal must therefore consider whether the personal possession by the hunter

who took the animal will itself pose a detriment to the survival of the species.

84.     CITES does not require that the importing country conduct an NDF for species listed on Appendix II.

85.     The ESA states that, for species classified as threatened, that are listed on CITES Appendix II, where the take and exportation of the species comply with all CITES provisions and requirements, a presumption exists that the importation of the species for non-commercial purposes does not violate federal statute or regulation.  16 U.S.C. § 1538(c).

86.     Despite this presumption, the FWS has, by regulation, imposed additional requirements for the importation of sport-hunted elephants, whether they are listed on CITES Appendix I or II ("special rule").  50 C.F.R. § 17.40(e)(3)(iii).

Sport-hunted trophies may be imported into the United States provided:

(A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;

(B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;

(C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

(D) The trophy is legibly marked by means of punch-dies, under a marking and registration system established by the country of origin, that includes the following information: Country of origin represented by the two-letter code established by the International Organization for Standardization (see appendix A to chapter I) followed by the registration number assigned to the last two digits of the year of registration and the weight of raw ivory to the nearest kilogram. Any mark must be placed on the lip mark area and indicated by a flash of color which serves as a background for such mark.

87.     The FWS promulgated the special rule on August 10, 1992.  That regulation created the requirement that the take of the elephant to be imported would enhance the survival of the species.  57 Fed. Reg. 35473 (Aug. 10, 1992).  At the time that the FWS promulgated the rule, all African elephants were listed on CITES Appendix I.  In addition, at the time that the

FWS promulgated the special rule, the CITES resolution pertaining to the importation of

Appendix I species contained a requirement for a determination by the importing country that the

take of the animal intended for importation enhanced the survival of the species by financially

benefitting elephant conservation.

> CITES requirements included a determination that the killing of elephants for
> sport-hunting enhances the survival of the species by providing financial support
> programs for elephant conservation. This requirement is retained in the final
> revised special rule for the import of sport-hunted trophies from threatened
> populations that are on CITES appendix I.

57 Fed. Reg. at 35485; Res. Conf. 2.11. (Annex 1).  The FWS's reason for including the

enhancement of survival requirement was the parallel obligation adopted by CITES.

88.     Since the FWS promulgated the special rule, CITES changed the listing status of

African elephants from Zimbabwe from Appendix I to Appendix II.  Consequently, CITES

would no longer have imposed an enhancement of survival requirement for the species once it

was downlisted to Appendix II.  In addition, at the CITES COP 9 in 1994 the parties to CITES

amended Res. Conf. 2.11 and removed the enhancement of survival finding requirement entirely

from the resolution.  As a result, from that point forward CITES no longer required an

enhancement of survival determination for the importation of sport-hunted elephants from either

Appendix I or Appendix II species and therefore would not have required the finding for

elephants from either Zimbabwe or Tanzania.

89.     The FWS has made no change to its special rule's enhancement of survival

finding requirement for the importation of elephants since including those requirements in the

rule in 1992, despite the fact that the criteria upon which the FWS based its finding requirement

have all disappeared.  The FWS has never explained why the retention of the enhancement

requirement is necessary or advisable for the conservation of elephants listed on Appendix I or

Appendix II of CITES or offered the public an opportunity to comment on the retention of the

enhancement of survival requirement, despite the fact that the FWS's justification for the

imposition of this requirement no longer exists.

90.     Since at least as early as 1993 until April 4, 2014, the FWS has consistently made

NDFs for the importation of sport-hunted African elephants from Tanzania and has determined

that all criteria identified in 50 C.F.R. § 17.40(e)(3)(iii) have been met.

**B.     The Administrative Procedure Act ("APA")**

91.     The APA provides for judicial review of final agency action by persons

"aggrieved" by the action.  5 U.S.C. § 702.

