# EXHIBIT 1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAFARI CLUB INTERNATIONAL, et al. ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> S.M.R. JEWELL, et al. ) <br> ) <br> Defendants. ) <br> And ) <br> ) <br> FRIENDS OF ANIMALS, *et al.*, ) <br> ) <br> Defendant-Intervenors. ) | Civil Action No. 14-cv-00670 (RCL) |

### DECLARATION OF TIMOTHY J. VAN NORMAN

I, Timothy J. Van Norman, hereby declare as follows:

1. I am the Chief, Branch of Permits, the Division of Management Authority (DMA), of the United States Fish and Wildlife Service (FWS). As Chief, Branch of Permits, I am responsible to the Director of the Fish and Wildlife Service for the issuance of permits and certificates to import, export, and re-export species that are protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES), the Endangered Species Act (ESA) and various other wildlife conservation laws. In addition, I am responsible for the implementation of 50 CFR § 17.40(e), which requires, among other things, my office to make a finding whether the killing of the African elephant whose sport-hunted trophy is intended for import would enhance the survival of the species in the wild.

2. On April 4, 2014, DMA found that it was unable to determine that the killing of African elephants in Zimbabwe in 2014 whose trophies are intended for import

would enhance the survival of the species. On April 4, 2014, FWS announced a temporary suspension on the import of sport-hunted elephant trophies taken in Zimbabwe during the 2014 due to the inability of FWS to make a positive finding that the import of the trophies would meet the import criteria under 50 CFR 17.40(e). On April 17, 2014, DMA issued a revised finding that it was unable to determine that the killing of African elephants in Zimbabwe on or after April 4, 2014 whose trophies are intended for import would enhance the survival of the species.

3. FWS published notice of the April 2014 enhancement findings for Zimbabwe in the Federal Register on May 12, 2014. (79 FR 26986).

4. On July 17, 2014, DMA issued a new finding that it was unable to determine that the killing of African elephants in Zimbabwe on or after April 4, 2014 whose trophies are intended for import would enhance the survival of the species. The July 17, 2014 finding superseded the April 4, 2014 finding and April 17, 2014 revised finding. On July 22, 2014, DMA issued a revised finding to correct technical errors in the July 17, 2014 finding. On July 23, 2014, FWS announced that it was unable to make a positive finding that the import of trophies taken in Zimbabwe on or after April 4, 2014 would meet the import criteria under 50 CFR 17.40(e).

5. FWS published notice of the July 2014 enhancement finding for Zimbabwe in the Federal Register on July 31, 2014. (79 FR 44459).

6. FWS received a Freedom of Information Act (FOIA) request dated April 8, 2014, from Safari Club International (SCI).

7. On June 12, 2014, FWS responded to the April 8, 2014 FOIA request from SCI by providing 809 pages of material.

8. In an effort to use our limited staff time efficiently while balancing other workload, when collecting documents responsive to a new FOIA request, we typically also review responses to similar past FOIA requests to complete new requests. We endeavor to tailor our response to the new request by screening out irrelevant documents that may have been provided in prior broader FOIA requests on similar topics.

9. Given the number of pages of information requested by SCI's April 8, 2014 FOIA request and in an effort to respond to the request as expeditiously as practicable, the June 12 response inadvertently failed to screen out an e-mail dated June 14, 2002, from Karl Stromayer to Kenneth Stansell et al., that was not responsive to the April 8, 2014, FOIA request, but that had been provided in a prior broader FOIA request from Conservation Force requesting, among other documents, "[A]ny and all factual inquiries to Tanzania or Zimbabwe about the status or management of elephants in the Tanzania or Zimbabwe, respectively, as well as any responses to such inquiries." The e-mail was initially identified as a relevant document for this request, but was later pulled from the response to this request and not sent to the requester.

10. On July 24, 2014, SCI submitted a second FOIA request.

11. On December 22, 2014, FWS responded to the July 24, 2014 FOIA request by providing 3,041 pages of material.

12. Again, given the number of pages of information potentially responsive to the FOIA request and in an effort to respond to the request as expeditiously as practicable, the December 22 response inadvertently failed to screen out an e-mail dated June 7, 2002, from myself to FW9 OMA-BOP (general e-mail address to all Branch of Permit staff) and Richard McDonald, that was not responsive to the July 24, 2014, FOIA request, but that

had been provided in response to a prior broader FOIA request from Conservation Force requesting, among other documents, "[A]ny and all factual inquiries to Tanzania or Zimbabwe about the status or management of elephants in the Tanzania or Zimbabwe, respectively, as well as any responses to such inquiries." The e-mail was initially identified as a relevant document for this request, but was later pulled from the response to this request and not sent to the requester.

13.    Neither the June 7, 2002 e-mail from myself nor the June 14, 2002 e-mail from Karl Stromayer was considered directly or indirectly in the decision-making process and neither provided relevant information that could contribute to the decision-making process. As such, these e-mails were not included in the Administrative Records for the April and July 2014 findings.

14.    The June 7, 2002 e-mail was written by me to staff within the Branch of Permits discussing concerns that had been expressed within the Branch on the issuance of permits authorizing the import of sport-hunted leopard trophies from Zimbabwe. At the time, the staff of the Branch was questioning our ability to issue leopard import permits. As stated in the e-mail, after discussions among senior staff members and Division of Management Authority management, the decision was made to continue issuing import permits.

