IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **Safari Club International**, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 14-cv-00670-RCL |
| v. | ) | *Consolidated for purposes of* |
| | ) | *briefing with* |
| **S.M.R. Jewell,** in her official capacity as | ) | Case No. 15-cv-1026-RCL |
| Secretary of the United States Department of | ) | |
| Interior, *et al.*, | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| And | ) | |
| | ) | |
| **Friends of Animals**, *et al.*, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

## MEMORANDUM IN SUPPORT OF FEDERAL DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

PAGE

INTRODUCTION…………………………………………………………………………...1

BACKGROUND ........................................................................................................... 2

   I.   LEGAL BACKGROUND ...................................................................... 2

   II.   FACTUAL BACKGROUND .................................................................. 5

   III.   PROCEDURAL BACKGROUND ......................................................... 8

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ............................................................................................................... 10

   I.   The Service's Enhancement Findings Are Rational and Supported by the Record. ......... 10

      A.  2014 findings ...................................................................... 11

         1.  July 2014 ..................................................................... 11

         2.  April 2014 Finding ...................................................... 14

      C.  March 2015 .......................................................................... 18

      D.  The Service Applied the Enhancement Requirement Correctly. ................................... 22

      E.  The Service Did Not Use Illegal Guidelines in Making its Enhancement Findings ...... 24

   II.   The Service's Enhancement Findings Satisfy all Procedural and Other Applicable Requirements of the ESA and APA ...................................................................... 25

      A.  Because Enhancement Findings are Adjudications, APA Notice and Comment is Not Required ............................................................................................... 25

B.   Enhancement Findings Can be Retroactive. ................................................................ 28

C.   The Service Did Not Voluntarily Bind Itself to Provide Notice in the Federal Register or Base its Findings Only on New Information, But Complied in Any Event. .................... 30

D.   The Service's Continued Application of the Enhancement Requirement After Zimbabwe's Elephant Population Was Transferred to CITES Appendix II was Rational... 34

E.   The Service Has Rebutted the Presumption in ESA Section 9(c)(2). ........................... 36

III.   No Remedy is Necessary, But Plaintiffs' Requested Remedy Would be Inappropriate. . 40

CONCLUSION .................................................................................................................... 411

# TABLE OF AUTHORITIES

CASES                                                                                              PAGE

*Abenaki Nation of Mississquoi v. Hughes*,
    805 F. Supp. 234 (D. Vt. 1992)................................................................................ 26

*Am. Wildlands v. Kempthorne*,
    530 F.3d 991 (D.C. Cir. 2008) ................................................................................ 19

*Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*,
    515 U.S. 687 (1995)................................................................................................ 22

*Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*,
    462 U.S. 87 (1983).................................................................................................... 9

*Bowen v. Georgetown Univ. Hosp.*,
    488 U.S. 204, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988).......................................... 27

*Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
    No. CV 14-0892 (RC), 2015 WL 5449791 (D.D.C. Sept. 16, 2015) ...................... 24

*Carolina Fisheries Ass'n, Inc. v. Gutierrez*,
    550 F.3d 16 (D.C. Cir. 2008) .................................................................................. 40

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971)............................................................................................ 9, 26

*City of St. Paul v. FAA*,
    865 F.2d 1329 (D.C. Cir. 1989) .............................................................................. 26

*Davis v. Mich. Dep't of
    Treas.*, 489 U.S. 803 (1989).................................................................................... 37

*Dixon v. United States*,
    381 U.S. 68 (1965).................................................................................................. 29

*Empresa Cubana Exportadora v. U.S. Dep't of
    Treas.*, 516 F. Supp. 2d 43 (D.D.C. 2007).............................................................. 31

iii

*Envtl. Def. Fund, Inc. v. Costle,*
   657 F.2d 275 (D.C. Cir. 1981) ............................................................... 9

*Ethyl Corp. v. EPA,*
   541 F.2d 1 (D.C. Cir. 1976) ................................................................... 9

*Forester v. Consumer Prod. Safety Comm.,*
   559 F.2d 774 (D.C. Cir. 1977) ............................................................. 38

*Franks v. Salazar,*
   816 F. Supp. 2d 49 (D.D.C. 2011) ....................................................... 26

*General Motors v. EPA,*
   363 F.3d 442 (D.C. Cir. 2004) ............................................................. 32

*Hill Dermaceuticals v. FDA,*
   No. 11-cv-1950 RCL, 2012 WL 5914516 (D.D.C. May 18, 2012) ........... 5

*Humane Soc'y v. Pritzker,*
   75 F. Supp. 3d 1 (D.D.C. 2014) ........................................................... 40

*Marcum v. Salazar,*
   810 F. Supp. 2d 56 (D.D.C. 2011) ....................................................... 25

*Monsanto Co. v. Geertson Seed Farms,*
   561 U.S. 139 .................................................................................... 40

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ............................................................................ 10

*Nat'l Wildlife Fed'n v. Marsh,*
   568 F. Supp. 985 (D.D.C. 1983) ......................................................... 26

*Nevada v. Dep't of Energy,*
   457 F.3d 78 (D.C. Cir. 2006) ............................................................... 39

*Padula v. Webster,*
   822 F.2d 97 (D.C. Cir.1987) ............................................................... 31

*Prime Time Int'l Co. v. Vilsack,*
   930 F. Supp. 2d 240 (D.D.C. 2013) ..................................................... 38

*Roberts v. Sea-Land Servs, Inc.,*
   132 S.Ct. 1350 (2012) ........................................................................ 37

*Safari Club Int'l v. Babbitt,*
   No. MO-93-CA-001, 1993 WL 13932673 (W.D. Tex. Aug. 12, 1993) ................................. 36

*Safe Extensions, Inc. v. FAA,*
   509 F.3d 593 (D.C. Cir. 2007) ..................................................................... 26

*Serono Labs. v. Shalala,*
   158 F.3d 1313 (D.C. Cir. 1998) ..................................................................... 17

*State of Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.,*
   435 F.3d 326 (D.C. Cir. 2006) ..................................................................... 40

*United States v. Florida East Coast Ry. Co.,*
   410 U.S. 224, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973) ................................................ 27

*United States v. Jones,*
   No. CRIM. 08-40, 2010 WL 7697509 (W.D. Pa. Oct. 18, 2010) ........................................ 29

*United States v. Lavi,*
   No. 02-CV-6299(SLT)(JMA), 2004 WL 2482323 (E.D.N.Y. Sept. 23, 2004) ....................... 29

*United States v. One Etched Ivory Tusk of African Elephant,*
   871 F. Supp. 2d 128 (E.D.N.Y. 2012) ............................................................. 37

*Walter O. Boswell Mem'l Hosp. v. Heckler,*
   749 F.2d 788 (D.C. Cir. 1984) ..................................................................... 5

## STATUTES

1 U.S.C. § 109 ....................................................................................... 29
5 U.S.C. § 551(6) ................................................................................... 26
5 U.S.C. § 551(7) ................................................................................... 26
5 U.S.C. § 551(8) ................................................................................... 26
5 U.S.C. § 551(9) ................................................................................... 26
5 U.S.C. § 706 ...................................................................................... 9
5 U.S.C. § 706(2)(A) ................................................................................ 9
16 U.S.C. § 1531 ..................................................................................... 2
16 U.S.C. § 1532(6) .................................................................................. 3
16 U.S.C. § 1533(d) .................................................................................. 35
16 U.S.C. § 1538(a)(1) ................................................................................ 3
16 U.S.C. § 1538(b)(2)(A) ............................................................................ 38
16 U.S.C. § 1538(c)(2) ............................................................................... 36
16 U.S.C. §§ 1537a .................................................................................. 2

FEDERAL REGULATIONS

50 C.F.R. § 17.11(h) ........................................................................................... 3
50 C.F.R. § 17.31(c) ........................................................................................... 3
50 C.F.R. § 17.8 ................................................................................................ 38
50 C.F.R. § 17.8(b) ........................................................................................... 38
50 C.F.R. §§ 17.40(j)(2) .................................................................................... 31
56 Fed. Reg. 11,392, 11,393 (Mar. 18, 1991) ................................................... 3
43 Fed. Reg. 20,499, 20,502 (May 12, 1978) .................................................... 3
47 Fed. Reg. 31,384 (July 20, 1982) .................................................................. 3
57 Fed. Reg. 35,473 (Aug. 10, 1992) ................................................................. 3
60 Fed. Reg. 12,969, 12,971 (Mar. 9, 1995) ................................................... 25
62 Fed. Reg. 44,627, 44,629 (Aug. 22, 1997) ................................................... 4
80 Fed. Reg. 45,160, 45,165, 45,179 (July 29, 2015) ....................................... 5
80 Fed. Reg. 42524 (July 17, 2015) ................................................................... 7
80 Fed. Reg. 45,154 (July 29, 2015) .................................................................. 3

## INTRODUCTION

The Endangered Species Act ("ESA") and a U.S. Fish and Wildlife Service ("Service") regulation prohibit the importation of sport-hunted African elephant trophies unless four conditions are satisfied. One of these conditions is that the Service must make a finding that the killing of the elephant will enhance the survival of the species ("enhancement finding"). The Service makes enhancement findings on a periodic and country-specific basis. In this case, as of April 4, 2014, the Service concluded that it was unable to find that the taking of sport-hunted elephant trophies in Zimbabwe will enhance the survival of the species and, accordingly, it suspended importation from that country. Even after gathering additional data and information, including from sport-hunting groups and the Zimbabwean government, the Service remained unable to make a positive enhancement finding for Zimbabwe in July 2014 and again in March 2015. Therefore, in accordance with the special rule for African elephants, elephant trophies from Zimbabwe taken on or after April 4, 2014 cannot be imported until the required conditions are met, until the Service is able to make a positive enhancement finding.

Plaintiffs' challenges to the substance of the Service's three enhancement findings are entirely without merit. The available information on the factors the Service has consistently used for enhancement findings demonstrate that Zimbabwe lacks an updated management plan or adequate data to properly set a hunting quota; poaching is an issue; and it is unclear whether revenues generated by sport-hunting are going to conservation efforts to protect the country's elephants. Consequently, the Service's findings are consistent with the ESA, rational, and supported by the administrative records.

