**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

SEP 3 0 2016

Clerk, U.S. District and
Bankruptcy Courts

)
SAFARI CLUB INTERNATIONAL, *et al.*, )
)
Plaintiffs, )
)
v. )        Civil Action No. 14-0670 (RCL) and
)        15-cv-01026 (RCL) (consolidated briefing)
SALLY M. R. JEWELL, in her official )
capacity as Secretary of the U.S. )
Department of the Interior, *et al.*, )
)
Defendants, and )
)
FRIENDS OF ANIMALS, *et al.*, )
)
Defendant-Intervenors. )
)
)

## MEMORANDUM OPINION

Plaintiffs Safari Club International and the National Rifle Association challenge the federal government's suspension of imports of trophies from elephants sport-hunted in Zimbabwe. On April 4, 2014, the U.S. Fish and Wildlife Service ("the Service") suspended imports of these trophies on an interim basis. On July 31, 2014, the Service published notice finalizing the April decision, prohibiting imports of trophies from elephants sport-hunted from April 4, 2014 through the remainder of the year. And on March 26, 2015, it announced a suspension of imports for the 2015 hunting seasons and future hunting seasons. The Service explained that it suspended imports because it could no longer make the finding required under its regulations "that the killing of the animal whose trophy is intended for import would enhance survival of the species" – referred to as an enhancement finding. Plaintiffs assert that the three decisions are invalid due to a number

1

of procedural defects and because they are arbitrary and capricious. For the reasons set forth below, the Court will grant plaintiffs' motion for summary judgment in part on the issue that the Service failed to comply with its commitment not to change the enhancement finding before publishing notice in the Federal Register. It will deny plaintiffs' motion on all other issues. The Court will grant defendants' motion for summary judgement in part on all issues except it will deny the motion on the issue of its commitment to publish notice of changes in the Federal Register. The Court will also order that the effective date of the April 2014 interim suspension is May 12, 2014, not April 4, 2014.

## LEGAL FRAMEWORK AND BACKGROUND

Importation into the United States of threatened species such as African elephants is governed by international convention and U.S. law.

## I. The Convention on International Trade in Endangered Species of Wild Fauna and Flora

The Convention on International Trade in Endangered Species of Wild Fauna and Flora, Mar. 3, 1973, 27 U.S.T. 1087 ("CITES"), is a multilateral treaty that regulates the international trade of protected wildlife and plants. The treaty establishes requirements for importing and exporting covered species and categorizes them into three appendices, depending on the level of protection each species requires. Relevant here, Appendix I covers species threatened with extinction, *see* CITES art. II.1, and Appendix II covers species for which trade is controlled to avoid trade incompatible with the species' survival. *Id.*, art. II.2.[1] Signatories to the treaty, including the United States and Zimbabwe, agree that they "shall not allow trade in specimens of

---

1  Appendix III, which is not implicated in this action, covers species subject to regulation by a particular country "for the purpose of preventing or restricting exploitation." CITES art. II.3.

species included in Appendices I, II and III except in accordance with the provisions of" CITES. *Id.*, art. II.4.

### A.    Appendix I

Under the treaty, a species listed on Appendix I may only be traded if both the importing and the exporting countries issue import and export permits, respectively. In issuing these permits, each country's designated authority must make a number of findings, including that the trade of the species "will be for purposes which are not detrimental to the survival of the species." *Id.*, art. III.2(a), III.3(a). This determination is sometimes referred to as a "non-detriment finding," and both the importing and the exporting countries must separately make this finding before each can issue the required permit. *Id.*

Before 1994, the treaty required importing countries to also determine that the import of an Appendix I species "would enhance the survival of the species." This determination is sometimes referred to as an "enhancement finding." CITES Res. Conf. 2.11. (Annex 1), AR 249 at 5563;[2] *see also* Endangered and Threatened Wildlife and Plants; Retention of Threatened Status for the Continental Population of the African Elephant, 57 Fed. Reg. 35,473, 35,485 (Aug. 10, 1992). But the enhancement finding requirement was eliminated from the treaty in 1994. *See* Res. Conf. 2.11 and CITES Doc. 9.50, AR at 5559–61, 5563.

### B.    Appendix II

A species listed on Appendix II requires the exporting country to issue an export permit, including making the non-detriment finding described above. CITES, art. IV. The importing

---

2      The first time the Court cites a document in the Administrative Record ("AR"), it will cite to the document number in the Joint Appendix Index [Dkt. # 97-1 at 1–11], then the relevant Bates number(s). Subsequent citations to the document will refer to the relevant Bates numbers only.

country is not required to issue an import permit or make a non-detriment finding, and the treaty has never required enhancement findings for Appendix II species. *Id.*

## II.   U.S. Law

### A.   The Endangered Species Act

Described as "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation," *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180 (1978), the Endangered Species Act ("ESA") is a federal statute that seeks "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of such endangered species and threatened species." ESA, 16 U.S.C. § 1531(b) (2010). The Act implements CITES into U.S. law. §§ 1532(4), 1537a, 1538(c).

Separately, the Act also provides federal protection to species listed as endangered or threatened pursuant to its provisions, and the listing of a species as endangered or threatened does not depend on whether or how it is categorized under CITES. *See* §§ 1533(a)(1), 1533(d), 1538(a).

With respect to endangered species, section 9(a) of the Act prohibits a number of activities, including "taking"[3] them and importing or exporting them into or from the United States, except as authorized by the statute. §§ 1538(a)(1)(A); § 1532(19).

With respect to threatened species, the Act mandates:

> Whenever any species is listed as a threatened species pursuant to subsection (c) of this section, the Secretary shall issue such regulations as he deems necessary and advisable to provide for the conservation of such species.

---

3    "Take" is defined to mean "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19).

16 U.S.C. § 1533(d).  The Act also gives the Secretary authority to promulgate regulations to "prohibit with respect to any threatened species any act prohibited under section 1538(a)(1) . . . with respect to endangered species." *Id.*

The Secretary has exercised the authority under section 1533(d) by issuing a regulation that extends the Act's prohibitions on endangered species to all threatened species, 50 C.F.R. § 17.31(a), unless the agency has issued a special rule to govern a specific species.  § 17.31(c) ("Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply.  The special rule will contain all the applicable prohibitions and exceptions.").

### B.    The Special Rule Governing African Elephants

In 1978, the Service listed African elephants as a threatened species under the Endangered Species Act and simultaneously issued a special rule for them.  Listing of the African Elephant as a Threatened Species, 43 Fed. Reg. 20499 (May 12, 1978); 50 C.F.R. §17.11(h); 50 C.F.R. § 17.40(e) ("Special Rule").  The Special Rule allows imports of sport-hunted trophies of African elephants under the following conditions:

> (A) The trophy originates in a country for which the Service has received notice of that country's African elephant ivory quota for the year of export;
>
> (B) All of the permit requirements of 50 CFR parts 13 and 23 have been complied with;
>
> (C) A determination is made that the killing of the animal whose trophy is intended for import would enhance survival of the species; and

5

>   (D) The trophy is legibly marked [as set forth in the regulation].

50 CFR § 17.40(e)(3)(iii).[4]

Subpart (C) of the Special Rule contains an enhancement finding requirement that was added to the Special Rule in 1992, when all African elephants were on Appendix I and CITES required both non-detriment and enhancement findings to trade an Appendix I species.  57 Fed. Reg. at 35,473–01.  Although CITES no longer requires enhancement findings for Appendix I species, the enhancement finding requirement remains in U.S. law in the Special Rule governing African elephants.  *See id.*

## III.   Changes to Import Requirements under CITES and the Endangered Species Act

### A.   The 1997 Downlisting of African Elephants

Signatories to CITES hold regular meetings called the Conference of the Parties to review the treaty's operation and the listing of species under its appendices.  When CITES was first implemented, African elephants appeared on Appendix I.  In 1997, signatories to the treaty transferred three African elephant populations – from Zimbabwe, Botswana, and Namibia – from Appendix I to Appendix II.  Changes in List of Species in Appendices to the CITES, Proposed Rule, 62 Fed. Reg. 44627, 44629 (proposed Aug. 22, 1997) ("1997 Proposed Rule").  The consequence of this downlisting is that under the treaty, a hunter need obtain only an export permit issued by the exporting country to bring home a sport-hunted elephant trophy from one of those three countries.  Import permits were no longer required.

---

4   The Special Rule was amended effective July 6, 2016.  Endangered and Threatened Wildlife and Plants; Revision of the Section 4(d) Rule for the African Elephant (*Loxodonta africana*); Final Rule, 81 Fed. Reg. 36,388 (June 6, 2016).  That amendment does not affect this case, which is governed by the rule in effect before the amendment.

After this downlisting and other changes to the CITES appendices, the Service published the 1997 Proposed Rule advising the public of these changes and proposing to amend U.S. regulations to incorporate "all changes in CITES Appendices I and II that were approved by the Conference of the Parties."  62 Fed. Reg. at 44,634.

Because of "the complexity of the terms of the CITES downlistings" and "the high public interest" in the species, the Service specifically explained how these changes affected the treatment of African elephants under U.S. law.  *Id.* at 44,633.  First, it reiterated the four requirements under the Special Rule to import a sport-hunted trophy.  *Id.,* citing 50 C.F.R. § 17.40(e) (stating that an import will be authorized when the trophy "has (1) originated in a country for which the Service has received notice for that country's African elephant ivory quota for the year of export; (2) the permit requirements of the regulations for CITES permits (50 CFR 13 and 23) have been met; (3) the Service has determined that the take of the trophy for import would enhance the survival of the species; and (4) the ivory has been marked as outlined in the special rule").  It explained that a species' downlisting under CITES does not alter requirements under U.S. law:

> Changes in the CITES listing status of species as a consequence of actions taken at [the tenth Conference of the Parties] do not supersede import or export requirements pursuant to other wildlife conservation laws.  For example, import or export of species listed as Threatened or Endangered under the U.S. Endangered Species Act (ESA) still must meet the provisions of that law and its implementing regulations in 50 CFR Part 17, even if those species have been transferred to a less protective CITES Appendix or removed from the Appendices entirely.

*Id.*  In other words, the conditions of the Special Rule – including the enhancement finding requirement – would continue to apply after the Appendix II listing for elephants from Botswana, Namibia, and Zimbabwe took effect, even though the requirement was no longer imposed by the treaty.  *See id.*  The Service then stated that it reviews "the status of the population and the total

management program for the elephant in each country to ensure the program is promoting the conservation of the species" when making an enhancement finding under the Special Rule. *Id.*

The "practical effect" of the CITES downlistings was that "an import permit will no longer be required for non-commercial imports of African elephant sport-hunted trophies from these countries only. Only a CITES export permit from the country of origin . . . [would] be required." *Id.*[5] The enhancement findings for Botswana, Namibia, and Zimbabwe – which would be made "on a periodic basis upon receipt of new information on the species' population or management" – were "on file in the Office of Management Authority." *Id.* They would remain in effect until the Service found, "based on new information, that the conditions of the special rule [were] no longer met" and it "published a notice of any change in the Federal Register." *Id.; see* Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe, AR 20 at 2557–60 ("1997 Finding").

The 1997 Finding for Zimbabwe remained in effect until April 4, 2014, when the Service announced it could no longer make the finding for imports from that country. It is this changed enhancement finding that plaintiffs challenge.