92.     It also provides standards applicable when a Federal agency proposes and adopts

final rules and regulations.  Those standards include formal notice of the proposed rulemaking

and an opportunity to participate in the rulemaking by providing comments through the

submission of data, views and/or arguments.  5 U.S.C. § 553; *id.* § 551(4).

93.     The APA authorizes a reviewing court to

> (1) compel agency action unlawfully withheld or unreasonably delayed; and

> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--

>> a.   arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . .

5 U.S.C. § 706.

## CAUSES OF ACTION

### Count I - Violations of the ESA and APA:

**Federal Defendants Illegally Reversed a Longstanding Approach to Sport-hunted African Elephant Importation from Zimbabwe Based on a Lack of Information**

27

94.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

95.     Federal Defendants abruptly suspended the importation of legally sport-hunted African elephants from Zimbabwe after consistently allowing such importations for over two decades.  On April 4, 2014, Federal Defendants made the decision to suspend importation of legally sport-hunted African elephants based on "limited" data and "anecdotal evidence" without first waiting to obtain comprehensive and substantiated data on the issues relevant to the continued importation of those elephants from the Scientific or Management Authorities of Zimbabwe or from others.

96.     Although Federal Defendants later attempted to rectify the illegalities of their decision-making by recharacterizing their importation ban decision as "temporary" and "interim," this increased the illegality of their actions.  Federal Defendants lacked authority to make a "temporary" or "interim" decision and to deprive SCI/NRA members of the ability to import their legally sport-hunted elephants during the period of time that Federal Defendants had not obtained the "new" information necessary to make a determination that the conditions of 50 C.F.R. §17.40(e)(3)(iii) had not been met.  When finalizing the decision to ban importation of Zimbabwe's elephants on July 22, 2014, Federal Defendants did not correct the errors they had made when they illegally banned importation on a temporary basis.  Federal Defendants continued to rely on a lack of information about the status of Zimbabwe's elephants, rather than on new information.

97.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

28

98.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

99.     If this Court determines the April 4, 2014 decision to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken in Zimbabwe between April 4, 2014 and July 31, 2014.  If the Court determines the July 31, 2014 decision to be illegal, the Court should enjoin the importation ban for all sport-hunted elephants taken from April 4, 2014 until such date as Federal Defendants make a legally supportable decision concerning the importation of sport-hunted elephants from Zimbabwe.  The remedies requested would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count II - Violations of the ESA and APA:

### Federal Defendants Applied an Illegal Standard for Determining Whether Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species

100.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

101.     Federal Defendants abruptly suspended the importation of legally hunted African elephants from Zimbabwe, first on a temporary, and then later on a final basis, without fully analyzing 1) the role that the presence of sport hunters in the field plays in reducing and discouraging the poaching of elephants in Zimbabwe and 2) the economic role that U.S. hunters play in providing Zimbabwe with the financial resources to combat poaching.  Federal Defendants did not sufficiently consider the harm to elephant conservation that will result from the absence of U.S. hunters in the field and the loss of revenue from U.S. hunters.

102.     Federal Defendants failed to consider that, instead of being additional to the illegal take of elephants by poachers, the legal sport hunting by U.S. hunters in fact reduces the number of elephants illegally killed in Zimbabwe.

103.     Federal Defendants failed to adhere to the purpose for which the FWS included the enhancement of survival requirement in the special rule for African elephant importation – to determine whether the sport hunting "enhances the survival of the species by providing financial support programs for elephant conservation."  57 Fed. Reg. 35473, 35485 (Aug. 10, 1992). Instead of focusing on whether the sport hunting enhances the survival of the species, Federal Defendants based its decision on *how much* sport hunting enhances elephant survival.

104.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

105.     This maladministration of the law by Federal Defendants violated the ESA and the APA.  5 U.S.C. § 706(2); 16 U.S.C. §§ 1533(d) and 1538(c).