15.    The June 7, 2002 e-mail goes on to state that I would draft a Federal Register notice and that the notice would "state that we do not know at this time whether we would be able to issue permits for leopards or allow elephant imports next year." However, due primarily to workload constraints, no Federal Register notice was drafted at that time.

4

16. This email, therefore, was not considered when making the April or July 2014 findings on the suspension of elephant trophy imports from Zimbabwe because it did not contain any information that spoke to the elephant management or population levels in Zimbabwe in recent years leading up to the 2014 findings. While the email did mention the development of a Federal Register notice, no notice was ever drafted or published and therefore was not relevant to our 2014 findings.

17. During this same time period, a member of the Division of International Conservation, Karl Stromayer, Ph.D., was traveling to Zimbabwe for grant site visits. In an effort to obtain additional information about the leopard situation in Zimbabwe, Dr. Stromayer was asked by Michael Carpenter, a Senior biologist within the Branch at that time, and me to investigate the situation. In addition, since he would be in Zimbabwe, he was also asked to see what information he could find regarding elephant management and trophy hunting at that time.

18. On June 14, 2002, Dr. Stromayer sent the above referenced e-mail to Kenneth Stansell, the Assistant Director of International Affairs, Peter Thomas, Chief of the Office of Management Authority, several members of the Branch of Permits, and myself, with a brief summary of the information he obtained while in Zimbabwe.

19. As stated in the e-mail, Dr. Stromayer discussed the annual rainfall in Zimbabwe and how it affected the hunting season within the country, how permits for elephants were usually sold in conjunction with other game species, an elephant survey and its preliminary population estimate of 88,000 compared to an estimated carrying capacity of elephants within the country of 42,000-45,000 from an unknown source.

20. As stated above, this e-mail was not considered when making the April or July 2014 findings on the suspension of elephant trophy imports from Zimbabwe. The e-mail did not contain any information that spoke to the elephant management or population levels in Zimbabwe in recent years leading up to the 2014 findings. Further, that information was dated and the source of the information is not clear. Therefore the e-mail was not relevant to the issues that FWS expressed in its 2014 findings about the need for current data on population numbers and trends, government efforts to manage elephant populations, efforts to address human elephant conflicts and poaching, and the state of the hunting program within the country.

21. Carrying capacity of a habitat (i.e., the number of animals a particular habitat can sustain over a given period of time) depends on a number of factors, not least of which is the size of the animal, the available habitat, human impacts on the animal, and natural predators or cause of mortality. As documented within the Administrative Record (See, e.g., July AR 9, 001967; AR 11 (throughout); AR 16 (throughout); AR 95, 003710, 003711, 003713, 003718, 003723, 003724, 003725; AR 126 (throughout); AR 127 (throughout); AR 153, 004173, 004177), there are clear indications that parts, if not most, of the elephant habitat within Zimbabwe has been significantly impacted, either through human activities (e.g., farming) or by the past and current elephant populations within Zimbabwe. Elephants can significantly impact flora composition and structure by stripping and trampling smaller plants and trees or knocking over larger trees in an effort to graze on the vegetation. Management of elephants within a limited space (e.g., national parks or areas also occupied by human settlements) may require the relocation or removal of excess animals. In the past, Zimbabwe had carried out culling operations, as identified

6

in several documents within the Administrative Record (July AR 7, 001932; AR 9, 001967-001968; AR 11 (throughout); AR 16 (throughout); AR 25, 002692; AR 95, 003710, 003717, 003724, 003760; AR 126 (throughout); AR 127 (throughout); AR 153, 004174), to reduce elephant populations and maintain viable elephant habitat (e.g., maintain the same carrying capacity, but reduce the number of animals putting pressure on the habitat).

22.    While carrying capacity can play a role when considering an overall management program (e.g., what should be the "ideal" population number that the management program is striving for), there is no information in the June 14, 2002 email or in the record that was in front of the FWS in making its April or July 2014 findings that demonstrates that the actions of U.S. hunters wishing to import elephant trophies would significantly impact or even begin to address the impact of elephant populations on available habitat and vegetation structure. To the extent that sport-hunting programs, which target specific, but limited, specimens (i.e., elephants with large tusks), can play a role in addressing such issues, there is no information in the June 14, 2002 email or in the record that was in front of the FWS in making its April or July 2014 findings that demonstrates that the actions of U.S. hunters specifically play a role in addressing such issues.

23.    As explained in the April and July 2014 findings, when making the findings on whether to allow the importation of trophies from Zimbabwe FWS considered whether it had current data on population numbers and trends, government efforts to manage elephant populations, efforts to address human elephant conflicts and poaching, and the state of the hunting program within the country that would enable it to make a

finding that sport hunting in Zimbabwe is enhancing the survival of the species and that imports of trophies from that sport hunting would meet the criteria established under the ESA for African elephants. Without that information, the FWS was unable to make a finding that sport hunting in Zimbabwe is enhancing the survival of the species and that imports of trophies from that sport hunting would meet the criteria established under the ESA for African elephants. The June 14, 2002 e-mail is over 10 years old with an unsupported statement on the carrying capacity in Zimbabwe in 2002. It was therefore not relevant to the 2014 findings, was not considered directly or indirectly in making the findings, and not included in the administrative record.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed in Arlington, Virginia, on this 10th day of April 2015.

Timothy J. Van Norman
Chief, Branch of Permits
Division of Management Authority
U.S. Fish and Wildlife Service
Department of the Interior