Plaintiffs' arguments that the procedures the Service used to make the enhancement findings violate the Administrative Procedure Act ("APA") and ESA similarly are unmeritorious.

1

First, the Service is not obligated to provide notice and an opportunity to comment on enhancement findings because they are adjudications, not rules. Second, because enhancement findings are adjudications, not rules, the Service can make enhancement findings retroactive. Third, although the Service was not obligated to publish notice of its enhancement findings in the Federal Register or base its findings on "new information," the agency did so. Fourth, the Service's decision to continue to require those wishing to import sport-hunted African elephant trophies from Zimbabwe to meet the conditions of the special rule (including the enhancement finding requirement) after Zimbabwe's elephant population was transferred to Appendix II of the Convention on International Trade in Endangered Species of Wild Flora and Fauna ("CITES"), is consistent with both CITES and the ESA. Finally, the Service's addition of the enhancement requirement to the special rule for African elephants and its decision to continue to require an enhancement finding for Zimbabwe's elephants rebutted the presumption contained in ESA Section 9(c)(2) that importation of threatened species listed on CITES Appendix II does not violate that Act if certain conditions are met.

For all these reasons, as further demonstrated below, the Court should grant summary judgment to Federal Defendants and deny Plaintiffs' motion for summary judgment.

## BACKGROUND

### I.    LEGAL BACKGROUND

Two legal regimes govern the trade in sport-hunted African elephant trophies:  the ESA, 16 U.S.C. § 1531, *et seq.*, and CITES, 27 U.S.T. 1087; T.I.A.S. No. 8249, Mar. 3, 1973, a multilateral treaty that aims to protect wildlife that is vulnerable to or adversely affected by commercial or non-commercial trade, which Congress has implemented into domestic law through the ESA, 16 U.S.C. §§ 1537a; 1538(c). In 1977, the CITES Parties listed the African elephant (*Loxodonta africana*) on Appendix II, which includes species that, although not

necessarily threatened with extinction currently, may become so unless trade in them is strictly controlled. *See* CITES Art. II(2); 43 Fed. Reg. 20,499, 20,502 (May 12, 1978). A year later, the Service listed the African elephant as a threatened species under the ESA.[1] 43 Fed. Reg. 20,499; 50 C.F.R. § 17.11(h).

Under the ESA, Section 9(a)(1) contains certain prohibitions, including against import into the United States, that apply to species of fish and wildlife listed as endangered. 16 U.S.C. § 1538(a)(1). ESA Section 4(d) allows the Service to extend those same prohibitions to species of fish or wildlife listed as threatened. *Id.* § 1533(d). The Service has extended all of the Section 9(a)(1) prohibitions to wildlife species listed as threatened, except where the Service issues a "special rule" containing "all the applicable prohibitions and exceptions." 50 C.F.R. § 17.31(c). The Service issued a "special rule" for African elephants at the same time it listed the species as threatened. 43 Fed. Reg. at 20,502.

The Service has revised the special rule twice, and has recently proposed further revisions to the rule to address, among other things, an increase in African elephant poaching. 47 Fed. Reg. 31,384 (July 20, 1982); 57 Fed. Reg. 35,473 (Aug. 10, 1992); 80 Fed. Reg. 45,154 (July 29, 2015). After African elephants were transferred to CITES Appendix I in 1990 because of an increase in poaching, the Service amended the special rule to address, in part, the importation of sport-hunted African elephant trophies. *See* 56 Fed. Reg. 11,392, 11,393 (Mar. 18, 1991); 57 Fed. Reg. at 35,473. The special rule, as amended, allows sport-hunted elephant trophies to be imported into the United States provided four conditions are met. 50 C.F.R. § 17.40(e)(3)(iii)(A)-(D). The third of these conditions is that "[a] determination is made that the killing of the animal

---

[1] An "endangered species" is one "in danger of extinction throughout all or a significant portion of its range," and a "threatened species" is one likely to become endangered in the foreseeable future. 16 U.S.C. § 1532(6), (20).

whose trophy is intended for import would enhance survival of the species." *Id.* §
17.40(e)(3)(iii)(C).

In 1997, African elephants in Botswana, Namibia, and Zimbabwe were transferred back
to CITES Appendix II at the 10th Conference of the Parties, after a motion to transfer the
elephants to Appendix II was approved by a majority of voting countries, although the United
States and others voted against it. 62 Fed. Reg. 44,627, 44,629 (Aug. 22, 1997). On August 22,
1997, in the context of a proposed rule announcing amendments to CITES Appendices I and II,
including the transfer of African elephants from Botswana, Namibia, and Zimbabwe to CITES
Appendix II, the Service explained that all the conditions of the special rule "will continue to
apply." 62 Fed. Reg. at 44,633. The Service further explained that "[i]n making the required
enhancement findings, [it] reviews the status of the population and the total management
program for the elephant in each country to ensure the program is promoting the conservation of
the species." *Id.* The Service stated that it "will make such findings on a periodic basis upon
receipt of new information on the species' population or management" and that the enhancement
finding for Zimbabwe would "remain in effect until the Service finds, based on new information,
that the conditions of the special rule are no longer met and has published a notice of any change
in the Federal Register." *Id.*

The import of a CITES Appendix II species requires the prior grant and presentation of a
valid CITES export permit issued by the exporting country. CITES Art. IV(4). The Service has
explained that, for Appendix II African elephants, there is no requirement for a CITES import
permit for non-commercial imports of sport-hunted African elephants. 62 Fed. Reg. at 44,633.
However, as explained above, a person can import sport-hunted African elephant trophies from
Zimbabwe under the ESA only if four conditions are met, including that the Service has made a

4

determination that "the killing of the animal whose trophy is intended for import would enhance survival of the species." 50 C.F.R. § 17.40(e)(iii)(C). The Service generally does not require ESA import permits for ESA threatened species also listed on CITES Appendix II that meet all requirements of ESA section 9(c)(2) or other applicable requirements, but has proposed to do so for African elephants. 80 Fed. Reg. at 45,160, 45,165, 45,179 (July 29, 2015).

## II.    FACTUAL BACKGROUND

On April 4, 2014, the Chief of the Branch of Permits for the Division of Management Authority for the Service issued a press release announcing that the Service was suspending importation of sport-hunted African elephant trophies from Zimbabwe under the ESA because the agency could no longer make a positive enhancement finding for that country. AR 89; April 2014 AR 195; April 2014 AR 196.[2] The Service noted that it appeared that there has been an increase in human-elephant conflicts in Zimbabwe. AR 89 at 3652. The Service also explained that it had not received recent information from Zimbabwe regarding its elephant population, regulations, and conservation programs and therefore, because of insufficient information, the Service was unable to make an enhancement finding for Zimbabwe. *Id.* Also on April 4, 2014,

---

[2] Throughout the brief, for consistency with Plaintiffs' brief, *see* ECF No. 87, Pls. Br. at 8 n.3, we cite the most recent administrative record, the revised record for the March 2015 finding, unless otherwise indicated. The original April 2014 finding is in the record at AR 89. An updated version was issued on April 17 correcting the effective date of the finding. This is the version cited by Plaintiffs in their argument section, and which we will cite for consistency. *See* AR 102. However, each finding should be reviewed based on the applicable administrative record, and materials that post-date the finding are not part of its record. *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) (When a court reviews an agency action, "it should have before it neither more nor less information than did the agency when it made its decision."). This includes information that post-dates the agency decision. *See Hill Dermaceuticals v. FDA*, No. 11-cv-1950 RCL, 2012 WL 5914516, at * 9 (D.D.C. May 18, 2012) (rejecting post-decisional factual information because it "was not before FDA at the time of the challenged decisions, and therefore [is] not relevant to the issue before the Court; whether FDA's decisions were well-reasoned based upon the information available to FDA at the time FDA made those decisions"), *aff'd* 709 F.3d 44 (D.C. Cir. 2013).

the Service sent a letter to the Government of Zimbabwe, requesting more information about Zimbabwe's elephant population and conservation efforts. AR 74. Zimbabwe responded by letter on April 17, 2014, April 2014 AR 46, and has provided further information since then. AR 7, 7a, 9, 10, 10a, 11-18, 21, 23-33, 35, 36, 39, 40-41, 43, 53, 98, 100. On May 7, 2014, consistent with the April 4th press release, the Service submitted a notice to the Federal Register that explained that the Service was reviewing the information recently sent by Zimbabwe, as well as other information that it expected to soon receive, and would announce its final enhancement finding for Zimbabwe in the future in the Federal Register. *Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies*, 79 Fed. Reg. 26,986, 26,988 (May 12, 2014), AR 147. On May 8, 2014, representatives from the Service met with members of the Zimbabwean government to discuss the state of African elephants in Zimbabwe.