### B.      The Challenged Enhancement Findings

#### 1.      April 2014 Finding

On April 4, 2014, the Service announced a suspension of imports of sport-hunted African elephant trophies taken from Zimbabwe. Service Suspends Import of Elephant Trophies from Tanzania and Zimbabwe, April 2014, AR 196 at 3021–22 ("Service Bulletin"). It stated that "[i]n

---

5      The Service noted that African elephants from all other countries remained on CITES Appendix I, so imports of sport-hunted elephant trophies from those countries would continue to require prior issuance of both an import and an export permit. 62 Fed. Reg. at 44,633.

Zimbabwe, available data, though limited, indicate a significant decline in the elephant population. Anecdotal evidence, such as the widely publicized poisoning last year of 300 elephants in Hwange National Park,[6] suggests that Zimbabwe's elephants are [ ] under siege." *Id.* at 1.

In its finding, the Service cited an International Union for Conservation of Nature ("IUCN") Elephant Database Report ("2013 Africa Report")[7] as showing the elephant population in Zimbabwe in 2007 was 84,416 but in 2013 it was "reduced to 47,366." Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zimbabwe during 2014 (April 17, 2014), AR 102 at 3820 ("April 2014 Finding").[8] It noted that despite this, the government of Zimbabwe continued to provide population estimates of 100,000 elephants. *Id.*, AR at 3821 (explaining that most estimates are based on 2001 figures and that for a substantial part of the country, no recent surveys have occurred). The finding also expressed concern about the management, funding, and resources of the Zimbabwe Parks and Wildlife Management Authority ("ZPWMA") and its process for determining the country's hunting quotas, given the lack of recent population surveys. *Id.*, AR at 3821–22 ("[T]he government's belief that they have a population of 100,000 elephants may result in the over-estimation of the sustainable offtake."). Finally, it noted that the "current poaching problem does not appear to be under control or even acknowledged." *Id.*, AR at 3823. The agency stated the "most significant aspect of [its] analysis is the lack of recent data on what

---

6       The Service corrected this statement on the number of elephants poisoned in the Hwange incident in its subsequent enhancement findings. *See* n.16 below.

7       The 2013 Africa Report appears in the Administrative Record at AR 80 at 3626–27.

8       The Service first issued the finding on April 4, 2014, AR 89 at 3651–56, but reissued it on April 17, 2014 to correct the effective date. April 2014 Finding, AR at 3818–23.

is occurring in Zimbabwe." *Id.* It said it would gather additional information but until then, it was "unable to make [a] positive finding." *Id.*

On May 12, 2014, the Service published notice of the suspension in the Federal Register. Notice of Interim Suspension on Importation of Zimbabwean Elephant Trophies, 79 Fed. Reg. 26,986 (May 12, 2014). The Service Bulletin stated that the suspension applied to elephants taken in all of 2014, but the Federal Register notice changed the effective date to elephants taken on or after April 4, 2014. *Id.* The Service also stated, "[W]e recognize that our inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species," and it indicated that it was "actively pursuing additional information from the Government of Zimbabwe" and other sources to make a final determination. 79 Fed. Reg. at 26,987.

The agency requested information from the government of Zimbabwe on April 4, 2014. Letter to ZPWMA Director, Apr. 4, 2014, AR 74 at 3604–05.

### 2.    July 2014 Finding

After receiving information from the government, the Service issued its final enhancement determination on July 22, 2014. Enhancement Finding for African Elephants Taken as Sport-hunted Trophies in Zimbabwe during 2014 (July 22, 2014), AR 206 at 4505–4517 ("July 2014 Finding").[9] The July 2014 Finding "supersede[d]" the April 2014 Finding. *Id.*, AR at 4505. The Service published notice of the finding on July 31, 2014. Notice of Suspension of Imports of

---

9       The Service issued the finding on July 17, 2014 but revised it on July 22, 2014 "to make a technical revision to address an editorial error . . . and to reflect ETIS data from the 16th Meeting of the Conference of Parties to CITES . . . ." July 2014 Finding, AR at 4505 (stating the technical revisions did not alter the analysis or decision announced in the July 17 finding).

Zimbabwe Elephant Trophies Taken in 2014 On or After April 4, 2014, 79 Fed. Reg. 44,459, 44,460 (July 31, 2014).

With respect to population, the Service cited data from the 2013 Africa Report, which showed the 2007 total population estimate at 99,107. July 2014 Finding, AR at 4510. The report categorized data into the categories of definite, probable, possible, and speculative to reflect the level of certainty associated with particular counts within the total population estimate. May 30, 2014 email string, AR 151 at 4166. Of the 99,107 total elephants in 2007, eighty-five percent or 84,416 were classified as "definite,"[10] compared to the 2012 population total estimate of 100,291 elephants, of which only forty-seven percent or 47,366 was classified as "definite." July 2014 Finding, AR at 4510. Noting that the data for 2012 was more than ten years old and that "[v]ery few new surveys have been conducted since 2007," the Service said the government of Zimbabwe's population estimates of more than 100,000 elephants was "clearly based on outdated information." *Id.* Without more current population data and "a better understanding of the offtake from other sources, like poaching and problem animal control," the Service found it could not determine if the government was meeting its management plan goals and objectives. *Id.*, AR at 4511.

The Service received a number of documents regarding the management plan, including the Policy and Plan for Elephant Management in Zimbabwe (1997) and Elephant Management in Zimbabwe, third edition (July 1996). *See id.*, AR at 4507. The documents presented "well-

---

10    This corrected the statement in the April 2014 Finding that the elephant population in 2007 was 84,416, AR at 3820, when that number reflected only those elephants classified as "definite" in the survey.

articulated, but general, goals and objectives," and the government of Zimbabwe provided no information on implementation. *Id.*, AR at 4509. "Without management plans with specific goals and actions that are measurable, the Service cannot determine if ZPWMA is implementing" the plan. *Id.*

Regarding Zimbabwe's applicable laws and regulations, the agency found that they provided for sufficient penalties for poaching "[i]f properly enforced." AR at 4511. The Service, however,

> [did] not have a good understanding of the ZPWMA's annual operational budget, how much money is generated by elephant hunting, or how these funds (or the lack of these funds) impacts the ability of ZPWMA to adequately enforce the Parks and Wild Life Act, day-to-day management, or anti-poaching efforts . . . .

*Id.*

With respect to the country's annual hunting quota, the Service found that while the methodology for determining the quota was based on "sound wildlife management principles used globally," 79 Fed. Reg. at 44,461, it did not receive "specific information on how quotas are established" or whether they were "reasonable or beneficial to elephant populations and, therefore whether sport hunting is enhancing the survival of the species." July 2014 Finding, AR at 4515.

The finding also discussed the CAMPFIRE project, a program that "has been the model for community-based conservation efforts in several other African countries and identified as an innovative program in the past." *Id.* The agency found that CAMPFIRE has been criticized for "excessive retention of generated funds by district councils," reducing the program's effectiveness. *Id.* It stated that information the program provided to a CITES panel of experts in 2002 indicated this problem was improving, but the Service had no current information on the situation.

"[W]ithout current information on how [CAMPFIRE] funds are utilized and the basis for hunting off-takes," the Service stated it could not assess whether sport-hunting would enhance the survival of the species. *Id.*, AR at 4515–16.

The Service acknowledged some "bright spots" in elephant conservation by non-governmental entities and individuals in the country but did not change its finding. *Id.*, AR at 4517. It stated the finding would be re-evaluated in December 2014. *Id.*, AR at 4505.

### 3.    March 2015 Finding

The Service received more information from the government of Zimbabwe on December 10, 2014, as well as information from plaintiffs Conservation Force and Safari Club International in late 2014 and early 2015. Enhancement Finding for African Elephants Taken as Sport-Hunted Trophies in Zimbabwe On or After January 1, 2015, AR 344 at 7256–73, 7258 ("2015 Finding").

On March 26, 2015, the Service issued the 2015 Finding for trophies of elephants taken in Zimbabwe as of January 1, 2015. *Id.*, AR at 7256–73. The Service again determined that it was unable to make an enhancement finding and extended the import suspension to the 2015 hunting season and future seasons. *Id.*, AR at 7256. It said that the suspension could be lifted if the agency received addition information on the status and management of the species that satisfied the Special Rule. *See id.*

As with the July 2014 Finding, the Service found no "specific measurable outcomes" against which to review implementation of the government's elephant management plan. *Id.*, AR at 7259 (stating it had "not received sufficient information to indicate . . . which objectives are being met or how they are being met"). ZPWMA explained that it does not have a

"proscriptive management plan" because it uses an "adaptive management approach" and is "devolving wildlife management authority" to local authorities, private conservancies, and CAMPFIRE. *Id.*, AR at 7260. But because the government of Zimbabwe previously told the Service that elephants were managed on a national level, the Service found "there needs to be a national approach and understanding of the basis of this adaptive management and that the country . . . is taking a logical, scientifically based approach to reach the agreed upon end result." *Id.* And while the government was preparing a new management plan, the agency stated that the government provided no information on recent or future hunting seasons to indicate it was implementing the existing plan. *See id.*, AR at 7261.

Regarding the elephant population, ZPWMA provided information about two surveys conducted in 2012–13, one in Save Valley Conservancy and the other in Gonarezhou National Park and the surrounding areas. *Id.*, AR at 7262. The first survey counted 1,538 elephants in an aerial survey. *Id.* Based on nine years of aerial surveys, the Service noted a short-term increase in population density of 9.5 percent, but also found that the trend in the last three years of survey was only a 2.2 percent increase and noted that "conditions were such that double counting may have occurred." *Id.*

The second survey estimated 10,151 elephants in the surveyed area – "the highest estimate since sample surveys began there in 1975." *Id.* The Service stated that while the apparent population increase was "excellent news," the reported carcass ratio was low and could indicate that the survey did not accurately detect all the carcasses. *Id.*, AR at 7263.

The Service cited the 2014 Pan African Aerial Elephant Survey as reporting a provisional population estimate of 82,000–83,000 elephants, a six percent decline since 2001

surveys. *Id.* Further, figures presented at the March 2013 CITES conference indicated that from 2002–2010, the percentage of illegally killed elephants ("PIKE") in the Chewore area was twenty-four percent but in 2011, it was sixty-seven percent. *Id.* The Service explained that a PIKE level of fifty percent higher or means "half or more of all carcasses were the result of illegally killed elephants," indicating "that the elephant population is very likely to be in net decline." *Id.*

With regard to Zimbabwe's laws, it found that the Parks and Wildlife Act "includes sections on virtually every aspect of ZPWMA, including requirements for annual financial audits and reporting to the central government," along with substantial penalties for the unlawful possession of or trading in ivory. *Id.* But again, the Service did not receive adequate information on enforcement. *Id.*

While ZPWMA reported that "elephant hunting contributes in excess of US$14 million annually and that approximately 30% of [its] revenue is from hunting, of which the elephant is the major contributor," the Service was concerned it did not have information on how much money is generated by elephant hunting specifically, how the funds are distributed, or how they impacted enforcement of the country's laws and regulations, day-to-day management, or anti-poaching efforts. *Id.*, AR at 7264.