106.     The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## Count III – Violations of the ESA and APA:

### Federal Defendants Illegally Failed to Provide a Notice and Comment Opportunity on the Importation Ban Decision

107.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

108.     Federal Defendants abruptly changed their position on April 4, 2014 on the legality of the importation of legally sport-hunted African elephants from Zimbabwe without first notifying the public of the change of position and/or giving the public the opportunity a formal opportunity to comment on the change in position.  Federal Defendants kept that importation status in place from April 4, 2014 through July 31, 2014 and then reaffirmed that decision on July 31, 2014, again without giving the public a formal opportunity to comment on the change of position.

109.    Despite notifying the public of their "temporary" and "interim" decision to ban

the importation of elephants from Zimbabwe for 2014 in a Federal Register notice on May 12,

2014,  and later of their subsequent affirmation of that decision in a July 31, 2014 Federal

Register Notice, Federal Defendants have never provided the public with notice of the standards

that they have established for an enhancement finding for Zimbabwe's elephants or a formal

opportunity to comment in order to demonstrate Zimbabwe's compliance with those standards.

110.    These actions were arbitrary and capricious, not in accordance with law, and an

abuse of discretion.

111.    This maladministration of the law by Federal Defendants violated the ESA and

the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. §

1538(c).

112.    The remedies requested in this Complaint would redress the injuries of SCI/NRA

and their respective members, as outlined in this Complaint.

## Count IV - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed an Enhancement of Survival
### Finding Requirement in the Special Rule Pertaining to
### Importation of Sport-hunted African Elephants on CITES Appendix II

113.    SCI/NRA reallege and incorporate by reference all the allegations of the

paragraphs preceding this Causes of Action section, as though fully set forth below.

114.    Federal Defendants failed to explain why the enhancement finding requirement

included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant

conservation.  For species classified as "threatened, the ESA authorizes Federal Defendants to

issue such regulations deemed "necessary and advisable to provide for the conservation of such

species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement

finding is "necessary and advisable" for African elephant conservation.  On August 10, 1992, Federal Defendants instituted the enhancement of survival finding requirement when all African elephants, including Zimbabwe's, were listed on CITES Appendix I and when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding for the importation of Appendix I species. Federal Defendants included the enhancement of survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) to match that same CITES requirement for Appendix I species.  Despite the fact that in 1994 CITES removed the enhancement of survival finding requirement from its resolution applicable to Appendix I species and in 1997 CITES downlisted African elephants from Zimbabwe to CITES Appendix II, Federal Defendants have never deleted the enhancement of survival finding requirement from § 17.40(e)(3)(iii).  In addition, Federal Defendants have never published a public notice justifying the enhancement of survival requirement for African elephants listed on CITES Appendix II and have never given the public the opportunity to comment on the requirement.  Despite the fact that the status of the species changed and the FWS's original justification for the requirement disappeared, Federal Defendants have never provided proper justification, notice and an opportunity for comment on its decision to modify the basis for imposing an enhancement of survival requirement on an elephant population listed on CITES Appendix II.

115.    On April 4, 2014 on a temporary basis and then on July 22, 2014 on a final basis, for the first time since imposing the enhancement of survival requirement for the importation of legally sport-hunted African elephants from Zimbabwe, Federal Defendants determined that an enhancement of survival finding could not be made.  These April 4, 2014 and July 22, 2014 actions caused harm to SCI/NRA and their members for the first time since Federal Defendants illegally retained the requirement in the special rule.

116.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

117.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

118.     The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count V - Violation of the ESA and APA:

**Federal Defendants Illegally Refused to Determine That the Importation of Sport-hunted Elephants from Zimbabwe Enhances the Survival of the Species**

119.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

120.     On July 22, 2014, Federal Defendants illegally concluded that they could not find that the importation of sport-hunted elephants in Zimbabwe enhances the survival of the species. The Zimbabwe elephant conservation and management laws, plans and strategies that Federal Defendants found as sufficient proof of enhancement for its July 2, 1997 Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe and continued to hold sufficient proof until April 4, 2014, were the same laws, plans and strategies that Federal Defendants reported to be insufficient proof in their July 2014 Zimbabwe Enhancement Finding.