The Service announced the final 2014 enhancement finding for Zimbabwe in the Federal Register on July 31, 2014. *See Notice of Suspension of Imports of Zimbabwe Elephant Trophies Taken in 2014 on or After April 4, 2014*, 79 Fed. Reg. 44,459 (July 31, 2014), AR 212. The Service had received additional information from Zimbabwe and other sources after making its April 4 enhancement finding for that country. The Service thus explained that its new enhancement finding "is the result of an analysis of this more recent information from Zimbabwe and other sources." AR 206 at 4507-16. The Service found that Zimbabwe's strategy for implementing its elephant management plan was unclear, that Zimbabwe did not have "adequate information on current elephant populations to establish scientifically defensible hunting quotas," and that Zimbabwe was not enforcing its laws or allocating most hunting revenues to elephant conservation and management. *Id.* at 45016-17. The Service reviewed the International Union for Conservation of Nature's ("IUCN") report on population data and found that "half of

6

the population estimates included in 2012 is older than 10 years." *Id.* at 4510. The IUCN report cautioned "this lack of systematic and updated monitoring data is of serious concern for possibly the third largest elephant population in Africa." *Id.* And although there were "bright spots" of elephant conservation efforts scattered around Zimbabwe, the Service concluded that "there are not enough of these 'bright spots' to overcome the problems currently facing Zimbabwe elephant populations and to support a finding that sport hunting is enhancing survival of the species." *Id.* at 4517. Because the Service could not make a positive enhancement finding for Zimbabwe, the Service announced that "trophies, parts or products, of elephants taken in Zimbabwe after April 4, 2014, will not be allowed to be imported into the United States." *Id.* at 004505. The Service stated that it would reevaluate the finding in December 2014 to determine whether to allow imports of trophies from Zimbabwe taken starting in 2015. *Id.*

On March 26, 2015, the Service issued its enhancement finding for African elephants taken as sport-hunted trophies in Zimbabwe on or after January 1, 2015. AR 344; 80 Fed. Reg. 42524 (July 17, 2015), AR 346. The Service once again concluded that it was unable to make a positive enhancement finding for Zimbabwe, based on some of the same rationale as its prior findings. AR 344. It explained that Zimbabwe's management plans did not include specific, measurable goals and actions, so it was difficult to determine if the country's elephants were being well managed. *Id.* at 7260. Additionally, Zimbabwe was in the process of creating a new management plan but the plan remained incomplete at the time of the March finding. AR 344 at 7261. The March finding also analyzed new population data recently collected. A Pan African Aerial Elephant Survey had been completed, with a provisional estimate of 82,000-83,000 elephants in Zimbabwe. *Id.* at 7263. Finally, the Service reviewed whether hunting revenues from U.S. hunters were enhancing the survival of elephants in Zimbabwe and found that there

was insufficient data provided to conclude that such revenues were enhancing survival. *Id.* at 7269-71. Based on all these factors, the Service again concluded it could not make a positive enhancement finding for elephants sport-hunted in 2015.[3]

## III.    PROCEDURAL BACKGROUND

On April 21, 2014, Plaintiff SCI filed a complaint challenging the Service's April 4, 2014 enhancement finding for Zimbabwe and its April 4, 2014 enhancement and non-detriment findings for Tanzania. ECF No. 1. On April 30, 2014, SCI moved for a preliminary injunction. ECF No. 4. On May 13, 2014, Federal Defendants filed a memorandum in opposition to the motion for preliminary injunction and a motion to dismiss for lack of jurisdiction. ECF Nos. 10, 11. SCI amended its complaint on May 16, 2014 to add the National Rifle Association as a co-plaintiff. ECF No. 13. The Court denied the motion for preliminary injunction on June 6, 2014. ECF No. 24. With the Court's permission, Federal Defendants filed a supplemental motion to dismiss on non-jurisdictional grounds on August 8, 2014. ECF No. 36. On that same date, Federal Defendants filed the certified list of the contents of the April 2014 administrative record with the Court and provided copies of the record to the parties. ECF No. 35. On December 26, 2014, the Court granted Federal Defendants' motions to dismiss in part, dismissing Plaintiffs' Tanzania claims for failure to exhaust administrative remedies. ECF No. 47.

On February 10, 2015, Federal Defendants filed the certified list of the contents of the administrative record for the July 2014 Zimbabwe enhancement finding with the Court and

---

[3] Plaintiffs submitted a Statement of Material Facts regarding standing, ECF 87-1, rather than, as is typical in administrative record cases, including those facts in the body of their memorandum in support of summary judgment as appears to be required under the local rules. *See* LCvR 7(a). Federal Defendants have not contested Plaintiffs' standing as to their Zimbabwe claims in this litigation. Beyond noting that the attached standing declarations speak for themselves, Federal Defendants have no further response to this Statement of Material Facts.

provided copies to the parties. ECF No. 60. On March 31, 2015, Plaintiffs filed a motion to

compel supplementation of the July 2014 administrative record, ECF No. 64, which the Court

denied on June 29, 2015, ECF No. 72.

On June 30, 2015, Plaintiffs filed a new complaint challenging the Service's March 26,

2015 enhancement finding for Zimbabwe. Case No. 1:15-cv-01026, ECF No. 1. After a status

hearing with the Court, the parties agreed to, and the Court approved, a consolidated briefing

schedule for both cases. Minute Orders of July 17 and 21, 2015. On August 14, 2015, Federal

Defendants filed the certified list of the contents of the administrative record for the Service's

March 2015 Zimbabwe enhancement finding with the Court and provided copies of the record

documents to the parties. ECF No. 79, *as updated* D.D.C. 15-1026, ECF 29 (Nov. 10, 2015).

## STANDARD OF REVIEW

The Service's decisions are reviewed under the standard of review provided in the APA,

5 U.S.C. § 706. The APA provides that a court may set aside final agency action if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C.

§ 706(2)(A). Review under the "arbitrary and capricious" standard is "highly deferential" and

"presumes the agency's action to be valid." *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283

(D.C. Cir. 1981) (citing, *inter alia*, *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402,

419 (1971)). Reviewing courts are to be at their "most deferential" when the agency is "making

predictions, within its area of special expertise, at the frontiers of science." *Baltimore Gas &*

*Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 93, 96, 103, 105-106 (1983); *Ethyl Corp. v.*

*EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (*en banc*). A reviewing court may reverse under the

"arbitrary and capricious" standard only "if the agency has relied on factors which Congress has

not intended it to consider, [has] entirely failed to consider an important aspect of the problem,

[or has] offered an explanation for [that] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## ARGUMENT

I.     **The Service's Enhancement Findings Are Rational and Supported by the Record.**

The special rule for African elephants allows importation of sport-hunted African elephant trophies only if four conditions are met. 50 C.F.R. § 17.40(e)(3)(iii)(A)-(D). The third of these conditions requires the Service to make a positive determination: a finding that the killing of the elephant whose trophy is intended for import will enhance the survival of the species. *Id.* § 17.40(e)(3)(iii)(C). The Service has explained that it "looks at a number of aspects" in making its determination whether sport-hunting is contributing to the enhancement of African elephants within a country. AR 102 at 3818; AR 206 at 4506; AR 344 at 7256. In general, these aspects can be grouped into four factors:  (1) whether the country has a valid national or regional management plan and the resources and political will to enact the plan; (2) the status of the country's elephant population and trends over time; (3) whether the country has policies addressing management efforts, human-elephant conflicts, poaching, and sport-hunting; and (4) whether sport-hunting has been incorporated into the country's national or regional management strategies effectively. AR 102 at 3818-19; AR 206 at 4506; AR 344 at 7256-57. After considering all available information regarding these factors, the Service rationally determined in April 2014, July 2014, and March 2015 that it was "***unable to find*** that the taking of sport-hunted elephant trophies in Zimbabwe will enhance the survival of the species." AR 102 at 3818; AR 206 at 4516-17; AR 344 at 7272-73.

10

### A.     2014 findings

The Service made an interim finding in April 2014 and finalized it July, which superseded the April finding. Consequently, the Court need only review the July finding, as the Service's operative enhancement finding for sport-hunted elephant trophies that were hunted after April 4, 2014.

### 1.   July 2014

In the July 2014 finding, the Service considered the 2013 surveys provided by Zimbabwe and all other information received from the country and other members of the public, including plaintiff SCI and other sport hunting advocacy organizations, but was still unable to make a positive enhancement finding. AR 206. The Service reviewed Zimbabwe's management plans and frameworks and determined that, although they contained clear goals, they did not include specific management actions or explain how the government would implement them. *Id.* at 4507-09. For example, one of the management documents provided by Zimbabwe set a guideline to halt sport hunting if total elephant non-hunting based mortality rose above 0.75% of the population. *Id.* at 4508. The Service noted that, because of the stale elephant population data for Zimbabwe, it was impossible to determine whether this guideline had been met. *Id.* Other management documents appeared to have been superseded by events: older management documents relied on culling as the primary elephant management tool to reduce conflicts between elephants and other land uses, and the Service learned that the country was no longer using culling. *Id.* at 4507-08.

Plaintiffs criticize the Service's discussion of elephant population data, suggesting that the Service "missed the mark" in interpreting the IUCN elephant population data. Memorandum in Support of Plaintiffs' Motion for Summary Judgment (ECF No. 87) ("Pls. Br.") at 28.

11

However, it is Plaintiffs who misinterpret the Service's use of the data: the Service did not base its finding on a population estimate, but rather on the country's inability to manage elephant hunting if the population data is uncertain. And, the Service simply noted that for Zimbabwe, many of the population surveys included in the IUCN data were over 10 years old as of 2012 (which is an accurate description of the data). *See* AR 80 (listing dates of surveys). Some of the more recent survey data was labeled as "definite" and others, "speculative," to indicate the robustness of the surveys methodology and their age. *See id.* Plaintiffs also criticize the Service for failing to include in their estimates a 2007 survey in the Hwange area, and argue that this omission was key to the Service's finding. Pls. Br. at 28-29. The survey was inadvertently omitted for the simple reason that the IUCN survey data, a source for the Service's population data, also did not include the 2007 Hwange survey. AR 80; AR 256 at 5739-40 (later email explaining that the 2007 Hwange survey was "inadvertently" left out of the provisional IUCN report). And, neither the population data in general, nor the Hwange population numbers in particular were key to the finding. Instead, as explained, the July 2014 finding was not based on the population estimates, but rather based on the fact that Zimbabwe's population data was outdated and therefore, could not be used as the basis for robust management of elephants or the basis for sound elephant hunting quotas.