The Service considered information from third parties about ZPWMA's budget and resources, and noted press reporting that Zimbabwean politicians and military personnel were involved in illicit wildlife trade with Chinese nationals. *Id.*, AR at 7264–65. The Service also cited reports about increasing illegal ivory trade. *Id.*, AR at 7265. Although it received information from Zimbabwean safari outfitters and hunting guide organizations suggesting

that the presence of hunters is the major deterrent to poaching, the Service said it received "no evidence" that poaching would significantly increase without hunters generally or U.S. elephant hunters specifically. *Id.* Rather, it concluded that legal hunting is "not widespread enough or at a high enough density level to reduce significantly poaching in and of itself." *Id.* It was also concerned with a "lack of sufficient information" about ZPWMA's "funding levels or any indication that [the agency's] financial base, management skills, equipment, or infrastructure have improved." *Id.*, AR at 7266.

Regarding sustainable use, the Service stated it had not received adequate information about offtake in Zimbabwe. *Id.* The export quota in 2014 and 2015 was 500 elephants per year, and it had been at that number since 2004. *Id.* The Service noted that for the April and July 2014 Findings, it had not received information on the number of trophies exported annually or of elephants killed by categories of offtake[11] but, based on third party and press sources, the Service found that poaching was on the rise. *Id.*; *see also id.* n.1 (highlighting the poisoning of 105 elephants in Hwange National Park 2013, which the agency initially stated in the Service Bulletin involved 300 elephants). For the 2015 Finding, ZPWMA provided percentage information on offtake categories and reported a five-year average of 190 poached elephants, *id.* at 7266, then a three-year average of 180 poached elephants, excluding the Hwange poisonings. *Id.* at 7267. But the Service questioned ZPWMA's percentages because they reflected a natural mortality rate "far below the likely natural morality rate" of healthy populations. *Id.*

---

11     Categories of offtake are cropping, natural mortality, accidents, poaching, problem animals, and management offtake. 2015 Finding, AR at 7266.

The Service also highlighted the lack of information on how the government sets quotas and allocates them spatially. *Id.*, AR at 7267. It noted that quotas are set to "maximize the sustainable production of high-quality trophies," which caused the Service to question if quotas are set for each hunting area based on the overall quota or to facilitate management goals for each area. *Id.*, AR at 7268. The Service emphasized that ZPWMA only provided "a general overview" of setting quotas for all species. *Id.*

As for CAMPFIRE, as in the July 2014 Finding, the Service was unable to determine how much revenue elephant sport-hunting provides, and how much of that comes from U.S. hunters. *Id.*, AR at 7271.

The Service concluded that the suspension could be lifted if additional information showed that the conditions of the Special Rule had been satisfied. *Id.*, AR at 7256. It published notice of the finding in the Federal Register on July 17, 2015. Notice of Continued Suspension of Imports of Zimbabwe Elephant Trophies Taken On or After April 4, 2014, 80 Fed. Reg. 42,524 (July 17, 2015).

## PROCEDURAL HISTORY

On April 21, 2014, plaintiffs filed suit challenging the April 4, 2014 decision. Compl. [Dkt. # 1], *Safari Club Int'l v. Jewell*, 14-cv-670-RCL. On December 26, 2014, the Court denied defendants' motion to dismiss for lack of subject matter jurisdiction and granted plaintiffs' motion to file an amended complaint. Order [Dkt. # 47] (granting plaintiffs leave to file a second amended complaint to add claims to challenge the July 2014 Finding).[12] On March 12, 2015, the Court

---

12    The Court also granted defendants' motion to dismiss claims related to the suspension of imports of trophies of elephants sport-hunted in Tanzania because plaintiffs failed to exhaust their administrative remedies. *See Safari Club Int'l v. Jewell*, 76 F. Supp. 3d 198 (D.D.C. 2014).

granted Friends of Animals and the Zimbabwe Conservation Task Force leave to intervene as defendants.  Order [Dkt. # 62].

On June 30, 2016, plaintiffs filed a related case challenging the Service's March 26, 2015 suspension of imports of elephant trophies sport-hunted in Zimbabwe.  Compl. [Dkt. # 1], *Safari Club Int'l v. Jewell*, 15-cv-1026-RCL; Notice of Related Case [Dkt. # 10].  Friends of Animals and the Zimbabwe Conservation Task Force were granted leave to intervene in the related lawsuit.  Min. Order (Aug. 21, 2015).  The Court granted the parties' motion for a proposed joint consolidated briefing schedule for the two related cases.  *See* Min. Order (Jul. 21, 2015).  The parties have briefed the motions for summary judgment,[13] which are now pending before the Court.

## STANDARD OF REVIEW

Summary judgment is appropriate when the pleadings and evidence show that "there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, in cases involving review of agency action under the Administrative Procedure Act ("APA"), Rule 56 does not apply due to the limited role of a court in reviewing the administrative record.  *Select Specialty Hosp.-Akron, LLC v. Sebelius*, 820 F. Supp. 2d 13, 21 (D.D.C. 2011).  Under the APA, the agency's role is to resolve factual issues and arrive at a decision that is supported by the administrative record, and the court's role is to "determine whether or not as a matter of law the evidence in the administrative record

---

13     *See* Pls.' Mot. for Summ. J. [Dkt. ## 87 & 32] ("Pls.' Mot."); Fed. Defs.' Cross-Mot. for Summ. J. [Dkt. ## 90 & 34]; Fed. Defs.' Mem. in Supp. [Dkt. ## 90-1 & 34-1] ("Fed. Defs.' Mem."); Intervenors' Mem. in Opp. to Pls.' Mot. [Dkt. ## 91 & 35] ("Intervenors' Mem."); Pls.' Opp. to Fed. Defs.' Cross-Mot. & Reply [Dkt. ## 92 & 36] ("Pls.' Opp./Reply"); Reply in Supp. of Fed. Defs.' Cross-Mot. [Dkt. ## 96 & 39] ("Fed. Defs.' Reply").

permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977).

Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), in excess of statutory authority, § 706(2)(C), or "without observance of procedure required by law." § 706(2)(D).  However, the scope of review is narrow.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The agency's decision is presumed to be valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the court must not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.  A court must be satisfied, though, that the agency has examined the relevant data and articulated a satisfactory explanation for its action, "including a 'rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006), quoting *Motor Vehicle Mfrs. Ass'n* at 43 (stating that administrative action would be arbitrary and capricious "if the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.")  Deference to an agency's judgment is particularly appropriate where the decision at issue "requires a high level of technical expertise." *Marsh v. Or. Nat. Res. Council,* 490 U.S. 360, 375–77 (1989), quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

In reviewing an agency's interpretation of a statute, courts use the two-step analysis outlined in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).   Step one involves determining whether Congress has spoken directly to the precise question at issue. If it has, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and that is the end of the matter.   *Id.*; *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 392 F.3d 498, 500 (D.C. Cir. 2004).   If the statute is silent or ambiguous on the question, *Chevron* instructs the Court to go on to a second step and determine "whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843.   An agency's interpretation will warrant deference if it is reasonable. *Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991).

## ANALYSIS

Plaintiffs assert a number of procedural and substantive defects with the three enhancement findings for Zimbabwe.   They contend with respect to all three findings that the agency (1) violated APA rulemaking requirements by not providing for notice and comment before issuing them; (2) applied prohibited guidelines and the wrong standard in making the findings; (3) failed to overcome a statutory presumption in Section 9(c)(a) of the Endangered Species Act governing these imports; and (4) violated the APA by failing to explain why it maintained the enhancement finding requirement in the Special Rule after the requirement was eliminated from CITES.

Plaintiffs further argue that the April 2014 Finding violated binding commitments the agency made concerning how it would change the enhancement finding, failed to request information from reliable sources and misinterpreted available information in making the finding, and sought to correct the problems with the April 2014 Finding retroactively without authority to

do so.  With respect to the July 2014 Finding, they argue that it was arbitrary and capricious because it was based on a lack of information and because the Service improperly analyzed the information it did have.  Finally, they argue the March 2015 Finding was arbitrary and capricious because the agency improperly analyzed the data.

For the reasons set forth below, the Court will grant federal defendants' cross-motion for summary judgment on all issues except it will grant plaintiffs' motion for summary judgment on the issue that the agency failed to comply with its binding commitment not to change the 1997 enhancement finding before publishing notice of the change in the Federal Register.  The analysis below first addresses the arguments that apply to all three findings, then addresses plaintiffs' individual challenges to each of the three findings.

## I.     The Service Was Not Required to Provide for Notice and Comment Under the APA Before Issuing the Enhancement Findings because the Findings are Not Rules.

The APA requires that "[g]eneral notice of proposed rule making shall be published in the Federal Register" and after providing this notice, "the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(b)–(c).  Plaintiffs argue that the enhancement findings are substantive rules, subject to the APA's notice and comment requirement.  *See* Pls.' Mot. at 49–50 (citing authority that distinguish between substantive rules and interpretive rules).  Intervenor-defendants agree that the findings are rules.  Intervenors' Mem. at 5–6.  While plaintiffs are correct that interpretive rules are not subject to the notice and comment requirements, 5 U.S.C. § 553(b)(3)(A), the Court must first address the threshold question of whether the findings are rules in the first place.

The APA defines "'rule' very broadly," *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002), to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). The APA defines "rule making" as the "process for formulating, amending, or repealing a rule." § 551(5).

"[A]n agency pronouncement that lacks the firmness of a [prescribed] standard . . . is not a rule." *Sugar Cane Growers Co-op. of Fla.*, 289 F.3d at 95, citing *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *see also Sprint Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (holding that only an "agency's imposition of requirements that affect subsequent [agency] acts and have a future effect on a party before the agency triggers the APA notice requirement," in contrast to an informal adjudication, which "lacks the firmness of a [prescribed] standard") (internal quotations omitted). While "[t]he line between [adjudication and rulemaking] is frequently a thin one," *Gen. Am. Transp. Corp. v. Interstate Commerce Comm'n*, 883 F.2d 1029, 1030 n.2 (D.C. Cir. 1989), quoting *City of Chicago v. Fed. Power Comm'n*, 458 F.2d 731, 739 (D.C. Cir. 1971), the Court concludes that the enhancement findings are adjudications.

The Supreme Court has explained the "basic distinction between rulemaking and adjudication" as a difference between "proceedings for the purpose of promulgating policy-type rules or standards, on the one hand, and proceedings designed to adjudicate disputed facts in particular cases on the other." *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 244–45 (1973); *see also Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216–17 (1988) (Scalia, J., concurring)

(stating that the "central distinction between rulemaking and adjudication" is that "rules have legal consequences only for the future").

In *Franks v. Salazar*, this Court held that enhancement findings made in the context of import permits that individuals must obtain to import a species on CITES Appendix I are adjudications. 816 F. Supp. 2d 49 (D.D.C. 2011). In that case, the Service conditioned the grant of a permit to import sport-hunted elephants from Mozambique on the presence of a national management plan. *Id.* at 54, 59. The plaintiffs contended that doing so amounted to the promulgation of new rules governing the issuance of import permits. *Id.* at 59. But the Court disagreed, noting that the Service was merely evaluating the permit applications "against the existing regulatory standards." *Id.*; *see also Marcum v. Salazar*, 810 F. Supp. 2d 56, 71–72 (D.D.C. 2011) (holding that the denial of permit applications to import elephant trophies from Zambia were adjudications rather than rulemakings), *vacated and remanded on other grounds*, 694 F.3d 123 (D.C. Cir. 2012). The question here is whether enhancement findings made in the Appendix II context – in the absence of individual permit applications – are rules or adjudications.