121.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

122.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

123.    The remedies requested in this Complaint would remedy the injuries of SCI/NRA

and their respective members, as outlined in this Complaint.

## Count VI - Violation of the ESA and APA:

### Federal Defendants Illegally Failed to Provide the Public with Notice and the Opportunity to Comment on the Elephant Importation Ban for Tanzania

124.    SCI/NRA reallege and incorporate by reference all the allegations of the

paragraphs preceding this Causes of Action section, as though fully set forth below.

125.    Federal Defendants announced the elephant importation ban for Tanzania in a

press release published on the FWS's website and implemented the ban immediately.  Despite

the fact that the ban applied to the hunting public generally, and reversed an opportunity

available to Safari Club members and others for decades, Federal Defendants failed to publish

notice of the ban in the Federal Register and provide the public with an opportunity for comment

on a proposed ban.

126.    These actions were arbitrary and capricious, not in accordance with law, and an

abuse of discretion.

127.    This maladministration of the law by Federal Defendants violated the ESA and

the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. §

1538(c).

128.    The remedies requested in this Complaint would redress the injuries of SCI/NRA

and their respective members, as outlined in this Complaint.

## Count VII - Violations of the ESA and APA:

### Federal Defendants Illegally Imposed an Enhancement of Survival Finding Requirement in the Special Rule Pertaining to Importation of Sport-hunted African Elephants on CITES Appendix I

34

129.    SCI/NRA reallege and incorporate by reference all the allegations of the
paragraphs preceding this Causes of Action section, as though fully set forth below.

130.    Federal Defendants failed to explain why the enhancement finding requirement
included in 50 C.F.R. § 17.40(e)(3)(iii) is necessary and advisable for African elephant
conservation.  For species classified as "threatened," the ESA authorizes Federal Defendants to
issue such regulations deemed "necessary and advisable to provide for the conservation of such
species."  16 U.S.C. §1533(d).  Federal Defendants have not explained why the enhancement
finding is "necessary and advisable" for African elephants listed on CITES Appendix I.

131.    On August 10, 1992, Federal Defendants instituted the enhancement of survival
finding requirement when CITES Res. Conf. 2.11. (Annex 1) required an enhancement finding
for the importation of Appendix I species.  Federal Defendants included the enhancement of
survival finding requirement in 50 C.F.R. § 17.40(e)(3)(iii) as a result of a parallel CITES
requirement.  Despite the fact that in 1994 CITES removed the enhancement of survival finding
requirement from its resolution applicable to Appendix I species, Federal Defendants never
removed the enhancement of survival finding requirement from § 17.40(e)(3)(iii), never
provided a public notice justifying the retention of the requirement for African elephants,
including those from Tanzania, and never gave the public the opportunity to comment on the
requirement when the reason for the requirement no longer existed.  On April 4, 2014, for the
first time since imposing the enhancement of survival requirement for the importation of legally
sport-hunted African elephants from Tanzania, Federal Defendants determined that an
enhancement of survival finding could not be made.  These April 4, 2014 actions caused harm to
SCI/NRA and their members for the first time since Federal Defendants illegally retained the
requirement in the special rule.

132.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

133.     This maladministration of the law by Federal Defendants violated the ESA and the APA. 5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

134.     The remedies requested in this Complaint would redress the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

### Count VIII - Violation of the ESA and APA:

### Federal Defendants Illegally Applied the Incorrect Non-Detriment Standard to the Importation of Sport-hunted African Elephants from Tanzania

135.     SCI/NRA reallege and incorporate by reference all the allegations of the paragraphs preceding this Causes of Action section, as though fully set forth below.