Likewise, Plaintiffs discount the Service's reliance on the CITES MIKE and PIKE data, which are sample sites to estimate the rate of poaching. Pls. Br at 30. They note that, after the finding was issued, an elephant researcher criticized the Service's use of this data in the April finding to the extent the Service reported these numbers as an absolute value for poaching levels within Zimbabwe. Pls. Br. at 30. Plaintiffs overstate the importance of these data to the finding: the Service referenced these CITES reports as evidence that poaching was a concern that affected

12

management of Zimbabwe's elephants, not that the level of poaching provided at those two sites (if extrapolated to the entire country) was the basis for the July 2014 finding. *See* AR 206 at 4510-11; AR 42a (describing elephant poaching generally and providing Zimbabwe data). The Service clearly understood that the data came from particular MIKE sites, not from a nationwide survey. *See, e.g.*, AR 79 at 3624 (January 2014 Briefing Paper). Moreover, the Service responded that it would look into Dr. Dublin's concerns as it continued to evaluate the elephant program. AR 151.[4]

Finally, Plaintiffs argue that the Service failed to consider the impact of the loss of hunting revenue on anti-poaching efforts in Zimbabwe. Pls. Br. at 30-31. To the contrary, the Service did analyze this issue. In the July 2014 finding, the Service explained that the relevant Zimbabwean management agency, the ZPWMA, appeared to lack a budget sufficient to enforce their statutory requirements, conduct day-to-day management, or deter poaching. AR 206 at 4511. According to some analyses, a sufficient budget to protect the elephant range would be over $21 million, whereas ZPWMA received only $1.5 million of a request to the Zimbabwean Treasury in 2013 and, even with hunting revenues that year, it was unclear at the time of the July finding that this amount was sufficient. AR 206 at 4512. The Service also identified management

---

[4] Plaintiffs criticize the Service's other accurate descriptions of the IUCN survey data, Pls. Br. at 29 (noting that the Service described which kind of methodology—whether dung counts or sample counts—were used to estimate the population data). They suggest that the Service improperly distinguished among different surveys methods, but provide no scientific support for their statement. The IUCN itself distinguishes among different types of survey methods and further categorizes the outputs of those counts. *See* April 2014 AR 4 at 38. Moreover, they overread the Service's straightforward explanation of the data as suggesting that the Service was trying to "cast doubt" on the IUCN's methodology. The July 2014 finding contains nothing of the sort: the Service explained its view that properly conducted aerial surveys (like the Hwange survey, AR 35), are more accurate than dung or sample counts, but noted that all of those survey methods are counted in the "definite" category of IUCN population estimates. The Service was not "justify[ing] its earlier mistakes," it was describing the IUCN report. *See* AR 80.

issues within the agency and the government based on CITES reports and other sources. *Id.* at 4512-13. Finally, it addressed the arguments raised by Plaintiffs that hunters and hunting concessions deter poaching by noting that hunting concessions are not allowed in national parks, and it is unlikely that the density of hunters is sufficient to adequately deter poaching. *Id.* For all these reasons, the Service's July 2014 finding should be upheld.

### 2. April 2014 Finding

As explained *supra* in its July 2014 enhancement finding for Zimbabwe, the Service finalized its interim finding made in April 2014, and the July 2014 finding superseded the April finding. Consequently, the Court need not review the April finding at all, because the July finding is the operative finding for elephants sport hunted in Zimbabwe in 2014. Nevertheless, even if the Court does review the April finding on its merits, it passes muster under the APA's standard of review.

The Service relied on multiple factors to determine that it could not make a positive enhancement finding for Zimbabwe in April 2014, including reviewing the government's implementation of its management plans and available information on the elephant population. The Service had reached out by letter to Zimbabwe in 2007 and received some information in response, but had not received substantial updates since then, despite personal meetings between the Service and Zimbabwean representatives at annual meetings in the United States, thus it relied on what scant information it had. AR 102 at 3819. The Service found that government representatives had been involved in the criminal wildlife trade and that official law enforcement effort aimed at reducing poaching had declined, based on a 2013 CITES Panel of Experts and information from the 15th meeting of the Parties. *Id.* at 3822. The Service highlighted a 2013 elephant poisoning incident in government-protected Hwange National Park, noting that the

elephants' ivory was removed. *Id.* at 3819. It also found that poaching deaths had increased as a

percentage of all mortality, based on CITES sampling sites in Zimbabwe. *Id.* at 3821. The

Service found that the government lacked current data on elephants to effectively manage the

population: for a substantial portion of the country, much of the IUCN population data for

Zimbabwe was from surveys that were over 10 years old. AR 102 at 3821; *see* AR 80. On this

basis, the Service concluded that it and the Zimbabwean government could not be certain of the

elephant population in Zimbabwe and newer survey data was needed to effectively manage the

population and to provide rational hunting quotas. AR 102 at 3823. Based on all of these

considerations, the Service concluded that it could not make a positive enhancement finding. *Id.*

Plaintiffs suggest that the April finding relies on "rumor and inaccurate data." Pls. Br. at

20. In support of this charge, they cite the Service's reference in the April finding to an incident

in Hwange National Park of 300 elephant poisonings, rather than to the later confirmed death toll

of 105. The Service, however, did not suggest that the particular number of elephants poisoned in

the Hwange incident factored into its decision. Instead, it highlighted this incident as evidence

that recent information has indicated that poaching had become an issue within the country. AR

102 at 3819. Plaintiffs do not dispute that the Hwange incident occurred, that poaching of over

100 elephants is significant, or that nearly 300 elephants were poached in Zimbabwe in 2013,

Pls. Br. at 20-21 & n.10, but appear to suggest that the Service should have verified the actual

number of elephants poisoned in Hwange rather than highlight the event itself. Newspaper

reporting at the time suggested that 300 elephants were poisoned, and the totals varied among the

reports. *See* April 2014 AR 196; *see* AR 50 (newspaper reports on the incident); AR 46 at 3401-

02 (other 2013 newspaper reporting on poaching in Zimbabwe); AR 47; April 2014 AR 77 at

1451 (also reporting 300 elephants poisoned). Plaintiffs have not identified a reason to overturn

the finding—instead they focus on details not material to the Service's decision. And, as Plaintiffs acknowledge, in the July 2014 finding, the Service updated its information on the incident and clarified that nearly 300 elephants had been poached in Zimbabwe, including the Hwange poisonings. AR 206 at 4513 & n.1.

Plaintiffs also charge that the Service "never asked for new or additional data" from Zimbabwe and, thus the primary justification for the April finding was that the Service "lacked sufficient information" to make an enhancement finding. Pls. Br. at 18-19. Plaintiffs are wrong on both fronts. First, the Service did review available information, which indicated that poaching had become an important issue for the country and that Zimbabwe lacked up-to-date information needed to effectively manage its population. For example, the Service relied on data provided by the IUCN and CITES information. It reviewed the available population data and noted that the IUCN's estimates were based on stale data. Second, as the April finding noted, the Service had had contacts with Zimbabwean representatives in the intervening years but, despite these visits, the Zimbabwean government did not provide updated information not reflected in the IUCN or CITES data.

In support of their argument that the Service's purported failure to reach out to Zimbabwe caused the Service to ignore key information, Plaintiffs now point to descriptions of three 2013 surveys in sub-areas of Zimbabwe's elephant regions that showed increases in certain elephant populations, April 2014 AR 46, and suggest that the Service was therefore of these survey. Thus, Plaintiffs imply, had the Service possessed this information, it would have drawn a different conclusion. Pls. Br. at 21-22. This argument is wrong on several grounds.[5] First, the Service

---

[5] Additionally, as with all post-decisional information, letters that post-date the April finding are not part of the administrative record for that finding. *See Hill Dermaceuticals v. FDA*, No. 11-cv-1950 RCL, 2012 WL 5914516, at *9.

made its finding based on a holistic assessment of elephant management in Zimbabwe and the impact of sport-hunting and not in exclusive reliance on population levels. Second, Plaintiffs do not contest that most of the survey data for Zimbabwe was stale, irrespective of the three 2013 surveys in discrete areas of Zimbabwe. Third, the Service placed more weight on evidence of poaching in the country and the lack of up-to-date population survey data. AR 102 at 3823. Finally, even when it considered the surveys in the July finding, the Service declined to make a positive enhancement finding, as explained *supra*. For all these reasons, the Service's April 2014 finding was a reasonable analysis of the available information regardless whether it considered three surveys from 2013.

Finally, Plaintiffs cite several documents from an employee at the Service and argue that "the choice made dictated the facts to be found." Pls. Br. at 23-24. Plaintiffs here ignore the context of the comments and cited email. In her email, as Plaintiffs quote, the Service employee mentioned putting the "cart before the horse," but she meant she was waiting for a briefing paper [BP] to be finalized that presented the considered views on Zimbabwe before speaking further with the Assistant Director or forwarding him individual articles. *See* April 2014 AR 99, April 2014 AR 97 (forwarding April 2014 AR 98). The briefing paper was finalized in January 2014— months before the finding. *See* AR 79. Moreover, as a legal matter, the Court reviews the ultimate decision, not the intermediate discussions of employees within the agency that show the decision-making process. *See Serono Labs. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) ("deference is owed to the decisionmaker authorized to speak on behalf of the agency, not to each individual agency employee").

//

//

C.      March 2015

On March 26, 2015, the Service issued its enhancement finding for African elephants

taken as sport-hunted trophies in Zimbabwe on or after January 1, 2015. AR 344, AR 346; 80

Fed. Reg. 42,524. The Service again concluded that it was unable to make a positive

enhancement finding for Zimbabwe, based on some of the same pieces of information and

analyses as under the prior findings. AR 344. It explained that Zimbabwe's management plans

did not include specific, measurable goals and actions, so it was difficult to determine if the

country's elephants were being well managed. AR 344 at 7260. Additionally, Zimbabwe was

then in the process of creating a new management plan, but it had not completed it by the time of

the March finding. AR 344 at 7261. The March finding also analyzed new population data that

had been recently collected. A Pan African Aerial Elephant Survey had been completed, with a

provisional estimate of 82,000-83,000 elephants in Zimbabwe. *Id.* at 7263. The Service reviewed

whether hunting revenues from U.S. hunters were enhancing the survival of elephants in

Zimbabwe and found that there was insufficient data provided to conclude that those revenues

were enhancing survival. The Service had additional information on poaching, showing that the

average annual number of elephants poached increased from nearly 100 elephants per year to just

under 250 elephants per year in 2011-13. *Id.* at 7266. The Service reviewed the available

information about how hunting quotas were established or whether they appropriately accounted

for other sources of elephant offtake and could not conclude that the quotas were reasonable. *Id.*

at 7266-69. Based on all these factors, the Service could not make a positive enhancement

finding.