The Court recognizes that these findings bear some of the characteristics of a rule: they do not require individuals to submit permit applications, they affect a group of hunters and not individual permit applicants, and they operate both prospectively and retrospectively. But substantively, the findings are adjudications because they do not "promulgat[e] policy-type rules or standards," but rather "adjudicate disputed facts in particular cases." *Fla. E. Coast Ry. Co.*, 410 U.S. at 245.

An agency decision made by applying facts to existing regulatory standards does not become a rule merely because the decision was not made in response to a pending matter before

the agency.  In *Safe Extensions, Inc. v. FAA*, the FAA promulgated a series of "advisory circulars" that changed which types of products needed to pass a safety test and made the test itself more stringent.  509 F.3d 593, 596 (D.C. Cir. 2007).  This change was not made in response to a matter then before the agency, and it constituted a departure from what had been FAA standard operating procedure for thirty-five years.  *See id.*  The D.C. Circuit held that the advisory circulars were informal adjudications not subject to the APA's notice and comment requirement.  *Id.* at 604.

Like the adjudication at issue in *Safe Extensions*, the enhancement findings at issue here do not become rules merely because they were not made in the context of a specific permit application.  The Special Rule governing elephants requires the Service to make an enhancement finding before allowing the importation of sport-hunted African elephants.   50 C.F.R. § 17.40(e)(3)(iii)(C).  That rule has been in effect since 1992, and the Service has not changed the rule here.  It has not created a new rule, and it has not even changed the criteria it uses in applying that rule.  Instead, it has merely evaluated the status of African elephants in Zimbabwe and their management by the government there, applied the Special Rule, and arrived at an agency decision.  This is the hallmark of adjudication.  *See Fla. E. Coast Ry. Co.,* 410 U.S. at 245.

Also, contrary to plaintiffs' argument, *see* Pls.' Opp./Reply at 24–27, the fact that the findings affect a group of people and have prospective effect do not make them rules.  First, adjudications do not become rules merely because they impact a broad class of individuals.  *See Goodman v. FCC*, 182 F.3d 987, 993–94 (D.C. Cir. 1999) (holding that an FCC order was an adjudication, and not a rulemaking, even though it impacted the validity of licenses held by non-parties to the proceeding).  "Just as a class action can encompass the claims of a large group of plaintiffs without thereby becoming a legislative proceeding, an adjudication can affect a large

group of individuals without becoming a rulemaking." *Id.* at 994; *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 292 (1974) (rejecting the notion that an agency is required to resort to rule making in order to promulgate new standards that govern the future conduct of non-parties).

Second, adjudications can, and necessarily do, have prospective effect. They "generally provide a guide to action that the agency may be expected to take in future cases." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765–66 (1969). A rule of law announced in an adjudication with exclusively prospective effect can be accepted as binding with "new analysis[ ] in subsequent adjudications." *Bowen*, 488 U.S. at 221 (holding that otherwise, "it would constitute rulemaking"). The enhancement findings at issue here do not have exclusively prospective effect, and the Service has made clear they can be revised with new facts and a new analysis. *See* April 2014 Finding, AR at 3823; July 2014 Finding, AR at 4505, March 2015 Finding, AR at 7256.

Further, the enhancement findings do not set "policy-type rules or standards" for future enhancement findings. They do not establish the conditions that must be satisfied for the agency to allow imports. The Special Rule and its preamble did that. *See* 50 C.F.R. § 17.40(e)(3)(iii) (establishing the four requirements for imports, including the enhancement finding); *see also* 1997 Proposed Rule, 62 Fed. Reg. at 44,633 (stating the agency would review "the status of the population and the total management program for the elephant in each country to ensure the program is promoting the conservation of the species"). Rather, the findings "adjudicate[d] disputed facts." *Fla. E. Coast Ry. Co.,* 410 U.S. at 245. They analyzed the status of the population in Zimbabwe and the management program there to determine "if the killing of the animal whose trophy is intended for import would enhance survival of the species." 50 C.F.R. § 17.40(e)(3)(iii) And while the *result* of the adjudication – no enhancement finding – has the prospective effect of

suspending imports from Zimbabwe, that effect will remain in place only until new facts arise to change the results of the agency's analysis – which occurs against existing regulations. *See Franks*, 816 F. Supp. at 59 (ruling that the decision to grant or deny import permits involves an evaluation of the permit applications "against the existing regulatory standards"). Accordingly, the Court holds that the Service's enhancement findings are adjudications not subject to the notice and comment requirements of the APA.

## II.   The Special Rule Rebuts the Presumption in Section 9(c) of the ESA.

Plaintiffs also challenge the three findings on the grounds that the Service failed to rebut a statutory presumption in the ESA. Pls.' Mot. at 55–61.

Section 9(c) of the Endangered Species Act makes it unlawful to engage in trade of species in violation of CITES. 16 U.S.C. §§ 1538(c)(1), 1532(4). It also provides:

> (2) Any importation into the United States of fish or wildlife shall, if –
>
> > (A) such fish or wildlife is not an endangered species listed pursuant to section 1533 of this title but is listed in Appendix II to the Convention,
> >
> > (B) the taking and exportation of such fish or wildlife is not contrary to the provisions of the Convention and all other applicable requirements of the Convention have been satisfied,
> >
> > (C) the applicable requirements of subsections (d), (e), and (f) of this section have been satisfied, and
> >
> > (D) such importation is not made in the course of a commercial activity,
>
> be presumed to be an importation not in violation of any provision of this chapter or any regulation issued pursuant to this chapter.

16 U.S.C. § 1538(c)(2).

Plaintiffs contend that the Service failed to rebut this presumption because the provision requires the Service to presume that all conditions of the Special Rule are met, including the enhancement finding requirement, absent facts to the contrary. Pls.' Mot. at 55–61 (arguing that the Service must make "an affirmative finding based on the facts available at the time of the importation" but here the Service only "lacked" sufficient information to make a positive finding).

Defendants argue that the Special Rule rebuts the presumption. Fed. Defs.' Mem. at 36–40; *see also Safari Club Int'l v. Babbitt*, No. MO-93-CA-001, 1993 WL 13932673 at 12 (W.D. Tex. Aug. 12, 1993) ("The Service has interpreted § 9(c)(2) to raise a presumption of the legality of importing trophies which could be rebutted by the promulgation of a special protective regulation pursuant to § 4(d) of the Act, 16 U.S.C. § 1533(d).").

Under *Chevron*, the Court must first consider whether the statute is unambiguous on the issue. If it is, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress," and that is the end of the matter. *Chevron*, 467 U.S. at 842–43; *Nat'l Treasury Emps. Union*, 392 F.3d at 500. If the statute is silent or ambiguous on the question, *Chevron* instructs the Court to then determine "whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843. An agency's interpretation will warrant deference if it is reasonable. *Pauley*, 501 U.S. at 702.

Section 4 of the ESA gives the Secretary broad authority to protect threatened species. 16 U.S.C. § 1533(d) (authorizing the Secretary to promulgate regulations she "deems necessary and advisable"); *see Babbitt v. Sweet Home Chapter of Cmtys for a Great Or.*, 515 U.S. 687, 708 (1995) (describing this authority as "broad administrative and interpretive power" and holding that

"[f]ashioning appropriate standards for issuing permits under § 10 for takings that would otherwise violate § 9 necessarily requires the exercise of broad discretion").

Section 4 also authorizes the Secretary to extended the prohibitions on endangered species to threatened ones. 16 U.S.C. § 1533(d). The Secretary exercised this authority with a single blanket regulation covering all threatened species, but allowed for the agency to carve out certain species from these prohibitions by issuing species-specific rules.

> (c)  Whenever a special rule in §§ 17.40 to 17.48 applies to a threatened species, none of the provisions of paragraphs (a) and (b) of this section will apply. *The special rule will contain all the applicable prohibitions and exceptions.*

50 C.F.R. § 17.31 (emphasis added). The Service issued just such a special rule to govern African elephants.

While the Court agrees that plaintiffs' reading of the statute offers one interpretation, it does not agree that this is the only reading or that Congress "unambiguously expressed [its] intent" on the issue. *Chevron*, 467 U.S. at 842–43. Section 9(c) of the Act establishes a presumption that imports of Appendix II species not on the endangered species list do not violate the ESA or its regulations, but section 4 of the Act gives the Secretary broad authority to issue regulations "deem[ed] necessary and advisable" to protect threatened species. 16 U.S.C. § 1533(d). Given that section 9(c) makes imports of threatened species on Appendix II presumptively valid under the ESA and section 4 gives the agency broad discretion to protect threatened species, the Court finds that the statute is silent on the issue of whether an agency regulation can rebut the statutory presumption.

Given this, the Court must next determine whether the agency's interpretation is "based on a permissible construction of the statute," *Chevron*, 467 U.S. at 843, and reasonable to warrant

deference. *Pauley*, 501 U.S. at 702. The Court holds that it is. The Secretary acted within her statutorily-delegated authority to prohibit imports of all threatened species, *see* 50 C.F.R. § 17.31(a) – and could have stopped there – but instead allowed the agency to carve out species from these prohibitions with special rules. 50 C.F.R. § 17.31(c). In doing so, the Secretary provided that these special rules would establish "*all* the applicable prohibitions and exceptions" for the species. 50 C.F.R. § 17.31(c) (emphasis added); *see also* 50 C.F.R. § 17.8 (setting conditions for imports of threatened, CITES Appendix II wildlife "[e]xcept as provided in a special rule"). It was not unreasonable for the Secretary to interpret the Special Rule as rebutting the statutory presumption, particularly in light of her broad authority and discretion to promulgate regulations to protect threatened species. *See Sweet Home Chapter of Cmtys*, 515 U.S. at 708. Accordingly, the Court holds that the Special Rule rebuts the section 9(c) presumption.

III.    **The Service was Not Required to Provide Additional Explanation or Solicit Public Comment on the Special Rule after the Enhancement Finding Requirement was Removed from CITES.**

Plaintiffs argue that the Service acted in an arbitrary and capricious manner when it failed to solicit public comment and explain why it maintained the enhancement finding requirement in the Special Rule after CITES no longer required it. Pls.' Mot. at 51 (emphasizing that the Service added the requirement to the rule in 1992 because CITES mandated it).

An agency's action "is arbitrary and capricious" if it fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Sw. Power Pool, Inc. v. FERC*, 736 F.3d 994, 997 (D.C. Cir. 2013), quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. If an agency "changes course" it "must 'provide reasoned explanation for its action.'" *National Ass'n of Home Builders v. EPA*, 682 F.3d

1032, 1038 (D.C. Cir. 2012), quoting *FCC v. Fox T.V. Stations, Inc.*, 556 U.S. 502, 515 (2009).

Additionally, "changes in factual and legal circumstances may impose upon the agency an obligation to reconsider a settled policy or explain its failure to do so." *Bechtel v. FCC*, 957 F.2d 873, 881 (D.C. Cir. 1992). Plaintiffs cite no case law where an agency must provide ongoing explanation and public comment for regulations when the regulation and justification for the regulation remain unchanged. *See* Pls.' Mot. 51–55.