136.     Federal Defendants failed to conduct the proper NDF assessment for the importation of an Appendix I species.  When considering the potential detriment posed by U.S. importation of legally sport-hunted elephants from Tanzania, Federal Defendants applied the analysis authorized for exportation, rather than importation.

137.     Federal Defendants wrongfully assessed the potential detrimental impact of both legal and illegal (poaching) take of elephants in Tanzania rather than focusing their NDF assessment on the purpose for which sport-hunted elephant importations would be intended.  In doing so, Federal Defendants ignored and/or contradicted their own published conclusion that the "finding for the import of an Appendix-I species is based on a consideration of purpose for which the specimen will be used upon import into the United States." 71 Fed. Reg. 20168, 20195 (Apr. 19, 2006).  On April 4, 2014, Federal Defendants, for the first time since African elephants in Tanzania were listed as a threatened species, determined that it could not make an NDF for the

importation of sport-hunted African elephants and caused SCI/NRA and their members harm for the first time.

138.     These actions were arbitrary and capricious, not in accordance with law, and an abuse of discretion.

139.     These actions by Federal Defendants violate the ESA and the APA.  5 U.S.C. § 706(2); 5 U.S.C. § 553; 5 U.S.C. § 551(4); 16 U.S.C. § 1533; 16 U.S.C. § 1538(c).

140.     The remedies requested in this Complaint would remedy the injuries of SCI/NRA and their respective members, as outlined in this Complaint.

## PRAYER FOR RELIEF

For the reasons stated above, SCI/NRA respectfully request that the Court grant the following relief:

1.     Declare that Federal Defendants violated the ESA and the APA in suspending the importation of African elephants legally hunted in Zimbabwe between April 4, 2014 and December 31, 2014.

2.     Declare that Federal Defendants violated the ESA and APA in making a temporary decision to suspend importation of sport-hunted elephants from Zimbabwe on April 4, 2014, and leaving that ban in place through July 31, 2014.

3.     Declare that Federal Defendants violated the ESA and APA in making a decision to suspend importation of sport-hunted elephants from Zimbabwe on July 22, 2014.

4.     Declare that Federal Defendants violated the ESA and APA in suspending the importation of African elephants legally sport-hunted in Tanzania in 2014.

5.     Declare that Federal Defendants' decisions to suspend  the importation of legally sport-hunted African elephants from Zimbabwe on April 4, 2014 and on July 22, 2014 were

arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension decisions were invalid.

6.     Declare that Federal Defendants' suspension of the importation of legally sport-hunted African elephants from Tanzania was arbitrary and capricious, contrary to law, and an abuse of discretion and therefore the suspension is invalid.

7.     Enjoin the Federal Defendants from continuing and/or enforcing the ban on importation of legally sport-hunted elephants from Zimbabwe in 2014.

8.     Enjoin the Federal Defendants from continuing and/or enforcing the ban on importation of legally sport-hunted elephants from Tanzania in 2014.

9.     Award SCI/NRA the costs of litigation, including reasonable attorneys' fees.

10.   Award SCI/NRA such other relief that is just and proper.

Dated this 1st day of August 2014.


Respectfully submitted,


/s/ Anna M. Seidman

Anna M. Seidman, Esq. (DC Bar No. 417091)
Douglas S. Burdin, Esq. (DC Bar No. 434107)
Jeremy E. Clare, Esq. (DC Bar No. 1015688)
Safari Club International
501 2nd Street, NE
Washington, DC 20002
Telephone: (202) 543-8733
Facsimile: (202) 543-1205
aseidman@safariclub.org
dburdin@safariclub.org
jclare@safariclub.org

*Counsel for Plaintiff,*
*Safari Club International*


Christopher A. Conte (DC Bar No. 43048)
National Rifle Association of America/ILA
11250 Waples Mill Rd., 5N
Fairfax, VA 22030
Telephone: (703) 267-1166
Facsimile: (703) 267-1164
cconte@nrahq.org

*Counsel for Plaintiff,*
*National Rifle Association of America*