Plaintiffs make many of the same arguments regarding the March 2015 finding as they

did for previous findings, challenging the Service's interpretation of the data. But, again,

Plaintiffs mistakenly suggest that the Service must make an enhancement finding if the elephant population reaches a certain level. Instead, the Service appropriately evaluates whether the country is properly managing elephant hunting so that U.S. imports of sport-hunted elephant trophies enhances the survival of the species.

For example, Plaintiffs note that now that the Pan African Aerial Elephant Survey preliminary results have been released, and, according to Plaintiffs, the population estimate is only 6% lower than it was 13 years ago, this means that the conservation benefits of elephant hunting are an enhancement. Pls. Br. at 35.[6] Beyond the fact that Plaintiffs provide no support for their statement that an estimated 6% population decline shows that sport hunting would enhance the survival of the species, the Service's finding was not based on Zimbabwe's elephant population achieving a particular number. Instead, the Service focused on whether the population and elephant offtake is being appropriately managed. The Service noted that Zimbabwe has not provided complete figures on elephant offtake and, thus, without a clear understanding of the relationship between elephants taken for hunting or other purposes, it is unable to conclude that hunting is sustainable. *See* AR 344 at 7267-69. Likewise, the Service was unable to conclude that revenues from U.S. hunters were contributing to the enhancement of the survival of the species because of gaps in revenue data. *Id.* at 7269-71. Thus, Plaintiffs' scientific critiques of the Service's statements about the population estimates in Zimbabwe before and after the Pan African Aerial Elephant Survey are largely irrelevant. Moreover, the Service is entitled to rely on the opinions of its experts even if Plaintiffs may disagree. *See, e.g. Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1000 (D.C. Cir. 2008).

---

[6] As an initial matter, Plaintiffs' opinion on whether a 6% population decline over 13 years is a small decline is irrelevant given that they do not even purport to be scientific experts on African elephants.

Based on similar logic, Plaintiffs take an email about elephant population data out of context. They contend that an email in which the Service noted that if the population of elephants in Zimbabwe is close to 100,000, removal of 500 elephants "is not a problem." AR 228. But, the email goes on to explain that the Service's larger concern is that "if they are completely off on the numbers (e.g., population is actually 50,000 removing 500 elephants may have a bigger impact)." *Id.* Reading the email in context shows that the Service was simply trying to make the point that elephant management depends on good data and, at the time of the earlier findings, the elephant population data for Zimbabwe was stale and, therefore, uncertain. Plaintiffs attempt to extrapolate from this email a hard-and-fast rule that if the ratio between hunting quota and elephant population is less than 500/100,000, the Service must make a positive enhancement finding. Even if it could do so by informal email, the Service made no such guideline and bases its enhancement finding on no such benchmark.

Plaintiffs also suggest that the Service failed to acknowledge more recent data from the MIKE areas in Zimbabwe in 2014. Pls. Br. at 35. This is irrelevant because the Service did acknowledge that poaching may have declined from 2011 to 2013 and did not base its enhancement finding on poaching data alone. Ironically, Plaintiffs highlight this poaching decline which occurred during a year when U.S. hunters were not allowed to import sport-hunted elephant trophies from Zimbabwe. Under Plaintiffs' theory, U.S. hunters who can import trophies are an important component of an effective anti-poaching strategy in Zimbabwe. *See, e.g.*, Pls. Br. at 37-38. But, at least in the small areas where the MIKE estimates are developed, poaching fell even without trophy importation.

Plaintiffs further contend that the March 2015 finding omits key facts because the Service stated that the hunting quota was 500 elephants. Pls. Br. at 36 (citing information from the

ZPWMA). The Service used the 500 figure because it was the quota as reported by the CITES website. *See, e.g.*, AR 7 at 1944 (information from Zimbabwe in 2014 describing the quota information provided to CITES as 500 elephants); *see also* cites.org/eng/resources/quotas/index.php (last visited March 25, 2016). Moreover, the report cited by Plaintiffs describes the 2015 quota as a "proposed" number, not a final quota, thus the Service reasonably did not rely on it. *See* AR 276 at 5882-83.

Again, Plaintiffs contend that U.S. hunters and safari operators make a contribution toward anti-poaching efforts such that the Service erred in making its negative enhancement finding. While the Plaintiffs presented anecdotal evidence of particular companies supporting anti-poaching efforts, the Service examined the available information on financial support for anti-poaching as a whole and concluded that it lacked sufficient data to find that hunting enhanced the survival of the elephant. *See* AR 344 at 7269-71. For example, it noted that the CAMPFIRE program, which provides conservation benefits to local communities from hunting revenues, is only extant on communal lands, and the Service does not have clear information on the role that CAMPFIRE plays in elephant conservation because it does not have information on the percentage of the total the elephant habitat on communal land comprises or the percentage of trophies taken on these lands. *Id.* at 7269. Further, recent estimates from the Pan African Aerial Elephant Survey show significant population declines in areas with communal lands. *Id.* at 7270-71. For these reasons, the Service reasonably concluded that it could not make an enhancement finding, despite the revenues from elephant hunting that may aid in anti-poaching efforts in some regions.[7]

---

[7] Plaintiffs also include in their brief a table with three further allegations about purported errors in the March 2015 finding. Each of these is based on a misreading of the record. First, Plaintiffs

**D.      The Service Applied the Enhancement Requirement Correctly.**

Plaintiffs complain that the Service applied an improperly high standard in making its enhancement finding. Instead of requiring that the killing of the elephant whose trophy is intended for import enhance the survival of the species, Plaintiffs contend, the Service allegedly imposed a requirement that it "ensure" the survival of the species. Pls. Br. at 45. Contrary to Plaintiffs' argument, the Service has consistently required enhancement and provided a thorough explanation of its standard.

To begin with, although we agree that the Court should give the term enhance its ordinary meaning because neither the ESA nor the Service's regulations provide a definition, Pls. Br. at 45, the Court also has to read the term in the context of the phrase "enhance the survival of the species." *Babbitt v. Sweet Home Chapter of Cmtys. For a Great Or.*, 515 U.S. 687, 697 (1995).

---

argue that the Service wrongly explained that Zimbabwe had not provided the average sentence or penalty for a poaching crime, Pls. Br. at 38-39. Zimbabwe did not provide the average sentence or penalty, and, although it did include some parameters about poaching sentencing, those are not averages. *See* AR 276 at 5871-72, 5874; AR 7 at 1938. In addition, although Zimbabwe lists the numbers of people prosecuted in 2013, it does not provide convictions over time and Table 1 omits the number of people arrested per year for more recent years. And, although it is unclear if the people involved in the Hwange incident are included in the 2013 total convictions, it appears that most of those arrested and prosecuted in 2013 were related to the Hwange poisoning (35 out of 40), rather than other poaching incidents, so much of the information is related to one, hopefully unusual, event. *See* AR 276 at 5874. These numbers differ significantly from information previously provided. *See* AR 7 at 1938 (listing 77 prosecutions with only 3 acquittals). Second, Plaintiffs correctly note that the CITES report discussed in the March 2015 finding lacks data after 2011. AR 344 at 7265. It is unclear why it was an error for the Service to rely on recently acquired information from CITES. In addition, Plaintiffs fail to acknowledge the Service's discussion of more recent information on offtakes, provided by Zimbabwe. *See id.* at 7267. Third, Plaintiffs then explicitly cite the information about offtake provided by Zimbabwe, AR 276 at 5880-81, and suggest that the Service did not address it. This is incorrect. *See* AR 344 at 7267. Moreover, while the March 2015 finding does include the statement quoted about problem animals, *see* Pls. Br. at 39, the Service qualified it had received the information as "anecdotal evidence"—not that it was asserting the statement itself.

Survival is defined as "the state or act of continuing to live or exist[,] especially in spite of difficult conditions." Merriam-Webster online (last visited March 25, 2016). Thus, to meet the regulatory requirement of the special rule, the Service must find that sport-hunting increases or improves the continued existence of African elephants in Zimbabwe.

The standard the Service has consistently applied in making its enhancement findings comports with this ordinary meaning. In the 1997 Zimbabwe enhancement finding, the Service based its finding on Zimbabwe's elephant population status, management plan, management program, regulations/enforcement, and sustainable use. AR 20 at 2557-59. In the 2014 and 2015 enhancement findings, the Service similarly based its finding on Zimbabwe's elephant population status, management plans, regulations and enforcement, sustainable use, revenue utilization, and local conservation efforts. AR 102; AR 206; AR 344. In all instances, the Service considered the available information on all factors to determine whether sport-hunting enhances the survival or contributes to the continued existence of elephants in Zimbabwe.

Plaintiffs' arguments that the Service changed the requirement for enhancement lack merit. First, the only documents relevant to the standard the Service uses for enhancement findings under the special rule are the preamble to the rule itself and the Service's enhancement findings. The Service's statement in 1992 that "the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation," Pls. Br. at 46, refers to CITES requirements, not ESA ones. Similarly, the Service's statements in 1995 about benefits to the survival of the elephant were made in the context of CITES non-detriment findings, not enhancement findings under the special rule. Pls. Br. at 46 (quoting 60 Fed. Reg. 12,969 (Mar. 9, 1995)). While the Service may consider some similar factors in deciding whether sport-hunting in a particular country enhances the survival of

the elephant, the Service's statements in 1992 and 1995 were not binding and did not establish a standard for making enhancement under the ESA or the special rule.

Second, the difference between the Service's 1997 and 2014-2015 enhancement findings is not the standard used, but the information available regarding the factors the Service considers in determining whether sport-hunting in Zimbabwe is meeting the standard. For example, regarding Zimbabwe's elephant population, the Service stated in 1997 that "Zimbabwe has one of the best sets of elephant population data in Africa" and that the population was growing by "about 5% per annum." AR 20 at 2557-58. In April 2014, in contrast, the population data indicated that "[f]or a substantial portion of the country, there have been no recent surveys and most estimates are based on 2001 figures." AR 102 at 3821. Even after receiving additional information from Zimbabwe and the completion of the Pan African Aerial Elephant Survey in 2014, the data showed that the population had experienced a "6% decline since 2001 surveys." AR 206 at 7263.