In 1992, the Service added the enhancement finding requirement to the Special Rule. 57 Fed. Reg. at 35,473; 50 C.F.R. § 17.40(e)(3)(iii). It did this as part of its decision on a petition to elevate the African elephant from the ESA threatened list to the endangered list. 57 Fed. Reg. at 35,473. The agency decided to keep the species on the threatened list and to allow the importation of sport-hunted elephant trophies under "prescribed conditions." *Id.*

The Service explained that allowing imports of sport-hunted elephant trophies was a "form of consumptive utilization" that "provide[s] important revenues for elephant conservation to range states." 57 Fed. Reg. at 35,485. CITES required importing countries to make "a determination that the killing of elephants for sport-hunting enhances the survival of the species by providing financial support programs for elephant conservation" and that this requirement applied to species on CITES Appendix I. *Id.* Accordingly, the agency recognized that imports can contribute to elephant conservation and that an enhancement finding requirement was a mechanism to ensure that an import does so. The agency added the enhancement requirement to the Special Rule, aligning U.S. regulations for importing African elephant trophies with CITES' requirements. *Id.*

In 1994, the treaty's signatories eliminated the requirement. In 1997, elephants from Botswana, Namibia, and Zimbabwe were transferred from Appendix I to Appendix II – which has

30

never required an enhancement finding. Pls.' Mot. at 52; Fed. Defs.' Mem. at 34. Throughout this time, all African elephants remained on the threatened list under the ESA, and the Service made no changes to the Special Rule, maintaining the enhancement finding requirement under U.S. law.

Plaintiffs do not challenge the agency's addition of the requirement to the Special Rule in 1992. Rather, they complain that the agency improperly kept the requirement in U.S. law after CITES was amended to remove it from the treaty. Pls.' Mot. at 51–52 (arguing that the agency "passively modified" the rule without providing for public notice and comment). But CITES allows signatories to enact stricter regulations than those found in the treaty, setting a floor on the protections signatory nations must give to covered species, but not a ceiling. CITES art. XIV(1)(a). Moreover, the agency did not modify the rule or "chang[e] course" in 1992 by leaving the requirement in place, *Nat'l Ass'n of Home Builders*, 682 F.3d at 1038, so the agency did not need to "provide reasoned explanation for its action." *Fox T.V. Stations, Inc.*, 556 U.S. at 515. Although one reason for adding the requirement changed when CITES was amended, another reason – ensuring that imports generate "revenues for elephant conservation to range states" – did not change. 57 Fed. Reg. at 35,485. Thus, an underlying rationale for the requirement remained the same, and the Service did not need to re-explain that rationale. *Bechtel*, 957 F.2d at 881.

## IV.   The Service Did Not Apply Withdrawn Guidelines or Illegally Require Sport-Hunting to "Ensure" the Survival of the Species.

Plaintiffs next argue that the Service applied illegal guidelines and the wrong standard in issuing the enhancement findings. Pls.' Mot. at 43–49. They contend that the agency improperly used guidelines that were the subject of prior litigation and withdrawn by the agency more than twenty years ago. Pls.' Mot. at 43–44 (comparing the withdrawn guideline factors, including

whether the population was increasing or stable and a country's management program, goals, and ability to control poaching, with the challenged enhancement findings, which considered Zimbabwe's elephant population trends, management plans and laws, and poaching). Federal defendants argue that plaintiffs did not make this claim in their amended complaint and that this Court has already ruled that the agency did not use these guidelines. Fed. Defs.' Mem. at 24–25, citing *Marcum*, 810 F. Supp. 2d at 72 n.3. The Court agrees that plaintiffs did not raise this claim in their complaint, and in any event, it does not find that the "overlap" that plaintiffs assert demonstrates that the agency relied on the withdrawn guidelines. *Marcum*, 810 F. Supp. 2d at 72 n.3 ("The fact that there was some overlap between the withdrawn *Safari Club* guidelines and the factors [the Service] considered in denying plaintiffs' permit applications doesn't mean that [the Service] reinstituted those guidelines . . . .").

Plaintiffs also argue that the agency applied the wrong standard in the enhancement findings, requiring a showing that sport-hunting elephants in Zimbabwe ensures the species' survival, not just enhances it. Pls.' Mot. at 47 (contending that the agency "continue to focus on the negative implications of issues other than sport hunting" and improperly considered how much, instead of whether, sport hunting enhances elephant survival). Comparing the 1997 finding to the recent findings, plaintiffs note that the agency made a positive finding in 1997 despite expressing the same concerns set forth in the recent findings – "lack of government funding, increase in human-elephant conflicts, criticism of the CAMPFIRE district councils, and poor infrastructure." Pls.' Mot. at 45; *see also id.* at 47–48 (arguing the challenged findings "focused on a lack of recently updated elephant data, an incorrectly perceived drastic decline in population, and incorrect anecdotal evidence of an increase in poaching" and issues other than sport hunting).

But plaintiffs fail to recognize the difference in the quality and amount of information the agency had in 1997 compared to the information it had in 2014 and 2015. While many of the same concerns expressed in the recent findings existed in 1997, the agency had facts before it at that time showing the concerns were being addressed. For example, in 1997, survey issues like double counting were addressed with additional surveys, including an independent one conducted by Price Waterhouse in 1996. 1997 Finding, AR at 2557. Concerns in 1997 about CAMPFIRE's district councils retaining excess funds were addressed with information on how some of its districts were reducing the amount of funds that they retained. *Id.*, AR at 2559. Moreover, the 1997 finding was made against a backdrop of estimates showing a growing elephant population – estimates in which the agency had confidence. *Id.*, AR at 2557–57. In contrast, the record indicates that the same concerns were no longer being addressed in 2014 and 2015, and that the information that supported the agency's conclusions in 1997 was stale by 2014 and 2015. *See, e.g.*, July 2014 Finding, AR at 4507, 4510, 4516; 2015 Finding, AR at 7261–63, 7272.

In making an enhancement finding pursuant to the Special Rule, the Service reviewed "the status of the population and the total management program for the elephant in each country to ensure the program is promoting the conservation of the species." 1997 Proposed Rule, 62 Fed. Reg. at 44,633. In 1997, it carried out this analysis by reviewing the status of the elephant population in Zimbabwe, Zimbabwe's management plan, its management program including CAMPFIRE, its regulations and enforcement, sustainable use in the country, and its implementation of CITES. *See* 1997 Finding, AR at 2557–60. In carrying its reviews in 2014 and 2015, the agency reviewed these same factors. July 2014 Finding, AR at 4507–17 (reviewing management plans, population status, regulation and enforcement, sustainable use, revenue

utilization by CAMPFIRE, and local conservation efforts); 2015 Finding, AR at 7256–73 (same). Plaintiffs did not challenge either the standard the Service applied in making the 1997 finding or the data and information it reviewed.  And the Court is not persuaded that this standard was wrong now.

Plaintiffs would have the agency focus only on whether sport-hunting generates revenue for species conservation and whether the presence of hunters deters poaching.  But these factors address only the first part of the inquiry, and taken as true, they would *always* result in an positive enhancement finding.  Instead, the agency examines not only whether these factors exist but their effect on the species as a whole:  whether fees generated by U.S. hunters are in fact being used to promote conservation and how they are being used under the government's management plan and sport-hunting program, whether their use is improving the species' prospects for survival into the future, and how the species would fare if U.S. hunters could not import trophies.  *See* 62 Fed. Reg. at 44,633.  The Court holds that this inquiry is appropriate because the agency must find a causal connection between "the killing of the animal whose trophy is intended for import" and the "survival of the *species*" – not just the survival of a single or some elephants.  50 CFR § 17.40(e)(3)(iii) (emphasis added).  Thus, generating hunting fees and deterring poaching in specific instances do not show enhancement, without a showing that a government is properly using funds and protecting the species more broadly.  Accordingly, the Court holds that the agency did not apply an improper standard in issuing the three challenged findings.

V.      **The Three Findings**

A.      **The Service Properly Based the April 2014 Finding on New Information but Failed to Provide the Required Notice in the Federal Register Before Changing the Zimbabwe Finding.**

Plaintiffs argue that the Service bound itself to changing the Zimbabwe enhancement finding based only on new information and after publishing notice of the change in the Federal Register. Pls.' Mot. at 14–18; Pls.' Opp./Reply at 2–6. They further argue that the agency's failure to comply with these commitments tainted both the April and July 2014 Findings. *Id.*

In the 1997 Proposed Rule announcing the transfer of African elephants in Zimbabwe, Botswana, and Namibia from Appendix I to Appendix II, the agency wrote the following about the enhancement findings for the three countries:

> The Service will make such findings on a periodic basis upon receipt of new information on the species' population or management.  The enhancement findings for importation of sport-hunted elephant trophies from Botswana, Namibia, and Zimbabwe are on file in the Office of Management Authority and remain in effect until the Service finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register.

62 Fed. Reg. at 44,633.

Plaintiffs argue that this statement bound the Service to base any change to the findings for these three countries "on new information, that the conditions of the special rule are no longer met" and keep the 1997 Finding in effect until it published notice of the change in the Federal Register. *See* Pls.' Mot. at 14–18; Pls.' Opp./Reply at 2–4. They contend the agency's failure to follow these binding procedures makes April and July 2014 enhancement findings invalid. *See id.*

Federal defendants argue that the Service is bound only by the Special Rule, as published in Code of Federal Regulations, and not by the text of the preamble to the 1997 Proposed Rule.

35

*See* Fed. Defs.' Mem. at 31; Fed. Defs.' Reply at 23–24.  Given the mandatory language in the preamble and the Service's actions after announcing the changed Zimbabwe finding, the Court finds that the preamble is binding on the agency.

Generally speaking, preambles to rules are not binding agency actions subject to judicial review, *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 564–65 (D.C. Cir. 2009), and agency statements "having general applicability and legal effect" are to be published in the Code of Federal Regulations.  *Id.*, citing Federal Register Act, 44 U.S.C. § 1510(a)–(b) and 1 C.F.R. § 8.1.  But in certain circumstances, a preamble may be legally binding.  *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1222–23 (D.C. Cir. 1996) (internal citations omitted) (holding that whether a preamble is binding on an agency "hinges upon whether the preamble has independent legal effect, which in turn is a function of the agency's intention to bind either itself or regulated parties" and even without an express statement, a court may "infer that the agency intended the preamble to be binding if what it requires is sufficiently clear").  Accordingly, the Court must consider whether this preamble is binding.

"[A]n agency pronouncement will be considered binding as a practical matter if it either appears on its face to be binding, or is applied by the agency in a way that indicates it is binding." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 7 (D.C. Cir. 2011), quoting *Gen. Elec. Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002); *see also Wildearth Guardians v. Salazar*, 783 F. Supp. 2d 61, 72 (D.D.C. 2011) (internal quotation marks omitted) ("Generally speaking, 'an agency pronouncement is transformed into a binding norm if the statement's language, context, and available extrinsic evidence indicate the agency so intended.'"), quoting

*Empresa Cubana Exportada de Alimentos y Productos Varios v. U.S. Dept. of Treasury*, 516 F. Supp. 2d. 43, 58 (D.D.C. 2007).