In short, there is no evidence that the Service imposed a higher standard for the enhancement requirement in 2014 and 2015. Instead, the evidence demonstrates that the Service has always relied on the same factors in determining whether sport-hunting enhances the survival of elephants in Zimbabwe.

### E.   The Service Did Not Use Illegal Guidelines in Making its Enhancement Findings.

Plaintiffs also suggest that the Service improperly based its findings on specific agency guidelines challenged by Plaintiff Safari Club and then withdrawn in the 1990s. Pls. Br. at 41-45. Plaintiffs did not include this claim in their Complaint, *see* 3rd Am. Compl., ECF 82 at ¶¶ 94-122, and cannot now amend their complaint through briefing. *See, e.g.*, *Campbell v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. CV 14-0892 (RC), 2015 WL 5449791, at *2 (D.D.C. Sept.

16, 2015). Moreover, the Service explained two decades ago that it no longer relies on these guidelines. Instead, the Service relies on appropriate authorities like the ESA and its regulations. *See, e.g.*, Service, Withdrawal of Proposed Guidelines on African Elephant Sport–Hunted Trophy Permits, 60 Fed. Reg. 12,969, 12,971 (Mar. 9, 1995). And, as this Court has recognized in past cases, the fact that the Service may have interpreted the applicable authorities in a way that is consistent with the withdrawn guidelines does not show that the Service has been using the guidelines, even if Plaintiffs could state such a claim in this litigation. *Marcum v. Salazar*, 810 F. Supp. 2d 56, 72 n.3 (D.D.C. 2011) *vacated and remanded on other grounds*, 694 F.3d 123 (D.C. Cir. 2012). For those reasons, Plaintiffs' allegations regarding the withdrawn guidelines should be rejected.

## II.     The Service's Enhancement Findings Satisfy all Procedural and Other Applicable Requirements of the ESA and APA.

Perhaps recognizing the weakness of their challenges to the substance of the Service's findings, Plaintiffs devote a lot of energy attacking the Service's decisionmaking process, and contend that process suffered from a host of procedural infirmities. Plaintiffs are grasping at straws. The Service complied with all applicable requirements of the ESA and APA and many that were not even applicable. The Court should reject Plaintiffs' arguments to the contrary.

### A.     Because Enhancement Findings are Adjudications, APA Notice and Comment is Not Required.

Plaintiffs allege that the Service's enhancement findings are substantive, or legislative, rules that were promulgated without the requisite notice and opportunity for comment. Pls. Br. at 49-50; 2014 Complaint, Count III; 2015 Complaint, Count III. Plaintiffs' claims fail as a matter of law because the Service's enhancement findings are adjudications that do not require notice and comment before issuance.

The APA defines "adjudication" as the process of issuing an "order," 5 U.S.C. § 551(7), which in turn is defined to include "licensing," 5 U.S.C. § 551(6). "Licensing" is defined to include "the grant of a license," 5 U.S.C. § 551(9), which is defined to include an agency "permit." 5 U.S.C. § 551(8). Thus, under the plain language of the APA, the Service's decisions to issue permits squarely fall within the meaning of an "adjudication." *Franks v. Salazar*, 816 F. Supp. 2d 49, 59 (D.D.C. 2011) ("[a] permit decision-making proceeding is clearly adjudication rather than rule making.") (quoting *Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 992 n.12 (D.D.C. 1983)); *Abenaki Nation of Mississquoi v. Hughes*, 805 F. Supp. 234 (D. Vt. 1992), *aff'd* 990 F.2d 729 (2nd Cir. 1993) (Army Corps of Engineers' general permit was an "adjudication" not a "rule"). The D.C. Circuit has held that adjudications do not require notice and comment under the APA. *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 598-600, 604 (D.C. Cir. 2007) (FAA advisory circulars "fall into the vast category of 'informal adjudications' in which agencies routinely engage" and thus are not subject to APA requirements of notice and comment and record proceeding); *City of St. Paul v. FAA*, 865 F.2d 1329, at *1 (D.C. Cir. 1989) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414-15 (1971)) ("we find that this case involves informal adjudication, not informal rulemaking, so there is no requirement of 'notice and comment' under the APA").

Here, although the Service does not currently require hunters to individually apply for permits to import elephant trophies from Appendix II countries such as Zimbabwe, the Service's enhancement findings for such countries are akin to permit decisions for the import of all sport-hunted elephant trophies from a country. The Service's enhancement findings also have the same hallmarks as adjudications. This Court has explained

the "basic distinction between rulemaking and adjudication" as a difference between "proceedings for the purpose of promulgating policy-type rules or

> standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Florida East Coast Ry. Co.*, 410 U.S. 224, 245, 93 S.Ct. 810, 35 L.Ed.2d 223 (1973). Stated differently, the "central distinction between rulemaking and adjudication" is that "rules have legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216-17, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988) (Scalia, J., concurring).

*Franks*, 816 F. Supp. 2d at 59. Like adjudications, the Service's enhancement findings are designed to adjudicate disputed facts in particular cases. Specifically, in making enhancement findings the Service considers the available information on a variety of factors to determine whether the killing of the animal whose sport-hunted trophy is intended for import into the United States contributes to the enhancement of African elephants within country. ARs 102, 206, 344. In addition, unlike rules, enhancement findings have legal consequences that can apply retroactively. Indeed, the Service's enhancement and non-detriment findings for Appendix I countries apply for entire calendar years, *i.e.* from January 1, even though the Service often makes them in March or April. *See* April 2014 ARs 49, 50, 51, 57, 62, 67. For Appendix II countries, the Service could require permits on an individual basis, but chose to issue them on a country-wide basis for convenience.[8] Because enhancement findings are adjudications, notice and comment is not required.

Plaintiffs' argument that enhancement findings are substantive rules hinges on inapposite case law. Pls. Br. at 50. Both of the cases they cite pertain to the distinction between substantive rules, which require notice and comment, and interpretive rules, which do not. However, the question here is not whether enhancement findings are substantive or interpretive rules, but whether they are rules at all. As demonstrated above, the Service's enhancement findings are

---

[8] In fact, the Service has recently proposed to require individual ESA permits for the importation of sport-hunted African elephant trophies from Appendix II countries. 80 Fed. Reg. at 45,165.

adjudications, not rules.[9] Plaintiffs contend that enhancement findings are substantive rules because they "produced and continue to produce significant effects on the hunting community's private interests as hunters are not able to import elephants from Zimbabwe as a result of these decisions." Pls. Br. at 50. But both adjudications and rules have legal consequences. The main distinction is that rules have only future legal consequences. *Franks*, 816 F. Supp. 2d at 59 (citing *Bowen*, 488 U.S. at 216-17). As explained above, enhancement findings are applicable as soon as issued and often apply retroactively back to the beginning of the calendar year in which they are issued. Consequently, the Service's failure to provide notice and an opportunity to comment on its 2014 and 2015 enhancement findings for Zimbabwe did not violate the APA's notice and comment provision.

**B.      Enhancement Findings Can be Retroactive.**

Under the plain language of the APA, *see supra*, the Service's decisions to issue enhancement findings squarely fall within the meaning of an "adjudication," which can operate retroactively. *See, e.g.*, *Franks v. Salazar*, 816 F. Supp. 2d at 59 ("[a] permit decision-making proceeding is clearly adjudication rather than rule making.") (quoting *Nat'l Wildlife Fed'n*, 568 F. Supp. at 992 n.12); *Bowen*, 488 U.S. 204 ("[W]here legal consequences hinge upon the interpretation of statutory requirements, and where no pre-existing interpretive rule construing those requirements is in effect, nothing prevents the agency from acting retroactively through adjudication.") (Scalia, J. concurring). Plaintiffs contend that the July 31, 2014 Federal Register notice (or July 2014 finding) could not operate retroactively to replace the April 2014 enhancement finding because it is a rule and thus can only have prospective effect. *See* Pls. Br. at

---

[9] And, even if the findings were rules they may be subject to the foreign affairs exception to the APA, which provides an exception to notice and comment requirements. *See* 5 U.S.C. § 553(a).

25-26. But, because all the findings are adjudications, there are no retroactivity concerns, and

Plaintiffs' arguments fail.

Plaintiffs suggest that the Service itself did not describe the July 2014 finding as applying

retroactively because it merely explained that the July finding "supersede[d]" the April 2014

finding. *See* Pls. Br. at 26-27 (citing the Merriam-Webster dictionary). This is too narrow a

definition of supersede. In legal dictionaries, supersede is defined as "[t]o annul, make void, or

repeal by taking the place of." Black's Law Dictionary (10th ed. 2014) (using in context: "the

1996 statute supersedes the 1989 act"). This definition encompasses a definition where

"supersed[ing]" actions have a retroactive effect. *See, e.g.*, *Dixon v. United States*, 381 U.S. 68,

74 (1965) ("There we held that the Commissioner could make retroactive a new regulation

increasing tax liability beyond that provided for by the prior regulation where the superseding

regulation corrected an erroneous interpretation of the statute."); *United States v. Lavi*, No. 02-

CV-6299(SLT)(JMA), 2004 WL 2482323, at *5 (E.D.N.Y. Sept. 23, 2004) (describing

subsequent IRS ruling as having retroactive effect and as "supersed[ing]" prior IRS ruling);

*United States v. Jones*, No. CRIM. 08-40, 2010 WL 7697509, at *1 (W.D. Pa. Oct. 18, 2010)

("The 'general savings statute,' 1 U.S.C. § 109, requires a court to apply the penalties in place at

the time that a crime is committed unless an amending or superceding statute expressly provides

for its own retroactive application.").