### 1.    The preamble contains exclusively mandatory language.

An agency statement will be considered binding if it "is in purpose or likely effect one that narrowly limits administrative discretion." *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. & Loan Ins. Corp.*, 589 F.2d, 658, 666–67 (D.C. Cir. 1978).   Indeed, "the mandatory language of a document alone can be sufficient to render it binding," *Gen. Elec.*, 290 F.3d at 383; *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987) ("[W]e have . . . found decisive the choice between the words 'will' and 'may.'"); *compare Am. Bus. Ass'n v. United States*, 627 F.2d 525, 532 (finding use of the word "will" to be evidence that an agency statement is a binding norm) *with Guardian Fed.*, 589 F.2d at 666 (finding use of the word "may" to be evidence that an agency statement is a non-binding, "general statement of policy").   "If a statement denies the decisionmaker discretion . . . then the statement is binding."   *McLouth Steel Prods. Corp. v. Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988).   And "procedures may be binding on an agency when they affect individuals' rights." *Chiron Corp. v. NTSB*, 198 F.3d 935, 944 (D.C. Cir. 1999); *see also Mass. Fair Share v. Law Enf't Assistance Admin.*, 758 F.2d 708, 711–12 (D.C. Cir. 1985) (holding that an agency is bound by its manual's procedures for grant-funding).

The language here appears to be binding on its face:   the Service "*will* make such findings . . . upon receipt of new information."   1997 Proposed Rule, 62 Fed. Reg. at 44,633 (emphasis added).   It adds that the positive enhancement finding for the three countries would "remain in effect until [the agency] finds, based on new information, that the conditions of the special rule are no longer met and has published a notice of any change in the Federal Register."

*Id.* While this language gives the Service discretion to *change* the enhancement finding, it does not leave the agency discretion on *how* it will change the finding. It must do so only with new information and after publishing notice in the Federal Register. The preamble's mandatory language "strongly suggest[s] that [it] is not just a musing about what the agency might do in the future." *McLouth*, 838 F.2d at 1321, quoting *Cmty. Nutrition Inst.*, 818 F.2d at 948. Indeed, the text leaves less room for discretion than have other pronouncements the D.C. Circuit concluded were binding. *See, e.g., McLouth* at 1320–21 (finding language in the preamble of an EPA regulation on how it would compute contamination levels using a particular model binding because it stated that the model "*will* be used to predict the various toxicants," despite equivocal statements such as the model, "while providing important input to a delisting decision, are not necessarily the sole basis for such a decision"). The text at issue here contains no such equivocal language.

### 2.     The Service has applied the preamble to indicate it is binding.

Even without express language that indicates an agency's intent to bind itself, a court may infer such intent so long as what the preamble "requires is sufficiently clear." *Kennecott*, 88 F.3d at 1223. "Agency intent is 'ascertained by an examination of the provision's language, its context, and any available extrinsic evidence.'" *Chiron*, 198 F.3d at 944, quoting *Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977); *see also McLouth*, 838 F.2d at 1321 ("More critically than [the agency's] language adopting the model, its later conduct applying it confirms its binding character.").

Federal defendants do not argue the language is not mandatory but instead point to context and extrinsic evidence to argue that it should be not read as mandatory. They argue that when the Service intends to bind itself, it publishes the statement in the Code of Federal Regulations, and

that as soon as the conditions of the Special Rule were not satisfied, it was required to halt importation – "regardless of whether its inability to make a positive finding [was] based on new information or [on the] lack of information." Fed. Defs.' Reply at 23–24; *see* Fed. Defs.' Mem. at 31. But the agency's current characterization of the statement bears "little weight. The agency's past characterizations, and more important, the nature of its past applications . . . are what count." *McLouth*, 838 F.2d at 1320; *see also Cmty. Nutrition Inst.*, 818 F.2d at 946 (noting that "courts are to give far greater weight to the language actually used by the agency" than to the agency's current characterization of that language).

In support of their first argument, defendants point to two special rules that govern other species. Fed. Defs.' Mem. at 31, citing 50 C.F.R. §§ 17.40(j)(2), (n)(2). These special rules provide for publication of notice in the Federal Register when the Service intends to authorize imports. *Id.* But an agency need not publish a commitment in the Code of Federal Regulations to bind itself. *Kennecott Utah Copper Corp.*, 88 F.3d at 1222–23 (internal citations omitted).

The Service next argues that as soon as it was unable to make a positive enhancement finding, the conditions of the Special Rule were no longer satisfied and it was required to halt imports, regardless of the availability of new information. Fed. Defs.' Reply at 24. But rather than proving it did not intend to be bound by the preamble, the Service's actions shows the opposite. As federal defendants note, 50 C.F.R. § 17.40(e)(3)(iii)(C) requires the Service to make an enhancement finding before allowing imports of sport-hunted African elephant trophies from any country. And the requirement that the Service base any withdrawal of the enhancement findings for Botswana, Namibia, and Zimbabwe on new information and after publishing notice in the Federal Register appears only in the preamble. So in theory, the Service would be

39

correct – if it had no intention to be bound by the preamble, it could have halted imports as soon as it found it was unable to make the positive enhancement finding.

But that is not what happened. Instead, on May 12, 2014, the agency published notice in the Federal Register that it was suspending importation on an interim basis. *See* 79 Fed. Reg. 26,986. It wrote:

> [W]e recognize that our inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species. Therefore, the Service is actively pursuing additional information from the Government of Zimbabwe, as well as other sources, in an effort to make a final determination on whether African elephant sport-hunted trophies taken in 2014 could be imported into the United States.

*Id.* at 26,987. This statement indicates that the Service knew of its prior commitment to base the suspension of its enhancement findings on new information and intended to be bound by that commitment. Indeed, the Court notes that while federal defendants contend that the preamble's statement on how it would change the finding are not binding, it separately asserts that "the only documents relevant to the standard the Service uses for enhancement findings under the special rule are the *preamble to the rule itself* and Service's enhancement findings." Fed. Defs.' Mem. at 23 (emphasis added). This further suggests the Service gives significant weight to the preamble's authority. Given all of this, the Court concludes that the agency bound itself to comply with its statements in the preamble.

But that does not end the inquiry. The Court must next consider whether the agency complied with its commitments.

### 3.     The Service based the interim finding on new information.

The agency's own statements repeatedly indicated the agency did not have much information and no new information from Zimbabwe before suspending imports.  Service Bulletin, AR at 3021 (describing "available data" to the agency as "limited"); April 2014 Finding, AR at 3823 (stating the "most significant aspect of our analysis is the lack of recent data on what is occurring in Zimbabwe"); 79 Fed. Reg. 26,986–87 (stating the interim suspension was "due primarily to the Service having insufficient information on the status of elephants in Zimbabwe and the current management program in Zimbabwe" and that the "inability to make a finding is based primarily on a lack of information, not on specific information that shows that Zimbabwe's management is not enhancing the survival of the species").

By the July 2014 Finding, the agency had received information from the government of Zimbabwe and other sources, but found that this additional information still did not support a positive finding.  July 2014 Finding, AR at 4505, 4507.  Plaintiffs argue that even though the Service received this information, the finding was still based on a "lack" of information.  Pls.' Mot. at 27.

Plaintiffs' argument on the April 2014 Finding appears to be that the agency is only allowed to change the finding based on information provided by the government of Zimbabwe.  But this cannot be the case.  If it were, Zimbabwe could simply refuse to provide the Service any information and keep the Service's enhancement finding in place in perpetuity.  Even the original positive enhancement finding from 1997 relied on third party data. *See, e.g.,* 1997 Finding, AR at 2557 (citing an independent population survey by Price Waterhouse).  The Service committed to keep the enhancement finding in place until it found the Special Rule's conditions were no longer

met "based on new information" – not "based new information from the exporting country." So the April 2014 Finding is not improper simply because the Service had not yet received information from Zimbabwe.

> **4.     The Service failed to comply with its commitment to provide public notice of the April 4, 2014 change.**

The Service also promised in the 1997 Proposed Rule that the finding would "remain in effect until [it] . . . published a notice of any change in the Federal Register." 62 Fed. Reg. at 44,633. The Service did not do so until May 12, 2014, but it made the suspension effective April 4, 2014. 79 Fed. Reg. at 26,986. The Court finds that this violated the commitment in the preamble. Federal defendants argue the error is harmless because hunters had actual notice of the change, given the agency's Service Bulletin and announcement of the suspension on its website. Fed. Defs.' Mem. at 32–33. But the agency did not say that the finding would remain in effect until it posted a notice on its website, or issued a bulletin, or hunters received actual notice of a change. It said the finding would "remain in effect" until the agency "published a notice of any change in the Federal Register." 62 Fed. Reg. at 44,633. The agency failed to live up to this commitment.

Because remand cannot resolve this issue, the Court holds that the appropriate remedy is to order that the effective date of the 2014 interim suspension is not April 4, 2014 but May 12, 2014, the date of the Federal Register notice. The result is that imports of trophies from elephants sport-hunted in Zimbabwe from April 4, 2014 to May 11, 2014 may proceed.[14]

---

14     Given its holding, the Court does not reach the question of whether the agency sought to correct the alleged problems with the April 2014 Finding retroactively without authority.

**B.      The July 2014 Finding is Not Arbitrary and Capricious.**

After issuing the April interim finding, the agency received information from a number of sources, including the government of Zimbabwe, hunting organizations, and numerous individuals. *See, e.g.*, July 2014 Finding, AR at 4507–17. The agency reviewed the information but did not change the interim finding.

Plaintiffs argue that the July 2014 Finding violated the 1997 commitment to base a change to the finding on "new information." Pls.' Mot. at 27 (asserting that "[i]n July, the Service continued to base its decision on a 'lack of information'"). But the document plaintiffs quote states that the April 2014 Finding was based on a "lack of information" and that the July 2014 Finding was based on a "lack of current information." *Id.*, quoting AR 196 at 4443. Plaintiffs do not dispute, and the record shows, that the government of Zimbabwe provided information to the agency, which the agency considered before issuing the July 2014 Finding. Pls.' Mot. at 27; *see, e.g.*, Response to Questions Raised by FWS to Address the USA Endangered Species Act by ZPWMA, AR 7 at 1925–56 ("ZPWMA Response to Questions"). Accordingly, the Court holds that the July 2014 Finding did not violate the Service's commitment.[15]

Plaintiffs also argue that the July 2014 Finding was arbitrary and capricious because the Service "ignored, rejected or discounted" the information ZWPMA and others provided to the agency. Pls.' Mot. at 28. The Court's role in deciding this issue is narrow. An agency's decision is presumed valid, *see Citizens to Preserve Overton Park*, 401 U.S. at 415, and the Court cannot

---

15     The Service also did not violate the commitment to publish "any change" to the enhancement finding in the Federal Register when it issued the finding on July 17 (and 22), 2014 but did not publish notice of it until July 31, 2014 because the July final finding did not change the April interim finding.

"substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (holding that after a "careful study of the record, [the court] must take a step back from the agency decision" and "look at the decision not as the chemist, biologist or statistician that [it is] qualified neither by training nor experience to be, but as a reviewing court exercising [its] narrowly defined duty of holding agencies to certain minimal standards of rationality").