Plaintiffs also again cite Federal Defendants' brief in a now-dismissed appeal in this

litigation in support of their argument that the Service acknowledged its own "concerns" about

their authority to take retroactive action. Pls. Br. at 27 (citing Case. No. 14-5152 (D.C. Cir.),

Federal Appellees Answering Brief (ECF No. 1508081) at 10 n.8). As we explained in our reply

in support of our supplemental motion to dismiss, ECF No. 42 at 16 n.5, Plaintiffs have again

mischaracterized this portion of the appellate brief. The Service did not alter the effective date of its finding because it was concerned about its authority to make the findings retroactive. Instead, it was simply exercising its discretion to make the finding begin in April, starting with the date that the press release was issued. In short, enhancement findings may be retroactive and none of Plaintiffs' arguments against retroactivity has merit.

> **C.    The Service Did Not Voluntarily Bind Itself to Provide Notice in the Federal Register or Base its Findings Only on New Information, But Complied in Any Event.**

In 1997, the Service issued a proposed rule announcing decisions by the Conference of the Parties to CITES to amend Appendices I and II, including the transfer of African elephants from Zimbabwe, Namibia, and Botswana from Appendix I to Appendix II, and seeking comment on whether the United States should enter any reservations on any of the amendments. 62 Fed. Reg. at 44,627. The Service also determined to continue to apply the enhancement finding requirement after the transfer of the elephants from these three countries to CITES Appendix II entered into effect. *Id.* at 44,633. The Service then stated that it

> will make such findings on a periodic basis upon receipt of new information on the species' population or management. The enhancement findings for importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register.

*Id.*

Plaintiffs argue that, in issuing its April 4, 2014 enhancement finding, the Service failed to adhere to its commitments made in this statement to (1) publish notice of any new enhancement findings for Zimbabwe in the Federal Register and (2) base any new enhancement

findings for Zimbabwe only on new information.[10] Pls. Br. at 14-24. Plaintiffs are mistaken that the Service's discussion in the preamble created a binding commitment. However, even if the Service did bind itself, the Service complied with both commitments in this case.

To begin with, the Service was not proposing in 1997 to amend the special rule by adding a requirement to publish notice of enhancement findings in the Federal Register or base enhancement findings only on new information. Indeed, the special rule for African elephants contains neither requirement. 50 C.F.R. § 17.40(e)(3)(iii). In contrast, the Service has explicitly provided for publication of notice in the Federal Register when it authorizes the importation of sport-hunted trophies of two other mammal species. 50 C.F.R. §§ 17.40(j)(2) (special rule for the argali allowing the Service Director to "authorize by publication of a notice in the Federal Register the importation of personal sport-hunted argali trophies …"); 17.40(n)(2) (special rule for the straight-horned markhor allows the Service Director to "authorize by publication of a notice in the Federal Register the importation . . . of [a] personal sport-hunted straight horned markhor . . ."). These other rules show that when the Service intends to bind itself, it includes the requirement for publication in the Federal Register in the text of the special rule itself. These rules thus provide extrinsic evidence that the Service did not intend to bind itself to provide notice in the Federal Register of new enhancement findings for Zimbabwe. *Empresa Cubana Exportadora v. U.S. Dep't of Treas.*, 516 F. Supp. 2d 43, 58 (D.D.C. 2007) ("available extrinsic evidence" is considered in determining whether an agency pronouncement is transformed into a binding norm) (citing *Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir.1987)). Moreover, since the Service had not issued a new enhancement finding for Zimbabwe (or Namibia or Botswana)

---

[10] For the same reasons discussed above, the Court need not reach this issue because the July 2014 enhancement finding superceded the April 2014 finding. *See supra* Argument I.A.

between 1997 and 2014, there is no other evidence that the Service intended to follow these alleged commitments forever.

Even if the Court were to find that the Service bound itself by its statement in the 1997 proposed rule, the Service satisfied its obligations here. When the Service stated that it would provide notice in the Federal Register of any new enhancement findings, the internet was less commonly used and providing notice in the Federal Register was therefore the best means of ensuring that the public and interested parties received notice of agency actions. However, today, providing notice on an agency's website is just as likely, if not more likely, to provide actual notice to interested parties and members of the public than publication in the Federal Register. *See General Motors v. EPA*, 363 F.3d 442, 451 (D.C. Cir. 2004) ("Although the interpretation was not published in the Federal Register, . . . '[w]ith the advent of the Internet, the agency does not need these official publications to ensure widespread circulation; it can inform those affected simply by posting its new guidance or memoranda or policy statement on its website.'") (citations and quotations omitted). In order to notify the affected community and the public promptly of the immediate suspension on importation, the Service posted two documents on its website on April 4, 2014:  (1) a bulletin announcing the suspension on imports of African elephant trophies from Zimbabwe; and (2) a Question and Answer ("Q and A") document regarding the suspension. April 2014 AR 195; 2014 April AR 196. Plaintiffs do not dispute that they received notice in a timely fashion. *See*, *e.g.*, AR 95 at 3704 (letter dated April 9, 2014 indicating that safari operators were aware of the suspension); ARs 94, 96, 97, 99, and 105 (SCI itself); *see also* AR 192, AR 194. Some of Plaintiffs' members complain that they were unaware of the decision because they were hunting in Zimbabwe at the time the bulletin and Q and As were posted, *see*, *e.g.*, ECF No. 87-6 at ¶ 7, but these hunters would not have received notice

published in the Federal Register either. In addition, the Service published notice of the suspension in the Federal Register on May 12, 2014. July 2014 AR 147 at 4144. The Service thus provided sufficient notice of its decision by providing actual notice on the date it was made and notice in the Federal Register.

As for the Service's statement that it would base any new enhancement finding on "new information," the Service did not define what it meant by "new information." Plaintiffs argue that the Service's determination in its enhancement finding that it lacked sufficient information to make a positive finding means that the Service did not base its decision on "new information." Pls. Br. at 18. This is incorrect for at least two reasons. First, determining that the agency lacked sufficient information to find that the sport-hunting of elephants from Zimbabwe is not enhancing the survival of the species *was* "new information" of which the Service was not previously aware. Indeed, had the Service previously known that it could no longer make a positive enhancement finding it would have been obligated to make such a determination at that time.

Second, the Service based its decision on all the information available to it at that time, which included a substantial amount of new information that had not been available when it made the last enhancement finding for Zimbabwe in 1997. The Service had at its disposal, for example, documents on the status of African elephants from the International Union for Conservation of Nature, CITES documents on elephant poaching, and articles from news sources. *See*, *e.g.*, April 2014 ARs 2-4, 11-13, 23-26, 30, 32. Contrary to Plaintiffs' argument, the Service was not obligated to solicit information from Zimbabwe or any other source before making its enhancement finding. Pls. Br. at 18-20. The Service had attempted to obtain information from Zimbabwe over the years, April 2014 AR 43 at 1015; AR 206 at 4506-07, but

33

it was not until the Service suspended importation of elephant trophies from Zimbabwe that the Service finally received any such information. AR 206 at 4507 (July 2014 finding explaining the information received). In any case, while the Service had "new information," none of that information supported a positive finding. For all these reasons, the Service met any requirement to provide notice in the Federal Register and base its April finding on "new information."[11]

> **D.** **The Service's Continued Application of the Enhancement Requirement After Zimbabwe's Elephant Population Was Transferred to CITES Appendix II was Rational.**

The Service initially added the enhancement requirement to the special rule in 1992 when there was a similar requirement in CITES for trade in hunting trophies of species listed in Appendix I and all African elephants were listed on CITES Appendix I. *See* 57 Fed. Reg. at 35,485. The parties to CITES removed that similar requirement in 1994. The Service made no change to the special rule for African elephants to remove the enhancement finding requirement. African elephants in Zimbabwe (and two other countries) were later transferred to CITES Appendix II in 1997. At that time, the Service explicitly stated that it was retaining the enhancement requirement of the special rule for African elephants, explaining that it was doing so to ensure that each country's management program "is promoting the conservation of the species." 62 Fed. Reg. at 44,633. Plaintiffs ignore this explanation, arguing that the Service has illegally continued to impose the enhancement requirement without justification. Pls. Br. at 51-55.

The Service's explanation is perfectly rational. Although CITES eliminated the similar enhancement requirement, the treaty expressly allows signatory nations to enact stricter domestic

---

[11] Plaintiffs make this argument only with respect to the April 2014 finding, not the July 2014 or March 2015 ones.

measures that are more protective of wildlife than the specific provisions of CITES. CITES, art. XIV(1)(a); *see also Franks*, 816 F. Supp. 2d at 64. Because CITES signatories are expressly authorized to enact stricter domestic laws and the special rule for African elephants was lawfully promulgated under the ESA and APA, Plaintiffs' claim that the enhancement requirement in the special rule is invalid fails.[12] The Service's application of the enhancement requirement to the threatened African elephant was proper.

Plaintiffs argue that by "retaining the enhancement of survival requirement for Appendix II elephants after the reason for the requirement disappeared, the Service implicitly codified a 4(d) rule based on some new conclusion that the enhancement finding remains necessary and advisable for the conservation of the elephants" in violation of the ESA. Pls. Br. at 52-4. Plaintiffs provide no support for their theory that an agency can passively or implicitly modify a rule, and we are aware of none.[13] This is likely because it would not be feasible for agencies to constantly update their regulations. Indeed, the history here shows that there have been numerous changes to the treatment of African elephants under CITES over the years. Nevertheless, all African elephants are listed as threatened under the ESA, and that status has not changed since 1997, so the Service reasonably found that it was appropriate to maintain a consistent ESA special rule that applies to all countries. *Cf.* 16 U.S.C. § 1533(d). The Service does not need to

---

[12] The special rule was lawfully promulgated also because the rule, including the enhancement standard, was subject to public notice and the opportunity to comment at the time of promulgation. In addition, if at any time Plaintiffs thought the enhancement requirement was inappropriate for the species, it could have petitioned under the APA for modification of the rule. *See* 50 C.F.R. part 14.

[13] Plaintiffs' citation to generic case law for the proposition that an agency must provide an adequate explanation when it engages in a rulemaking process to change an existing rule are inapplicable here because the Service was not required to and did not engage in a rulemaking process here. Pls. Br. at 53-54.

constantly provide an explanation for retaining the regulation, but in any case it did provide one as to retaining the enhancement requirement in 1997.