Plaintiffs present competing analyses of the information before the Service, but the Court's role is not to choose among the competing views presented. It is to determine whether the Service examined the relevant data and articulated a satisfactory explanation for its finding, "including a 'rational connection between the facts found and the choice made.'" *Alpharma, Inc.*, 460 F.3d at 6, quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. With this narrow mandate in mind, and as explained further below, the Court concludes that the July 2014 Finding is not arbitrary and capricious.

### 1.    Population Status

Plaintiffs contend that the agency improperly analyzed population data in the July 2014 Finding. Pls.' Mot. at 22, 28–30. For 2007, the IUCN's 2013 Africa Report estimated the population in Zimbabwe was 99,107 elephants. July 2014 Finding, AR at 4510. Of that total, eighty-five percent (84,416) was classified as "definite." *Id.* For 2012, the report estimated the population had increased to 100,291, but only forty-seven percent (47,366) was classified as "definite." *Id.*

Plaintiffs cite an email to the Service from Dr. Holly Dublin, senior adviser and chair of the IUCN's African Elephant Specialist Group, about the 2013 Africa Report. Pls.' Mot. at 28,

citing May 30, 2014 email string, AR 151 at 4166.  Dr. Dublin wrote that the agency's description

of the population being "reduced" from 84,416 in 2007 to 47,366 in 2013 is based only on the data

from the "definite" category.  May 30, 2014 email string, AR at 4166.  She stated that the reason

for the decline in "is NOT due to an observed decline, but rather due to the fact that much of data

the estimate is based on were considered 'out of date' by our system."  *Id.* (explaining that the

database categorizes survey data into four categories – definite, probable, possible and speculative

– "to reflect the uncertainty in the population estimates at the national and regional levels").  In

Zimbabwe's case, she elaborated, "much of the data on population estimates is out of date, which

has resulted in those data being moved 'down' in terms of the category of reliability.  That should

not be interpreted to mean that we believe the elephant populations have declined, just that we

have greater uncertainty about the numbers."  *Id.*  Citing Dr. Dublin's email, plaintiffs argue that

agency ignored or did not give sufficient weight to the numbers of elephants that fell outside the

"definite" category.  Pls. Mot. at 28.

While the agency's statement in the April 2014 Finding that the population "had been

reduced to 47,366" was misleading, its statements in the July 2014 Finding about the reliability of

the survey data came directly from the 2013 Africa Report.  *See* 2013 Africa Report, AR at 3626–

27.  The report shows that 304 elephants were counted by aerial total counts (labeled "AT" in the

report's table) in 2010.  *Id.*, AR at 3627.  The report further ranked the reliability of the surveys

reflected in it, from "A" (best) through "E" (worst).  *Id.*, AR at 3627 n.2.  Only a 2010 survey

conducted by Selier & Page, which only covered three of forty-one areas, received an "A" ranking.

*Id.*, AR at 3626–27.  The 2013 Africa Report summarized:

> Very few new surveys were conducted in Zimbabwe since 2007, covering a small percentage of the overall population. Half of the estimates included in the current update are now older than 10 years, resulting in an overall degradation of the quality of data from Zimbabwe. This lack of systematic and updated monitoring data is of serious concern for possibly the third largest elephant population in Africa. As a result of the data degradation, the DEFINITE category has seen a drop of 41,536, while the SPECULATIVES have increased by 45,084. Only 8 of the estimates in this update were as a result of repeated surveys, increasing the number of DEFINITE elephants by 3,759.

*Id.*, AR at 3627.

The record does not indicate that the agency ignored the other survey categories or that it concluded the elephant population had in fact declined by half. *See* July 2014 Finding, AR at 4510 (acknowledging that the 2013 Africa Report estimated more than 100,000 elephants in Zimbabwe and the government of Zimbabwe estimated the same). Rather, the agency's concern was that the survey data was unreliable. *See id.* The record – and, indeed, Dr. Dublin's email – confirmed that the reliability of the data had declined since the 1997 Finding. *See, e.g.*, May 30, 2014 email string, AR at 4166.

Plaintiffs also challenge the statement in the July 2014 Finding that in 2012, "[o]nly 304 . . . were counted by aerial or ground counts, while the remaining 41,840 . . . were counted through sample counts or dung counts, . . . a less accurate methodology." AR at 4510. Plaintiffs assert the agency "failed to comprehend the IUCN Report and how population surveys are conducted." Pls.' Mot. at 29. But plaintiffs' argument about survey methodology does not undermine the fact that only 47,366 elephants surveyed were considered "definite" in 2012, compared to the much higher number in that category in 2007. 2013 Africa Report, AR at 3626. Again, the Service's concern was not that the population had in fact declined but that survey data was old, making the estimates less reliable than when it made the affirmative finding in 1997. *Compare* CITES Doc. 10.88,

Consideration of Proposals for Amendments of Appendices I or II at 10th Conf. of Parties (1997), AR 19 at 2542 ("CITES Doc. 10.88") ("Zimbabwe has carried out a regular series of aerial surveys of its elephant population since 1980 using standard sample count techniques.  Zimbabwe has one of the best sets of elephant population data in Africa."), *with* 2013 Africa Report, AR at 3627 ("Half of the estimates included in the current update are now older than 10 years, resulting in an overall degradation of the quality of data from Zimbabwe.").

The July 2014 Finding was not based solely on the population numbers but in part on the conclusion that the available population data was inadequate to determine the status of the population or to understand Zimbabwe's management of the species. *See, e.g.*, July 2014 Finding, AR at 4516 (concluding that "it does not appear that Zimbabwe has adequate information on elephant populations to establish scientifically defensible hunting quotas").

### 2. Poaching

Plaintiffs next contend that the agency improperly analyzed poaching data, pointing again to the email from Dr. Dublin.  Pls.' Mot. at 30, quoting May 30, 2014 email string, AR at 4167 (stating that the agency's "extrapolation of the [Monitoring the Illegal Killing of Elephants ("MIKE")] PIKE figures to the national level based on the data from one or two MIKE sites . . . probably also deserve closer scrutiny").  Plaintiffs do not argue that the poaching data from the two locations is wrong[16] but that the Service over-extrapolated the data nationwide and failed to analyze how the import ban would affect the country's ability to fight poaching.  Pls.' Mot. at 30–

---

16     Plaintiffs do emphasize that the agency relied on inaccurate press reports about the number of elephants killed in the Hwange poisoning in the April 2014 Finding, Pls.' Mot. at 10, but the Service corrected that statement in its subsequent findings.  July 2014 Finding, AR at 4513 n.1; 2015 Finding, AR at 7266 n.1.

31.  They also contend the agency "rejected concrete data presented by ZPWMA and others that hunters and hunting concession provide a major deterrent to poaching." *Id.* at 31.  According to plaintiffs, poaching is not a new problem in Zimbabwe, and the Service had only the Hwange poisoning incident and the incorrectly extrapolated MIKE/PIKE data to support the change in position from 1997 to 2014.  Pls.' Opp./Reply at 9–10.

Federal defendants argue that the agency did not rely solely on the poaching data for the finding but considered it evidence that poaching remains a concern in Zimbabwe.  Fed. Defs.' Mem. at 12–13.  In any event, the record shows other information indicating that poaching was an ongoing problem.  *See* Information Memo. for the Director, Jan. 8, 2014, AR 79 at 3625 (memorandum stating that the United States has sanctions in place for senior officials of the government of Zimbabwe for public corruption and citing articles and unofficial reports "that Zimbabwean government officials may be financially linked to sport hunting"); Information Memo. for the Director, Jan. 6, 2014, AR 76 at 3610 (draft memorandum reflecting "reports of government corruption, including politicization of hunting quota distribution and abuse of ration quotas, as well as purported direct and indirect participation in wildlife trafficking by Zimbabwean politicians, defense forces, and intelligence officers").  Regarding the role of hunters in deterring poaching, federal defendants emphasize that Zimbabwe's budget for the ZPWMA to manage wildlife, including deterring poach, is insufficient to carry out its statutory mandate, even with hunting revenues.  Fed. Defs.' Mem. at 13.  Further, because hunting concessions are not allowed in national parts, "it is unlikely the density of hunters is sufficient to adequately deter poaching." *Id.* at 14, citing July 2014 Finding, AR at 4512–13.

As with its analysis of the population data, the agency did not ignore or disregard evidence in the record about poaching or how hunters help deter it, but weighed it differently than the plaintiffs would have.

### 3. Wildlife Laws and Regulations and the Elephant Management Plan

Plaintiffs contend that Zimbabwe's elephant conservation and management laws, plans, and strategies were the same in 1997 as they were in 2014, and the Service acted in an arbitrary and capricious manner when it found them sufficient in 1997 but "abruptly" found them insufficient in 2014. Pls.' Mot. at 27–28 n.13. But plaintiffs ignore the difference between the quality and substance of the information before the agency in 1997 and before it in July 2014.

The record indicates that when the agency made its 1997 finding, a CITES report showed that the predecessor agency to ZPWMA provided assurances that the "current poor state of finances and general organization" of the agency was improving. CITES Doc. 10.88, AR at 2541; *see also id.* at 2547 ("The status of DNPWLM changed on 1 July 1996 to become a statutory 'Fund', responsible for financing operations directly from wildlife revenue . . . managed by the Director on behalf of the Accounting Officer for the Ministry of Environment and Tourism, who is in turn accountable to Parliament.").

Plaintiffs emphasize that the Service incorrectly cited this 1997 CITES report as a source for more recent concerns about ZPWMA's weak financial base, lack of management skills, inadequate or old equipment, and poor infrastructure.[17] In fact, the information came from the 1997 CITES report. CITES Doc. 10.88, AR at 2547; *see also* Fed. Defs.' Reply at 6

---

17   *See* April 2014 Finding, AR at 3822 (first stating the concerns came from a 2013 CITES report); July 2014 Finding, AR at 4511–12 (then stating the concerns came from a 2002 CITES panel report).

(acknowledging errors).   Plaintiffs contend these errors are "[e]mblematic of the Service's careless treatment of the facts."  Pls.' Opp./Reply at 7.

The 1997 CITES report was, however, not the only basis in the record for the agency's concerns about Zimbabwe's management of elephants.  A 2013 report submitted to the CITES Conference of the Parties stated:

> Governance indicators are mixed, with a much lower than average World Bank 'rule of law' score, but the second highest law enforcement ratio of any group.  *Zimbabwe is the country that pulls these scores down in both cases, especially the 'rule of law' score, indicating that far greater challenges exist in that country.*

Monitoring of illegal trade in ivory and other elephant specimens, Elephant Trade Information System (ETIS) Report of TRAFFIC, Mar. 3–14, 2013, AR 42 at 3320–22 (describing rule of law in Botswana, Namibia, and Zimbabwe) (emphasis added).

Further, the record includes press articles from 2013 that reflect concerns about the government's ability to enforce its wildlife laws and regulations.  *Zimbabwe elephants a jumbo problem*, G. Staden, Sept. 10, 2013, AR 44 at 3394 (reporting statement of ZPWMA spokesperson that "[l]aw enforcement requires operational equipment such as patrol kits, uniforms, radio communication kits, vehicles, boats, tracking equipment [eg GPS]," but "[c]urrently, most of the existing field equipment is old and obsolete").