Plaintiffs next argue that the Service "violated the APA by changing a regulation without going through a proper rulemaking process," including notice and an opportunity to comment. Pls. Br. at 52-53. However, the Service did not modify the regulatory text in any way and, as such, notice and comment was not required. Moreover, as shown above, there is no authority for the proposition that an agency can "passively modify" a regulation or must go through notice and comment even assuming it could.

The Service's original promulgation of the ESA special rule for this threatened species, including the enhancement requirement, and its retention of the rule and the enhancement requirement throughout the subsequent years as CITES provisions for the species changed is entirely rational and consistent with the ESA and APA.

E.     **The Service Has Rebutted the Presumption in ESA Section 9(c)(2).**

Pursuant to ESA Section 9(c)(2), the importation into the United States of species of fish or wildlife that are also listed in CITES Appendix II and not listed as endangered under the ESA is presumed not to be a violation of any provision of the ESA or any regulation issued pursuant thereto if, among other things (1) the taking and exportation of the fish or wildlife is not contrary to CITES and all other applicable requirements of CITES have been satisfied; and (2) the importation is not made in the course of a commercial activity. 16 U.S.C. § 1538(c)(2). "The Service has interpreted § 9(c)(2) to raise a presumption of the legality of importing trophies which could be rebutted by the promulgation of a special protective regulation pursuant to § 4(d) of the Act, 16 U.S.C. § 1533(d)." *Safari Club Int'l v. Babbitt*, No. MO-93-CA-001, 1993 WL

13932673, at *12 (W.D. Tex. Aug. 12, 1993); *United States v. One Etched Ivory Tusk of African Elephant*, 871 F. Supp. 2d 128, 134 (E.D.N.Y. 2012) (citing 50 C.F.R. § 17.8(b)).

Plaintiffs' incorrectly contend that the Service cannot rebut the 9(c)(2) presumption by issuing a special rule because a special rule is unambiguously a "regulation issued pursuant to this chapter" to which the presumption applies. Pls. Br. at 56, 58 (quoting 16 U.S.C. § 1538(c)(2)). Plaintiffs fail to read Section 9(c)(2) in context. *See Roberts v. Sea-Land Servs, Inc.*, 132 S.Ct. 1350, 1357 (2012) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (quoting *Davis v. Mich. Dep't of Treas.*, 489 U.S. 803, 809 (1989)).

Congress chose to prohibit certain acts, including import, "with respect to any endangered species of fish or wildlife," *see* 16 U.S.C. § 1538(a)(1), and Congress also authorized the Service to extend any of the same prohibited acts to threatened species of fish or wildlife. *Id.* § 1533(d). Where the Service has extended the prohibition on import to a threatened species via a special rule, the presumption can be rebutted within the special rule, which establishes any exceptions to the prohibition on import and under what circumstances. This is precisely what occurred here. The Service issued a special rule that extended the prohibition on import to African elephants, but provided an exception for import of sport-hunted elephant trophies where certain enumerated conditions are met, including the enhancement requirement.

Taken to its logical conclusion, Plaintiffs' argument that a regulation issued pursuant to the ESA, such as a special rule, cannot rebut the presumption would mean that the Service could never rebut the presumption. Plaintiffs fail to identify what other means the Service has at its disposal to rebut the presumption, if not a regulation. This cannot be what Congress intended. Indeed, where Congress wanted to provide a complete exemption from the prohibitions in

Section 9(a)(1) such as the prohibition on importation it did so without providing for a rebuttable presumption. *See* 16 U.S.C. § 1538(b)(2)(A) (exempting raptors legally held in captivity or a controlled environment on the effective date of the ESA Amendments of 1978 from the provisions of Section 9(a)(1)). With 9(c)(2), Congress clearly established a presumption that could be rebutted, not a complete exemption. In sum, read in context, a special rule is clearly not a "regulation issued pursuant to this chapter" to which the presumption applies. To read Section 9(c)(2) as Plaintiffs argue would lead to absurd results. *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998) (a statute should not be construed to produce an absurd result).

At best the statute is silent or ambiguous on the issue of whether a special rule is a "regulation issued pursuant to this chapter" to which the 9(c)(2) presumption applies, and the Court should defer to the Service's reasonable interpretation that the provisions of a special rule can rebut the 9(c)(2) presumption.[14] *Prime Time Int'l Co. v. Vilsack*, 930 F. Supp. 2d 240, 248 (D.D.C. 2013) ("if the statute is silent or ambiguous with respect to the specific issue the court must defer to the agency's interpretation if it is reasonable.") (citation and quotations omitted). At least one other court has already done so. *One Etched Ivory Tusk of African Elephant*, 871 F. Supp. 2d at 134.

Plaintiffs next argue that even if the Service could rebut the presumption with a special rule, the Service has not done so in the case of African elephants listed on CITES Appendix II. Pls. Br. at 57. This is untrue. Although the Service originally added the sport-hunted trophy

---

[14] The Service's interpretation is embodied at 50 C.F.R. § 17.8, which sets forth conditions for importation of threatened species listed on CITES Appendix II, except as provided in a special rule. 50 C.F.R. § 17.8(b). Plaintiffs have not challenged the regulation and the Court must presume its validity. *Forester v. Consumer Prod. Safety Comm.*, 559 F.2d 774, 783 (D.C. Cir. 1977) ("A regulation is presumed to be valid unless it is shown by those attacking it to be contrary to law.") (citation omitted).

exception to the prohibition on import to the special rule at a time when Section 9(c)(2) did not

apply (because all African elephants were listed on CITES Appendix I), the Service specifically

stated that the conditions for qualifying for the exception (including the enhancement

requirement) would continue to apply after the Zimbabwe population was transferred to CITES

Appendix II in 1997 and explained its reasons for this decision. 62 Fed. Reg. at 44,633 ("In

making the required enhancement findings, the Service reviews the status of the population and

the total management program for the elephant in each country to ensure the program is

promoting the conservation of the species."). Thus, the Service has rebutted the 9(c)(2)

presumption for importation of sport-hunted African elephant trophies from Zimbabwe.[15]

For all the foregoing reasons, Plaintiffs' argument that the Service "must independently

rebut the presumption of validity with an affirmative finding based on the facts available at the

time of importation" fails. Pls. Br. at 56-57. Additionally, no such requirement to prepare an

independent rebuttal of the presumption on a case-by-case basis can unambiguously be read from

the plain language of the ESA and Plaintiffs have provided no evidence that Congress intended

to impose such a requirement. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 50 (1983) ("a court may not impose additional procedural requirements upon an

agency.").

Finally, to the extent that the Service may, or is required to, rebut the 9(c)(2) presumption

through the issuance of a document separate from the special rule, the Service's 2014 and 2015

enhancement findings more than adequately do so. In all three of its findings, the Service

---

[15] Moreover, the Service has reiterated its position that the presumption has been rebutted in its proposed amendment to the special rule. 80 Fed. Reg. at 45,165-66. Thus, any suggestion that the Service must explicitly rebut the presumption is harmless error. 5 U.S.C. § 706 ("due account shall be taken of the rule of prejudicial error."); *Nevada v. Dep't of Energy*, 457 F.3d 78, 90 (D.C. Cir. 2006).

determined that it was unable to find that the killing of elephants from Zimbabwe whose trophies are intended for import would enhance the survival of the species. As a positive enhancement finding is a requirement of the special rule in order to qualify for the sport-hunted trophy exception to the prohibition on import, importation without a positive enhancement finding is a violation of a regulation issued pursuant to the Act.

## III. No Remedy is Necessary, But Plaintiffs' Requested Remedy Would be Inappropriate.

An injunction must be narrowly tailored to remedy the specific harm shown. *See, e.g.*, *State of Nebraska Dep't of Health & Human Servs. v. Dep't of Health & Human Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006). Plaintiffs suggest in their briefing that the appropriate remedy, should the Court find a legal violation regarding any of the enhancement findings, is to set aside the challenged findings which, they contend, will result in the reinstatement of the 1997 positive Enhancement Finding. That is not the proper remedy, should the Court find a violation of law. When a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action. *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 20 (D.C. Cir. 2008) ("Only in extraordinary circumstances do we issue detailed remedial orders, and this maxim applies equally to district courts acting in an agency review capacity."). Here, Plaintiffs ask that the Court direct the Service to reissue a 1997 positive enhancement finding that it has now found is not warranted under the statute and, certainly by 2016, is based on stale information. If the Court finds a legal error, the proper remedy is remand to the Service which can then determine a course of action to take. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 164 (2010); *Humane Soc'y v. Pritzker*, 75 F. Supp. 3d 1, 15 (D.D.C. 2014) (approving remedy remanding finding rather than requiring the Service to take particular actions).

40

## CONCLUSION

The Service's April 2014, July 2014, and March 2015 enhancement findings are rational, supported by the administrative records, and comport with all substantive and procedural requirements of the ESA and APA. Accordingly, the Court should deny Plaintiffs' Motion for Summary Judgment and grant Defendants' Cross-Motion.

Dated: March 25, 2016                     Respectfully submitted,

                                          JOHN C. CRUDEN,
                                          Assistant Attorney General
                                          SETH M. BARSKY, Chief

                                          _/s/ Meredith L. Flax_
                                          MEREDITH L. FLAX, Assistant Section Chief
                                          (D.C. Bar No. 468016)
                                          ANDREA GELATT, Trial Attorney
                                          U.S. Department of Justice
                                          Environment & Natural Resources Division
                                          Wildlife & Marine Resources Section
                                          Ben Franklin Station. P.O. Box 7611
                                          Washington, DC 20044-7611
                                          Phone: (202) 305-0404
                                          Fax: (202) 305-0275
                                          meredith.flax@usdoj.gov

                                          **_Counsel for Federal Defendants_**


Of Counsel:
Holly Wheeler
Russell Husen
U.S. Department of the Interior
Office of the Solicitor
Washington, D.C.