So while plaintiffs are correct that the Service misattributed of statements from a 1997 CITES report about Zimbabwe's wildlife management, the record nonetheless supports the conclusion that Zimbabwe's elephant management and laws are an area of continuing concern.  *See* July 2014 Finding, AR at 4511 (stating the Service needed a better understanding ZPWMA's

budget and operations, as well as how money generated by elephant hunting impacts ZPWMA's efforts, including its in anti-poaching efforts before it could issue a positive enhancement finding).

In sum, plaintiffs challenge specific parts of the Service's analysis of the record and even identify errors in its citation of the 1997 CITES report, but their arguments do not lead the Court to conclude that the agency failed to make a "rational connection between the facts found and the choice made." *Alpharma, Inc.*, 460 F.3d at 6 (citations omitted) (internal quotation marks omitted). The Service properly weighed the competing data and information before it, and reasonably determined that, taken together, they indicate that allowing imports of trophies of sport-hunted elephants from Zimbabwe would not enhance the survival of the species.

### C.     The March 2015 Finding is Not Arbitrary and Capricious.

For the same reasons that the Court holds the July 2014 Finding was not arbitrary and capricious, it holds the same for the 2015 Finding. Plaintiffs' challenges to this finding assert the same types of arguments raised against the July 2014 Finding: that the Service did not properly analyze or consider data about the elephant population, anti-poaching efforts, or the role of hunters on the ground and financially toward in those efforts. However, plaintiffs' myriad arguments, at bottom, challenge how the agency weighed competing data before it – a task that that is left to the expertise of the agency. *See Marsh,* 490 U.S. at 375–77; *Am. Wildlands v. Kempthorne*, 478 F. Supp. 2d 92, 96 (D.D.C. 2007), *aff'd*, 530 F.3d 991 (D.C. Cir. 2008), quoting *Carlton v. Babbitt,* 900 F. Supp. 526, 530 (D.D.C.1995) (recognizing "the expertise of the [Service] in the area of wildlife conservation and management").

The Service declined to make a positive enhancement finding for Zimbabwe in 2015 because much of the data before it was preliminary or incomplete or reflected proposals that had

not yet been implemented.   *See, e.g.*, 2015 Finding, AR at 7261 (stating that the government of

Zimbabwe was in the process of creating a new management plan, which was not completed when

the 2015 Finding was issued in March, and the existing plan did not provide measurable goals);

*id.*, AR at 7263 (stating that the new population data from the Pan African Aerial Elephant Survey

was provisional); *id.*, AR at 7266 (finding data about hunting revenues insufficient).   While

plaintiffs present numerous ways that the agency could have analyzed the data to reach a different

result, the Court cannot hold that the agency's conclusion was irrational or unsupported by the

record.

For example, plaintiffs argue that the Service based the 2015 Finding on a lack of current

and adequate population data when the 2014 Pan African Aerial Elephant Survey, which estimated

a population of 82,000–83,000 elephants, provided "sufficient population data." Pls.' Mot. at 33,

citing 2015 Finding, AR at 7263.   But even plaintiffs acknowledge that the survey was not final,

but "preliminary" and "provisional."   Pls.' Mot. at 33.   Given this, it was rational for the Service

to decide not to give this preliminary estimate the weight that plaintiffs do.   *See In re Polar Bear*

*ESA Listing & § 4(d) Rule Litig.*, 794 F. Supp. 2d 65, 90 n.28 (D.D.C. 2011) (accepting "as

reasonable" agency's explanation that it declined to find "preliminary, alpha-level population

models, which came relatively late in the decision-making process," sufficiently persuasive to

warrant an endangered listing for the polar bear).

Plaintiffs also argue that the agency should have compared this preliminary estimate to the

estimate of 66,000 elephants in the 1997 finding or to the 2014 IUCN estimate found in the April

and July 2014 Findings, instead of a 2001 survey. Pls.' Mot. at 33, citing 2015 Finding, AR at

7263.   But the record shows that a stated objective of the 2014 Pan African Aerial Elephant Survey

was to produce results "[d]irectly comparable with 2001 population estimates," which showed

"(-6%) since 2001." Nat'l Survey of the Elephant in Zimbabwe:  2014 Some Preliminary Results,

AR 274 at 5841, 5854.  In light of this, the Court does not find that the agency's comparison of

the 2014 estimate to 2001 estimate was unreasonable.

Plaintiffs also spend much time arguing that the statement of an agency employee – that

"assuming that the population is close to what they claim (100,000 elephants), removal of 500

elephants is not a problem" – shows that the 2014 preliminary estimate of 82,000–83,000 elephants

shows hunting benefits sufficient to qualify as "enhancement."  Pls.' Mot. at 35–36 (arguing that

the population is "at least relatively close to" 100,000, so removal of 500 elephants through hunting

"is not a problem"), quoting email from T. Van Norman to C. London (Sept. 22, 2014), AR 228 at

4640; *see also* Pls.' Opp./Reply at 16.

But, again, all of these arguments about how much weight the agency gave the population

data and what other data it was compared against present precisely the type of issues that courts

must leave to the expertise of the agency. *See Marsh*, 490 U.S. at 375–77.  The question for the

Court is not whether plaintiffs' competing analysis of the data is better than the agency's, but

whether the agency's analysis was rational. *Alpharma, Inc.*, 460 F.3d at 6; *Ethyl Corp.*, 541 F.2d

at 36.

Plaintiffs present other, similar criticisms of the Service's analysis.

- They argue the agency incorrectly analyzed or misstated poaching data. *See* Pls.' Mot. at 35, citing AR 177a at 4335-17 (arguing that the agency incorrectly analyzed the MIKE data and ignored reports that poaching in the two MIKE areas in Zimbabwe has "decreased substantially"); Pls. Mot. at 35–36, citing AR at 7263 (arguing the agency incorrectly stated that the PIKE numbers increased in 2012 but backed away from its use of the MIKE/PIKE data in the 2015 Finding after Dr. Dublin sent a second letter). Data from ZPWNA showed, however, that the number of elephants poached

from 2009 through 2013 increased. *See* ZPWMA Response to Questions, AR at 1936 (estimating the number of poached elephants in 2009 at 145, in 2010 at 77, in 2011 at 223, in 2012 at 212, and in 2013 at 293).

- Plaintiffs argue that the 2015 Finding wrongly stated the agency received no information on the number of prosecuted poaching crimes or the average sentence or penalty in Zimbabwe. Pls.' Mot. at 38, citing 2015 Finding, AR at 7263. The record shows that while Zimbabwe provided some data on poaching convictions, the information was piecemeal and did not show Zimbabwe's enforcement of its poaching laws and regulations over time. Information from ZPWMA, AR 276 at 5871–72, 5874 ("ZPWMA Information").

- Plaintiffs argue the Service improperly relied on a CITES report, which noted that sixty-five percent of ivory trade between 2006 and 2011 occurred since 2009, to conclude "that illegal ivory trade is increasing," but ignored declines in poaching in the three years before and "offered no data about poaching" in the more recent years of 2012 to 2013, when "poaching *may have* leveled off or decreased." Pls.' Mot. at 39 (emphasis added), citing 2015 Finding, AR at 7265. But, again, ZPWNA's own numbers show poaching increased from 2009 through 2013. ZPWMA Response to Questions, AR at 1936.

- Plaintiffs argue the agency wrongly stated that Zimbabwe had a hunting quota of 500 in 2015, when the government had proposed a quota of 380 for that year. Pls.' Mot. at 36, citing ZPWMA Information, AR at 5882–83. But the 380 quota was only a proposal, as plaintiffs later concede. *Id.*; *see also* Pls.' Opp./Reply at 17 ("[T]he document SCI/NRA cited does establish a *proposed* quota of 380.") (emphasis added).

- Plaintiffs assert the agency wrongly stated that "the number of problem animals may equal or exceed the number of elephants taken through sport-hunting," 2015 Finding, AR at 7267, when the government of Zimbabwe addressed this assertion. Pls.' Mot. at 39, citing ZPWMA Information, AR at 5880–81. But Zimbabwe's data again was piecemeal, providing snapshots of offtake as a result of human-elephant conflicts, rather than a review of offtake over time. *See* ZPWMA Information, AR at 5881.

- Plaintiffs contend that the Service disregarded information describing contributions two outfitters made to the CAMPFIRE program and local communities, focusing instead on perceived flaws in the accounting of the revenue handled by CAMPFIRE, which it did not do in 1997. But the 2015 Finding acknowledged that "[e]ffective conservation work is being carried out in some independently managed areas." 2015 Finding, AR at 7271; *see*

54

> *also* Information Mem. for the Associate Dir. (Oct. 28, 2014), AR 252 at 5727–28 (stating that information from organizations, outfitters, and professional hunting organizations "did indicate that hunting in Zimbabwe was providing some benefit to elephants"). However, the Service concluded that it did not have "clear information on the significance [CAMPFIRE lands] play in elephant conservation" or "how much revenue is generated by elephant hunting." *See* 2015 Finding, AR at 7269-71.

- Plaintiffs argue the agency ignored or discounted operator-provided information. Pls.' Mot. at 37 (asserting the agency gave "inadequate weight and consideration" to information showing that sport hunting is a solution to elephant conservation problems), citing AR 8 at 1959–60, AR 239 at 4734–36, and AR 249 at 5704–05.

These arguments not only ask the Court to substitute its judgment for that of the agency but also misperceive the regulatory standard. The issue before the agency is not the status of the population or the management plan in isolation. So whether the population estimate or PIKE/MIKE levels or number of poaching arrests or annual hunting quota was at a particular a number at a specific point in time is not the question. Rather, the question is whether, taken together, the information before the agency showed that "the killing of the animal whose trophy is for import would enhance survival of the species." 50 C.F.R. § 17.40(e); *see also* 1997 Proposed Rule, 62 Fed. Reg. at 44,633. As explained above, determining whether imports support conservation does not simply involve finding whether hunters pay fees into the government's confers or deter some poachers, but whether hunters' fees and activities more broadly improve the ability of the species to survive overall.

The 2015 Finding explained that this regulatory standard was not satisfied because of a number of ongoing concerns, including with Zimbabwe's ability to manage its elephants, its ability to incorporate new survey data into its management, and its capacity to enforce its laws regarding elephant management. *See* 2015 Finding, AR at 7272–73. The Service stated that it needed more

reliable information to be able to make a causal connection between imports of sport-hunted elephant trophies and enhancement of the elephant's survival in Zimbabwe.   While plaintiffs identify mis-sourced data, point to information the agency could have interpreted differently, and reiterate that the agency had to reissue findings and notices to correct technical errors, the Court holds that the agency rationally determined that the status of the elephant population and Zimbabwe's management of the population did not warrant a positive enhancement finding based on the record before it.   Upon careful review of the parties' arguments and the record, the Court holds the agency's 2015 Finding was not irrational, arbitrary, or capricious.

## CONCLUSION

For the reasons stated above, the Court will grant plaintiffs' motion for summary judgment on the issue that the Service failed to publish notice of the changed Zimbabwe enhancement finding in the Federal Register until May 12, 2014 and deny the remainder of plaintiffs' motion. The Court will grant federal defendants' motion for summary judgment in all other respects.   The Court will also order that the effective date of the April 2014 Finding is May 12, 2014.   A separate order will issue.

ROYCE C. LAMBERTH
United States District Judge

DATE:  September 30, 2016